# EXHIBIT A

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF** NEW YORK

---------------------------------------------------------------------x
FATES GROUP, LLC, a Florida limited liability company

Plaintiff/Petitioner,

- against -

Index No. 655093/2026

NEIGHBORHOOD POWER CORPORATION, a California corporation, et al.

Defendant/Respondent.

---------------------------------------------------------------------x

**NOTICE OF ELECTRONIC FILING**
**(Mandatory Case)**
(Uniform Rule § 202.5-bb)

**You have received this Notice because**:

1) The Plaintiff/Petitioner, whose name is listed above, has filed this case using the New York State Courts E-filing system ("NYSCEF"), and

2) You are a Defendant/Respondent (a party) in this case.

- **If you are represented by an attorney**:
Give this Notice to your attorney. (Attorneys: see "Information for Attorneys" pg. 2).

- **If you are not represented by an attorney:**
**You will be served with all documents in paper and you must serve and file your documents in paper, unless you choose to participate in e-filing.**

**If you choose to participate in e-filing, you must have access to a computer and a scanner or other device to convert documents into electronic format, a connection to the internet, and an e-mail address to receive service of documents.**

The **benefits of participating in e-filing** include:

- serving and filing your documents electronically
- free access to view and print your e-filed documents
- limiting your number of trips to the courthouse
- paying any court fees on-line (credit card needed)

**To register for e-filing or for more information about how e-filing works:**

- visit: www.nycourts.gov/efile-unrepresented or
- contact the Clerk's Office or Help Center at the court where the case was filed. Court contact information can be found at www.nycourts.gov

To find legal information to help you represent yourself visit www.nycourthelp.gov

**Information for Attorneys**
**(E-filing is Mandatory for Attorneys)**

An attorney representing a party who is served with this notice must either:

1) immediately record his or her representation within the e-filed matter on the NYSCEF site www.nycourts.gov/efile ; or

2) file the Notice of Opt-Out form with the clerk of the court where this action is pending and serve on all parties. Exemptions from mandatory e-filing are limited to attorneys who certify in good faith that they lack the computer hardware and/or scanner and/or internet connection or that they lack (along with all employees subject to their direction) the knowledge to operate such equipment. [Section 202.5-bb(e)]

For additional information about electronic filing and to create a NYSCEF account, visit the NYSCEF website at www.nycourts.gov/efile or contact the NYSCEF Resource Center (phone: 646-386-3033; e-mail: nyscef@nycourts.gov).

Dated: September 8, 2026

Victoria Kennedy, Esq.
Name
Romano Benowitz & Brochetelli, LLP
Firm Name

99 Wall Street, Suite 3740
Address
New York, New York 10005

929-777-2133
Phone

vkennedy@rbnylaw.com
E-Mail

To: Please see attached Rider

**RIDER**

TO:
NEIGHBORHOOD POWER CORPORATION, a California corporation:
Main Office 415 Dairy Rd Suite E-216 Kahului, HI 96732

NEIGHBORHOOD GP, LLC:
415 Dairy Rd Suite E-216 Kahului, HI 96732

STEPHEN GATES:
33 Lokelau Place Haiku, Hawaii 96708

DEYLA SERENA TAPPAN
2323 SE Creighton Avenue Milwaukie, Oregon 97267

DON NISSANKA:
4703 Belleview, Kansas City, Missouri 64112

LANKAN BAL:
29 Grantham Road, Seven Hills, New South Wales 2147, Australia
and c/o Elite Crown Diamond Limited, First Floor, 85 Great Portland Street, London W1W 7LT, United Kingdom

WILLIAM C. MORRO:
410 South Michigan Avenue, Suite 908, Chicago, Illinois 60611

INTERAMERICAN ACQUISITION GROUP, INC:
2918 Fifth Avenue South, Suite 209 San Diego, California 92103

ELITE GLOBAL EQUITY, LLC:
4703 Belleview Avenue, Kansas City, MO 64112

ELITE CROWN DIAMOND LIMITED:
85 Great Portland Street, First Floor, London, W1W 7LT

ELITE GLOBAL EQUITY FUND:
415 Dairy Rd Suite E-216 Kahului, HI 96732; Two Artillery Court, 2nd Floor, 161 Shedden Road, P.O. Box 799, Grand Cayman KY1-1103

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK — COMMERCIAL DIVISION**

FATES GROUP, LLC, a Florida limited liability company,

Plaintiff,

– against –

NEIGHBORHOOD POWER CORPORATION, a California corporation; NEIGHBORHOOD GP, LLC, a Hawaii limited liability company; STEPHEN GATES; DEYLA SERENA TAPPAN; DON NISSANKA; LANKAN BAL; WILLIAM C. MORRO; INTERAMERICAN ACQUISITION GROUP, INC., a Delaware corporation; ELITE GLOBAL EQUITY, LLC, a Delaware limited liability company; ELITE CROWN DIAMOND LIMITED, an English company; and ELITE GLOBAL EQUITY FUND, a Cayman Islands exempted company,

Defendants.

Index No. ______________

**SUMMONS**

Plaintiff designates NEW YORK COUNTY as the place of trial.

The basis of venue is the parties' contractual designation of the courts of New York County (CPLR 501) and Plaintiff's designation under CPLR 503.

TO THE ABOVE-NAMED DEFENDANTS:

YOU ARE HEREBY SUMMONED to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's attorney within twenty (20) days after the service of this summons, exclusive of the day of service (or within thirty (30) days after service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

**Notice:** The nature of this action is: Breach of contract, Breach of Fiduciary, Fraud, Conversion, The relief sought is: Damages, Injunctive Relief, Constructive Trust.

Upon your failure to appear, judgment will be taken against you by default for the sum of $40,000,000.00, together with interest thereon from September 4, 2020 and the costs of this action.

Dated: New York, New York
September 3, 2026

ROMANO BENOWITZ & BROCHETELLI, LLP

By: /s/ *Victoria Kennedy*

Victoria Kennedy, Esq.
99 Wall Street, Suite 3740
New York, New York 10005
Tel: (929) 777-2133
Fax: (212) 658-9506
vkennedy@rbnylaw.com
Attorneys for Plaintiff Fates Group, LLC

Plaintiff Address:
500 E Broward Blvd, 9th Floor
Fort Lauderdale, FL 33394

TO:
NEIGHBORHOOD POWER CORPORATION, a California corporation:
Main Office 415 Dairy Rd Suite E-216 Kahului, HI 96732

NEIGHBORHOOD GP, LLC:
415 Dairy Rd Suite E-216 Kahului, HI 96732

STEPHEN GATES:
33 Lokelau Place Haiku, Hawaii 96708

DEYLA SERENA TAPPAN
2323 SE Creighton Avenue Milwaukie, Oregon 97267

DON NISSANKA:
4703 Belleview, Kansas City, Missouri 64112

LANKAN BAL:
29 Grantham Road, Seven Hills, New South Wales 2147, Australia
and c/o Elite Crown Diamond Limited, First Floor, 85 Great Portland Street, London W1W 7LT, United Kingdom

WILLIAM C. MORRO:
410 South Michigan Avenue, Suite 908, Chicago, Illinois 60611

INTERAMERICAN ACQUISITION GROUP, INC:
2918 Fifth Avenue South, Suite 209 San Diego, California 92103

ELITE GLOBAL EQUITY, LLC:
4703 Belleview Avenue, Kansas City, MO 64112

ELITE CROWN DIAMOND LIMITED:
85 Great Portland Street, First Floor, London, W1W 7LT

ELITE GLOBAL EQUITY FUND:
415 Dairy Rd Suite E-216 Kahului, HI 96732; Two Artillery Court, 2nd Floor, 161 Shedden Road, P.O. Box 799, Grand Cayman KY1-1103

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK — COMMERCIAL DIVISION**

| | |
|---|---|
| FATES GROUP, LLC, a Florida limited liability company,<br><br>Plaintiff,<br><br>– against –<br><br>NEIGHBORHOOD POWER CORPORATION, a California corporation; NEIGHBORHOOD GP, LLC, a Hawaii limited liability company; STEPHEN GATES; DEYLA SERENA TAPPAN; DON NISSANKA; LANKAN BAL; WILLIAM C. MORRO; INTERAMERICAN ACQUISITION GROUP, INC., a Delaware corporation; ELITE GLOBAL EQUITY, LLC, a Delaware limited liability company; ELITE CROWN DIAMOND LIMITED, an English company; and ELITE GLOBAL EQUITY FUND, a Cayman Islands exempted company,<br><br>Defendants. | Index No. ______________<br><br>**VERIFIED COMPLAINT**<br><br>Plaintiff designates NEW YORK COUNTY as the place of trial.<br><br>The basis of venue is the parties' contractual designation of the courts of New York County (CPLR 501) and Plaintiff's designation under CPLR 503. |

**VERIFIED COMPLAINT**

COMES NOW, Plaintiff, FATES GROUP, LLC, by and through its undersigned attorneys files its Verified Complaint against Defendants, NEIGHBORHOOD POWER CORPORATION ("NPC"), a California corporation, NEIGHBORHOOD GP, LLC ("Neighborhood GP"), a Hawaii limited liability company, STEPHEN GATES ("Gates"), DEYLA SERENA TAPPAN ("Deyla"), DON NISSANKA ("Nissanka"), LANKAN BAL ("Bal"), WILLIAM C. MORRO ("Morro"), INTERAMERICAN ACQUISITION GROUP, INC. ("Interamerican"), a Delaware corporation, ELITE GLOBAL EQUITY, LLC ("Elite Global"), a Delaware limited liability company, ELITE

CROWN DIAMOND LIMITED ("ECD"), a company incorporated in England and Wales, and ELITE GLOBAL EQUITY FUND ("EGEF"), a Cayman Islands company.

## I. INTRODUCTION

1. This is an action for damages in excess of $40,000,000.00 for loans made by Plaintiff, and never repaid, together with damages for the coordinated stripping of every asset that secured the loan.

2. In 2016 Plaintiff, Fates Group, LLC ("Fates"), lent a sum of $7,392,416.63 to NPC, a Hawaii-based solar developer, under a Loan Agreement, dated August 5, 2016, and a First Amendment, dated November 8, 2016 (together, the "Loan Agreement"). The loan was secured by certain assets/properties, including solar photovoltaic project companies pledged by NPC and five parcels of real estate located in Hawaii pledged by Gates and Deyla as collateral for the loan. Of the real estate pledged by Gates and Deyla, one of the parcels was their personal residence. Neighborhood GP contemporaneously guaranteed the debt absolutely and unconditionally.

3. To date, not one dollar of principal or interest has ever been repaid by NPC or the other Defendants.

4. Instead, the individuals who controlled NPC, Gates and Nissanka, together with Defendant Morro, who sat on NPC's board as Fates' own nominee and acted as Fates' authorized signatory, used the loan proceeds and the pledged collateral to build a different business for themselves and their affiliates. That business is the Elite group, consisting of ECD, Elite Global Equity, and EGEF (collectively referred to as "Elite"). Nissanka is EGEF's Chief Executive Officer and Fund Director. Gates is its Chief Operating Officer. Defendant, Bal, is its Chief Strategy Officer.

5. When repayment became due, Fates was given assurances, and affirmations of the debt, rather than money, or assets.

6. In January 2019, Nissanka introduced Bal to Fates as the prospective purchaser of the Fates loans.

7. In 2019, Nissanka represented that a takeout investment through HSBC and Barclays was imminent.

8. On September 4, 2020, Gates signed and delivered a letter to Fates acknowledging the debt in the sum of $12,176,547 and stating that NPC would pay it by the end of that month.

9. On November 12, 2020, Bal signed and delivered a letter on ECD letterhead confirming its intention to purchase the Fates loans in full.

10. However, none of this occurred, despite Defendants' repeated assurances of same.

11. Meanwhile, while Fates forbore the debt, Defendants began a series of improper transfers and encumbrances of the collateral which secured the debt owed to Fates.

12. NPC's pledged solar projects were transferred or hypothecated to Elite.

13. On June 16, 2025, EGEF issued a $1.5 billion senior secured asset-backed bond offering, rated BBB by Egan-Jones, secured in whole, or in part, by the very projects pledged that had already been pledged to Fates.

14. Elite's own published article of October 7, 2021, authored by Nissanka as Chief Executive Officer of EGEF, describes NPC as "an affiliate company of Elite."

15. On February 16, 2021, while Fates' principal, Gilbert Armenta ("Mr. Armenta") was incarcerated and unable to supervise his affairs, Morro executed two share purchase agreements purporting to convey the entire shareholding of AEE Acquisitions Holdings LLC in AEE Power Holdings Sàrl and AEE Power Ventures, S.L., to Bal personally for a stated cash consideration of ten (10) dollars.

16. Into that same instrument, Morro inserted a personal entitlement for himself of the greater of ten (10%) percent of any future monetization proceeds, or $250,000.00. The transaction is pleaded here not for the value of those shares, the recovery of which remains in progress, but because it establishes what these Defendants were doing, together, in the same window, using the same methods.

17. Fates now brings claims for breach of contract, breach of guarantee, fraud and fraudulent inducement, breach of fiduciary duty, and the knowing assistance of that breach, conversion, voidable transactions under Article 10 of the Debtor and Creditor Law, constructive trust, unjust enrichment, accounting, and the forfeiture of compensation paid to a faithless agent.

18. The operative date for limitations purposes is September 4, 2020. On that date NPC acknowledged, and affirmed the debt to Fates in writing, quantified it, and promised to pay it in full, renewing the limitations period under General Obligations Law § 17-101.

## II. THE PARTIES

19. Plaintiff, Fates, is a limited liability company organized under the laws of Florida with its principal place of business at 500 East Broward Boulevard, Suite 900F, Fort Lauderdale, Florida 33394. Its sole member is Mr. Armenta, a citizen of Florida.

20. Defendant, NPC is a corporation organized under the laws of California with its principal place of business at 415 Dairy Road, Suite E-216, Kahului, Hawaii 96732. NPC is the borrower under the Loan Agreement.

21. Defendant, Neighborhood GP, is a limited liability company organized under the laws of Hawaii. Neighborhood GP is the Guarantor under Section 9 of the Loan Agreement.

22. Defendant, Gates is a natural person residing at 33 Lokelau Place, Haiku, Hawaii 96708. Gates is the founder and President of NPC and is Chief Operating Officer of EGEF. Gates executed the Control, Security, and Pledge Agreements in his individual capacity.

23. Defendant, Deyla, is a natural person residing at 2323 SE Creighton Avenue, Milwaukie, Oregon 97267, and is the former spouse of Defendant, Stephen Gates. She was formerly known as "Deyla Serena Tappan Gates" and was restored to her former name, Deyla Serena Tappan, by order of the Circuit Court of the State of Oregon for the County of Clackamas entered December 12, 2022, in Case No. 22DR20841. See **Exhibit A.** Deyla executed the Control, Security and Pledge Agreements in her individual capacity and pledged to Fates her interest in the five (5) parcels of Hawaii real property identified below.

24. Defendant, Nissanka, is a natural person residing at 4703 Belleview, Kansas City, Missouri 64112. Nissanka was Chief Strategy Officer of NPC and is Chief Executive Officer and Fund Director of EGEF. He was a director of ECD, and a person notified to the Registrar of Companies as having significant control over it, from May 31, 2018 to February 28, 2019, and again from June 30, 2019 to date. He is also the President and Chief Executive Officer of Exergonix, Inc.

25. Defendant, Bal, is a natural person residing at 29 Grantham Road, Seven Hills, New South Wales 2147, Australia, and maintaining a business address at c/o ECD, First Floor, 85 Great Portland Street, London W1W 7LT, United Kingdom. Bal is Chief Strategy Officer of EGEF and has been a director of ECD since June 30, 2019.

26. Defendant, Morro, is a natural person residing in Chicago, Cook County, Illinois, and maintaining a business address at 410 South Michigan Avenue, Suite 908, Chicago, Illinois 60611. At all material times Morro (a) acted as Fates' authorized signatory, executing the Loan Agreement, the First Amendment and other agreements on its behalf, and received and disbursed Fates' funds through WHI, Inc., a company of which he is a principal, (b) served on the board of directors of NPC as Fates' nominee, and (c) was paid a director's fee.

27. Defendant, InterAmerican, is a corporation organized under the laws of Delaware. InterAmerican is Morro's corporate vehicle and held itself out to Fates as an expert in investment banking and project management.

28. Defendant, Elite Global Equity, is a limited liability company organized under the laws of Delaware, with offices at 415 Dairy Road, Suite E-216, Kahului, Hawaii 96732 — the same premises pledged to Fates and occupied by NPC.

29. Defendant, ECD, is a company incorporated in England and Wales under company number 10009926, with its registered office at First Floor, 85 Great Portland Street, London W1W 7LT. Bal and Nissanka were each appointed a director of ECD, and each notified as a person with significant control over it, with effect from May 31, 2018; both ceased with effect from February 28, 2019; and both were re-appointed and re-notified with effect from June 30, 2019. A true copy of the Companies House record of ECD is attached hereto as **Exhibit B**.

30. Defendant, EGEF, is an exempted company domiciled in the Cayman Islands and regulated by the Cayman Islands Monetary Authority. Nissanka is its Chief Executive Officer and Fund Director; Gates is its Chief Operating Officer; Bal is its Chief Strategy Officer.

31. Elite Global Equity, ECD and EGEF are referred to collectively as "Elite" or "Elite Defendants". Elite operates as a single common enterprise, sharing executive leadership, premises, electronic mail infrastructure, corporate counsel and outside counsel.

## III. JURISDICTION AND VENUE

32. This Court has subject matter jurisdiction as a court of general jurisdiction. The amount in controversy exceeds $500,000.00, exclusive of interest, costs and counsel fees, and the action arises from a transaction described in Rule 202.70(b) of the Uniform Civil Rules for the Supreme Court, so that assignment to the Commercial Division is appropriate.

33. Section 11 of the Loan Agreement provides that the Loan Agreement, the other Loan Documents, and "any claim, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to" them "shall be governed by, and construed in accordance with, the law of the State of New York," and that borrower and lender "each submit to the exclusive jurisdiction of the State and Federal courts in New York County, New York." NPC further waived any objection based on lack of personal jurisdiction, improper venue or forum non conveniens. Venue is proper under CPLR 501.

34. This Court has personal jurisdiction over Gates, Deyla, Nissanka, Bal, Morro, InterAmerican, and the Elite Defendants under CPLR 302(a)(1), (a)(2) and (a)(3). Each transacted business within the State and contracted to supply goods or services in the State in connection with a New York-governed credit facility carrying an exclusive New York forum clause; each committed tortious acts causing injury within the State by design; and each participated in a common scheme in which acts were performed in New York by co-conspirators acting at their direction and for their benefit, including the negotiation, documentation and administration of the New York-governed Loan Agreement and the marketing of the EGEF bond offering to investors.

35. Section 9.6 of the Loan Agreement provides that the guarantee given in Section 9 "constitutes an instrument for the payment of money," and the Guarantor consented and agreed that the Lender "shall have the right to bring a motion-action under New York CPLR Section 3213."

## IV. FACTUAL ALLEGATIONS

### *A. Morro introduces the transaction and stands on both sides*

36. In 2016, Morro and InterAmerican approached Fates about investment opportunities. They represented themselves as subject-matter experts in investment banking and project management with respect to the businesses they introduced.

37. In or about early 2016, Morro introduced Gates and Nissanka to Fates and urged Fates to lend monies to NPC. Fates relied on Morro's and InterAmerican's professed expertise in the industry.

38. Morro was appointed to the Board of directors of NPC as Fates' nominee. Morro was to receive a director's fee, and that fee was to be his only compensation in connection with the transaction.

39. As Fates' authorized signatory and agent, being the person who executed Fates' agreements and through whose company Fates' funds were received and disbursed, Morro owed Fates fiduciary duties of loyalty, care and candor. Those duties extended to the oversight of NPC's reporting obligations, the perfection of the collateral securing the loan, and the proper application of the loan proceeds.

40. Upon information and belief, and contrary to that agreement, NPC paid Morro, and Morro and InterAmerican received from NPC, sums in connection with the closing of the Fates loan and thereafter, whether in cash, stock, options or warrants. Fates did not authorize any payment by NPC to Morro or to InterAmerican. No such payment was ever disclosed to Fates. Morro was at once the person who executed the Loan Agreement for the Lender, the person through whose company the Lender's funds were received and disbursed, and the recipient of payments from the Borrower.

41. Any such payment was a breach of the Loan Agreement by NPC and an Event of Default under Section 7.2. Morro, as a director of NPC, was an Affiliate of NPC within the meaning of the Loan Agreement, which defines "Affiliate" to include "each of that Person's senior executive officers, directors, partners." Section 6.8 prohibited NPC from directly or indirectly entering into or permitting any material transaction with an Affiliate, except for transactions in the ordinary course of business upon fair and reasonable terms no less favorable to NPC than would be obtained in an arm's length transaction with a non-affiliated Person. Section 5.14 provided that the proceeds of the Credit Extensions "shall not in any event be used for … payments to employees other than regular salaries, relocation expenses and reimbursements for costs incurred on behalf of Borrower in the ordinary course of business." Section 6.7 prohibited NPC from paying any dividend or making any distribution or payment in respect of its capital stock. Section 6.2(a)(iv) prohibited NPC from issuing or selling any capital stock, or any option, right or warrant convertible into or exchangeable for capital stock, without the consent of Fates.

42. Any such payment was concealed from Fates by the same default that concealed the remainder of NPC's affairs. Section 5.2(a) required NPC to deliver monthly financial statements, and Section 5.2(b) required a monthly Compliance Certificate signed by a Responsible Officer certifying that NPC was "in full compliance with all of the terms and conditions of this Agreement." Those documents would have disclosed a payment to a director. They were demanded and were not delivered, and Morro, who sat on the board for Fates and was paid to report to Fates, did not report their absence.

43. Nissanka took an interest in the capital of NPC in connection with the closing of the Fates loan, and that interest was never disclosed to Fates. Section 1.1 of the Loan Agreement defines "Warrant" as "the warrants, dated as of July 29, 2016, to Don Nissanka." The form of Shareholder Rights Agreement annexed to the Loan Agreement as Exhibit D thereto defines the same instrument as "that certain warrant to purchase Common Stock held by Don Nissanka dated August __, 2016." The warrants were issued, and were outstanding, seven days before the Effective Date of August 5, 2016.

44. Section 4.7(c) of the Loan Agreement required NPC to set forth on Schedule 4.7(c), as of immediately prior to the Effective Date, "all outstanding or authorized warrants, convertible securities or other rights, agreements, arrangements or commitments of any character relating to

the capital stock of Borrower or obligating Borrower to issue or sell any shares of capital stock of, or any other interest in, Borrower," together with "the number and kind of securities reserved for issuance on exercise or conversion of any such securities or other rights, the exercise or conversion price of any such securities or other rights and any applicable vesting schedule for any such securities or other rights." Schedule 4.7(c) as delivered to Fates reads, in its entirety, "Not Applicable." Schedule 4.7(a) shows Gates as the holder of all one thousand (1,000) issued and outstanding shares of NPC. Fates was given no disclosure of the number of shares subject to Nissanka's warrants, of their exercise price, of their vesting, or of the dilution they would work upon the equity Fates was entitled to acquire under Sections 2.1.2(d) and 2.7 of the Loan Agreement. By Section 4 of the First Amendment, NPC and Neighborhood GP confirmed that representation again on November 8, 2016, expressly "[t]o induce the Lender to enter into this Amendment."

45. That the warrants were live, and known to those who drafted the Loan Agreement, appears from the Loan Agreement itself. The definition of "Change in Control" excepts from that term any cessation of Gates' ownership of one hundred percent of NPC occurring "in connection with (x) the exercise of the Warrant." Section 6.2(a)(iv), which otherwise forbade NPC to issue or sell any capital stock, or any option, right or warrant convertible into capital stock, without Fates' consent, excepts "the exercise of the Warrant." Section 6.7(a)(i), which otherwise forbade NPC to make any distribution or payment in respect of its capital stock, permits NPC to "convert the Warrants into shares of Common Stock." Nissanka thus stood to become a shareholder of NPC by reason of the closing that Fates funded, and to be diluted by the very Conversion Option and Purchase Option that Fates held.

46. Nissanka's interest in the equity of NPC pre-dated the Loan Agreement and was known to him. By an Agreement Regarding Provision of Funds For CODA Asset Purchase made between Fates and Exergonix, Inc. effective April 4, 2016 and executed on April 5, 2016, Fates agreed to fund the acquisition by Exergonix of assets of CODA Energy Holdings, LLC. Nissanka executed that agreement as President and Chief Executive Officer of Exergonix, and executed it a second time in his own name, acknowledging that he was the principal shareholder of Exergonix and agreeing to be "personally bound by Section 4 and Section 5(c) hereof if and to the extent that the equity purchase and investment rights ascribed to Exergonix therein are actually held by me or

any affiliates under my control." By Section 4 of that agreement Exergonix assigned to Fates and covenanted not to assign or pledge to any other party, "all rights it has to purchase equity in Neighborhood Power Corporation ('NPC'), which right Exergonix represents to be 50% of the fully diluted equity interests of NPC for $5.0 million." By Section 5(d) Exergonix further represented that NPC was a business "in which Exergonix has equity investment rights." A true copy of that agreement is attached hereto as **Exhibit C**. Plaintiff pleads that agreement as evidence of the interest Nissanka held and represented in NPC at and before the Effective Date, and not as a subsisting security: the agreement provided that the assignment of the NPC Purchase Right would terminate upon Fates receiving the Exergonix Price in full, and Plaintiff is informed that the agreement was subsequently amended by an addendum dated April 25, 2016 and a second addendum dated July 25, 2016, neither of which is presently in the possession of Plaintiff.

47. Either that right existed or it did not. If it existed, it was a right of the character which Section 4.7(c) of the Loan Agreement required NPC to disclose upon Schedule 4.7(c), NPC did not disclose it, and Nissanka knew that Schedule 4.7(c) was false when it was delivered to Fates on August 5, 2016, and again when the representation was restated on November 8, 2016, because he was the holder of the undisclosed right and had assigned it to Fates himself. If it did not exist, then Nissanka misrepresented it to Fates in writing on April 5, 2016 in order to procure Fates' funding of the acquisition of assets by his own company. Plaintiff pleads these matters in the alternative. Plaintiff further pleads that the Purchase Option granted to Fates by Section 2.7 of the Loan Agreement — an option to acquire not less than fifty percent of the combined voting power of NPC's then outstanding securities on a fully diluted basis for an aggregate purchase price of $5,000,000 — was expressed in the same terms as the right Nissanka had assigned to Fates on April 5, 2016, and that neither Gates nor Nissanka disclosed to Fates the relationship, if any, between the two.

***B. The Loan Agreement, the guarantee and the collateral***

48. On or about August 5, 2016, NPC as borrower executed a Loan Agreement with Fates as lender providing for a term loan of $2,500,000.00 ("Term Loan") and a revolving line of up to $12,000,000.00 ("Revolving Line"). Morro executed the Loan Agreement as authorized signatory for Fates and was closely involved in its drafting. A true copy of the Loan Agreement is attached hereto as **Exhibit D**.

49. Section 2.3 of the Loan Agreement provides that advances under the Revolving Line would bear interest at fourteen (14%) percent per annum payable monthly; that the Term Loan bears interest at fifteen (15%) percent per annum; that upon an Event of Default the Obligations bear interest at a rate five (5) percentage points above the rate otherwise applicable; that interest is computed on a 360-day year for the actual number of days elapsed; and that "[i]nterest shall be capitalized on an annual basis by becoming a part of the Obligations, and such interest shall thereafter accrue interest at the rate then applicable under this Agreement (including any interest accrued at the Default Rate)."

50. Section 2.4 provides for a fully earned, non-refundable funding fee of $40,000.00 and a commitment fee. Section 2.3(b) provides that fees not paid when due bear interest until paid at the highest rate applicable to the Obligations.

51. On or about November 8, 2016, NPC, as borrower, and Neighborhood GP, as guarantor, executed a First Amendment to Loan Agreement with Fates. Morro executed it for Fates and was closely involved in its drafting. A true copy of First Amendment is attached hereto as **Exhibit E**.

52. The First Amendment fixed the Term Loan principal at $4,500,000.00, restated the commitment fee as two (2%) percent of the maximum aggregate advances outstanding under the Revolving Line in the preceding twelve (12) months payable on each anniversary of the Amendment Effective Date, and required additional collateral.

53. The collateral pledged to Fates, defined and memorialized in the Control, Security, and Pledge Agreements, executed with original signatures by NPC, Neighborhood GP, Gates individually, Deyla individually, and Morro as authorized signatory for Fates, comprised the following, a schedule of which is attached hereto as **Exhibit F**:

- NPC's interests in Green Bridge Group, LLC, Terton Solar, LLC and Neighborhood GP, LLC;
- Neighborhood GP's interests in RSP HI, LLC (50%), ISOLAR, LLC (40%) and AR Solar, LLC (40%);
- the project companies subordinate to those entities, namely Taki PV, LLC, OwensPV, LLC, CyanoPV, LLC, RPPA HI, LLC, T10PV, LLC, T12PV, LLC, T13PV, LLC, Red River Solar, LLC, Alanui Kihei Solar, LLC, Alanui Kona Solar,

LLC, S&F Building PV, LLC, Redstone Energy, LLC, BSOLAR, LLC and Solar Energy Equities, LLC; and

• five parcels of Hawaii real property owned individually and pledged by Gates and Deyla: 415 Dairy Road Suite E-216, Kahului; 358 Papa Place, Kahului; 2000 Mokulele Highway Lot #2, Puunene; 7500 Kulakula Road, Kula; and 33 Lokelau Place, Haiku, being the Gates personal residence.

54. Under Section 9 of the Loan Agreement, Neighborhood GP guaranteed the Obligations. That guarantee is, in the words of the instrument, "a continuing, absolute, irrevocable and unconditional guarantee of payment," under which the Guarantor waived diligence, presentment, demand, protest and all notices, and waived any requirement that Fates first exhaust any remedy against NPC.

55. Between November 8, 2016, and July 26, 2017, Fates wired $7,392,416.63 to NPC in seven tranches: $4,500,000.00 under the Term Loan and $2,892,416.63 under the Revolving Line.

56. The Term Loan Maturity Date was August 5, 2017. The Revolving Line Maturity Date was August 5, 2018. However, NPC paid nothing to Fates on or before either date, and has paid nothing toward the payment of the debt since.

### *C. Morro fails to perfect the collateral and conceals NPC's conduct*

57. Section 3.4 of the Loan Agreement, as amended, required delivery to Fates of executed Control Agreements, landlord consents for each of the five (5) Hawaii parcels, and executed Consent and Pledge Agreements over NPC's interests in AR Solar, LLC and ISOLAR, LLC. Upon information and belief, Morro, whose responsibility as Fates' authorized signatory and agent it was to see those steps completed, failed to perfect those interests, and did not tell Fates that they had not been perfected.

58. From late 2018 through late 2020, Fates repeatedly demanded that Gates and Nissanka comply with NPC's reporting covenants (i.e. monthly financial statements, audited annual financial statements and monthly compliance certificates). However, Gates and Nissanka refused to comply.

59. Morro, sitting on the NPC board as Fates' nominee and paid to protect Fates' interests, did not enforce those covenants and did not report the failure to Fates.

60. Instead, upon information and belief, Morro, Gates and Nissanka applied the loan proceeds contractually committed to NPC's projects to the formation, capitalization and operating costs of the enterprise that became Elite, including substantial officer compensation for Nissanka and Gates individually.

61. The loan proceeds so applied were entrusted to Morro in his capacity as Fates' authorized signatory and agent. The Loan Agreement required that they be applied to NPC's projects.

62. Upon information and belief, they were instead appropriated, with Morro's knowledge and participation, to purposes Fates had not authorized and from which Morro stood to benefit personally.

***D. The assurances that bought time***

63. On or about January 13, 2019, Nissanka introduced Bal to Fates as a prospective purchaser of the Fates loans, sending an electronic mail copying Gates and Morro and arranging a conference call for that express purpose. Bal was presented as a third-party purchaser dealing at arm's length. Bal had never had any commercial relationship with Fates, and neither Bal nor Nissanka disclosed to Fates that they were, and since May 31, 2018 had been, co-directors of ECD and co-holders of significant control over it.

64. Through 2019 and 2020, Nissanka gave Fates a succession of assurances that repayment was imminent and gave them in writing and directly to Fates. On March 28, 2019, he wrote to Mr. Armenta that the delay was "due to getting the tax cleared through the European Central Bank on the custodial account," that "[t]he trade that was made has been cleared and the funds are in the account according to the attorney that is managing the transaction," and that he was "in touch daily." On April 9, 2019, he wrote to Mr. Armenta and to Morro that funds "were received by the paymaster last Thursday" and that they awaited "confirmation that the funds are ready to transfer at HSBC London, once sub-accounts are set up by the banker." On April 24, 2019, he reported that the sub-accounts were "now active/in place," that transfers had "took place today," and instructed Gates to "[f]eel free to update Bill and Gilbert." On July 26, 2019, he wrote to Mr. Armenta and to Morro that "[w]e have made significant progress on the funding," that "[t]he subaccounts are done and they expect funds in the accounts today," that "I have already sent NPC

detail to them," and that "I will be working though [sic] the weekend to get everything ready for Monday." True copies of the communications of April 9 and July 26, 2019, are attached hereto as **Composite Exhibit G**. He further represented the bringing of "the three companies under one roof" to complete a funding round, reported as substantially complete.

65. On July 23, 2020, Nissanka wrote to Fates, copying Gates, that he was spending "99%" of his time on that funding and that they were "in the last leg of their requirements to bring the three companies under one roof and complete the funding round." A true copy of that communication is attached hereto as **Exhibit H**.

66. However, no such funds ever arrived. Upon information and belief, the entity formed is EGEF.

***E. The acknowledgment of September 4, 2020***

67. On September 4, 2020, Gates, in his capacity as President of NPC, signed and sent to Fates a letter affirming the debt to Fates on NPC letterhead (the "Affirmation Letter"). A true copy is attached hereto as **Exhibit I**.

68. In that letter, Gates confirmed the terms of "two loans our company, Neighborhood Power Corporation (NPC) has with your company Fates Group, LLC,", identifying the Term Loan principal of $4,500,000.00 and the Revolver principal of $2,892,417.00. He also stated that "[t]he total principle of both loans is $7,392,417", that if both loans were paid in full by the end of September 2020 "including all interest the payoff amount would be $12,176,547", and that "NPC is currently working on an equity raise to secure the funds to pay off this loan and we plan to have these funds by the end of September 2020."

69. The Affirmation Letter is a writing signed by the party to be charged, NPC. It recognizes an existing debt, quantifies it, and contains nothing inconsistent with an intention on NPC's part to pay the full debt under the Loan Agreement to Fates. It was delivered directly to Fates and was intended to influence Fates' conduct.

70. It is clear now that, when Gates signed the Affirmation Letter, neither NPC, nor any of its controlling members/officers, intended or expected to pay the acknowledged sum by the

end of September 2020, or at any time thereafter. The representation was made to induce Fates to forbear, and Fates did forbear in reliance upon it.

***F. The Elite Crown Diamond letter of November 12, 2020***

71. On or about November 12, 2020, Bal signed and sent to Fates a letter on ECD letterhead, in his capacity as Executive Director of ECD, confirming "the intention of Elite Crown Diamond Ltd. (ECD), a UK based investment company, to purchase the two loans your company Fates Group, LLC has with Neighborhood Power Corporation." The letter states on its face that it was issued "upon the request of NPC." See attached hereto as **Exhibit J**.

72. No such purchase was ever affected, and upon information and belief none was ever intended or was capable of being funded. Upon information and belief, ECD had no capital with which to acquire loans of this size. The letter was procured by Gates and Nissanka and given by Bal to induce Fates to continue to forbear, and Fates did continue to forbear in reliance upon it.

73. The representation was false. ECD is not, and has never been, an investment company. It was incorporated in England and Wales on February 17, 2016, with an issued share capital of two (£2) pounds. Its only filed full accounts, for the year ended February 28, 2017, state that its principal activity was "Educational support services" and record net assets of fifty-one (£51) pounds. At no time has ECD been registered as, or filed accounts as, an investment company, and at no time has it held capital approaching the sum required to purchase the Fates loans.

74. Nor was ECD a stranger to NPC. The letter records on its face that "ECD is issuing this letter upon the request of NPC." Bal and Nissanka were each appointed as directors of ECD, and each notified to the Registrar of Companies as a person with significant control over ECD, on May 31, 2018 — seven and a half months before Nissanka presented Bal to Fates as a prospective arm's length purchaser on January 13, 2019. Both resigned as directors and ceased as persons with significant control on February 28, 2019, and both were re-appointed as directors and re-notified as persons with significant control on June 30, 2019.

75. Gates has since sworn and stipulated that ECD is his own company. By a General Judgment for Dissolution of Marriage entered by the Circuit Court of the State of Oregon for the County of Clackamas on December 12, 2022 in Case No. 22DR20841, Gates was awarded, and was "declared to be the sole owner of," a schedule of entities which includes Elite Crown Diamond

Ltd, Elite Global Equity Fund and Elite Crown Cayman Ltd, together with Neighborhood Power Corporation, Neighborhood GP, LLC, Green Bridge Group, LLC, Terton Solar, LLC, RSP HI, LLC, ISOLAR, LLC, AR Solar, LLC and each of the project companies pledged to Fates. In the Mutual General Release incorporated into that judgment those same entities are described as the companies "NPC started," and Gates executed that instrument in the capacity of "Individual and either President, Officer or Manager of all companies listed on Exhibit A to that Release." A true copy of excerpts from the General Judgment for Dissolution of Marriage is attached hereto as Exhibit A, and a true copy of the Mutual General Release, with its "Exhibit A" list of companies, is attached hereto as **Exhibit K.**

76. Accordingly, upon information and belief, the purchaser presented to Fates in November 2020, as an independent United Kingdom investment company was an entity owned or controlled by NPC's own President, which issued its letter at NPC's request, for the purpose of inducing Fates to continue to forbear.

### *G. The stripping of the collateral into Elite*

77. From late 2020 onward, and while Fates forbore in reliance on the representations pleaded above, the solar photovoltaic assets pledged to Fates were transferred, hypothecated, or otherwise made subject to the claims of the Elite entities, without notice to Fates, and without Fates' knowledge, consent or written waiver (which the Loan Agreement required).

78. On June 16, 2025, EGEF issued a senior secured asset-backed bond offering in the stated amount of $1.5 billion, bearing CUSIP 28661X AB4 (Rule 144A) and G3002X AB8 (Regulation S), and rated BBB by Egan-Jones Ratings. Upon information and belief, the collateral securing that offering includes, in whole or in part, the NPC and Neighborhood GP project assets pledged to Fates. A true copy of the offering and of the Egan-Jones Ratings disclosure form is attached hereto as **Exhibit L**.

79. Elite has publicly and repeatedly held NPC out as its affiliate entity, or subsidiary. In an article published on Elite's website on October 7, 2021, entitled "Exploring the Lucrative Frontiers in the Renewable Energy Market," authored by Nissanka as "CEO, Elite Global Equity Fund," NPC is expressly described as "an affiliate company of Elite," and Gates is referenced as President of NPC. A true copy is attached hereto as **Exhibit M**.

80. Elite Global Equity occupies 415 Dairy Road, Suite E-216, Kahului, Hawaii — premises pledged to Fates as collateral and occupied by NPC. A true copy of Elite's published contact page is attached hereto as **Exhibit N**, and a chart of the Elite group corporate structure is attached hereto as **Exhibit O**.

81. Gates and Nissanka hold and use Elite-domain electronic mail addresses interchangeably with their NPC addresses. Nissanka holds himself out publicly and has done so throughout the period material to this action, as Chief Strategy Officer of NPC since January 2018, and as Chief Executive Officer of EGEF since March 2021. A true copy of that published profile is attached hereto as **Exhibit P**.

82. Upon information and belief, before the diversion of NPC's funds and assets to Elite, NPC held cash and assets sufficient to repay the principal and interest on the debt owed to Fates in full.

83. Instead, Defendants chose to entirely ignore its obligations under the Loan Agreement and fraudulently transfer all assets/properties which were pledged to secure that debt to other entities controlled by them.

***H. The same machinations are used by Defendants in the AEE Power conveyance***

84. From late 2019, Mr. Armenta, Fates' sole member, was the subject of legal proceedings in the United States and was subsequently incarcerated. His ability to supervise the affairs of Fates, and of affiliated entities, was materially impaired throughout the period material to this action. Defendants knew of this and decided to use this to their advantage.

85. On February 16, 2021, in Cook County, Illinois, Morro executed two share purchase agreements on behalf of AEE Acquisitions Holdings LLC, a Florida limited liability company of which Mr. Armenta is the sole beneficial owner, purporting to convey to Bal in his personal capacity: (a) 48,576 shares or quotas of AEE Power Holdings Sàrl (that company's entire 17.6% holding), and (b) 330 shares of AEE Power Ventures, S.L. The stated cash consideration was ten dollars ($10.00). The stated investment basis of AEE Acquisitions Holdings LLC in those shares was €4,456,136.

86. Morro executed and acknowledged those instruments, however, the purchaser's signature block on each was left blank. The transfers were nonetheless given effect on February 23, 2021, by registration in the Swiss and Spanish registers.

87. Within those same instruments Morro inserted a distribution waterfall under which, on any future monetization, the third priority, ahead of any return to the selling company, was a payment to Morro personally of the greater of ten (10%) percent of gross monetization proceeds, or $250,000.00, labeled as "Manager's Compensation." That entitlement was never disclosed to Mr. Armenta, nor was it ever authorized.

88. Mr. Armenta never authorized Morro to sell, assign, pledge, or otherwise dispose of those shares, and has sworn to that effect in an affidavit executed on August 3, 2026, before a notary public of the State of Florida.

89. Bal accepted registration of the shares on February 23, 2021, and has since held himself out as their owner, knowing the facts that made the transfer improper.

90. The issuers of those shares have determined that Bal holds no valid title to them. By letter dated August 28, 2026, signed by the Chairman and by the Gérant Solidaire and Managing Director of AEE Power Holdings Sàrl and AEE Power Ventures, S.L. — the two officers through whom the governing bodies of those companies act — the companies state that Morro had no authority to transfer the shares, that the transfer was made without value, and that it was accordingly null and of no effect; that it passed no title to Bal; and that neither company recognizes Bal as a holder of the shares or as a shareholder. The companies further state that their counsel has commenced the administrative and registry proceedings in Spain and in Switzerland to cancel the title standing in Bal's name and to restore the shares to their rightful owner Gilbert Armenta, and that in the meantime neither company will recognize Bal, register any dealing in the shares by him or by any person claiming through him, or make any payment to him. A true copy of that letter is attached hereto as **Exhibit Q**.

91. The conveyance is plead solely to show the breadth and scope of the machinations that Defendants employed to further their scheme. The AEE conveyance, and the stripping of the NPC collateral, share the same architect (Morro), the same recipient enterprise (Elite) and its Chief Strategy Officer, the same window of execution during Mr. Armenta's incapacity, and the same

illegal purpose. Each is evidence of the agreement, the intent and the method alleged in this Complaint.

*I. The pledged Hawaii real property*

92. Upon information and belief, since November 8, 2016, the five parcels of Hawaii real property pledged by Gates and Deyla have been sold, mortgaged, refinanced, transferred between them, or otherwise dealt with, without notice to Fates, without Fates' consent and without any part of the proceeds being applied to the Obligations.

93. Upon information and belief, Gates caused NPC to pay him money as compensation which he had no authority to take, and which was required to be applied to the repayment of the Obligations, and transferred that money, together with interests in the pledged parcels, to Deyla. Deyla gave no reasonably equivalent value in exchange. Gates was insolvent at the time of each such transfer or was rendered insolvent by it.

94. On November 1, 2022, Gates executed a Mutual General Release between himself, "including all companies listed on Exhibit A" to that Release — a defined term which that instrument styles "NPC" and which comprises Neighborhood Power Corporation, Neighborhood GP, LLC and each of the pledged project companies — and Deyla, under which Deyla released her interests in and claims against those companies. Section 2.0 of that instrument provides that "NPC shall pay DEYLA based on the terms in Stipulated General Judgment." See **Exhibit K.**

95. By that instrument NPC assumed the personal obligations of Gates to Deyla arising out of their divorce. Those obligations, fixed by the General Judgment entered December 12, 2022, comprise an equalizing judgment of $218,154.00 payable in monthly installments of $4,800.00 together with a further payment of $35,754.00; non-modifiable spousal support of $3,148.59 per month for eighty-four (84) months; and child support. The General Judgment further directs that fifty (50%) percent of the net proceeds of any sale of the listed entities occurring on or before January 1, 2026 — entities which include the project companies pledged to Fates — be applied to the mortgage on Deyla's residence, up to a ceiling of $405,436.82, being the payoff amount of that mortgage on January 1, 2022, reduced by any payments against principal made by Gates between January 1, 2022 and December 31, 2028. See **Exhibit A.**

96. NPC received nothing for that assumption. The consideration ran to Gates personally, in the release of his former wife's claims against him. When NPC assumed those obligations, it had been in default to Fates since August 5, 2017, had acknowledged and affirmed the debt to Fates on September 4, 2020, and had paid Fates nothing.

97. Gates had no authority to commit the funds or assets of NPC to the discharge of his personal obligations. Those funds and assets stood subject to Fates' first priority security interest and were required to be applied to the Obligations.

98. Upon information and belief, NPC has made payments to Deyla under that assumption in every month since November 2022 and continues to do so. Each such payment is a transfer of NPC's property to an insider, for which NPC received no value, at a time when NPC was insolvent.

99. Gates is himself in arrears to Deyla. By a motion for an order to show cause re contempt filed in the Clackamas County Circuit Court on December 5, 2025 in Case No. 25CN05440, related to Case No. 22DR20841, and by her declaration sworn December 4, 2025 in support of it, Deyla states on oath that the $35,754.00 due December 13, 2023 has never been paid; that spousal support has stood one month in arrears since June 2024; that $4,500.00 was paid in place of $4,800.00 in each of February, March, April, May, June, July and September 2025; that no payment at all was made in August 2025; and that Gates has never provided the $1,000,000.00 life insurance policy the General Judgment required of him. A true copy of that motion and declaration is attached hereto as **Exhibit R**.

***J. Default, demand, and the amount due***

100. NPC's failure to pay the Term Loan on August 5, 2017, and the Revolving Line on August 5, 2018, and its subsequent failure to pay both of these loans in September 2020 after they were affirmed and restated in that same both by NPC, constituted an Event of Default under Section 7.1 of the Loan Agreement, to which no cure period applies. The disposal of collateral without Fates' consent, and the failure to deliver financial statements and compliance certificates, each constituted a further Event of Default under Section 7.2.

101. The assumption by NPC of Gates' personal obligations, and each payment made under it, constituted a further Event of Default under Section 7.2(a) of the Loan Agreement, to

which no cure period applies. It breached Section 5.14, under which the proceeds of the Credit Extensions may not be applied to payments to employees other than regular salaries; Section 6.1, which permits the transfer of NPC's money only in the ordinary course of business for the payment of ordinary course business expenses; Section 6.4, which prohibits NPC from creating, incurring or assuming any Indebtedness other than Permitted Indebtedness, "Indebtedness" being defined to include a Contingent Obligation and "Contingent Obligation" to include any direct or indirect liability of NPC for the obligation of another; Section 6.7, which prohibits NPC from making any distribution or payment in respect of its capital stock, Gates being at all material times the holder of all one thousand (1,000) issued and outstanding shares of NPC; and Section 6.8, which prohibits any material transaction with an Affiliate otherwise than in the ordinary course of business and upon fair and reasonable terms no less favorable to NPC than would be obtained in an arm's length transaction with a non-affiliated Person.

102. The assumption further breached Section 5.2(f)(ii) of the Loan Agreement, under which NPC was required to give Fates written notice, within three (3) Business Days, of any legal action pending or threatened against it that could result in damages or costs of $50,000.00 or more. NPC gave Fates no notice of the divorce proceeding, of the Mutual General Release, or of the obligations it thereby assumed.

103. The diversion further constituted a Material Adverse Effect within the meaning of the Loan Agreement and therefore an Event of Default under Section 7.3, being both a material impairment of the value of the Collateral and a material impairment of the prospect of repayment of the Obligations.

104. No notice of default was required, and none was a condition of the Obligations falling due. Under Section 8.1 of the Loan Agreement, upon the occurrence and during the continuance of an Event of Default the Lender may, "without notice or demand," declare all Obligations immediately due and payable.

105. By Section 8.7 the Borrower expressly waived "demand, notice of default or dishonor, notice of payment and nonpayment, notice of any default, [and] nonpayment at maturity."

106. Upon each Event of Default in September 2020, therefore, all outstanding principal, accrued interest, fees and Lender Expenses became immediately due and payable without any act of Fates.

107. No Defendant has taken any step whatever to cure, and no Defendant has paid any part of the Obligations. The commencement of this action constitutes demand.

108. As of September 1, 2026, there is due and owing under the Loan Agreement: a total of $44,747,734.51 (principal of $7,392,416.63, plus interest, including interest capitalized annually under Section 2.3(c) and interest at the Default Rate under Section 2.3(b), = $36,794,682.88, and fees = $560,634.99), together with interest continuing to accrue at $24,089.08 per day, that daily sum increasing as the Obligations capitalize annually under Section 2.3(c). A true copy of the statement of amounts due is attached hereto as Exhibit S. The principal advanced is evidenced by Fates' own records, which by Section 2.8 of the Loan Agreement "shall be conclusive absent manifest error of the amount of the Credit Extensions made by Lender to Borrower," and was acknowledged in writing by NPC on September 4, 2020 in the sum of $7,392,417.

109. Fates has retained the undersigned attorneys and is obliged to pay a reasonable fee for its services. Under the Loan Agreement, Fates is entitled to recover its Lender Expenses, including reasonable attorneys' fees and costs of collection.

110. All conditions precedent to the commencement of this action have been performed, have occurred, or have been waived.

## V. CAUSES OF ACTION

### COUNT I — BREACH OF CONTRACT
### (Against Neighborhood Power Corporation)

111. Plaintiff hereby realleges and reasserts the allegations contained in paragraphs 1 through 110 above.

112. The Loan Agreement and the First Amendment are valid and binding contracts between Fates and NPC.

113. Fates performed all of its obligations under the Loan Agreement.

114. NPC has failed to perform its obligations under the contract by failing to repay principal and interest for the debt at maturity after it was affirmed in September 2020 by NPC, and thereafter, by disposing of pledged collateral without Fates' consent, and by failing to deliver the financial statements and compliance certificates the Loan Agreement required.

115. As such, NPC has defaulted on its contractual obligations under the Loan Agreement.

116. As a legal and proximate cause of NPC's breach, Fates has been damaged in the sum of $44,747,734.51, together with interest continuing to accrue at the Default Rate, Lender Expenses, and reasonable attorneys' fees and costs.

**COUNT II — BREACH OF GUARANTY**
**(Against Neighborhood GP, LLC)**

117. Plaintiff hereby realleges and reasserts the allegations contained in paragraphs 1 through 116 above.

118. By Section 9 of the Loan Agreement, Neighborhood GP absolutely, irrevocably and unconditionally guaranteed payment of NPC's debt Obligations to Fates, and waived diligence, presentment, demand, protest, all notices, and any requirement that Fates first proceed against NPC.

119. Since NPC has failed to meet its obligations under the Loan Agreement, and subsequent loan documents, Neighborhood GP is jointly and severally liable for the Obligations therein, including payment of principal, interest (pre and post judgment), and reasonable attorneys' fees and costs.

120. Neighborhood GP breached the guaranty when it failed to make any of the overdue payments due under the Loan Agreement, and subsequent loan documents. Since there has been an event of default (breach) by NPC, Plaintiff may proceed against the guarantor, Neighborhood GP, jointly and severally for payment of the guaranteed Obligations.

121. Fates has been damaged by the default of Neighborhood GP for all unpaid amounts due and owing to Fates under the Loan Agreement, and subsequent loan documents (currently $44,747,734.51 to date), together with continuing interest, Lender Expenses and reasonable attorneys' fees and costs.

**COUNT III — FRAUD/FRAUDULENT INDUCEMENT**

**(Against Gates, Nissanka, Bal and Morro)**

122. Plaintiff hereby realleges and reasserts the allegations contained in paragraphs 1 through 121 above.

123. Nissanka represented to Fates on January 13, 2019, that Bal was a prospective purchaser of the Fates loans, available to Fates at arm's length. The representation was false when made, and Nissanka knew it to be false. On that date, Nissanka was himself a serving director of ECD, and a person notified to the Registrar of Companies as having significant control over ECD, having been appointed as of May 31, 2018.

124. Bal held the identical two positions, appointed that same day. Nissanka disclosed neither fact to Fates.

125. Nissanka and Bal resigned those positions with effect from February 28, 2019, six weeks after the introduction, and both were re-appointed and re-notified with effect from June 30, 2019. ECD is the company which, on November 12, 2020, wrote to Fates offering to purchase the very loans that were the subject of the introduction.

126. Nissanka represented to Fates in writing through 2019, and directly to Mr. Armenta and to Morro, that the funds with which the Fates loans would be repaid were in hand or imminent, in the terms pleaded above. No funds were ever received by NPC or by Fates from any such source. No payment schedule was ever finalized and no sub-account transfer ever cleared. Each of those statements was false when made, and Nissanka knew them to be false or made it in reckless disregard of its truth.

127. Nissanka had a duty to correct the impressions he had created on January 13, 2019, that Bal was independent of him, and failed to do so. On July 26, 2019, writing to Mr. Armenta

and to Morro, Nissanka stated that he had "been working with Lankan Bal and Dr. Simburger on the payment details" of the funding by which the Fates loans were to be repaid. Twenty-six days earlier, on June 30, 2019, Nissanka and Bal had each been re-appointed as a director of ECD and each re-notified as a person having significant control over ECD, as each had previously been from May 31, 2018 until February 28, 2019. Nissanka disclosed none of that to Fates, then or at any time.

128. As such, Nissanka's representations to Fatesthat his dealings with Bal involved persons independent of one another were false, and Nissanka knew them to be false.

129. Nissanka represented to Fates in writing on July 23, 2020, copying Gates, that eight enumerated steps toward a funding round had been completed, namely: the formation of a "Newco" and the determination of "what elements go into it"; the agreement of term sheets, save only for the vehicle company; the completion of a full business plan; the completion of a financial plan; the completion of a placement memorandum; the obtaining of licenses and regulatory approvals; the appointment of regulatory agents; and the opening of bank accounts. He represented that they were "in the last leg of their requirements to bring the three companies under one roof and complete the funding round," that he was spending "99%" of his time upon it, and that "both Stephen and I are working day and night to get us there as quickly as possible, because both our livelihood depends on it." Nissanka urged Fates to "please stay patient until we complete our work and get us through this." See **Exhibit H**.

130. However, these factual representations were knowingly false when they were made. No funding round was ever completed and no funds reached NPC, or Fates, from it.

131. Upon information and belief, the entity assembled by the steps Nissanka described is EGEF, of which Nissanka is Chief Executive Officer and Fund Director. Gates is Chief Operating Officer, and into which the collateral pledged to Fates was afterwards moved for use in the issuance of the bond offering of June 16, 2025. The vehicle Nissanka told Fates was being built to repay Fates was, instead, being built for the benefit of the Defendants.

132. Nissanka procured the letter of November 12, 2020, upon which Bal's representation to Fates was made. That letter states that "ECD is issuing this letter upon the request

of NPC," and directs Fates to "continue to work with NPC and get updates from NPC directly on this issue."

133. However, Nissanka clearly knew at that time, as a serving director of ECD, that ECD had an issued share capital of two (£2) pounds; that its only filed full accounts, for the year ended February 28, 2017, recorded net assets of fifty-one (£51) pounds and stated its principal activity to be "Educational support services"; that ECD had at no time been registered as, or filed accounts as, an investment company; and that ECD had neither capital nor any means of raising capital with which to purchase loans then acknowledged by NPC in the sum of $12,176,547.00.

134. Nissanka nonetheless caused ECD to describe itself to Fates as "a UK based investment company" intending to purchase the Fates loans. Nissanka had himself assigned to Fates, on April 5, 2016, all rights he and Exergonix held to purchase equity in NPC and had covenanted not to assign or pledge those rights to any other party.

135. At all material times Nissanka spoke to Fates for NPC, with the knowledge and authority of Gates, and upon the subject of the repayment of the Fates loans. Nissanka held himself out publicly, throughout the period material to this action, as Chief Strategy Officer of NPC. Gates, as President of NPC and writing from NPC's own electronic mail domain, referred Fates' inquiries about repayment to Nissanka, asking him on July 22, 2020, in the presence of Fates, "Don, have you heard any updates from HSBC?" Nissanka answered Fates on behalf of NPC, and Gates neither corrected nor disclaimed that he did not have the authority to answer on behalf of NPC. Nissanka also wrote to Fates directly, addressing Mr. Armenta and Morro upon the subject of repayment on March 28, April 9 and July 26, 2019, and stating that he had "already sent NPC detail" to the proposed funder. Morro, acting for Fates, dealt with Nissanka as the person from whom NPC's position was to be obtained.

136. Under Section 7.8 of the Loan Agreement, it is an Event of Default where NPC "and/or any Person acting for [NPC] … makes any representation, warranty, or other statement now or later in this Agreement, any Loan Document or in any writing delivered to Lender … and such representation, warranty, or other statement is incorrect in any material respect when made."

137. Gates represented to Fates in writing on September 4, 2020, reaffirming the debt to Fates and stating that NPC would pay $12,176,547.00 by the end of that month (September 30,2020) from an equity raise that was in progress.

138. Additionally, Bal represented to Fates in writing, on November 12, 2020, that ECD intended to purchase the Fates loans in full.

139. Morro, acting for Fates and sitting on NPC's board as Fates' nominee, concealed from Fates that the collateral had not been perfected, that NPC was not complying with its reporting covenants, and that loan proceeds were being applied by the Defendants to the formation of Elite.

140. The concealment of these facts was continuing, and persisted after September 4, 2020, for as long as Morro held his seat on NPC's board.

141. Each representation was known by the Defendants to be false when made. Each of the Defendants knew those representations to be false when made or made those representations in reckless disregard of its truth.

142. Each of these misrepresentations was made for the purpose of inducing Fates to forbear from accelerating and collecting on the owed debt, from enforcing its security, and from commencing a lawsuit on same.

143. Fates justifiably relied on the misrepresentations of Defendants and did forbear.

144. Had Fates known the truth about Defendants' designs and misrepresentations, it would have accelerated and enforced its security, while NPC still held cash and assets sufficient to repay the loan.

145. Fates did not discover, and in the exercise of reasonable diligence could not have discovered, that the funding round Nissanka described was the assembly of an enterprise into which the collateral pledged to Fates would be transferred, or that the purchaser Nissanka had introduced was a company of which Nissanka was himself a director and a person with significant control, until EGEF issued its senior secured asset-backed bond offering on June 16, 2025, the

constitution of the Elite group, and the source of the collateral securing that offering became ascertainable.

146. Until that date, Fates had been refused access to, the financial statements and compliance certificates by which NPC's affairs would have been disclosed to it; its sole member was the subject of criminal proceedings and was subsequently incarcerated and unable to supervise its affairs; and its own nominee upon NPC's board, Morro, was concealing NPC's defaults from Fates rather than reporting them.

147. As a legal and proximate cause of Defendants' conduct, Fates has suffered damages and is entitled to actual and consequential damages proximately caused by Defendants.

148. Plaintiff reserves the right to plead and prove punitive damages.

## COUNT IV — BREACH OF FIDUCIARY DUTY
## (Against Morro, InterAmerican, Gates and Nissanka)

149. Plaintiff hereby realleges and reasserts the allegations contained in paragraphs 1 through 148 above.

150. Defendant Morro owed Fates a fiduciary duty as its authorized signatory and agent, being the person who executed its agreements and through whose company its funds were received and disbursed. Defendant, InterAmerican, through which Morro acted, owed the same duties.

151. Morro breached his fiduciary duties to Fates by taking undisclosed consideration from NPC, by failing to perfect the collateral Fates held on the NPC debt that he was retained to protect, by concealing NPC's defaults on the debt obligations, and by executing an instrument on February 16, 2021, conveying AEE Acquisitions Holdings LLC/Mr. Armenta's ownership interests to Bal for ten dollars while writing into that instrument a personal entitlement for Morro.

152. Gates, as sole director, President and shareholder of NPC, and Nissanka, as an officer of NPC holding himself out at all material times as its Chief Strategy Officer, each holding and controlling Fates' secured collateral, owed Fates a fiduciary duty to secure Fates' security in NPC as collateral for the loans to NPC. It is clear that Defendants never intended to uphold these duties and breached them by diverting the collateral in question to an enterprise (the Elite entities),

without notice to Fates, and without Fates' knowledge, consent or written waiver (which the Loan Agreement required).

153. Defendants have intentionally failed to uphold the fiduciary duties of honesty, loyalty, good faith, and care that an ordinary person would exercise under the same and similar circumstances, or in a manner reasonably believed to be proper with regard to Plaintiff.

154. As a legal and proximate cause of the Defendants' conduct, Plaintiff has suffered damages and is entitled to actual and consequential damages proximately caused by Defendants.

155. Plaintiff reserves the right to plead and prove punitive damages.

**COUNT V — AIDING AND ABETTING BREACH OF FIDUCIARY DUTY AND FRAUD**

**(Against Bal, Nissanka, Gates and the Elite Defendants)**

156. Plaintiff hereby realleges and reasserts the allegations contained in paragraphs 1 through 155 above.

157. Defendant, Morro, breached certain fiduciary duties he owed to Fates and engaged in fraudulent transactions as referenced above.

158. Defendants, Bal, Nissanka, Gates, and the Elite Defendants (ECD, EGEF, and Elite Global Fund") had actual knowledge of those breaches and assisted Morro in carrying out his fraudulent activities.

159. Bal knew that Morro was selling his AEE Acquisitions Holdings LLC/Mr. Armenta's ownership interests for ten dollars while paying himself out of that transaction.

160. Nissanka and Gates knew that Morro was Fates' nominee on the NPC board and knew that the collateral pledged to Fates was being moved to the enterprise of which they were Chief Executive Officer and Chief Operating Officer, i.e. Elite.

161. Each provided substantial assistance to aid and abet in Morro's fraudulent activities: Nissanka by introducing Bal and by procuring the ECD letter; Bal by taking the transfers and by signing the ECD letter; Gates by signing the Affirmation Letter and by causing NPC's assets

to move; and the Elite Defendants by receiving and converting those assets and by pledging them to secure the bond offering.

162. Defendants provided substantial assistance in Morro's commission of fraudulent activities and breach of his duties to Fates.

163. As a legal and proximate cause of the Defendant's conduct, Plaintiff has suffered damages and is entitled to actual and consequential damages proximately caused by Defendant.

164. Plaintiff reserves the right to plead and prove punitive damages.

**SIXTH CAUSE OF ACTION — CONVERSION**
**(Against Gates, Nissanka, Morro, InterAmerican and the Elite Defendants)**

165. Plaintiff hereby realleges and reasserts the allegations contained in paragraphs 1 through 164 above.

166. Fates held a perfected or, alternatively, an equitable security interest in the pledged collateral, and an immediate superior right to possession of it upon default.

167. These Defendants exercised unauthorized dominion over that collateral to the exclusion of Fates' rights, including by transferring and hypothecating it to Elite and by pledging it to secure the bond offering issued on June 16, 2025.

168. Further and in the alternative, Fates held an immediate superior right to the loan proceeds to the extent that they were applied otherwise than the Loan Agreement required. Those proceeds were specifically identifiable, were advanced for designated purposes, and were subject to an obligation to treat them in a particular manner.

169. Morro, Gates and Nissanka exercised unauthorized dominion over them by applying them to the formation, capitalization and operating costs of Elite and to their own compensation.

170. Fates demanded the return of that property, and these Defendants refused. The deprivation by Defendants to return Fates' property is inconsistent with Fates' ownership interest in same property.

171. Each act of transfer, hypothecation and pledge occurring within three years preceding the commencement of this action, including the pledge of collateral to secure the bond offering issued on June 16, 2025, and the refusal following demand, gives rise to a separate and timely claim under CPLR 214(3).

172. As a legal and proximate cause of the Defendants' conduct, Fates has suffered damages and is entitled to actual and consequential damages proximately caused by Defendants.

**SEVENTH CAUSE OF ACTION — VOIDABLE TRANSACTIONS**
**(Debtor and Creditor Law §§ 273, 274, 276 and 276-a — Against all Defendants who transferred or received property)**

173. Plaintiff hereby realleges and reasserts the allegations contained in paragraphs 1 through 172 above.

174. Fates is a creditor of NPC, Neighborhood GP, Gates and Deyla, and its claim arose before each improper transfer listed herein.

175. NPC is a debtor of Fates, and each payment made by NPC to Deyla under the General Judgment of Marital Dissolution was a transfer by a debtor of the debtor's property.

176. The payment by NPC to Gates of compensation he had no authority to take, the assumption by NPC of Gates' personal obligations to Deyla and each payment made under it, the transfers of NPC's and Neighborhood GP's pledged project interests to Elite pleaded at paragraphs 70 through 72, and the transfers by Gates to Deyla pleaded at paragraphs 85 and 86, were made with actual intent to hinder, delay or defraud Fates within the meaning of Debtor and Creditor Law § 273(a)(1). The badges of fraud include that the transfers were to insiders and to an enterprise controlled by the transferors' own officers; that the transferors retained possession and control after transfer; that the transfers were concealed; that they occurred after Fates had demanded compliance and threatened enforcement; that they comprised substantially all of the debtors' assets; and that the consideration received was not reasonably equivalent to the value of the assets transferred.

177. In the alternative, the transfers were made without receiving a reasonably equivalent value in exchange at a time when the transferors were engaged in a business for which

their remaining assets were unreasonably small, or intended to incur or believed they would incur debts beyond their ability to pay as they became due, or were insolvent or became insolvent as a result, within the meaning of Debtor and Creditor Law §§ 273(a)(2) and 274.

178. This cause of action is timely under Debtor and Creditor Law § 278 as to each transfer made within four years before commencement, including the pledge of collateral to secure the bond offering issued on June 16, 2025, and as to any earlier transfer, within one year after Fates discovered, or could reasonably have discovered, said improper transfers.

179. Fates is entitled to avoidance of the transfers to the extent necessary to satisfy its claim, to attachment against the assets transferred, to an injunction against further disposition of those assets, to appointment of a receiver to take control of the assets in question, and to judgment against each transferee for the value of the asset transferred, together with attorneys' fees.

180. Deyla received the payments made to her by NPC as a subsequent transferee within the meaning of Debtor and Creditor Law § 278(b) and did not take them in good faith or for value.

**EIGHTH CAUSE OF ACTION — CONSTRUCTIVE TRUST**
**(Against Bal, Morro and the Elite Defendants)**

181. Plaintiff hereby realleges and reasserts the allegations contained in paragraphs 1 through 180 above.

182. A fiduciary and confidential relationship existed between Fates and Morro.

183. Fates transferred the loan proceeds and granted the security in question to Bal and the Elite Defendants in reliance on the express and implied promise that the proceeds would be applied to NPC's projects and that the collateral would be preserved for Fates' benefit. Morro further reserved a financial benefit for himself individually through these transactions.

184. Defendants have been unjustly enriched at Fates' expense by the receipt and retention of the collateral and of the value derived from these improper transactions.

185. As such, Fates is entitled to a constructive trust over the security collateral which was improperly transferred by Morro to the other Defendants, and all of its traceable

income/proceeds, including any income/proceeds of the bond offering referable to it, and to an accounting and tracing order.

**NINTH CAUSE OF ACTION — UNJUST ENRICHMENT**
**(Against Bal, Deyla and the Elite Defendants)**

186. Plaintiff hereby realleges and reasserts the allegations contained in paragraphs 1 through 185 above.

187. Defendants were unjustly enriched at Fates' expense by the receipt of security collateral assets and value that were pledged to Fates to secure the loan to NPC, or that were required to be applied to the repayment of the Obligations.

188. Defendants knowingly and voluntarily accepted and received the transfer of these security collateral assets and directly benefited from them.

189. Defendants failed to provide any labor, services, materials, monies, or any consideration whatsoever for these transfers.

190. Defendants have inequitably received benefits from these transfers of security collateral that were to be applied for the repayment of Fates' loan to NPC, and it is unjust to permit Defendants to retain those benefits.

**TENTH CAUSE OF ACTION — CIVIL CONSPIRACY**
**(Against Gates, Nissanka, Bal, Morro, InterAmerican and the Elite Defendants)**

191. Plaintiff hereby realleges and reasserts the allegations contained in paragraphs 1 through 190 above.

192. This cause of action is pleaded to connect the acts of the individual Defendants to the underlying torts alleged above and to establish that those acts formed part of a common scheme.

193. Defendants hatched a scheme to defraud and induce Fates to forbear collecting on its overdue loan to NPC, by making false assurances to Fates, while simultaneously moving the collateral assets that secured Fates' loan into an enterprise (Elite Defendants) which they owned and/or controlled, and to deprive Mr. Armenta and his entities of value during the period of his incapacity.

194. Fates had no way of knowing that these statements/assurances by Defendants were false and Fates was justified in relying on them.

195. In furtherance of their scheme, Defendants committed the following overt acts/omissions: (a) the introduction of Bal on January 13, 2019; (b) the appointment of Bal and Nissanka to the board of ECD on June 30, 2019; (c) the assembly of the "three companies under one roof" (e.g. Elite) reported in 2020; (c) the Affirmation Letter of September 4, 2020; (e) the ECD letter of November 12, 2020; (f) the execution of the AEE share purchase agreements on February 16, 2021; (g) the transfer and hypothecation of NPC's pledged projects to Elite; and (h) the issuance of the EGEF bond offering on June 16, 2025.

196. The overt acts committed by Defendants further include the assignment to Fates on April 5, 2016 of a purchase right over fifty percent of NPC's equity which NPC thereafter denied existed; the delivery to Fates on August 5, 2016 of a Schedule 4.7(c) reading "Not Applicable"; the written assurances of Nissanka of March 28, April 9, April 24 and July 26, 2019 and of July 23, 2020; and the procurement of the letter of November 12, 2020.

197. Fates has been damaged by Defendants' civil conspiracy and the subsequent acts in furtherance of same.

198. Plaintiff reserves the right to plead and prove punitive damages.

## ELEVENTH CAUSE OF ACTION — ACCOUNTING AND DECLARATORY JUDGMENT
### (Against all Defendants)

199. Plaintiff hereby realleges and reasserts the allegations contained in paragraphs 1 through 198 above.

200. Fates has no adequate remedy at law with respect to the location and disposition of the pledged collateral and its proceeds, which are within Defendants' exclusive knowledge and/or control.

201. Defendants had a duty to preserve the security collateral to be applied to the loan obligation of NPC to Fates, but instead, transferred said collateral to either themselves, or to entities which they control (Elite).

202. Fatesis entitled to an accounting of the application of the $7,392,416.63 advanced; of every transfer, pledge and hypothecation of the pledged collateral since January 1, 2020; of the schedule of collateral securing the bond offering issued on June 16, 2025; and of all compensation and benefits paid to Gates, Deyla, Nissanka, Bal and Morro by NPC, Neighborhood GP or any Elite entity since August 2016.

203. Fates is uncertain of the actual current value of the collateral, including any income/proceeds/appreciation derived from the collateral after its transfer and has need for an accounting of same.

204. Fates is further entitled to a declaratory judgment declaring that its security interest in the pledged collateral is valid and enforceable and has priority over any interest asserted by the Elite Defendants, or by any holder of the bond offering issued on June 16, 2025.

**TWELFTH CAUSE OF ACTION — FAITHLESS SERVANT**
**(Against Morro and InterAmerican)**

205. Plaintiff hereby realleges and reasserts the allegations contained in paragraphs 1 through 204 above.

206. Morro was the agent and fiduciary of Fates. Fates entrusted him with authority to execute its agreements and with the receipt and disbursement of its funds through WHI, Inc., a company of which he is a principal.

207. InterAmerican, the vehicle through which Morro acted, stood in the same relation.

208. Morro was disloyal to Fates persistently and throughout the period of that engagement. He solicited and received undisclosed consideration from the other parties to the transaction he had introduced. He failed to perfect the collateral he was retained to protect and concealed that failure from Fates.

209. Morro concealed NPC's defaults from the principal, Fates, who paid him to report them. He applied, and permitted the application of, loan proceeds to purposes his principal, Fates, had not authorized.

210. On February 16, 2021, Morro executed an instrument conveying his principal's, Fates, property for ten dollars while directing to himself, out of any future proceeds and in priority to that principal, the greater of ten percent of gross monetization proceeds or $250,000.00.

211. That disloyalty was not incidental to Morro's service. It went to the heart of what he was engaged to do, and it permeated the whole of it.

212. Under New York law an agent who is faithless to his principal forfeits all compensation paid to him during the period of his disloyalty.

213. Independently of the forfeiture of compensation, an agent who receives a benefit from a third party in connection with his agency, without the informed consent of his principal, must account to his principal for that benefit and holds it upon constructive trust. Morro and InterAmerican received such benefits from NPC. Fates neither consented to nor was informed of them.

214. Forfeiture does not depend upon proof that the principal suffered damage as a result of the disloyalty, and it is not reduced because the agent's services were in other respects beneficial to the principal.

215. Fates is accordingly entitled to the forfeiture and disgorgement of every director's fee and other sum paid to Morro, or to InterAmerican, in connection with the transaction; of all undisclosed consideration received by either of them from Gates, Nissanka, NPC, or any Elite Defendant; and of the entitlement Morro purported to confer upon himself by the instruments of February 16, 2021.

216. Fraud is essential to this claim, and it is governed by the six-year period of CPLR 213(8).

**WHEREFORE**, Plaintiff, Fates, demands judgment, jointly and severally, against Defendants for:

(i) damages, forfeiture and disgorgement of any income/proceeds/benefits wrongfully conferred on Defendants during the time they were disloyal agents to Fates;

(ii) voiding/rescinding the improper transfers of assets to the extent necessary to satisfy the loan obligations due and owing Fates, an order of attachment of said assets, a preliminary and permanent injunction restraining further disposition of the assets transferred and of its proceeds, the appointment of a receiver, and a judgment for damages for the value of the assets transferred, together with reasonable attorneys' fees under Debtor and Creditor Law §276-a;

(iii) directing a full accounting of Defendants with respect to the collateral assets, together with reasonable costs, interest, and such other and further relief as the Court deems just and proper, and;

(iv) imposing a constructive trust over the security collateral improperly transferred to Defendants, including all income/proceeds or appreciation of value generated by the security collateral since its transfer, the return of said security collateral and attenuated income/assets/appreciation to Plaintiff; and together with

(v) reasonable costs, interest, and such other and further relief as the Court deems just and proper.

Dated: New York, New York
September 3, 2026

**ROMANO BENOWITZ & BROCHETELLI, LLP**

By: /s/ *Victoria Kennedy*

Victoria Kennedy, Esq.
99 Wall Street, Suite 3740
New York, New York 10005
Tel: (929) 777-2133
Fax: (212) 658-9506
vkennedy@rbnylaw.com

Attorneys for Plaintiff Fates Group, LLC

## SCHEDULE OF EXHIBITS

| | |
|---|---|
| **Exhibit A** | **General Judgment for Dissolution of Marriage entered December 12, 2022, Clackamas County Case No. 22DR20841 (excerpts, certified copy)** |
| **Exhibit B** | **Companies House record of Elite Crown Diamond Limited (company number 10009926): statement of capital on incorporation; appointments and notifications of significant control of Lankan Bal and Don Nissanka effective May 31, 2018; cessations effective February 28, 2019; re-appointments and re-notifications effective June 30, 2019; and full accounts for the year ended February 28, 2017** |
| **Exhibit C** | **Agreement Regarding Provision of Funds For CODA Asset Purchase between Fates Group, LLC and Exergonix, Inc., effective April 4, 2016 and executed April 5, 2016** |
| **Exhibit D** | **Loan Agreement dated August 5, 2016** |
| **Exhibit E** | **First Amendment to Loan Agreement dated November 8, 2016, with Control, Security and Pledge Agreements** |
| **Exhibit F** | **Schedule of pledged collateral** |
| **Exhibit G** | **Electronic mail of Don Nissanka to Gilbert Armenta and William C. Morro dated April 9, 2019, and electronic mail of Don Nissanka to Gilbert Armenta and William C. Morro, copied to Stephen Gates, dated July 26, 2019, with reply** |
| **Exhibit H** | **Electronic mail of Don Nissanka to Fates Group, LLC, copied to Stephen Gates, dated July 23, 2020** |
| **Exhibit I** | **Debt Acknowledgment letter of Stephen Gates, President of Neighborhood Power Corporation, dated September 4, 2020** |
| **Exhibit J** | **Letter of Lankan Bal on Elite Crown Diamond Limited letterhead dated November 12, 2020** |
| **Exhibit K** | **Mutual General Release dated November 1, 2022, with its Exhibit A list of companies (certified copy)** |
| **Exhibit L** | **Senior secured asset-backed bond offering of Elite Global Equity Fund and Egan-Jones Ratings disclosure form** |
| **Exhibit M** | **Elite article of October 7, 2021** |
| **Exhibit N** | **Elite published contact page** |
| **Exhibit O** | **Chart of the Elite group corporate structure** |

| | |
|---|---|
| **Exhibit P** | **Published profile of Don Nissanka, captured October 6, 2025** |
| **Exhibit Q** | **Letter of AEEPower Holdings Sàrl and AEE Power Ventures, S.L. to Gilbert Armenta dated August 28, 2026** |
| **Exhibit R** | **Motion for Order to Show Cause re Contempt filed December 5, 2025, Clackamas County Case No. 25CN05440, with the Declaration of Deyla Tappan (certified copy)** |
| **Exhibit S** | **Statement of amounts due at September 1, 2026** |

## ATTORNEY VERIFICATION

I, VICTORIA KENNEDY, an attorney duly admitted to practice before the courts of the State of New York, affirm under penalty of perjury which may include a fine or imprisonment as follows:

I am the attorney for Plaintiff Fates Group, LLC in this action. I have read the foregoing Complaint and know the contents thereof to be true, except as to matters alleged upon information and belief, and as to those matters I believe them to be true. The grounds of my belief as to all matters not stated upon my personal knowledge are based on my review of documents and records provided to my office. The reason this verification is made by me and not by Fates Group, LLC is that Fates Group, LLC is not located in the same county where my office is located. My office is located in New York County, New York, and Fates Group, LLC is located in Florida.

I understand that this document will be filed in an action or proceeding in a court of law.

Dated: September 3, 2026
New York, New York

/s/ *Victoria Kennedy*

Victoria Kennedy, Esq.
ROMANO BENOWITZ & BROCHETELLI, LLP
99 Wall Street, Suite 3740
New York, New York 10005
Tel: (929) 777-2133
Fax: (212) 658-9506
vkennedy@rbnylaw.com

# EXHIBIT A

22DR20841
Exhibit 2

_Verified Correct Copy of Original 12/5/2025._

IN THE CIRCUIT COURT FOR THE STATE OF OREGON

IN THE COUNTY OF CLACKAMAS

| | | |
|---|---|---|
| In the Matter of the Marriage of: DEYLA SERENA TAPPAN GATES, Petitioner, and STEPHEN DANIEL GATES, Respondent. | ) | Case Number: GENERAL JUDGMENT FOR DISSOLUTION OF MARRIAGE AND MONEY AWARD FOR CHILD SUPPORT, SPOUSAL SUPPORT, EQUALIZING JUDGMENT (STIPULATED) |

THIS MATTER comes before the Court on the stipulation of the parties for a judgment dissolving their marriage, as evidenced by their signatures and the signatures of their attorneys below. Petitioner is represented by attorney Chasta L. Pyle of Jill Brittle Family Law Group P.C. Respondent is not represented by counsel. The court having been presented with this form of *General Judgment of Dissolution of Marriage and Money Award for Child Support, Spousal Support, Equalizing Judgment (Stipulated)* (hereinafter "Stipulated General Judgment"), having reviewed the records and documents on file herein, and being fully advised in the premises, makes the following findings:

1. Petitioner shall hereafter be referred to as Wife. Respondent shall hereafter be referred to as Husband.



*Jill Brittle Family Law Group P.C.*
3644 SW Troy Street, Ste. 200
Portland, Oregon 97219
P 503.445.1575 | F 503.445.1598

Verified Correct Copy of Original 12/5/2025.

2. Husband and Wife have irreconcilable differences that have caused the irremediable breakdown of their marriage.

3. The Court has jurisdiction over Husband and Wife.

4. Husband and Wife were married on September 19, 2003 at Ventura, Ventura County, California.

5. There are 2 children born as issue of this marriage: [redacted] Gates, age 18, and [redacted] Gates, age 16. The children's date of birth have been filed pursuant to UTCR 2.130. Petitioner is not now pregnant.

6. The data required by ORS 25.020(8)(a) and 107.085(4) are:

| WIFE | DEYLA SERENA TAPPAN GATES |
|---|---|
| Address: | 2323 SE Creighton Ave, Milwaukie, OR 97267 |
| Social Security No. | XXX-XX-3154; Redacted pursuant to UTCR 2.130 |
| Employer/Contact: | Redacted pursuant to UTCR 2.130 |
| Driver's License: | Oregon, XXX6391; full number redacted pursuant to UTCR 2.130 |
| Telephone Number: | Redacted pursuant to UTCR 2.130 |
| Age/DOB: | 45; Redacted pursuant to UTCR 2.130 |
| Previous Names: | Deyla Serena Tappan |

| HUSBAND | STEPHEN DANIEL GATES |
|---|---|
| Address: | 415 Dairy Road, E216, Kahului, HI, 96732 |
| Social Security No. | XXX-XX-2161; Redacted pursuant to UTCR 2.130 |
| Employer/Contact: | Redacted pursuant to UTCR 2.130 |
| Driver's License: | Oregon, XXX6383; full number redacted pursuant to UTCR 2.130 |
| Telephone Number: | Redacted pursuant to UTCR 2.1300 |
| Age/DOB: | 44; Redacted pursuant to UTCR 2.130 |

| ADULT CHILD | [redacted] GATES |
|---|---|
| Address: | 2323 SE Creighton Ave, Milwaukie, OR 97267 |
| Social Security No. | Redacted pursuant to UTCR 2.130 |
| Age/DOB: | 18; Redacted pursuant to UTCR 2.13 |

| JOINT CHILD | [redacted] GATES |
|---|---|
| Age: | 16 |
| Date of birth: | Redacted pursuant to UTCR 2.130 |
| Social Security No.: | Redacted pursuant to UTCR 2.130 |



*Jill Brittle Family Law Group P.C.*
3644 SW Troy Street, Ste 200
Portland, Oregon 97219
P 503 445 1575 | F. 503 445 1598

_Verified Correct Copy of Original 12/5/2025._

5. **LIFE INSURANCE.**

A. Husband shall maintain life insurance on his life in the amount of $1,000,000 naming the minor children as the irrevocable beneficiary and Wife as the trustee for the children so long as the obligation to pay child support continues or so long as an arrearage exists for accrued but unpaid support. Husband shall maintain life insurance in the amount of $1,000,000 naming Wife as the primary beneficiary so long as his obligation to pay spousal support continues or so long as an arrearage exists for accrued but unpaid support. Within 60 days following entry of Judgment Husband shall modify any life insurance policy on his life in the amount stated above. As soon as it is available and not later than 60 days from the date this Judgment is signed by the Court, Husband shall provide the company name and policy number to Wife. Thereafter, the parties shall promptly sign a supplemental judgment confirming the policy details so that a copy of the Judgment as supplemented may be served on the applicable life insurance company.

B. Husband shall not borrow money from the insurance policy. Pursuant to ORS 107.820(6), Husband shall provide Wife with a true copy of the insurance policy described above and shall immediately provide written notice of any action that will reduce the death benefit or change the designation of the beneficiaries under the policy.

C. Pursuant to ORS 107.820(6), Husband / Wife shall cause a certified copy of the Judgment dissolving the parties' marriage to be delivered to the applicable life insurance company or companies requesting notification when premium payments have not been made or the insured takes any action that will change the beneficiary or reduce the death benefit payable under the policy. The company shall notify Wife]whenever a premium payment has not been made or the insured takes any action that will change the beneficiary or reduce the benefits of the policy.

D. A constructive trust shall be imposed over the proceeds of any life insurance on Husband's life owned by Husband at the time of his death if he fails to maintain life insurance in the amount and with the beneficiary designation set forth. If the life insurance benefits actually paid upon



Jill Brittle Family Law Group P.C.
3644 SW Troy Street, Ste. 200
Portland, Oregon 97219
P 503 445 1575 | F 503 445 1598

_Verified Correct Copy of Original 12/5/2025._

(i) All personal property now in her possession not otherwise specifically described herein.

(ii) Chase Savings account ending in x9978.

(iii) 2021 Toyota RAV4 Prime Plug-In Hybrid, VIN JTMAB3FV5MD066206.

(iv) Any rewards or air miles associated with credit cards in her individual name.

(v) Any and all assets she received as gift or inheritance.

(vi) The entirety of the parties' Audible account and shall be responsible for paying all costs and monthly subscription fees associated with the Audible account.

C. All fire and extended coverage, and liability and casualty insurance policies upon or relating to any real or personal property herein described or referred to, and now in existence, shall be transferred with the property to which the same pertains to the party receiving such property pursuant to this judgment, without charge or credit to either party with respect to the surrendered value thereof.

7. **REAL PROPERTY**. Wife is awarded the real property located at 2323 SE Creighton Avenue, Milwaukie, Oregon 97267, more particularly described as:

Parcel 2, Partition Plat No. 1998-110, in the County of Clackamas and State of Oregon.

free and clear from any claim of Husband and subject to any encumbrances.

A. The parties stipulate that the value of the real property is currently $700,000 with debt secured by the real property having a principal amount of $405,436.82 as of January 1, 2022.

B. Wife shall make prompt and consistent good faith efforts to refinance or otherwise remove Husband's name from any liability associated with the real property, including, but not limited to, the debt due to NewRez home mortgage loan ending in #6015, no later than forty-eight (48) months from the date of entry of this judgment. Wife shall keep Husband apprised of her progress to refinance the property during said period.

C. If Wife is unable to refinance the property despite her consistent and good faith efforts to do so during the forty-eight month period, then Wife shall receive up to a twelve (12) month extension of



*Jill Brittle Family Law Group P.C.*
3644 SW Troy Street, Ste. 200
Portland, Oregon 97219
P 503 445 1575 | F 503.445 1598

_Verified Correct Copy of Original 12/5/2025._

time to refinance the property, during which the parties shall participate in mediation and/or binding arbitration to resolve the dispute. If the parties are unable to agree upon mediation and/or binding arbitration or if the parties are unable to resolve the dispute, then the issue in dispute shall be submitted for resolution to the court normally hearing domestic relations matters. Wife shall continue to actively pursue the refinance of the property during said period and shall keep Husband apprised of her progress.

D. Wife shall not borrow against or further encumber the real property in any way until Husband's name is removed from all liabilities associated with the property; however, Wife shall be entitled to refinance the property only to remove Husband's name from all liabilities associated with the property.

E. Except as otherwise provided herein, Wife shall be responsible for timely payments on the mortgage, fire and casualty loss insurance, utility bills, and all other liabilities associated with the property as they become due.

F. Except as otherwise provided herein, Wife shall defend, indemnify, and hold Husband harmless against any liabilities and encumbrances associated with the property, including, but not limited to, any failure to pay the debt due to NewRez home mortgage loan ending in #6015, as long as Husband's name is associated with the real property and its liabilities.

G. Husband shall sign a Bargain and Sale Deed and any other documents required to complete the refinance process. Wife shall pay the recording costs and fees required to record the deed.

H. If any issue pertaining to the real property or the removal of Husband's name from all liabilities associated with the property becomes a matter of dispute, any such issue in dispute shall be submitted for resolution to the court normally hearing domestic relations matters. Accordingly, the court shall retain jurisdiction over such matters.

8. **EQUALIZING JUDGMENT.** Wife is awarded an equalizing judgment against Husband of $218,154.


*Jill Brittle Family Law Group P.C.*
3644 SW Troy Street, Ste 200
Portland, Oregon 97219
P 503.445 1575 | F 503 445 1598

_Verified Correct Copy of Original 12/5/2025._

A. This judgment shall be paid in two parts. Of this amount $35,754 shall be due and payable from Husband within twelve (12) months of the date of entry of this Judgment. The remaining $182,500 shall be due and payable from Husband in 38 monthly payments of $4,800 beginning November 1, 2022. The monthly payments are in addition to the $35,754 and shall not be credited towards that amount. All payments under this section shall be considered as a non-taxable property settlement payment pursuant to 26 USC § 1041. There is no penalty or discount for prepayment.

B. This award shall accrue interest at the rate of nine percent (9%) per annum on the unpaid principal balance beginning from the date the arrearage accrues until paid.

C. This award is made to Wife in consideration of the cash and retirement accounts awarded to Husband and in order to effect a just and proper division of the parties' interests.

9. **DEBT ALLOCATION.** The liabilities and debts of the parties shall be paid as follows:

A. Each party shall pay the debts incurred by that party since their separation on January 1, 2022, and hold the other party harmless therefrom.

B. Husband shall pay, defend, indemnify and hold Wife harmless from:

(i) All debts incurred in Husband's sole name.

(ii) Fifty percent (50%) of the Mohela Federal Direct Loans - Direct Sub Spousal Consolidation Loan ending in #3953-001 and Direct Sub Spousal Consolidation Loan ending in #3953-002, which were refinanced into both parties' names. The balance of said loans totaled $83,127.46 as of April 18, 2022.

C. Wife shall pay, defend, indemnify and hold harmless Husband from:

(i) All debts incurred in Wife's sole name.

(ii) Fifty percent (50%) of the Mohela Federal Direct Loans - Direct Sub Spousal Consolidation Loan ending in #3953-001 and Direct Sub Spousal Consolidation Loan ending in #3953-002, which were refinanced into both parties' names. The balance of said loans totaled $83,127.46 as of April 18, 2022.


*Jill Brittle Family Law Group P.C.*
3644 SW Troy Street, Ste 200
Portland, Oregon 97219
P 503.445 1575 | F. 503.445 1598

_Verified Correct Copy of Original 12/5/2025._

10. **SPOUSAL SUPPORT.**

A. Judgment shall be entered in favor of Wife and against Husband for maintenance spousal support. The amount and duration of the support shall be as follows:

$3,148.59 per month for 84 months.

Payments shall not terminate until Husband's death, Wife's death, or until the final payment has been made in accordance with the above schedule, whichever shall first occur.

B. Payments shall begin on January 1, 2022 and shall be due on the first day of each month thereafter until terminated as described herein. Spousal support payments shall terminate as of December 31, 2028.

C. Payments shall be made directly to Wife via automatic deposit into a bank account designated byWife.

D. Husband and Wife each waive his or her right to apply to the court to modify this spousal support award. It is the intent and agreement of both parties that this award shall not be subject to modification, either in amount or duration. Husband and Wife each have the right to seek reinstatement of support, once the final payment is made, pursuant to ORS 107.135, ORS 107.136, or any successor statute. In so agreeing the parties expressly intend that all future changes int eh parties' economic and health-related conditions shall be deemed "foreseeable" for purposes of support modification and reinstatement and shall not be grounds for modification or reinstatement. To this end, both parties stipulate that it is foreseeable that:

i. Either party's income, assets, or liabilities will substantially increase or decrease;

ii. Either party's financial condition may substantially improve or decline;

iii. Either party's need may substantially increase or decrease;

iv. Either party's health will significantly change;

v. Either party will remarry or cohabitate with another; and/or


*Jill Brittle Family Law Group P.C.*
3644 SW Troy Street, Ste 200
Portland, Oregon 97219
P 503 445 1575 | F 503 445 1598

_Verified Correct Copy of Original 12/5/2025._

vi. Either party will change employment or occupation, resulting in a substantial reduction or increase in income.

E. Notwithstanding the non-modifiability of this spousal support, if either party is successful in convincing a court that the spousal support should be modified, then the party seeking modification shall indemnify, defend, and hold the other p arty harmless from any loss, additional payments, or damages incurred by the other party resulting from any such court ruling, including any attorney fees, costs, and expenses.

II. **BUSINESS INTERESTS.**

A. Husband is awarded all (100%) of his business interests, consistent with the terms of the "Mutual General Release", attached at Exhibit 3 and incorporated by reference herein, including, but not limited to, Husband's interests in the following (collectively "the entities"):

i. Neighborhood Power Corpoiation

ii. Neighborhood Farms Maui, LLC (all Neighborhood Farms)

iii. Neighborhood Power & Water, LLC

iv. Neighborhood Team Fund, LLC

v. Neighborhood Power, LLC

vi. Neighborhood Power OR, LLC

vii. Neighborhood GP, LLC

viii. Neighborhood PM, LLC

ix. RSP HI, LLC

x. RSP OR, LLC

xi. RSP PR, LLC

xii. RSP MO, LLC

xiii. RSP MM, LLC

xiv. RPPA HI, LLC


Jill Brittle Family Law Group P.C.
3644 SW Troy Street, Ste 200
Portland, Oregon 97219
P· 503 445 1575 | F· 503 445.1598

_Verified Correct Copy of Original 12/5/2025._

xv. Griffin Investments, Inc

xvi. Griffin EV, LLC

xvii. Elite Crown Diamond ltk

xviii. Elite Global Equity Fund

xix. Elite Crown Cayman LTD

xx. Solar Tree Capital, LLC

xxi. Windsor Carports PV, LLC

xxii. Waihee Water, LLC

xxiii. Volcano Solar, LLC

xxiv. Tickle Creek Solar, LLC

xxv. Thomas Creek Solar, LLC

xxvi. Terton Solar, LLC

xxvii. TakiPV, LLC

xxviii. T20 PV, LLC

xxix. T18 PV, LLC

xxx. T16 PV, LLC

xxxi. T15, LLC

xxxii. T14 PV, LLC

xxxiii. T13 PV, LLC

xxxiv. T12 PV, LLC

xxxv. T11 PV, LLC

xxxvi. T10 PV, LLC

xxxvii. FOM PV, LLC

xxxviii. St Louis Solar, LLC

xxxix. SPP1, LLC



Jill Brittle Family Law Group P.C.
3644 SW Troy Street, Ste 200
Portland, Oregon 97219
P. 503 445.1575 | F 503.445.1598

_Verified Correct Copy of Original 12/5/2025._

xl. S&F Building FIT, LLC

xli. S&F Pond, LLC

xlii. Red River Solar 3&4, LLC

xliii. Rancho Vistoso PV, LLC

xliv. Ralphs PV, LLC

xlv. PR Outlets PV, LLC

xlvi. Plaza PV, LLC

xlvii. Paso Robles PV, LLC

xlviii. Owens PV, LLC

xlix. Notre Dame PV, LLC

l. Mission PV, LLC

li. Metro PV, LLC

lii. LimeTree PV, LLC

liii. Kula Ag PV, LLC

liv. iSolar, LLC

lv. Hilo Hotel PV, LLC

lvi. Hilo Golf PV, LLC

lvii. Hawaii SPP1, LLC

lviii. Green Energy Solar, LLC

lix. Green Bridge Group, LLC

lx. CyanoPV, LLC

lxi. Clear Lake PV, LLC

lxii. Big Bear PV, LLC

lxiii. Bass Lake Solar Holdings, LLC

lxiv. AR Solar, LLC



*Jill Brittle Family Law Group P.C.*
3644 SW Troy Street, Ste 200
Portland, Oregon 97219
P 503 445 1575 | F 503 445 1598

_Verified Correct Copy of Original 12/5/2025._

lxv. Aloha Renewables, LLC

lxvi. Alanui Kona, LLC

lxvii. Alanui Kihei, LLC

lxviii. Clear Lake PC, LLC

lxix. LimeTree PV, LLC

lxx. Yarak Trading, LLC

B. Husband is awarded and declared to be the sole owner of the entities free and clear of any claim by Wife, including all business bank accounts, inventory, and equipment, and subject to any and all debts and liabilities owing thereon, including but not limited to those listed below.

C. Husband shall pay, indemnify and hold Wife harmless from any taxes, liens, indebtedness or liability encumbering, arising from or related to the entities. Husband shall exercise commercially reasonable efforts to obtain Wife's release from any guarantee signed by Wife with respect to the indebtedness of the entities and shall indemnify and hold harmless Wife from any costs, expenses or liabilities hereafter incurred by Wife by reason of her guarantee of any indebtedness of the entities. Wife shall sign all documents reasonably required to complete the transfer to Husband of Wife's interest in the entities.

D. Husband shall apply one-half (50%) of Husband's net sale proceeds ("net proceeds" is defined as gross proceeds less any and all reasonable transaction costs, costs of goods, liabilities, any expenses, and the tax consequences) from the sale of any of the above-listed business interests occurring on or before January 1, 2026, against the remaining principal on the mortgage loan on the real property located at 2323 SE Creighton Avenue, Milwaukie, Oregon 97267. The total payments applied to the home loan principal for Husband's one-half (50%) of his net sale proceeds from the sale of the above-listed business interests shall not exceed the payoff amount of the NewRez home loan ending in #6015 on January 1, 2022 ($405,436.82) less any payments against principal made by Husband from January 1, 2022 to December 31, 2028.


*Jill Brittle Family Law Group P.C.*
3644 SW Troy Street, Ste 200
Portland, Oregon 97219
P 503.445 1575 | F 503 445 1598

_Verified Correct Copy of Original 12/5/2025._

15. **ATTORNEY FEES AND COSTS.** Neither party shall be liable for any attorney fees and costs incurred by the other party in connection with the within proceeding and, pursuant to the parties' stipulation, each party waives the right to apply to the court for an award on account thereof against the other party.

16. **NAME RESTORATION.** Wife is restored her former name, Deyla Serena Tappan.

17. **BENEFICIARY REVOCATION.**

A. Any provision in a party's will that is now in force and effect that benefits the now former spouse shall be deemed revoked in accordance with the provisions of ORS 112.315. This revocation shall cause the will to be interpreted as if the former spouse did not survive the testator.

B. Any provision in any trust created by or for the benefit of a party that is now in force and effect that benefits the now former spouse shall be deemed revoked, and the trust shall be interpreted as if the former spouse did not survive the decedent. The intent of this provision is to prevent the former spouse from having any involvement in the trust in any capacity, including as a trustee or a beneficiary of the trust.

C. Except as otherwise provided herein, any designation of the now former spouse as a beneficiary of any benefit, including but not limited to, retirement benefits, IRA accounts, life insurance policies, annuities, or other assets where a party is able to designate a beneficiary to receive the proceeds of that asset upon the death of that party, that was in place on or before the date of this judgment, shall be deemed to have been revoked. The benefit shall be paid to the secondary or contingent beneficiary or, if no beneficiary is named, then to the decedent's estate. The surviving former spouse shall cooperate with the decedent's estate in assuring this directive is completed, specifically including the affirmative responsibility to disclaim, in writing, and within nine months of the date of death to assure that the surviving former spouse does not receive any benefit as a result of the decedent's failure to modify the beneficiary designation of the above-described assets.



*Jill Brittle Family Law Group P.C.*
3644 SW Troy Street, Ste 200
Portland, Oregon 97219
P. 503 445 1575 | F 503 445.1598

_Verified Correct Copy of Original 12/5/2025._

*******

**MONEY AWARD: CHILD SUPPORT AND SPOUSAL SUPPORT**

*This Judgment requires payment of a child support obligation through the Department of Justice under Title IV-D of the federal Social Security Act.* ___ Yes __X__ No

| | | |
|---|---|---|
| a. | Judgment Creditor and Address | Deyla Serena Tappan Gates<br>2323 SE Creighton Avenue<br>Milwaukie, OR 97267 |
| b. | Judgment Creditor Employer | N/A |
| c. | Judgment Creditor Driver's License: | Redacted per UTCR 2.130 |
| d. | Attorney for Judgment Creditor: | Chasta L. Pyle<br>3644 SW Troy St, Ste 200<br>Portland, OR 97219 |
| e. | Judgment Debtor and Address: | Stephen Daniel Gates<br>415 Dairy Road E 216<br>Kahului, HI 96732 |
| f. | Judgment Debtor Employer: | Self- Employed |
| g. | Judgment Debtor Social Security Number: | XXX-XX-2161 |
| h. | Judgment Debtor Driver's License: | Oregon xxx6383 |
| i. | Judgment Debtor's Year of Birth: | 1977 |
| j. | Attorney for Judgment Debtor: | N/A |
| k. | Judgment Amount: | |
| | Child Support: | $1,095 per month commencing January 1, 2022 through October 31, 2022.<br><br>$500 per month commencing November 1, 2022 until age 18 or until 21 if child is a "child attending school". Of this amount, $0 is cash medical support. |
| | Spousal Support: | $3,148.59 per month for 84 months beginning January 1, 2022, then terminates |



Jill Brittle Family Law Group P.C.
3644 SW Troy Street, Ste. 200
Portland, Oregon 97219
P 503.445 1575 | F: 503 445 1598

Verified Correct Copy of Original 12/5/2025.

| | | |
|---|---|---|
| l. | Prejudgment Interest: | None |
| m. | Attorney Fees and Costs: | None |
| n. | Postjudgment Interest: | Nine percent (9%) per annum simple interest on support arrearages from the date the arrearage accrues until paid. |

**MONEY AWARD: CHILD SUPPORT**

*This Judgment requires payment of a child support obligation through the Department of Justice under Title IV-D of the federal Social Security Act.* ___ Yes __X__ No

| | | |
|---|---|---|
| a. | Judgment Creditor and Address | [redacted] Gates<br>2323 SE Creighton Avenue<br>Milwaukie, OR 97267 |
| b. | Judgment Creditor Employer | N/A |
| c. | Judgment Creditor Driver's License: | Redacted per UTCR 2.130 |
| d. | Attorney for Judgment Creditor: | N/A |
| e. | Judgment Debtor and Address: | Stephen Daniel Gates<br>415 Dairy Road E 216<br>Kahului, HI 96732 |
| f. | Judgment Debtor Employer: | Self- Employed |
| g. | Judgment Debtor Social Security Number: | XXX-XX-2161 |
| h. | Judgment Debtor Driver's License: | Oregon xxx6383 |
| i. | Judgment Debtor's Year of Birth: | 1977 |
| j. | Attorney for Judgment Debtor: | N/A |
| k. | Judgment Amount: | |
| | Child Support: | $500 per month commencing November 1, 2022 until 21 if she is a "child attending school". Of this amount, $0 is cash medical support. |
| l. | Prejudgment Interest: | None |
| m. | Attorney Fees and Costs: | None |



Jill Brittle Family Law Group P.C.
3644 SW Troy Street, Ste 200
Portland, Oregon 97219
P: 503 445 1575 | F 503 445 1598

_Verified Correct Copy of Original 12/5/2025._

| | | |
|---|---|---|
| n. | Postjudgment Interest: | Nine percent (9%) per annum simple interest on support arrearages from the date the arrearage accrues until paid. |

**MONEY AWARD: PROPERTY DIVISION**

| | | |
|---|---|---|
| | Judgment Creditor and Address | Deyla Serena Tappan Gates<br>2323 SE Creighton Avenue<br>Milwaukie, OR 97267 |
| b. | Judgment Creditor Employer | N/A |
| c. | Judgment Creditor Driver's License: | Redacted per UTCR 2.130 |
| d. | Attorney for Judgment Creditor: | Chasta L. Pyle<br>3644 SW Troy St, Ste 200<br>Portland, OR 97219 |
| e. | Judgment Debtor and Address: | Stephen Daniel Gates<br>415 Dairy Road E 216<br>Kahului, HI 96732 |
| f. | Judgment Debtor Employer: | Self- Employed |
| g. | Judgment Debtor Social Security Number: | XXX-XX-2161 |
| h. | Judgment Debtor Driver's License: | Oregon xxx6383 |
| i. | Judgment Debtor's Year of Birth: | 1977 |
| j. | Attorney for Judgment Debtor: | N/A |
| k. | Judgment Amount: | $218,154 to be paid in monthly installments of $4,800 per month beginning November 1, 2022 and an additional $35,754 due 12 months after the entry of this judgment. |
| l. | Prejudgment Interest: | None |
| m. | Attorney Fees and Costs: | None |

///


*Jill Brittle Family Law Group P.C.*
3644 SW Troy Street, Ste 200
Portland, Oregon 97219
P 503 445 1575 | F. 503 445 1598

_Verified Correct Copy of Original 12/5/2025._

n. Postjudgment Interest: Nine percent (9%) per annum simple interest on unpaid balance beginning from the date the arrearage accrues until paid.

12/12/2022 4:06:58 PM

Todd L. Van Rysselberghe

Circuit Court Judge Todd VanRysselberghe

SUBMITTED BY:

s/ Chasta L. Pyle

Chasta L. Pyle, OSB #171348
Of Attorneys for Petitioner
chasta@brittle-law.com

_Verified Correct Copy of Original 12/5/2025._

## CERTIFICATE OF READINESS - UTCR 5.100

This proposed order or judgment is ready for judicial signature because:

__X__ Each party affected by this order or judgment has stipulated to the order or judgment, as shown by each party's signature on the document being submitted.

DATED this ___8th__ day of December 2022.

s/ Chasta aL. Pyle
Chasta L. Pyle, OSB #171348
Of Attorneys for Petitioner
Jill Brittle Family Law Group P.C.
3644 SW Troy Street, Ste. 200
Portland, Oregon 97219
P: 503.445.1575 F: 503.445.1598
Email: chasta@brittle-law.com

## STIPULATION, AFFIDAVIT AND AGREEMENT

By their signatures below the undersigned parties hereby acknowledge that the terms of the foregoing Stipulated General Judgment are accurate and equitable and that each party desires to be divorced upon the terms contained herein without a hearing and without further delay. Each party acknowledges that Wife's attorney, Chasta L. Pyle of Jill Brittle Family Law Group P.C., drafted this document and that Husband has had the opportunity to consult with his own attorney regarding the contents of this document.

Date: 12/07/2022

[signature] Stephen Gates (Dec 8, 2022 09:54 HST)
Stephen Daniel Gates, Respondent

Date: 12/7/22

Deyla Tappan Gates
Deyla Serena Tappan Gates, Petitioner

## NOTICE OF PERIODIC REVIEW

If you are receiving child support services through the Department of Justice, either parent may request that the Department of Justice, Division of Child Support review the amount of support ordered after three years from the date the order took effect or at any time upon a substantial change of circumstances.

**EXHIBIT B**

**File Copy**

# CERTIFICATE OF INCORPORATION
# OF A
# PRIVATE LIMITED COMPANY

Company Number [redacted]**9926**

The Registrar of Companies for England and Wales, hereby certifies that

ELITE CROWN DIAMOND LIMITED

is this day incorporated under the Companies Act 2006 as a private company, that the company is limited by shares, and the situation of its registered office is in England and Wales

Given at Companies House, Cardiff, on **17th February 2016**

*[redacted]9926E*

The above information was communicated by electronic means and authenticated by the Registrar of Companies under section 1115 of the Companies Act 2006

Companies House

REGISTRAR OF COMPANIES FOR ENGLAND AND WALES

THE OFFICIAL SEAL OF THE REGISTRAR OF COMPANIES

Companies House

# IN01(ef)

## Application to register a company

X50VX4AA

*Received for filing in Electronic Format on the:* **16/02/2016**

---

| | |
|---|---|
| *Company Name in full:* | ELITE CROWN DIAMOND LIMITED |
| *Company Type:* | **Private limited by shares** |
| *Situation of Registered Office:* | **England and Wales** |
| *Proposed Register Office Address:* | **CROWN HOUSE NORTH CIRCULAR ROAD**<br>**LONDON**<br>**ENGLAND**<br>**NW10 7PN** |

*I wish to adopt entirely bespoke articles*

## *Company Director 1*

*Type:* **Person**

*Full forename(s):* MR ZAHEER

*Surname:* MUNEER

*Former names:*

*Service Address:* 73 WIVENHOE ROAD
BARKING
ENGLAND
IG11 0RE

*Country/State Usually Resident:* UNITED KINGDOM

*Date of Birth:* [redacted]/1990 *Nationality:* PAKISTANI

*Occupation:* ONLINE MARKETING

The subscribers confirm that the person named has consented to act as a director.

---

*Company Director* 2

*Type:* **Person**

*Full forename(s):* **MR ZOABIB**

*Surname:* **ALI**

*Former names:*

*Service Address:* **73 WIVENHOE ROAD**
**BARKING**
**ENGLAND**
**IG11 0RE**

*Country/State Usually Resident:* **UNITED KINGDOM**

*Date of Birth:* [redacted]**1989** *Nationality:* **PAKISTANI**

*Occupation:* **ONLINE MARKETING**

The subscribers confirm that the person named has consented to act as a director.

## Statement of Capital (Share Capital)

| | | | |
|---|---|---|---|
| **Class of shares** | ORDINARY | *Number allotted* | 2 |
| | | *Aggregate nominal value* | 2 |
| *Currency* | GBP | *Amount paid per share* | 1 |
| | | *Amount unpaid per share* | 0 |

*Prescribed particulars*

FULL RIGHTS TO RECEIVE NOTICE OF, AND ATTEND VOTE AT GENERAL MEETINGS. ONE SHARE CARRIES ONE VOTE, AND FULL RIGHTS TO DIVIDENDS AND CAPITAL DISTRIBUTIONS (INCLUDING UPON WINDING UP).

## Statement of Capital (Totals)

| | | | |
|---|---|---|---|
| *Currency* | GBP | *Total number of shares* | 2 |
| | | *Total aggregate nominal value* | 2 |

# Initial Shareholdings

| | | | |
|---|---|---|---|
| *Name:* | ZAHEER MUNEER | | |
| *Address:* | 73 WIVENHOE ROAD<br>BARKING<br>ENGLAND<br>IG11 0RE | *Class of share:* | ORDINARY |
| | | *Number of shares:* | 1 |
| | | *Currency:* | GBP |
| | | *Nominal value of each share:* | 1 |
| | | *Amount unpaid:* | 0 |
| | | *Amount paid:* | 1 |
| *Name:* | ZOABIB ALI | | |
| *Address:* | 73 WIVENHOE ROAD<br>BARKING<br>ENGLAND<br>IG11 0RE | *Class of share:* | ORDINARY |
| | | *Number of shares:* | 1 |
| | | *Currency:* | GBP |
| | | *Nominal value of each share:* | 1 |
| | | *Amount unpaid:* | 0 |
| | | *Amount paid:* | 1 |

## Statement of Compliance

*I confirm the requirements of the Companies Act 2006 as to registration have been complied with.*

*memorandum delivered by an agent for the subscriber(s):* **Yes**

*Agent's Name:* **THEFORMATIONSCOMPANY.COM LIMITED**

*Agent's Address:* **FIRST FLOOR 130 OLD STREET**
**LONDON**
**ENGLAND**
**EC1V 9BD**

## *Authorisation*

*Authoriser Designation:* **agent** *Authenticated:* **Yes**

*Agent's Name:* **THEFORMATIONSCOMPANY.COM LIMITED**

*Agent's Address:* **FIRST FLOOR 130 OLD STREET**
**LONDON**
**ENGLAND**
**EC1V 9BD**

# THE COMPANIES ACT 2006

## PRIVATE COMPANY LIMITED BY SHARES

## MEMORANDUM OF ASSOCIATION

## OF

## ELITE CROWN DIAMOND LIMITED

Each subscriber to this memorandum of association wishes to form a company under the Companies Act 2006 and agrees to become a member of the Company and to take at least one share.

| Name of each subscriber | Authentication by each subscriber |
|---|---|
| Zaheer Muneer<br>Zoabib Ali | |

Dated 2016-02-16

# THE COMPANIES ACT 2006

## PRIVATE COMPANY LIMITED BY SHARES

## ARTICLES OF ASSOCIATION

## OF

## ELITE CROWN DIAMOND LIMITED

## PART 1

**1 Defined terms**

(1) The regulations contained in the Model Articles for Private Companies Limited by Shares set out in Schedule 1 of The Companies (Model Articles) Regulations 2008 (SI 3229/2008), shall not apply to the Company.

(2) In the articles, unless the context requires otherwise:

| | |
|---|---|
| "the 2006 Act" | means the Companies Act 2006; |
| "articles" | means the Company's articles of association; |
| "bankruptcy" | includes individual insolvency proceedings in a jurisdiction other than England and Wales or Northern Ireland which have an effect similar to that of bankruptcy; |
| "chairman" | has the meaning given in article 12; |
| "chairman of the meeting" | has the meaning given in article 39; |
| "Companies Acts" | means the Companies Acts (as defined in section 2 of the Companies Act 2006), in so far as they apply to the Company; |
| "director" | means a director of the Company, and includes any person occupying the position of director, by whatever name called |
| "distribution recipient" | has the meaning given in article 31; |
| "document" | includes, unless otherwise specified, any document sent or supplied in electronic form; |
| "electronic form" | has the meaning given in section 1168 of the 2006 Act; |
| "fully paid" | in relation to a share, means that the nominal value and any premium to be paid to the Company in respect of that share have been paid to the Company; |
| "hard copy form" | has the meaning given in section 1168 of the 2006 Act; |
| "holder" | in relation to shares means the person whose name is entered in the register of members as the holder of the shares; |
| "instrument" | means a document in hard copy form; |
| "ordinary resolution" | has the meaning given in section 282 of the 2006 Act; |
| "paid" | means paid or credited as paid; |
| "participate" | in relation to a directors' meeting, has the meaning given in article 10; |
| "proxy notice" | has the meaning given in article 45; |

| | |
|---|---|
| "shareholder" | means a person who is the holder of a share; |
| "shares" | means shares in the Company; |
| "special resolution" | has the meaning given in section 283 of the 2006 Act; |
| "subsidiary" | has the meaning given in section 1159 of the 2006 Act; |
| "transmittee" | means a person entitled to a share by reason of the death or bankruptcy of a shareholder or otherwise by operation of law; and |
| "writing" | means the representation or reproduction of words, symbols or other information in a visible form by any method or combination of methods, whether sent or supplied in electronic form or otherwise. |

Unless the context otherwise requires, other words or expressions contained in these articles bear the same meaning as in the 2006 Act as in force on the date when these articles become binding on the Company.

**2 Directors' general authority**

The liability of the shareholders is limited to the amount, if any, unpaid on the shares held by them.

**PART 2**
**DIRECTORS**
**DIRECTORS' POWERS AND RESPONSIBILITIES**

**3 Directors' general authority**

Subject to the articles, the directors are responsible for the management of the Company's business, for which purpose they may exercise all the powers of the Company.

**4 Shareholders' reserve power**

(1) The shareholders may, by special resolution, direct the directors to take, or refrain from taking, specified action.

(2) No such special resolution invalidates anything which the directors have done before the passing of the resolution.

**5 Directors may delegate**

(1) Subject to the articles, the directors may delegate any of the powers which are conferred on them under the articles:

(a) to such person or committee;
(b) by such means (including by power of attorney);
(c) to such an extent;
(d) in relation to such matters or territories; and
(e) on such terms and conditions;

as they think fit.

(2) If the directors so specify, any such delegation may authorise further delegation of the directors' powers by any person to whom they are delegated.

(3) The directors may revoke any delegation in whole or part, or alter its terms and conditions.

**6 Committees**

Committees to which the directors delegate any of their powers must follow procedures which are based as far as they are applicable on those provisions of the articles which govern the taking of decisions by directors. The directors may make rules of procedure for all or any committees, which prevail over rules derived from the articles if they are not consistent with them.

## DECISION-MAKING BY DIRECTORS

**7 Directors to take decisions collectively**

(1) The general rule about decision-making by directors is that any decision of the directors must be either a majority decision at a meeting or a decision taken in accordance with article 8.

(2) If:
(a) the Company only has one director, and
(b) no provision of the articles requires it to have more than one director

the general rule does not apply, and the director may, subject to articles 8(3) and 15 take decisions without regard to any other of the provisions of the articles relating to directors' decision-making.

**8 Unanimous decisions**

(1) A decision of the directors is taken in accordance with this article when all eligible directors indicate to each other by any means that they share a common view on a matter.

(2) Such a decision may take the form of a resolution in writing, copies of which have been signed by each eligible director or to which each eligible director has otherwise indicated agreement in writing.

(3) References in this article to eligible directors are to directors who would have been entitled to vote on the matter had it been proposed as a resolution at a directors' meeting.

(4) A decision may not be taken in accordance with this article if the eligible directors would not have formed a quorum at such a meeting.

**9 Calling a directors' meeting**

(1) Any director may call a directors' meeting by giving notice of the meeting to the directors or by authorising the Company secretary (if any) to give such notice.

(2) Notice of any directors' meeting must indicate:

(a) its proposed date and time;

(b) where it is to take place; and

(c) if it is anticipated that directors participating in the meeting will not be in the same place, how it is proposed that they should communicate with each other during the meeting.

(3) Notice of a directors' meeting must be given to each director, but need not be in writing.

(4) Notice of a directors' meeting need not be given to directors who waive their entitlement to notice of that meeting, by giving notice to that effect to the Company not more than 7 days after the date on which the meeting is held. Where such notice is given after the meeting has been held, that does not affect the validity of the meeting, or of any business conducted at it.

**10 Participation in directors' meetings**

(1) Subject to the articles, directors participate in a directors' meeting, or part of a directors' meeting, when:

(a) the meeting has been called and takes place in accordance with the articles, and

(b) they can each communicate to the others any information or opinions they have on any particular item of the business of the meeting.

(2) In determining whether directors are participating in a directors' meeting, it is irrelevant where any director is or how they communicate with each other.

(3) If all the directors participating in a meeting are not in the same place, they may decide that the meeting is to be treated as taking place wherever any of them is.

**11 Quorum for directors' meetings**

(1) At a directors' meeting, unless a quorum is participating, no proposal is to be voted on, except a proposal to call another meeting.

(2) The quorum for directors' meetings may be fixed from time to time by a decision of the directors, but it must never be less than two unless there is just a sole director in office, and unless otherwise fixed it is two.

(3) If the total number of directors for the time being is less than the quorum required, the directors must not take any decision other than a decision:

(a) to appoint further directors, or

(b) to call a general meeting so as to enable the shareholders to appoint further directors.

**12 Chairing of directors' meetings**

(1) The directors may appoint a director to chair their meetings.

(2) The person so appointed for the time being is known as the chairman.

(3) The directors may terminate the chairman's appointment at any time.

(4) If the chairman is not participating in a directors' meeting within ten minutes of the time at which it was to start, the participating directors must appoint one of themselves to chair it.

**13 Casting vote**

The chairman or other director chairing the meeting shall not, if the numbers of votes for and against a proposal are equal, have a second or casting vote.

**14 Conflicts of interest**

(1) If a proposed decision of the directors is concerned with an actual or proposed transaction or arrangement with the Company in which a director is interested, that director is not to be counted as participating in the decision-making process for quorum or voting purposes.

(2) But if paragraph (3) applies, a director who is interested in an actual or proposed transaction or arrangement with the Company is to be counted as participating in the decision-making process for quorum and voting purposes.

(3) (a) the Company by ordinary resolution disapplies the provision of the articles which would otherwise prevent a director from being counted as participating in the decision-making process;

(b) the director's interest cannot reasonably be regarded as likely to give rise to a conflict of interest; or

(c) the director's conflict of interest arises from a permitted cause.

(4) For the purposes of this article, the following are permitted causes:

(a) a guarantee given, or to be given, by or to a director in respect of an obligation incurred by or on behalf of the Company or any of its subsidiaries;

(b) subscription, or an agreement to subscribe, for shares or other securities of the Company or any of its subsidiaries, or to underwrite, sub-underwrite, or guarantee subscription for any such shares or securities; and

(c) arrangements pursuant to which benefits are made available to employees and directors or former employees and directors of the Company or any of its subsidiaries which do not provide special benefits for directors or former directors.

(5) For the purposes of this article, references to proposed decisions and decision-making processes include any directors' meeting or part of a directors' meeting.

(6) Subject to paragraph (7), if a question arises at a meeting of directors or of a committee of directors as to the right of a director to participate in the meeting (or part of the meeting) for voting or quorum purposes, the question may, before the conclusion of the meeting, be referred to the chairman whose ruling in relation to any director other than the chairman is to be final and conclusive.

(7) If any question as to the right to participate in the meeting (or part of the meeting) should arise in respect of the chairman, the question is to be decided by a decision of the directors at that meeting, for which purpose the chairman is not to be counted as participating in the meeting (or that part of the meeting) for voting or quorum purposes.

(8) Where the number of non-conflicted directors is less than the quorum for the purposes of approving a resolution authorising any situation or transaction constituting a conflict as anticipated by the Companies Acts, the quorum shall be all the disinterested directors.

(9) When all the directors of the Company are conflicted, the Company shall pass the conflict to the Company's shareholders for approval by ordinary resolution.

**15 Records of decisions to be kept**

The directors must ensure that the Company keeps a record, in writing, for at least 10 years from the date of the decision recorded of every unanimous or majority decision taken by the directors.

**16 Directors' discretion to make further rules**

Subject to the articles, the directors may make any rule which they think fit about how they take decisions, and about how such rules are to be recorded or communicated to directors.

## NUMBER AND APPOINTMENT OF DIRECTORS

**17 Methods of appointing directors**

(1) There shall be no maximum number of directors and the minimum number of directors shall be one. Whenever the Company has two or more directors, at least one of them shall be a natural person

(2) Any person 16 years of age or more and who is willing to act as a director, and is permitted by law to do so, may be appointed to be a director:

(a) by ordinary resolution; or

(b) by a decision of the directors.

(3) In any case where, as a result of death, the Company has no shareholders and no directors, the personal representatives of the last shareholder to have died have the right, by notice in writing, to appoint a person to be a director.

(4) For the purposes of paragraph (3), where 2 or more shareholders die in circumstances rendering it uncertain who was the last to die, a younger shareholder is deemed to have survived an older shareholder.

**18 Termination of director's appointment**

(1) A person ceases to be a director as soon as:

(a) that person ceases to be a director by virtue of any provision of the Companies Acts or is prohibited from being a director by law;

(b) a bankruptcy order is made against that person;

(c) a composition is made with that person's creditors generally in satisfaction of that person's debts;

(d) a registered medical practitioner who is treating that person gives a written opinion to the Company stating that that person has become physically or mentally incapable of acting as a director and may remain so for more than three months;

(e) notification is received by the Company from the director that the director is resigning from office, and such resignation has taken effect in accordance with its terms

(f) he shall for more than six consecutive months have been absent without permission of the directors from meetings of directors held during that period and the directors resolve that his office be vacated.

**19 Directors' remuneration**

(1) Directors may undertake any services for the Company that the directors decide.

(2) Directors are entitled to such remuneration as the directors determine:

(a) for their services to the Company as directors, and

(b) for any other service which they undertake for the Company.

(3) Subject to the articles, a director's remuneration may:

(a) take any form, and

(b) include any arrangements in connection with the payment of a pension, allowance or gratuity, or any death, sickness or disability benefits, to or in respect of that director.

(4) Unless the directors decide otherwise, directors' remuneration accrues from day to day.

(5) Unless the directors decide otherwise, directors are not accountable to the Company for any remuneration which they receive as directors or other officers or employees of the Company's subsidiaries or of any other body corporate in which the Company is interested.

**20 Directors' expenses**

The Company may pay any reasonable expenses which the directors properly incur in connection with their attendance at:

(a) meetings of directors or committees of directors;

(b) general meetings, or

(c) separate meetings of the holders of any class of shares or of debentures of the Company, or otherwise in connection with the exercise of their powers and the discharge of their responsibilities in relation to the Company.

**PART 3**
**SHARES AND DISTRIBUTIONS**
**SHARES**

**21 All shares to be fully paid up**

(1) No share is to be issued for less than the aggregate of its nominal value and any premium to be paid to the Company in consideration for its issue.

(2) This does not apply to shares taken on the formation of the Company by the subscribers to the Company's memorandum.

**22 Powers to issue different classes of share**

(1) Subject to the articles, but without prejudice to the rights attached to any existing share, the Company may issue shares with such rights or restrictions as may be determined by ordinary resolution.

(2) The Company may issue shares which are to be redeemed, or are liable to be redeemed at the option of the Company or the holder, and the directors may determine the terms, conditions and manner of redemption of any such shares.

**23 Company not bound by less than absolute interests**

Except as required by law, no person is to be recognised by the Company as holding any share upon any trust, and except as otherwise required by law or the articles, the Company is not in any way to be bound by or recognise any interest in a share other than the holder's absolute ownership of it and all the rights attaching to it.

**24 Share certificates**

(1) The Company must issue each shareholder, free of charge, with one or more certificates in respect of the shares which that shareholder holds.

(2) Every certificate must specify:

(a) in respect of how many shares, of what class, it is issued;

(b) the nominal value of those shares;

(c) that the shares are fully paid; and

(d) any distinguishing numbers assigned to them.

(3) No certificate may be issued in respect of shares of more than one class.

(4) If more than one person holds a share, only one certificate may be issued in respect of it.

(5) Certificates must:

(a) have affixed to them the Company's common seal, or

(b) be otherwise executed in accordance with the Companies Acts.

**25 Replacement share certificates**

(1) If a certificate issued in respect of a shareholder's shares is:

(a) damaged or defaced; or

(b) said to be lost, stolen or destroyed,

(2) A shareholder exercising the right to be issued with such a replacement certificate:

(a) may at the same time exercise the right to be issued with a single certificate or separate certificates;

(b) must return the certificate which is to be replaced to the Company if it is damaged or defaced and

(c) must comply with such conditions as to evidence, indemnity and the payment of a reasonable fee as the directors decide.

**26 Share transfers**

(1) Shares may be transferred by means of an instrument of transfer in any usual form or any other form approved by the directors, which is executed by or on behalf of the transferor.

(2) No fee may be charged for registering any instrument of transfer or other document relating to or affecting the title to any share.

(3) The Company may retain any instrument of transfer which is registered.

(4) The transferor remains the holder of a share until the transferee's name is entered in the register of members as holder of it.

(5) The directors may refuse to register the transfer of a share, and if they do so, the instrument of transfer must be returned to the transferee with the notice of refusal unless they suspect that the proposed transfer may be fraudulent.

**27 Transmission of shares**

(1) If title to a share passes to a transmittee, the Company may only recognise the transmittee as having any title to that share.

(2) A transmittee who produces such evidence of entitlement to shares as the directors may properly require:

(a) may, subject to the articles, choose either to become the holder of those shares or to have them transferred to another person, and

(b) subject to the articles, and pending any transfer of the shares to another person, has the same rights as the holder had.

(3) But transmittees do not have the right to attend or vote at a general meeting, or agree to a proposed written resolution, in respect of shares to which they are entitled, by reason of the holder's death or bankruptcy or otherwise, unless they become the holders of those shares.

**28 Exercise of transmitees' rights**

(1) Transmittees who wish to become the holders of shares to which they have become entitled must notify the Company in writing of that wish.

(2) If the transmittee wishes to have a share transferred to another person, the transmittee must execute an instrument of transfer in respect of it.

(3) Any transfer made or executed under this article is to be treated as if it were made or executed by the person from whom the transmittee has derived rights in respect of the share, and as if the event which gave rise to the transmission had not occurred.

**29 Transmitees bound by prior notices**

If a notice is given to a shareholder in respect of shares and a transmittee is entitled to those shares, the transmittee is bound by the notice if it was given to the shareholder before the transmittee's name has been entered in the register of members.

## DIVIDENDS AND OTHER DISTRIBUTIONS

**30 Procedure for declaring dividends**

(1) The Company may, by ordinary resolution declare dividends, and the directors may decide to pay interim dividends but a dividend must not be declared unless the directors have made a recommendation as to its amount. Such a dividend must not exceed the amount recommended by the directors and no dividend may be declared or paid unless it is in accordance with shareholders' respective rights.

(2) Unless:

(a) the shareholders' resolution to declare; or

(b) directors' decision to pay a dividend; or

(c) the terms on which shares are issued, specify otherwise,

it must be paid by reference to each shareholder's holding of shares on the date of the resolution or decision to declare or pay it.

(3) If the Company's share capital is divided into different classes, no interim dividend may be paid on shares carrying deferred or non-preferred rights if, at the time of payment, any preferential dividend is in arrear.

(4) The directors may pay at intervals any dividend payable at a fixed rate if it appears to them that the profits available for distribution justify the payment.

(5) If the directors act in good faith, they do not incur any liability to the holders of shares conferring preferred rights for any loss they may suffer by the lawful payment of an interim dividend on shares with deferred or non-preferred rights.

**31 Payment of dividends and other distributions**

(1) Where a dividend or other sum which is a distribution is payable in respect of a share, it must be paid by one or more of the following means:

(a) transfer to a bank or building society account specified by the distribution recipient in writing; or

(b) sending a cheque, payable to the distribution recipient, by post to the distribution recipient at his registered address (if the distribution recipient is a holder of the share), or (in any other case) to an address specified by the distribution recipient either in writing or as the directors may otherwise decide; or

(c) any other means of payment as the directors agree with the distribution recipient either in writing or by such other means as the directors decide.

(2) In the articles, "the distribution recipient" means, in respect of a share in respect of which a dividend or other sum is payable:

(a) the holder of the share; or

(b) if the share has two or more joint holders, whichever of them is named first in the register of members; or

(c) if the holder is no longer entitled to the share by reason of death or bankruptcy, or otherwise by operation of law, the transmittee.

**32 No interest on distributions**

The Company may not pay interest on any dividend or other sum payable in respect of a share unless otherwise provided by the terms on which the share was issued, or the provisions of another agreement between the holder of that share and the Company.

**33 Unclaimed distributions**

(1) All dividends or other sums which are payable in respect of shares and unclaimed after having been declared or become payable, may be invested or otherwise made use of by the directors for the benefit of the Company until claimed.

(2) The payment of any such dividend or other sum into a separate account does not make the Company a trustee in respect of it and if

(a) twelve years have passed from the date on which a dividend or other sum became due for payment; and

(b) the distribution recipient has not claimed it,

the distribution recipient is no longer entitled to that dividend or other sum and it ceases to remain owing by the Company.

**34 Non-cash distributions**

(1) Subject to the terms of issue of the share in question, the Company may, by ordinary resolution on the recommendation of the directors, decide to pay all or part of a dividend or other distribution payable in respect of a share by transferring non-cash assets of equivalent value (including, without limitation, shares or other securities in any company).

(2) For the purposes of paying a non-cash distribution, the directors may make whatever arrangements they think fit, including, where any difficulty arises regarding the distribution:

(a) fixing the value of any assets;

(b) paying cash to any distribution recipient on the basis of that value in order to adjust the rights of recipients; and

(c) vesting any assets in trustees.

**35 Waiver of distributions**

(1) Distribution recipients may waive their entitlement to a dividend or other distribution payable in respect of a share by giving the Company notice in writing to that effect, but if:

(a) the share has more than one holder, or

(b) more than one person is entitled to the share, whether by reason of the death or bankruptcy of one or more joint holders, or otherwise,

the notice is not effective unless it is expressed to be given, and signed, by all the holders or persons otherwise entitled to the share.

## CAPITALISATION OF PROFITS

**36 Authority to capitalise and appropriation of capitalised sums**

The directors may, if they are so authorised by an ordinary resolution:

(1) (a) decide to capitalise any profits of the Company (whether or not they are available for distribution) which are not required for paying a preferential dividend, or any sum standing to the credit of the Company's share premium account or capital redemption reserve; and

(b) appropriate any sum which they so decide to capitalise (a "capitalised sum") to the persons who would have been entitled to it if it were distributed by way of dividend (the "persons entitled") and in the same proportions.

(2) Capitalised sums must be applied:

(a) on behalf of the persons entitled, and

(b) in the same proportions as a dividend would have been distributed to them.

(3) Any capitalised sum may be applied in paying up new shares of a nominal amount equal to the capitalised sum which are then allotted credited as fully paid to the persons entitled or as they may direct.

(4) A capitalised sum which was appropriated from profits available for distribution may be applied in paying up new debentures of the Company which are then allotted credited as fully paid to the persons entitled or as they may direct.

(5) Subject to the articles the directors may:

(a) apply capitalised sums in accordance with paragraphs (3) and (4) above partly in one way and partly in another;

(b) make such arrangements as they think fit to deal with shares or debentures becoming distributable in fractions under this article (including the issuing of fractional certificates or the making of cash payments); and

(c) authorise any person to enter into an agreement with the Company on behalf of all the persons entitled which is binding on them in respect of the allotment of shares and debentures to them under this article.

## PART 4
## DECISION-MAKING BY SHAREHOLDERS
## ORGANISATION OF GENERAL MEETINGS

### 37 Attendance and speaking at general meetings

(1) A person is able to exercise the right to speak at a general meeting when that person is in a position to communicate to all those attending the meeting, during the meeting, any information or opinions which that person has on the business of the meeting.

(2) A person is able to exercise the right to vote at a general meeting when:

(a) that person is able to vote, during the meeting, all resolutions put to the vote at the meeting, and

(b) that person's vote can be taken into account in determining whether or not such resolutions are passed at the same time as the votes of all the other persons attending the meeting.

(3) The directors may make whatever arrangements they consider appropriate to enable those attending a general meeting to exercise their rights to speak or vote at it.

(4) In determining attendance at a general meeting, it is immaterial whether any two or more shareholders attending it are in the same place as each other.

(5) Two or more persons who are not in the same place as each other attend a general meeting if their circumstances are such that if they have (or were to have) rights to speak and vote at that meeting, they are (or would be) able to exercise them.

### 38 Quorum for general meetings

The quorum for a general meeting shall be determined according to section 318 of the 2006 Act and no business other than the appointment of the chairman of the meeting is to be transacted at a general meeting if the persons attending it do not constitute a quorum.

### 39 Chairing general meetings

(1) If the directors have appointed a chairman, the chairman shall chair general meetings if present and willing to do so.

(2) If the directors have not appointed a chairman, or if the chairman is unwilling to chair the meeting or is not present within ten minutes of the time at which a meeting was due to start:

(a) the directors present, or

(b) (if no directors are present), the meeting, must appoint a director or shareholder to chair the meeting, and the appointment of the chairman of the meeting must be the first business of the meeting.

(3) The person chairing a meeting in accordance with this article is referred to as "the chairman of the meeting".

**40 Attendance and speaking by directors and non-shareholders**

(1) Directors may attend and speak at general meetings, whether or not they are shareholders.

(2) The chairman of the meeting may permit other persons who are not:

(a) shareholders of the Company, or

(b) otherwise entitled to exercise the rights of shareholders in relation to general meetings, to attend and speak at a general meeting.

**41 Adjournment**

(1) If the persons attending a general meeting within half an hour of the time at which the meeting was due to start do not constitute a quorum, or if during a meeting a quorum ceases to be present, or if at any time during a quorate general meeting the meeting directs him to do so, the chairman of the meeting must adjourn it and he may adjourn a general meeting at which a quorum is present if:

(a) the meeting consents to an adjournment, or

(b) it appears to the chairman of the meeting that an adjournment is necessary to protect the safety of any person attending the meeting or ensure that the business of the meeting is conducted in an orderly manner.

(2) When adjourning a general meeting, the chairman of the meeting must:

(a) either specify the time and place to which it is adjourned or state that it is to continue at a time and place to be fixed by the directors; and

(b) have regard to any directions as to the time and place of any adjournment which have been given by the meeting.

(3) If the continuation of an adjourned meeting is to take place more than 14 days after it was adjourned, the Company must give at least 7 clear days' notice of it (that is, excluding the day of the adjourned meeting and the day on which the notice is given):

(a) to the same persons to whom notice of the Company's general meetings is required to be given, and

(b) containing the same information which such notice is required to contain.

(4) No business may be transacted at an adjourned general meeting which could not properly have been transacted at the meeting if the adjournment had not taken place and if, at an adjourned general meeting, a quorum is not present within half an hour from the time appointed for the meeting, the shareholders present shall be a quorum.

## VOTING AT GENERAL MEETINGS

**42 Voting: general**

A resolution put to the vote of a general meeting must be decided on a show of hands unless a poll is duly demanded and acted upon in accordance with these articles and sections 321 and 322 of the 2006 Act.

**43 Errors and disputes**

(1) No objection may be raised to the qualification of any person voting at a general meeting except at the meeting or adjourned meeting at which the vote objected to is tendered, and every vote not disallowed at the meeting is valid.

(2) Any such objection must be referred to the chairman of the meeting, whose decision is final.

**44 Poll votes**

(1) A poll on a resolution may be demanded:

(a) in advance of the general meeting where it is to be put to the vote, or

(b) at a general meeting, either before a show of hands on that resolution or immediately after the result of a show of hands on that resolution is declared.

(2) A poll may be demanded by:

(a) the chairman of the meeting;

(b) the directors;

(c) two or more persons having the right to vote on the resolution; or

(d) a person or persons representing not less than one tenth of the total voting rights of all the shareholders having the right to vote on the resolution.

(3) A demand for a poll may be withdrawn if:

(a) the poll has not yet been taken, and

(b) the chairman of the meeting consents to the withdrawal.

(4) Polls must be taken immediately and in such manner as the chairman of the meeting directs.

**45 Content of proxy notices**

(1) Proxies may only validly be appointed by a notice in writing (a "proxy notice") which

(a) states the name and address of the shareholder appointing the proxy;

(b) identifies the person appointed to be that shareholder's proxy and the general meeting in relation to which that person is appointed;

(c) is signed by or on behalf of the shareholder appointing the proxy, or is authenticated in such manner as the directors may determine; and

(d) is delivered to the Company in accordance with the articles and any instructions contained in the notice of the general meeting to which they relate.

(2) The Company may require proxy notices to be delivered in a particular form, and may specify different forms for different purposes.

(3) Proxy notices may specify how the proxy appointed under them is to vote (or that the proxy is to abstain from voting) on one or more resolutions.

(4) Unless a proxy notice indicates otherwise, it must be treated as:

(a) allowing the person appointed under it as a proxy discretion as to how to vote on any ancillary or procedural resolutions put to the meeting; and

(b) appointing that person as a proxy in relation to any adjournment of the general meeting to which it relates as well as the meeting itself.

**46 Delivery of proxy notices**

(1) A person who is entitled to attend, speak or vote (either on a show of hands or on a poll) at a general meeting remains so entitled in respect of that meeting or any adjournment of it, even though a valid proxy notice has been delivered to the Company by or on behalf of that person.

(2) An appointment under a proxy notice may be revoked by delivering to the Company a notice in writing given by or on behalf of the person by whom or on whose behalf the proxy notice was given.

(3) A notice revoking a proxy appointment only takes effect if it is delivered before the start of the meeting or adjourned meeting to which it relates.

(4) If a proxy notice is not executed by the person appointing the proxy, it must be accompanied by written evidence of the authority of the person who executed it to execute it on the appointor's behalf.

**47 Amendments to resolutions**

(1) An ordinary resolution to be proposed at a general meeting may be amended by ordinary resolution if:

(a) notice of the proposed amendment is given to the Company in writing by a person entitled to vote at the general meeting at which it is to be proposed not less than 48 hours before the meeting is to take place (or such later time as the chairman of the meeting may determine), and

(b) the proposed amendment does not, in the reasonable opinion of the chairman of the meeting, materially alter the scope of the resolution.

(2) A special resolution to be proposed at a general meeting may be amended by ordinary resolution, if:

(a) the chairman of the meeting proposes the amendment at the general meeting at which the resolution is to be proposed; and

(b) the amendment does not go beyond what is necessary to correct a grammatical or other non-substantive error in the resolution.

(3) If the chairman of the meeting, acting in good faith, wrongly decides that an amendment to a resolution is out of order, the chairman's error does not invalidate the vote on that resolution.

## PART 5
## ADMINISTRATIVE ARRANGEMENTS

**48 Means of communication to be used**

(1) Anything sent or supplied by or to the Company under the articles may be sent or supplied in any way in which the 2006 Act provides for documents or information which are authorised or required by any provision of that Act to be sent or supplied by or to the Company

(2) Every notice convening a general meeting shall comply with the provisions of section 307 and 325 of the 2006 Act as to the length of notice required for the meeting and the giving of information to shareholders in regard to their right to appoint proxies; and notices of and other communications relating to any general meeting which any shareholder is entitled to receive shall be sent to the directors and to the auditor for the time being of the Company.

(3) Any notice or document to be sent or supplied to a director in connection with the taking of decisions by directors may also be sent or supplied by the means by which that director has asked to be sent or supplied with such notices or documents for the time being.

(4) A director may agree with the Company that notices or documents sent to that director in a particular way are to be deemed to have been received within a specified time of their being sent, and for the specified time to be less than 48 hours.

**49 Company seals**

(1) Any common seal may only be used by the authority of the directors.

(2) The directors may decide by what means and in what form any common seal is to be used.

(3) Unless otherwise decided by the directors, if the Company has a common seal and it is affixed to a document, the document must also be signed by at least one authorised person in the presence of a witness who attests the signature.

(4) For the purposes of this article, an authorised person is:

(a) any director of the Company;

(b) the Company secretary (if any); or

(c) any person authorised by the directors for the purpose of signing documents to which the common seal is applied.

**50 No right to inspect accounts and other records**

Except as provided by law or authorised by the directors or an ordinary resolution of the Company, no person is entitled to inspect any of the Company's accounting or other records or documents merely by virtue of being a shareholder.

**51 Provision for employees on cessation of business**

The directors may decide to make provision for the benefit of persons employed or formerly employed by the Company or any of its subsidiaries (other than a director or former director or shadow director) in connection with the cessation or transfer to any person of the whole or part of the undertaking of the Company or that subsidiary.

**DIRECTORS' INDEMNITY AND INSURANCE**

**52 Indemnity**

(1) Subject to paragraph (2), a relevant director of the Company or an associated company may be indemnified out of the Company's assets against:

(a) any liability incurred by that director in connection with any negligence, default, breach of duty or breach of trust in relation to the Company or an associated company;

(b) any liability incurred by that director in connection with the activities of the Company or an associated company in its capacity as a trustee of an occupational pension scheme (as defined in section 235(6) of the 2006 Act);

(c) any other liability incurred by that director as an officer of the Company or an associated company.

(2) This article does not authorise any indemnity which would be prohibited or rendered void by any provision of the Companies Acts or by any other provision of law.

(3) In this article:

(a) companies are associated if one is a subsidiary of the other or both are subsidiaries of the same body corporate; and

(b) a "relevant director" means any director or former director of the Company or an associated company.

**53 Insurance**

(1) The directors may decide to purchase and maintain insurance, at the expense of the Company, for the benefit of any relevant director in respect of any relevant loss.

(2) In this article:

(a) a "relevant director" means any director or former director of the Company or an associated company;

(b) a "relevant loss" means any loss or liability which has been or may be incurred by a relevant director in connection with that director's duties or powers in relation to the Company, any associated company or any pension fund or employees' share scheme of the Company or associated company; and

(c) companies are associated if one is a subsidiary of the other or both are subsidiaries of the same body corporate.

Companies House

**AP01(ef)**

**Appointment of Director**

Company Name: **ELITE CROWN DIAMOND LIMITED**
Company Number: [redacted]**9926**

Received for filing in Electronic Format on the: **16/08/2018**

X7CGMNNC

## New Appointment Details

Date of Appointment: **31/05/2018**

Name: **MR LANKAN BAL**

The company confirms that the person named has consented to act as a director.

Service address recorded as Company's registered office

Country/State Usually Resident: **AUSTRALIA**

Date of Birth: [redacted]**/1971**

Nationality: **AUSTRALIAN**

Occupation: **MANAGING DIRECTOR**

## Authorisation

**Authenticated**

**This form was authorised by one of the following:**

**Director, Secretary, Person Authorised, Administrator, Administrative Receiver, Receiver, Receiver manager, Charity Commission Receiver and Manager, CIC Manager, Judicial Factor**

Companies House

# AP01(ef)

## Appointment of Director

Company Name: **ELITE CROWN DIAMOND LIMITED**
Company Number: [redacted]**9926**

Received for filing in Electronic Format on the: **16/08/2018**

X7CGLUG9

## New Appointment Details

Date of Appointment: **31/05/2018**

Name: **MR DON INDRAJITH NISSANKA**

The company confirms that the person named has consented to act as a director.

Service address recorded as Company's registered office

Country/State Usually Resident: **UNITED STATES**

Date of Birth: [redacted]**/1966**

Nationality: **AMERICAN**

Occupation: **MANAGING DIRECTOR**

# Authorisation

**Authenticated**

**This form was authorised by one of the following:**

**Director, Secretary, Person Authorised, Administrator, Administrative Receiver, Receiver, Receiver manager, Charity Commission Receiver and Manager, CIC Manager, Judicial Factor**

Companies House

**PSC01** (ef)

**Notice of Individual Person with Significant Control**

Company Name: **ELITE CROWN DIAMOND LIMITED**
Company Number: **[redacted]9926**

Received for filing in Electronic Format on the: **16/08/2018**

X7CGM9TM

## Notification Details

Date that person became registrable: **31/05/2018**

Name: **MR LANKAN BAL**

Service address recorded as Company's registered office

Country/State Usually Resident: **AUSTRALIA**

Date of Birth: **[redacted]/1971**

Nationality: **AUSTRALIAN**

## Nature of control

The person has the right to exercise, or actually exercises, significant influence or control over the company.

## Register entry date

Register entry date **31/05/2018**

## Authorisation

Authenticated

This form was authorised by one of the following:

Director, Secretary, Person Authorised, Administrator, Administrative Receiver, Receiver, Receiver manager, Charity Commission Receiver and Manager, CIC Manager, Judicial Factor

Companies House

# PSC01 (ef)

**Notice of Individual Person with Significant Control**

Company Name: **ELITE CROWN DIAMOND LIMITED**
Company Number: [redacted]**9926**

Received for filing in Electronic Format on the: **16/08/2018**

X7CGL9PK

## Notification Details

Date that person became registrable: **31/05/2018**

Name: **MR DON INDRAJITH NISSANKA**

Service address recorded as Company's registered office

Country/State Usually Resident: **UNITED STATES**

Date of Birth: [redacted]**/1966**

Nationality: **AMERICAN**

## Nature of control

The person has the right to exercise, or actually exercises, significant influence or control over the company.

## Register entry date

Register entry date **31/05/2018**

## Authorisation

Authenticated

This form was authorised by one of the following:

Director, Secretary, Person Authorised, Administrator, Administrative Receiver, Receiver, Receiver manager, Charity Commission Receiver and Manager, CIC Manager, Judicial Factor

Companies House

# TM01 (ef)

## Termination of a Director Appointment

Company Name: **ELITE CROWN DIAMOND LIMITED**
Company Number: **[redacted]9926**

Received for filing in Electronic Format on the: **04/04/2019**

X82OBOTC

## Termination Details

Date of termination: **28/02/2019**

Name: **MR LANKAN BAL**

## Authorisation

Authenticated

This form was authorised by one of the following:

Director, Secretary, Person Authorised, Liquidator, Administrator, Administrative Receiver, Receiver, Receiver manager, Charity Commission Receiver and Manager, CIC Manager, Judicial Factor.

Companies House

# TM01(ef)

**Termination of a Director Appointment**

Company Name: **ELITE CROWN DIAMOND LIMITED**
Company Number: **[redacted]9926**

Received for filing in Electronic Format on the: **04/04/2019**

X82OBW81

## Termination Details

Date of termination: **28/02/2019**

Name: **MR DON INDRAJITH NISSANKA**

## Authorisation

Authenticated

This form was authorised by one of the following:

Director, Secretary, Person Authorised, Liquidator, Administrator, Administrative Receiver, Receiver, Receiver manager, Charity Commission Receiver and Manager, CIC Manager, Judicial Factor.

Companies House

# PSC07(ef)

**Notice of ceasing to be a person with significant control (PSC)**

Company Name: **ELITE CROWN DIAMOND LIMITED**
Company Number: [redacted]**9926**

Received for filing in Electronic Format on the: **04/04/2019**

X82OBRSJ

## Cessation Details

Date ceased: **28/02/2019**

Name: **LANKAN BAL**

## Register entry date

Register entry date **28/02/2019**

## Authorisation

Authenticated

This form was authorised by one of the following:

Director, Secretary, Person Authorised, Liquidator, Administrator, Administrative Receiver, Receiver, Receiver manager, Charity Commission Receiver and Manager, CIC Manager, Judicial Factor.

Companies House

# PSC07(ef)

**Notice of ceasing to be a person with significant control (PSC)**

Company Name: **ELITE CROWN DIAMOND LIMITED**
Company Number: [redacted]**9926**

Received for filing in Electronic Format on the: **04/04/2019**

X82OBUOY

## Cessation Details

Date ceased: **28/02/2019**

Name: **DON NISSANKA**

## Register entry date

Register entry date **28/02/2019**

## Authorisation

Authenticated

This form was authorised by one of the following:

Director, Secretary, Person Authorised, Liquidator, Administrator, Administrative Receiver, Receiver, Receiver manager, Charity Commission Receiver and Manager, CIC Manager, Judicial Factor.

Companies House

# AP01 (ef)

## Appointment of Director

Company Name: **ELITE CROWN DIAMOND LIMITED**
Company Number: **[redacted]9926**

Received for filing in Electronic Format on the: **17/07/2019**

X89VIYMF

## New Appointment Details

Date of Appointment: **30/06/2019**

Name: **MR LANKAN BAL**

The company confirms that the person named has consented to act as a director.

Service address recorded as Company's registered office

Country/State Usually Resident: **AUSTRALIA**

Date of Birth: **[redacted]/1971**

Nationality: **AUSTRALIAN**

Occupation: **EXECUTIVE DIRECTOR**

## Authorisation

**Authenticated**

**This form was authorised by one of the following:**

**Director, Secretary, Person Authorised, Administrator, Administrative Receiver, Receiver, Receiver manager, Charity Commission Receiver and Manager, CIC Manager, Judicial Factor**

Companies House

# AP01 (ef)

## Appointment of Director

Company Name: **ELITE CROWN DIAMOND LIMITED**
Company Number: **[redacted]9926**

Received for filing in Electronic Format on the: **17/07/2019**

X89VIYPI

## New Appointment Details

Date of Appointment: **30/06/2019**

Name: **MR DON INDRAJITH NISSANKA**

The company confirms that the person named has consented to act as a director.

Service address recorded as Company's registered office

Country/State Usually Resident: **UNITED STATES**

Date of Birth: **[redacted]1966**

Nationality: **AMERICAN**

Occupation: **EXECUTIVE DIRECTOR**

## Authorisation

**Authenticated**

**This form was authorised by one of the following:**

**Director, Secretary, Person Authorised, Administrator, Administrative Receiver, Receiver, Receiver manager, Charity Commission Receiver and Manager, CIC Manager, Judicial Factor**

Companies House

# PSC01(ef)

**Notice of Individual Person with Significant Control**

Company Name: **ELITE CROWN DIAMOND LIMITED**
Company Number: **[redacted]9926**

Received for filing in Electronic Format on the: **17/07/2019**

X89V1YWX

## Notification Details

Date that person became registrable: **30/06/2019**

Name: **MR LANKAN BAL**

Service address recorded as Company's registered office

Country/State Usually Resident: **AUSTRALIA**

Date of Birth: **[redacted]/1971**

Nationality: **AUSTRALIAN**

## Nature of control

The person has the right to exercise, or actually exercises, significant influence or control over the company.

## Register entry date

Register entry date **30/06/2019**

## Authorisation

Authenticated

This form was authorised by one of the following:

Director, Secretary, Person Authorised, Administrator, Administrative Receiver, Receiver, Receiver manager, Charity Commission Receiver and Manager, CIC Manager, Judicial Factor

Companies House

# PSC01(ef)

**Notice of Individual Person with Significant Control**

Company Name: **ELITE CROWN DIAMOND LIMITED**

Company Number: [redacted]**9926**

Received for filing in Electronic Format on the: **17/07/2019**

X89VIZBN

## Notification Details

Date that person became registrable: **30/06/2019**

Name: **MR DON INDRAJITH NISSANKA**

Service address recorded as Company's registered office

Country/State Usually Resident: **UNITED STATES**

Date of Birth: [redacted]**/1966**

Nationality: **AMERICAN**

## Nature of control

The person has the right to exercise, or actually exercises, significant influence or control over the company.

## Register entry date

Register entry date **30/06/2019**

## Authorisation

Authenticated

This form was authorised by one of the following:

Director, Secretary, Person Authorised, Administrator, Administrative Receiver, Receiver, Receiver manager, Charity Commission Receiver and Manager, CIC Manager, Judicial Factor

Elite Crown Diamond Limited
ACCOUNTS COVER

Elite Crown Diamond Limited

Company No. [redacted]9926

Director's Report and Unaudited Accounts

28 February 2017

**Elite Crown Diamond Limited**
**CONTENTS**


| | Pages |
|---|---|
| Company Information | 1 |
| Director's Report | 2 |
| Accountant's Report | 3 |
| Profit and Loss Account | 4 |
| Balance Sheet | 5 |
| Statement of Changes in Equity | 6 |
| Notes to the Accounts | 7 |

**Elite Crown Diamond Limited**
**COMPANY INFORMATION**
**Director**

Zoaib Ali

**Registered Office**

37th Floor
One Canada Square
Canary Wharf
London
E14 5AA

**Accountants**

Kii Accountants Limited
Office 8-9
6 Hallfield Road
Bradford
BD1 3RQ

**Elite Crown Diamond Limited**
**DIRECTORS REPORT**

The Director presents his report and the accounts for the period ended 28 February 2017.

**Principal activities**

The principal activity of the company during the period under review was Educational support services.

**Director**

The Director who served at any time during the period was as follows:

Zoaib Ali

The above report has been prepared in accordance with the provisions applicable to companies subject to the small companies regime as set out in Part 15 of the Companies Act 2006.

Signed on behalf of the board

Zoaib Ali
Director
18 April 2017

**Elite Crown Diamond Limited**
**ACCOUNTANTS REPORT**
**Accountant's Report to the director of Elite Crown Diamond Limited on the preparation of the unaudited statutory accounts for the period ended 28 February 2017**

In order to assist you to fulfil your duties under the Companies Act 2006 and in accordance with your instructions, we have prepared for your approval the financial statements of Elite Crown Diamond Limited for the period ended 28 February 2017 set out on pages 4 to 7 from the company's accounting records and from information and explanations you have given us.

You consider that the company is exempt from an audit for the period ended 28 February 2017. You have acknowledged, on the balance sheet, your responsibilities for complying with the requirements of the Companies Act 2006 with respect to accounting records and the preparation of accounts. These responsibilities include preparing financial statements that give a true and fair view of the state of affairs of the company at the end of the financial period and of its profit for the period.

We have not carried out an audit or a review of the financial statements of Elite Crown Diamond Limited. For this reason, we have not verified the accuracy or completeness of the accounting records or information and explanations you have given to us and we do not, therefore, express any opinion on the statutory financial statements.

Kii Accountants Limited
Accountants
Office 8-9
6 Hallfield Road
Bradford
BD1 3RQ
18 April 2017

**Elite Crown Diamond Limited**
**PROFIT AND LOSS ACCOUNT**
**for the period ended 28 February 2017**

| | Notes | 2017 |
|---|---|---|
| | | £ |
| **Turnover** | | 267,692 |
| Cost of sales | | (210,829) |
| **Gross profit** | | 56,863 |
| Distribution costs and selling expenses | | (4,400) |
| Administrative expenses | | (45,402) |
| **Operating profit** | | 7,061 |
| **Profit on ordinary activities before taxation** | | 7,061 |
| **Taxation** | | (1,412) |
| **Profit for the financial period after taxation** | | 5,649 |

**STATEMENT OF COMPREHENSIVE INCOME**

**for the period ended 28 February 2017**

| | 2017 |
|---|---|
| | £ |
| **Profit for the financial period after taxation** | 5,649 |
| **Other comprehensive income** | - |
| **Total comprehensive income for the period** | 5,649 |

**Elite Crown Diamond Limited**
**BALANCE SHEET**
**at 28 February 2017**

| **Company No. 10009926** | **Notes** | **2017** |
|---|---|---|
| | | **£** |
| **Current assets** | | |
| Cash at bank and in hand | | 35,266 |
| | | 35,266 |
| **Creditors:** Amount falling due within one | 2 | (35,215) |
| **Net current assets** | | 51 |
| **Total assets less current liabilities** | | 51 |
| **Net assets** | | 51 |
| **Capital and reserves** | | |
| Called up share capital | | 2 |
| Profit and loss account | 3 | 49 |
| **Total equity** | | 51 |

These accounts have been prepared in accordance with the special provisions applicable to companies subject to the small companies regime of the Companies Act 2006.

For the period ended 28 February 2017 the company was entitled to exemption under section 477 of the Companies Act 2006 relating to small companies.

The members have not required the company to obtain an audit in accordance with section 476 of the Companies Act 2006.

The directors acknowledge their responsibilities for complying with the requirements of the Companies Act 2006 with respect to accounting records and the preparation of accounts.

Approved by the board on 18 April 2017

And signed on its behalf by:

Zoaib Ali
Director
18 April 2017

**Elite Crown Diamond Limited**
**STATEMENT OF CHANGES IN EQUITY**
**for the period ended 28 February 2017**

| | Share Capital | Retained earnings | Total equity |
|---|---|---|---|
| | £ | £ | £ |
| At 17 February 2015 | - | - | - |
| Shares issued during the period | 2 | | 2 |
| Profit for the period | | 5,649 | 5,649 |
| Dividends | | (5,600) | (5,600) |
| At 28 February 2017 | 2 | 49 | 51 |

**Elite Crown Diamond Limited**
**NOTES TO THE ACCOUNTS**
**for the period ended 28 February 2017**

1 **Accounting policies**

**Basis of preparation**

The accounts have been prepared in accordance with FRS 102 - The Financial Reporting Standard applicable in the UK and Republic of Ireland and the Companies Act 2006. There were no material departures from that standard.

The accounts have been prepared under the historical cost convention as modified by the revaluation of certain fixed assets and in accordance with the accounting policies set out below.

**Turnover**

Turnover is measured at the fair value of the consideration received or receivable. Turnover is reduced for estimated customer returns, rebates and other similar allowances.

Revenue from the sale of goods is recognised when all the following conditions are satisfied:

• the Company has transferred to the buyer the significant risks and rewards of ownership of the goods;

• the Company retains neither continuing managerial involvement to the degree usually associated with ownership nor effective control over the goods sold;

• the amount of revenue can be measured reliably;

• it is probable that the economic benefits associated with the transaction will flow to the Company; and

• the costs incurred or to be incurred in respect of the transaction can be measured reliably.

Specifically, revenue from the sale of goods is recognised when goods are delivered and legal title is passed.

**Taxation**

Income tax expense represents the sum of the tax currently payable and deferred tax.

The tax currently payable is based on taxable profit for the year. Taxable profit differs from profit as reported in the profit and loss account because of items of income or expense that are taxable or deductible in other years and items that are never taxable or deductible. The Company's liability for current tax is calculated using tax rates that have been enacted or substantively enacted by the end of the reporting period.

Deferred tax is recognised on timing differences between the carrying amounts of assets and liabilities in the financial statements and the corresponding tax bases used in the computation of taxable profit. Deferred tax liabilities are generally recognised for all taxable temporary differences. Deferred tax assets are generally recognised for all deductible timing differences to the extent that it is probable that taxable profits will be available against which those deductible temporary differences can be utilised. The carrying amount of deferred tax assets is reviewed at the end of each reporting period and reduced to the extent that it is no longer probable that sufficient taxable profits will be available to allow all or part of the asset to be recovered.

Deferred tax assets and liabilities are measured at the tax rates that are expected to apply in the period in which the liability is settled or the asset realised, based on tax rates (and tax laws) that have been enacted or substantively enacted by the end of the reporting period.

Current or deferred tax for the year is recognised in profit or loss, except when they relate to items that are recognised in other comprehensive income or directly in equity, in which case, the current and deferred tax is also recognised in other comprehensive income or directly in equity respectively.

**Trade and other creditors**

Short term creditors are measured at the transaction price. Other financial liabilities, including bank loans, are measured initially at fair value, net of transaction costs, and are measured subsequently at amortised cost using the effective interest method.

2 **Creditors:**

amounts falling due within one year

| | **2017** |
|---|---|
| | **£** |
| Corporation tax | 1,412 |
| Other taxes and social security | (164) |
| Other creditors | 33,967 |
| | 35,215 |

3 **Reserves**

Profit and loss account - includes all current and prior period retained profits and losses.

## 4 Dividends

| | 2017 |
|---|---|
| | £ |
| Dividends for the period: | |
| Dividends paid in the period | 5,600 |
| | 5,600 |
| Dividends by type: | |
| Equity dividends | 5,600 |
| | 5,600 |

## 5 Related party disclosures

***Controlling party***

Immediate controlling party    No single party controls the company.

## 6 Additional information

Its registered number is:
[redacted]9926
Its registered office is:
37th Floor
One Canada Square
Canary Wharf
London
E14 5AA

This document was delivered using electronic communications and authenticated in accordance with the registrar's rules relating to electronic form, authentication and manner of delivery under section 1072 of the Companies Act 2006.

# EXHIBIT C

**Agreement Regarding Provision of Funds For CODA Asset Purchase**

This agreement ("**Agreement**") is made between Fates Group, LLC (together with its affiliate Zala Group Limited "**Fates**") and Exergonix, Inc. ("**Exergonix**") effective as of April 4, 2016 ("**Effective Date**"). Fates and Exergonix are each referred to herein as a "**Party**" and collectively as "**Parties**".

**WHEREAS,** Exergonix desires to acquire certain assets of CODA Energy Holdings, LLC ("**CODA**") being sold by an assignee acting for the benefit of CODA's creditors ("**Acquisition**") in a process that requires a funding commitment as of the Effective Date;

**WHEREAS,** Exergonix requires funding from a third party to make the Acquisition; and

**WHEREAS,** Fates is willing to provide funding for the Acquisition up to the amount and on the terms and subject to the conditions set forth herein.

**NOW THEREFORE, THE PARTIES HAVE AGREED AS FOLLOWS**

1. Acquisition Funding. As of the Effective Date, Fates' affiliate, Zala Group LLC, has funded a deposit of $457,961 on behalf of Fates (the "**Deposit**") to support Exergonix initial bulk bid for the CODA assets of $1,831,841.60 and Fates or its designee will fund an additional $1,373,880.60 to complete the Acquisition if Exergonix bid is selected as the winning bid.

   In addition to the foregoing, Fates or its designee will provide up to an additional $920,000 to support an increase in the Exergonix bid, if necessary, to effect the Acquisition.

2. Assignment of Acquisition Rights / Management of Assets. If the Exergonix bid is successful, it will assign its rights under the asset purchase agreement submitted with its bid to Fates as a condition of Fates' funding in accordance with Section 1 hereof and Fates will become the owner of the acquired CODA assets ("**Assets**").

   Fates will take such steps as commercially reasonable to store and keep safe the Assets until the earlier of the six-month anniversary of the Acquisition (the "**Option Expiration**") or the purchase of the Assets by Exergonix. Thereafter, Fates shall be free to liquidate the assets and Exergonix shall make its best efforts to assist Fates if it has not been able to purchase the Assets from Fates or its designee prior to the expiration of its exclusive purchase right.

3. Asset Purchase Option. Exergonix shall have a six-month exclusive right to purchase the Assets from Fates or its designee in their entirety for the acquisition price plus 10% immediately following the Acquisition. (the "**Exergonix Price**"). For each month or fraction thereof from the consummation date of the Acquisition until Exergonix purchases the Assets, the Exergonix price shall increase by 3% plus all out-of-pocket costs incurred by Fates or its designee to store, insure, move and otherwise protect and administer the assets.

4. Exergonix Payment Guarantees. If the Acquisition is not consummated and any or all of the Deposit is forfeited for any reason other than Fates failure to meet its obligations under Section 1 hereof, Exergonix hereby agrees to pay Fates in full for 1.1 times the forfeited amount. If the Acquisition is consummated and Exergonix fails to acquire the Assets for the Exergonix Price or if Fates liquidates the Assets in accordance with the Agreement for less than the Exergonix Price, Exergonix hereby agrees to pay Fates for the shortfall. As additional collateral to support any shortfall in receipt of the Exergonix Price by Fates, Exergonix hereby assigns to Fates, and shall not assign or pledge to any other party, all rights it has to purchase equity in Neighborhood Power Corporation ("**NPC**"), which right Exergonix represents to be 50% of the fully-diluted equity interests of NPC for $5.0 million (the "**NPC Purchase Right**")If Fates receives the Exergonix Price in full within 90 days following the Option Expiration, the assignment of the NPC Purchase Right shall terminate.

5. Exergonix Covenants.

   a. If Exergonix receives funding from an equity or equity-linked offering (an "**Equity Financing**") or debt financing that is equal to or greater than the Exergonix Price prior to the Option Expiration, it shall contemporaneously apply, on a first priority basis, all proceeds from such funding, up to the Exergonix Price, to exercise its option to purchase the Assets.

   b. Subject to Section 5(c) hereof, if Exergonix receives funding from an Equity or Debt Financing prior to the Option Expiration and tenders to Fates the Exergonix Price, Fates shall have the obligation to deliver title to the acquired assets to Exergonix.

   c. If Exergonix receives funding from an Equity Financing after the Option Expiration but prior to Fates disposal of the Assets, Fates shall have the right, but not the obligation, to deliver title to the acquired assets to Exergonix and to take a participation in the equity funding pro rata to the Exergonix Price as of the closing date of such Equity Financing.

d. Exergonix shall work in good faith with Fates and its affiliates and make best efforts to afford them the opportunity to participate in any Equity Financing (for Exergonix) and also for any financing relating to the following businesses in which Exergonix has equity investment rights: (i) NPC, and (ii) the Sri Lanka plantation, forest and infrastructure enterprises that have been discussed with Fates' principal, Gilbert Armenta.

6. TERMINATION AND SATISFACTION OF AGREEMENT
Upon Exergonix's exercise of its option to purchase the Assets and payment of all amounts owed as contemplated in Paragraph 3 or 5(c) of this Agreement, all other obligations of Exergonix contemplated by this agreement shall terminate and this Agreement shall be deemed fully satisfied.

7. CONFIDENTIALITY AND PUBLIC ANNOUNCEMENTS.

a. Confidentiality

i. This Agreement shall be considered Confidential Information in accordance with that certain Confidentiality Agreement between Exergonix and BlueNRGY Group Limited (an affiliate of Fates and Zala Group Limited). dated as of February 9, 2016 (the "Confidentiality Agreement).

ii. The Confidentiality Agreement shall remain in full force and effect, shall be deemed to extend to and govern the obligations of the Parties hereto with respect to the matters set forth therein and shall not otherwise be deemed to be amended by this Agreement.

b. Public Announcements.

None of the Parties shall make any public announcements or disclosure to any third party (other than its shareholders and representatives on a need to know basis) relating to this Agreement or the subject matter hereof without the other Party's prior written consent. These restrictions do not apply if, and to the extent that, an announcement is required by applicable laws, regulation or any governmental or competent regulatory authority (including, without limitation, any securities exchange), provided that, to the extent reasonably practicable, the announcing Party shall consult in advance with the other Party on the proposed form, timing, nature and purpose of the announcement and limit the scope of such announcement to include only such information as is required to comply with applicable law or instruction of the regulatory authority.

8. MISCELLANEOUS.

a. Assignment. Neither Party shall assign this Agreement without the prior written consent of the other Party, except that Fates may assign this Agreement to one of its affiliates under common control upon notification to Exergonix provided the assignee assumes all of the obligation of Fates hereunder.

b. Amendments. No addition to or variation, consensual cancellation or novation of this Agreement and no waiver of any right arising from this Agreement or its breach or expiration shall be of any force or effect unless made in writing and executed by the Parties or their duly authorized representatives.

c. Binding Effect. This agreement is binding on the Parties. No party shall have any liability or rights with respect to the other parties other than as expressly set forth herein. There shall be no third-party beneficiaries to this Agreement.

d. Entire Agreement. This Agreement constitutes the entire agreement between the Parties relating to the subject matter hereof. No undertaking, representation, term or condition relating to the subject matter of this Agreement not incorporated herein shall be binding on any of the Parties. This MOU supersedes and replaces any and all agreements between the Parties (and other persons or third parties, as may be applicable) including any letter of intent, e-mail communications and other undertakings given to or on behalf of the Parties (and other persons or third parties, as may be applicable) in relation to the subject matter hereof.

e. Costs. Exergonix shall be solely responsible for (i) its own costs and expenses incurred in connection with the negotiation, preparation and closing of this Agreement and the Acquisition, including any costs of legal counsel or other professional representatives and (ii) all costs and expenses incurred by Fates in connection with documentation and consummation of this agreement, including any costs of legal counsel. Notwithstanding the foregoing, if any Party breaches this agreement, it shall be responsible for all costs of the other Party in enforcing this Agreement, or any provision hereof, including attorney's fees and travel and out-of-pocket expenses of its staff and representatives.

f. Governing Law / Disputes. Any dispute arising out of or in connection with this Agreement, including any question regarding to its existence, governance, validity or termination, shall be referred to and finally resolved by binding arbitration under the LCIA Rules, which Rules are deemed to be incorporated by reference into this clause, which shall include specifically:

a. The number of arbitrators shall be three (3).

b. The seat, or legal place, of arbitration shall be Broward County Florida. The law applied shall be that of Florida.

c. The language to be used in the arbitral proceedings shall be English. Any documentation not presented in English shall be translated into English at the expense of the party submitting them.

[Signatures on next page]

AGREED AND EXECUTED FOR AND ON BEHALF OF:

**FATES GROUP LLC**

______________________________
Name : William C. Morro
Its: Authorized Signatory
Date: 7/5/16

**EXERGONIX, INC.**

______________________________
Name: Don I. Nissanka
Its: President and CEO
Date: 4/5/16

As the principal shareholder of Exergonix, the undersigned acknowledges and accepts the entry of Exergonix into the Agreement and shall be personally bound by Section 4 and Section 5(c) hereof if and to the extent that the equity purchase and investment rights ascribed to Exergonix therein are actually held by me or any affiliates under my control.

DON I. NISSANKA

______________________________

**EXHIBIT D**

# LOAN AGREEMENT

**THIS LOAN AGREEMENT** (this "**Agreement**") dated as of August 5, 2016 (the "**Effective Date**"), by and among **NEIGHBORHOOD POWER CORPORATION**, a California corporation ("**Borrower**"), the Guarantors defined herein and **FATES GROUP LLC**, a Florida limited liability company ("**Lender**").

## RECITAL

**A.** Borrower has requested that Lender provide (i) a Term Loan in the aggregate principal amount of $4,500,000 and (ii) a Revolving Line in the aggregate principal amount of $12,000,000, and Lender has indicated its willingness to provide such Term Loan and Revolving Line on the terms and subject to the conditions set forth herein.

**B.** The Credit Extensions will be secured in favor of Lender by a continuing first priority security interest in the Collateral (subject to any Permitted Liens), pursuant to that certain Security Agreement, dated as of the date hereof, by and among each Credit Party and Lender (as amended, restated, supplemented or otherwise modified from time to time, the "**Security Agreement**"), and the other Security Documents.

## AGREEMENT

**NOW, THEREFORE**, in consideration of the foregoing, and the representations, warranties, covenants and conditions set forth below, Borrower and Lender, intending to be legally bound, hereby agree as follows:

## 1 DEFINITIONS; ACCOUNTING AND OTHER TERMS

**1.1 Definitions**. In addition to the words and terms defined elsewhere in this Agreement, the following terms when used herein have the following respective meanings:

"**Abbey Debt**" means indebtedness of Borrower to Stephen M. Abbey, an individual ("**Abbey**"), in the aggregate amount of $2,219,000.00 as of June 30, 2016, for loans made by Abbey to Borrower, as well as for consulting fees, commissions, and other benefits provided by Abbey to Borrower, all as described in that certain Settlement and Mutual General Release Agreement between Abbey and Borrower dated June 30, 2016.

"**Account**" is any "account" as defined in the Code with such additions to such term as may hereafter be made, and includes, without limitation, all accounts receivable and other sums owing to Borrower.

"**Account Debtor**" is any "account debtor" as defined in the Code with such additions to such term as may hereafter be made.

"**Advance**" or "**Advances**" means a revolving credit loan (or revolving credit loans) under the Revolving Line.

"**Affiliate**" is, with respect to any Person, each other Person that owns or controls directly or indirectly the Person, any Person that controls or is controlled by or is under common control with the Person, and each of that Person's senior executive officers, directors, partners and, for any Person that is a limited liability company, that Person's managers and members.

"**Agreement**" is defined in the preamble hereof.

"**Anti-Corruption Laws**" means all laws, rules, and regulations of any jurisdiction applicable to Borrower or its Subsidiaries from time to time concerning or relating to bribery or corruption, including, without limitation, the United States Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder.

"**Availability Amount**" is (a) the Revolving Line minus (b) the outstanding principal balance of any Advances minus (c) the aggregate Dollar Equivalent amount of all outstanding letters of credit (including drawn but unreimbursed letters of credit) issued by the Issuing Party pursuant to clause (h) of the definition of Permitted Indebtedness.

"**Bank of Hawaii Debt**" means indebtedness of Borrower to the Bank of Hawaii ("**Bank of Hawaii**") in the aggregate principal amount outstanding as of June 15, 2016 of approximately $490,094.76, plus accrued interest thereon from June 15, 2016, pursuant to that certain Term Loan Agreement, dated as of August 27, 2015, between Bank of Hawaii and Borrower, as amended, restated, modified or otherwise supplemented from time to time.

"**Borrower**" is defined in the preamble hereof.

"**Borrower's Books**" are all Borrower's books and records including ledgers, federal and state tax returns, records regarding Borrower's assets or liabilities, the Collateral, business operations or financial condition, and all computer programs or storage or any equipment containing such information.

"**Business Day**" is any day that is not a Saturday, Sunday or other day on which banking institutions in the State of New York are authorized or required by law or other governmental action to close.

"**Cash Equivalents**" means (a) marketable direct obligations issued or unconditionally guaranteed by the United States or any agency or any State thereof having maturities of not more than one (1) year from the date of acquisition; (b) commercial paper maturing no more than one (1) year after its creation and having the highest rating from either Standard & Poor's Ratings Group or Moody's Investors Service, Inc.; (c) Lender's certificates of deposit issued maturing no more than one (1) year after issue; and (d) money market funds at least ninety-five percent (95%) of the assets of which constitute Cash Equivalents of the kinds described in clauses (a) through (c) of this definition.

"**Change in Control**" means (a) a consolidation or merger of Borrower with or into any other corporation or other entity or person, or any other corporate reorganization, other than any such consolidation, merger or reorganization in which the shares of capital stock of Borrower immediately prior to such consolidation, merger or reorganization, continue to represent a majority of the voting power of the surviving entity immediately after such consolidation, merger

or reorganization; (b) any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act) (other than (x) Lender or any of its Affiliates; or (y) a trustee or other fiduciary holding securities under an employee benefit plan of Borrower), is or becomes a beneficial owner (within the meaning Rule 13d-3 promulgated under the Exchange Act), directly or indirectly, of securities of Borrower, representing 25%) or more of the combined voting power of Borrower's then outstanding securities; (iii) the sale or transfer of all or substantially all of Borrower's assets, or the exclusive license of all or substantially all of Borrower's material intellectual property; or (iv) Stephen Gates ceases to own at least 100% of Borrower (other than in connection with (x) the exercise of the Warrant and (y) a sale or issuance of shares to Lender and/or its Affiliates, including pursuant to a conversion of the Term Loan).

"**Claims**" is defined in Section 12.3(a).

"**Code**" is the Uniform Commercial Code, as the same may, from time to time, be enacted and in effect in the State of New York; provided, that, to the extent that the Code is used to define any term herein or in any Loan Document and such term is defined differently in different Articles or Divisions of the Code, the definition of such term contained in Article or Division 9 shall govern; provided further, that in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection, or priority of, or remedies with respect to, Lender's Lien on any Collateral is governed by the Uniform Commercial Code in effect in a jurisdiction other than the State of New York, the term "**Code**" shall mean the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for purposes of the provisions thereof relating to such attachment, perfection, priority, or remedies and for purposes of definitions relating to such provisions.

"**Collateral**" means the collateral security for the Obligations pledged or granted pursuant to the Security Documents.

"**Collateral Account**" is any Deposit Account, Securities Account, or Commodity Account.

"**Commodity Account**" is any "commodity account" as defined in the Code with such additions to such term as may hereafter be made.

"**Common Stock**" means Borrower's common stock.

"**Compliance Certificate**" is that certain certificate in the form attached hereto as Exhibit B.

"**Consent Agreement**" is any consent agreement entered into by (a) an issuer of any capital stock owned by any Credit Party (such issuer, a "**Pledged Entity**"); or (b) an owner or holder (other than a Credit Party) of any capital stock of a Pledged Entity, in each case, pursuant to which such Person consents to the pledge of the capital stock of such Pledged Entity owned or held by the applicable Credit Party.

"**Contingent Obligation**" is, for any Person, any direct or indirect liability, contingent or not, of that Person for (a) any indebtedness, lease, dividend, letter of credit or other obligation of another such as an obligation, in each case, directly or indirectly guaranteed, endorsed, co-made,

discounted or sold with recourse by that Person, or for which that Person is directly or indirectly liable; (b) any obligations for undrawn letters of credit for the account of that Person; and (c) all obligations from any interest rate, currency or commodity swap agreement, interest rate cap or collar agreement, or other agreement or arrangement designated to protect a Person against fluctuation in interest rates, currency exchange rates or commodity prices, but "Contingent Obligation" does not include endorsements in the ordinary course of business. The amount of a Contingent Obligation is the stated or determined amount of the primary obligation for which the Contingent Obligation is made or, if not determinable, the maximum reasonably anticipated liability for it determined by the Person in good faith; but the amount may not exceed the maximum of the obligations under any guarantee or other support arrangement.

"**Control Agreement**" is any control agreement entered into among the depository institution at which any Credit Party maintains a Deposit Account or the securities intermediary or commodity intermediary at which any Credit Party maintains a Securities Account or a Commodity Account, such Credit Party and Lender pursuant to which Lender obtains control (within the meaning of the Code) over such Deposit Account, Securities Account, or Commodity Account.

"**Conversion Option**" is defined in Section 2.1.2(d).

"**Copyrights**" are any and all copyright rights, copyright applications, copyright registrations and like protections in each work of authorship and derivative work thereof, whether published or unpublished and whether or not the same also constitutes a trade secret.

"**Costs**" is defined in Section 12.3(a).

"**Credit Extension**" is any Advance, Overadvance, Term Loan or any other extension of credit by Lender for Borrower's benefit.

"**Credit Party**" means Borrower and each Guarantor.

"**Default**" means any Event of Default or any event that with the giving of notice, lapse of time, or both, would constitute an Event of Default.

"**Default Rate**" is defined in Section 2.3(b).

"**Deposit Account**" is any "deposit account" as defined in the Code with such additions to such term as may hereafter be made.

"**Designated Deposit Account**" is the account denominated in Dollars, account number 0084-007617, maintained by Borrower with Bank of Hawaii.

"**Dollars**," "**dollars**" or use of the sign "$" means only lawful money of the United States and not any other currency, regardless of whether that currency uses the "$" sign to denote its currency or may be readily converted into lawful money of the United States.

"**Dollar Equivalent**" is, at any time, (a) with respect to any amount denominated in Dollars, such amount, and (b) with respect to any amount denominated in a Foreign Currency,

the equivalent amount therefor in Dollars as determined by Bank at such time on the basis of the then-prevailing rate of exchange in New York City, New York, for sales of the Foreign Currency for transfer to the country issuing such Foreign Currency.

"**Domestic Subsidiary**" means a Subsidiary organized under the laws of the United States or any state or territory thereof or the District of Columbia.

"**Effective Date**" is defined in the preamble hereof.

"**Environment**" shall mean ambient air, indoor air, surface water, groundwater, drinking water, land surface, sediments, and subsurface strata & natural resources such as wetlands, flora and fauna.

"**Environmental Claims**" means any and all administrative, regulatory or judicial actions, suits, demands, demand letters, claims, liens, allegations, notices of noncompliance or violation, investigations (other than internal reports prepared by any Person in the ordinary course of business and not in response to any third party action or request of any kind) or proceedings relating in any way to any actual or alleged violation of or liability under any Environmental Law or relating to any permit issued, or any approval given, under any such Environmental Law, including, without limitation, any and all claims by Governmental Authorities for enforcement, cleanup, removal, response, remedial or other actions or damages, contribution, indemnification, cost recovery, compensation or injunctive relief resulting from Hazardous Materials or arising from alleged injury or threat of injury to public health or the environment.

"**Environmental Laws**" means any and all applicable federal, foreign, state, provincial and local laws, statutes, ordinances, codes, rules, standards and regulations, permits, licenses, approvals, interpretations and orders of courts or Governmental Authorities (including the common law), relating to the protection of public health or the environment, including, but not limited to, requirements pertaining to the manufacture, processing, distribution, use, treatment, storage, disposal, transportation, handling, reporting, licensing, Release or threat of Release, permitting, investigation or remediation of Hazardous Materials.

"**Equipment**" is all "equipment" as defined in the Code with such additions to such term as may hereafter be made, and includes without limitation all machinery, fixtures, goods, vehicles (including motor vehicles and trailers), and any interest in any of the foregoing.

"**Equity Securities**" means Common Stock; provided, however that if at the time of any conversion of the Term Loan or purchase of capital stock of Borrower (or any successor or ultimate parent thereto) under this Agreement, any preferred stock of Borrower (or any successor or ultimate parent thereto) has been authorized, "Equity Securities" shall mean at Lender's sole election, such preferred stock and if multiple series of preferred stock have been authorized, Lender shall elect which series of preferred stock shall constitute "Equity Securities".

"**ERISA**" is the Employee Retirement Income Security Act of 1974, and its regulations.

"**Event of Default**" is defined in Section 7.

"**Exchange Act**" is the Securities Exchange Act of 1934, as amended.

"**Foreign Currency**" means lawful money of a country other than the United States.

"**Foreign Subsidiary**" means any Subsidiary which is not a Domestic Subsidiary.

"**Funding Date**" is any date on which a Credit Extension is made to or for the account of Borrower which shall be a Business Day.

"**GAAP**" is generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other Person as may be approved by a significant segment of the accounting profession, which are applicable to the circumstances as of the date of determination.

"**General Intangibles**" is all "general intangibles" as defined in the Code in effect on the date hereof with such additions to such term as may hereafter be made, and includes without limitation, all Intellectual Property, claims, income and other tax refunds, security and other deposits, payment intangibles, contract rights, options to purchase or sell real or personal property, rights in all litigation presently or hereafter pending (whether in contract, tort or otherwise), insurance policies (including without limitation key man, property damage, and business interruption insurance), payments of insurance and rights to payment of any kind.

"**Governmental Approval**" is any consent, authorization, approval, order, license, franchise, permit, certificate, accreditation, registration, filing or notice, of, issued by, from or to, or other act by or in respect of, any Governmental Authority.

"**Governmental Authority**" is any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization.

"**Guaranteed Obligations**" is defined in Section 9.1.

"**Guarantor**" means Neighborhood GP, LLC and any other Person providing a Guaranty in favor of Lender pursuant to Section 5.11; provided, however, that so long as each of Green Bridge Group, LLC and Terton Solar, LLC is not, directly or indirectly, a wholly-owned Subsidiary of Borrower, such Subsidiary shall not be required to be a Guarantor.

"**Guaranty**" is any guarantee of all or any part of the Obligations, as the same may from time to time be amended, restated, modified or otherwise supplemented.

"**Hazardous Materials**" means any substances, materials or wastes regulated or which can give rise to liability under any Environmental Law, including, without limitation, asbestos, polychlorinated biphenyls, urea formaldehyde foam insulation, petroleum hydrocarbons,

petroleum derived substances or waste, crude oil, nuclear fuel, electromagnetic frequency, natural gas or synthetic gas.

"**Indebtedness**" is (a) indebtedness for borrowed money or the deferred price of property or services, such as reimbursement and other obligations for surety bonds and letters of credit, (b) obligations evidenced by notes, bonds, debentures or similar instruments, (c) capital lease obligations, and (d) Contingent Obligations.

"**Indemnified Person**" is defined in Section 12.3(a).

"**Insolvency Proceeding**" is any proceeding by or against any Person under the United States Bankruptcy Code, or any other bankruptcy or insolvency law, including assignments for the benefit of creditors, compositions, extensions generally with its creditors, or proceedings seeking reorganization, arrangement, or other relief.

"**Intellectual Property**" means, with respect to any Person, means all of such Person's right, title, and interest in and to the following:

(a) its Copyrights, Trademarks and Patents;

(b) any and all trade secrets and trade secret rights, including, without limitation, any rights to unpatented inventions, know-how, operating manuals;

(c) any and all source code;

(d) any and all design rights which may be available to such Person;

(e) any and all claims for damages by way of past, present and future infringement of any of the foregoing, with the right, but not the obligation, to sue for and collect such damages for said use or infringement of the Intellectual Property rights identified above; and

(f) all amendments, renewals and extensions of any of the Copyrights, Trademarks or Patents.

"**Inventory**" is all "inventory" as defined in the Code in effect on the date hereof with such additions to such term as may hereafter be made, and includes without limitation all merchandise, raw materials, parts, supplies, packing and shipping materials, work in process and finished products, including without limitation such inventory as is temporarily out of Borrower's custody or possession or in transit and including any returned goods and any documents of title representing any of the above.

"**Investment**" is any beneficial ownership interest in any Person (including stock, partnership interest or other securities), and any loan, advance or capital contribution to any Person.

"**IP Agreement**" means any Intellectual Property Security Agreement in form and substance satisfactory to Lender, which is entered into among any Credit Party and Lender.

"**Issuing Party**" means Fates Group LLC or one of its Affiliates.

"**Lender**" is defined in the preamble hereof.

"**Lender Entities**" is defined in Section 12.9.

"**Lender Expenses**" are all audit fees and expenses, costs, and expenses (including reasonable attorneys' fees and expenses) for preparing, amending, negotiating, administering, defending and enforcing the Loan Documents (including, without limitation, those incurred in connection with appeals or Insolvency Proceedings) or otherwise incurred with respect to Borrower or any other Credit Party.

"**Lender's Consultant**" is defined in Section 2.1.1(a).

"**Letter of Credit**" means a standby letter of credit issued by the Issuing Party based upon an application, guarantee, indemnity or similar agreement on the part of the Issuing Party.

"**Lien**" is a claim, mortgage, deed of trust, levy, charge, pledge, security interest or other encumbrance of any kind, whether voluntarily incurred or arising by operation of law or otherwise against any property.

"**Loan Documents**" are, collectively, this Agreement and any schedules, exhibits, certificates, notices, and any other documents related to this Agreement, the Security Documents, any subordination agreement, any note, or notes or guaranties executed by Borrower or any Guarantor, and any other present or future agreement by Borrower and/or any of its Subsidiaries with or for the benefit of Lender in connection with this Agreement, all as amended, restated, or otherwise modified.

"**Material Adverse Effect**" is (a) a material impairment in the perfection or priority of Lender's Lien in the Collateral or in the value of such Collateral; (b) a Material Adverse Effect in the business, operations, or condition (financial or otherwise) of any Credit Party; or (c) a material impairment of the prospect of repayment of any portion of the Obligations.

"**Monthly Financial Statements**" is defined in Section 5.2(a).

"**Notice of Borrowing**" means a notice given by Borrower to Lender in accordance with Section 3.5, substantially in the form of Exhibit A, with appropriate insertions.

"**Obligations**" are Borrower's and its Subsidiaries' obligations to pay when due any debts, principal, interest, fees, Lender Expenses, and other amounts Borrower and its Subsidiaries' owe Lender now or later, whether under this Agreement, the other Loan Documents, or otherwise, including, without limitation, all obligations relating to letters of credit (including reimbursement obligations for drawn and undrawn letters of credit), cash management services, and foreign exchange contracts, if any, and including interest accruing after Insolvency Proceedings begin and debts, liabilities, or obligations of Borrower and its Subsidiaries assigned to Lender, and to perform Borrower's and its Subsidiaries' duties under the Loan Documents.

"**Operating Documents**" are, for any Person, such Person's formation documents, as certified by the Secretary of State (or equivalent agency) of such Person's jurisdiction of organization on a date that is no earlier than thirty (30) days prior to the Effective Date, and, (a) if such Person is a corporation, its bylaws in current form, (b) if such Person is a limited liability company, its limited liability company agreement (or similar agreement), and (c) if such Person is a partnership, its partnership agreement (or similar agreement), each of the foregoing with all current amendments or modifications thereto.

"**Overadvance**" is defined in Section 2.2.

"**Participant**" is defined in Section 12.10.

"**Patents**" means all patents, patent applications and like protections including without limitation improvements, divisions, continuations, renewals, reissues, extensions and continuations-in-part of the same.

"**Perfection Certificate**" means those certain Perfection Certificates delivered by the Credit Parties to Lender in connection with this Agreement.

"**Permitted Indebtedness**" is:

(a) Borrower's Indebtedness to Lender under this Agreement and the other Loan Documents;

(b) Indebtedness existing on the Effective Date and shown on Schedule A hereto;

(c) Subordinated Debt;

(d) unsecured Indebtedness to trade creditors incurred in the ordinary course of business;

(e) Indebtedness incurred as a result of endorsing negotiable instruments received in the ordinary course of business;

(f) Indebtedness secured by Liens permitted under clauses (a) and (c) of the definition of "Permitted Liens" hereunder;

(g) unsecured loans and advances (i) by Borrower or any Subsidiary to any Guarantor; (ii) by any Subsidiary to Borrower; and (iii) by any Subsidiary that is not a Guarantor to any other Subsidiary that is not a Guarantor;

(h) Indebtedness constituting reimbursement obligations in respect of Letters of Credit, bank guarantees, and similar instruments issued by the Issuing Party in its sole discretion for the account of Borrower in the ordinary course of business;

(i) construction loans in amounts approved with the written consent of Lender, in its sole and absolute discretion, to build projects on the approved project list, attached hereto as Exhibit F, which can be added to from time to time with written consent of Lender; provided,

that (A) no Event of Default shall have occurred and be continuing or would be caused by the incurrence of such indebtedness; (B) such indebtedness shall be subject to a subordination, intercreditor, or other similar agreement in form and substance satisfactory to Lender entered into between Lender and the other creditor on terms acceptable to Lender; and (C) Borrower shall have delivered all documents requested by Lender to be delivered in connection with such projects; and

(j) project permanent loans in amounts approved with the written consent of Lender, in its sole and absolute discretion, to fund projects on the approved project list, attached hereto as Exhibit F, which can be added to from time to time with written consent of Lender; provided, that (A) no Event of Default shall have occurred and be continuing or would be caused by the incurrence of such indebtedness; (B) such indebtedness shall be subject to a subordination, intercreditor, or other similar agreement in form and substance satisfactory to Lender entered into between Lender and the other creditor on terms acceptable to Lender; and (C) Borrower shall have delivered all documents requested by Lender to be delivered in connection with such projects.

"**Permitted Investments**" are:

(a) Investments (including, without limitation, Subsidiaries) existing on the Effective Date and shown on Schedule B hereto;

(b) Investments consisting of Cash Equivalents;

(c) Investments consisting of the endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of Borrower;

(d) Investments consisting of deposit accounts in which Lender has a perfected security interest;

(e) Investments accepted in connection with Transfers permitted by Section 6.1;

(f) Investments consisting of the creation of a Subsidiary for the purpose of consummating a merger transaction permitted by Section 6.3, which is otherwise a Permitted Investment;

(g) Investments (i) by any Credit Party in any other Credit Party; (ii) by any Credit Party in non-Guarantor Subsidiaries in an amount equal to the net cash proceeds received by Borrower from the contemporaneous sale and issuance of Common Stock or Borrower's incurrence of Permitted Indebtedness; provided that (x) the aggregate amount of Investments under this claue (ii) shall not to exceed $100,000 in the aggregate in any fiscal year and (y) any Investments in the form of loans or advances made by any Credit Party to any Non-Guarantor Subsidiary pursuant to this clause (ii) shall be evidenced by a demand note in form and substance reasonably satisfactory to Lender and shall be pledged and delivered to Lender pursuant to the Security Documents); and (iii) any non-Guarantor Subsidiary in any other non-Guarantor Subsidiary;

(h) Investments consisting of (i) travel advances and employee relocation loans and other employee loans and advances in the ordinary course of business (provided, that Investments pursuant to this clause (h)(i) together with Investments pursuant to clause (m), shall not to exceed $50,000 in the aggregate in any fiscal year), and (ii) loans to employees, officers or directors relating to the purchase of equity securities of Borrower or its Subsidiaries pursuant to employee stock purchase plans or agreements approved by Borrower's Board of Directors;

(i) Investments (including debt obligations) received in connection with the bankruptcy or reorganization of customers or suppliers and in settlement of delinquent obligations of, and other disputes with, customers or suppliers arising in the ordinary course of business;

(j) Investments consisting of notes receivable of, or prepaid royalties and other credit extensions, to customers and suppliers who are not Affiliates, in the ordinary course of business; provided, that this paragraph (j) shall not apply to Investments of Borrower in any Subsidiary;

(k) Investments consisting of the general partnership interests owned by Stephen Gates in Neighborhood GP, LLC contributed to Borrower pursuant to a contribution agreement, in form and substance reasonably acceptable to Lender;

(l) other Investments not otherwise permitted by Section 6.7 (provided, that Investments pursuant to this clause (m) together with Investments pursuant to clause (h)(i), shall not to exceed $50,000 in the aggregate in any fiscal year); and

(m) Investments in amounts approved with the written consent of Lender, in its sole and absolute discretion, required to complete projects on the approved project list, attached hereto as Exhibit F, which can be added to from time to time with written consent of Lender; provided, that Borrower shall have delivered all documents requested by Lender to be delivered in connection with such projects.

"**Permitted Liens**" are:

(a) Liens existing on the Effective Date and shown on the Perfection Certificate or arising under this Agreement and the other Loan Documents;

(b) Liens for taxes, fees, assessments or other government charges or levies, either (i) not due and payable or (ii) being contested in good faith and for which Borrower maintains adequate reserves on its Books; provided, that no notice of any such Lien has been filed or recorded under the Internal Revenue Code of 1986, as amended, and the Treasury Regulations adopted thereunder;

(c) purchase money Liens (i) on Equipment acquired or held by Borrower incurred for financing the acquisition of the Equipment securing no more than $50,000 in the aggregate amount outstanding, or (ii) existing on Equipment when acquired, if the Lien is confined to the property and improvements and the proceeds of the Equipment;

(d) Liens of carriers, warehousemen, suppliers, or other Persons that are possessory in nature arising in the ordinary course of business so long as such Liens attach only to Inventory

and which are not delinquent or remain payable without penalty or which are being contested in good faith and by appropriate proceedings which proceedings have the effect of preventing the forfeiture or sale of the property subject thereto;

(e) Liens to secure payment of workers' compensation, employment insurance, old-age pensions, social security and other like obligations incurred in the ordinary course of business (other than Liens imposed by ERISA);

(f) Liens incurred in the extension, renewal or refinancing of the indebtedness secured by Liens described in (a) through (c), but any extension, renewal or replacement Lien must be limited to the property encumbered by the existing Lien and the principal amount of the indebtedness may not increase;

(g) leases or subleases of real property granted in the ordinary course of Borrower's business (or, if referring to another Person, in the ordinary course of such Person's business), and leases, subleases, non-exclusive licenses or sublicenses of personal property (other than Intellectual Property) granted in the ordinary course of Borrower's business (or, if referring to another Person, in the ordinary course of such Person's business), if the leases, subleases, licenses and sublicenses do not prohibit granting Lender a security interest therein;

(h) non-exclusive license of Intellectual Property granted to third parties in the ordinary course of business;

(i) Liens arising from attachments or judgments, orders, or decrees in circumstances not constituting an Event of Default under Sections 7.4 and 7.7;

(j) Liens in favor of other financial institutions arising in connection with Borrower's deposit and/or securities accounts held at such institutions; provided, that Lender has a perfected security interest in the amounts held in such deposit and/or securities accounts; and

(k) Liens securing Indebtedness permitted under clauses (i) and (j) of the definition of Permitted Indebtedness; provided, that (i) such Liens do not at any time encumber any property or assets other than the property or assets financed by such Indebtedness, and (ii) the amount of Indebtedness secured thereby is not increased.

"**Person**" is any individual, sole proprietorship, partnership, limited liability company, joint venture, company, trust, unincorporated organization, association, corporation, institution, public benefit corporation, firm, joint stock company, estate, entity or government agency.

"**Pledge Agreement**" means any pledge agreement in form and substance satisfactory to Lender, which is entered into among any Credit Party and Lender, pursuant to which such Credit Party pledges its interest in any capital stock owned or held by such Credit Party.

"**Proceeding**" is defined in Section 12.3(a).

"**Project**" means a solar or hybrid solar/storage project that has reached the notice to proceed milestone, has obtained all necessary permits and/or Government Approvals in connection therewith.

"**Project Costs**" means the aggregate construction cost of the Project, inclusive of all documentable development and construction costs and fees payable to third parties including legal counsel, permitting costs, engineering and design costs, commissioning costs, start-up costs, financing costs, fees and expenses, interest during construction, all fees, costs and expenses payable to Lender prior to the Revolving Line Maturity Date, and all other costs incurred by Borrower with respect to the Project.

"**Project Sale Price**" means the pre-sold sale price for the Project.

"**Purchase Notice Date**" means December 3, 2016; provided, however, that if (a) Lender has provided written notice of its intent to purchase equity securities of Borrower prior to such date; and (b) the restructuring steps required under Section 5.9 have not been completed as of such date, then "**Purchase Notice Date**" shall mean March 3, 2017.

"**Purchaser Option**" is defined in Section 2.7.

"**Release**" means any release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into or through the Environment or within, from or into any building, structure, facility or fixture.

"**Requirement of Law**" is as to any Person, the organizational or governing documents of such Person, and any law (statutory or common), treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"**Responsible Officer**" is any of the Chief Executive Officer, President, Chief Financial Officer and Controller of Borrower or other Credit Party, as applicable.

"**Restricted License**" is any material license or other agreement with respect to which Borrower is the licensee (a) that prohibits or otherwise restricts Borrower from granting a security interest in Borrower's interest in such license or agreement or any other property, or (b) for which a default under or termination of could interfere with Lender's right to sell any Collateral.

"**Revolving Line**" is an aggregate principal amount equal to $12,000,000.

"**Revolving Line Maturity Date**" is August 5, 2018.

"**Revolving Line Note**" means a promissory note made by Borrower in favor of Lender evidencing the Advances made by Lender, substantially in the form attached as Exhibit C-1, and any substitutes therefor, and any replacements, restatements, renewals or extension thereof, in whole or in part.

"**Sanctions**" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by the U.S. government (including those administered by the U.S. Department of the Treasury's Office of Foreign Assets Control), the European Union, Her Majesty's Treasury, or other relevant sanctions authority.

"**Sanctioned Country**" means at any time, a country, region or territory which is itself the subject or target of comprehensive Sanctions (including, without limitation, Cuba, Iran, North Korea, Sudan, Syria and the Crimea region of Ukraine).

"**Sanctioned Person**" means, at any time: (i) any Person listed in any Sanctions-related list of designated Persons maintained by the U.S. Department of the Treasury's Office of Foreign Assets Control, the U.S. Department of State, the United Nations Security Council, the European Union, Her Majesty's Treasury, or other applicable sanctions authority; (ii) any Person operating, organized or resident in a Sanctioned Country; (iii) any agency of the government of aa Sanctioned Country; or (iv) any Person owned or controlled by any such Person or Persons described in clauses (i), (ii) and (iii).

"**SEC**" shall mean the Securities and Exchange Commission, any successor thereto, and any analogous Governmental Authority.

"**Securities Account**" is any "securities account" as defined in the Code with such additions to such term as may hereafter be made.

"**Security Documents**" means the Security Agreement, the IP Agreements, the Control Agreements, the Pledge Agreements, the Consent Agreements and all other pledge or security agreements, mortgages, deeds of trust, assignments or other similar agreements or instruments executed and delivered by Borrower or any of its Subsidiaries pursuant to the terms of this Agreement or otherwise in connection with the transactions contemplated hereby, in each case as amended, modified or supplemented from time to time.

"**Shareholder Agreement**" means a shareholder agreement between Borrower and Lender, in the form of Exhibit D, as amended, restated or otherwise modified from time to time.

"**Shares**" is one hundred percent (100%) of the issued and outstanding capital stock, membership units or other securities owned or held of record by Borrower or Borrower's Subsidiary, in any Subsidiary; provided, that, in the event Borrower demonstrates to Lender's reasonable satisfaction that a pledge of more than sixty five percent (65%) of the voting power of all classes of capital stock, membership units or other securities of such Subsidiary, which is a Foreign Subsidiary, creates a present and existing adverse tax consequence to Borrower under the U.S. Internal Revenue Code, in which case "Shares" shall mean sixty five percent (65%) of the voting power of all classes of capital stock, membership units or other securities of such Foreign Subsidiary entitled to vote (but only the portion of such capital stock, membership units or other securities in excess of sixty five percent (65%) of the voting power of such Foreign Subsidiary will be excluded) and shall include one hundred percent (100%) of the non-voting capital stock, membership units or other securities of such Foreign Subsidiary.

"**Stock Purchase Agreement**" means a stock purchase agreement between Borrower and Lender, in the form of Exhibit E, as amended, restated or otherwise modified from time to time.

"**Subordinated Debt**" is indebtedness incurred by Borrower subordinated to all of Borrower's now or hereafter indebtedness to Lender (pursuant to a subordination, intercreditor, or other similar agreement in form and substance satisfactory to Lender entered into between Lender and the other creditor), on terms acceptable to Lender.

"**Subsidiary**" is, as to any Person, a corporation, partnership, limited liability company or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person. Unless the context otherwise requires, each reference to a Subsidiary herein shall be a reference to a Subsidiary of Borrower or other Credit Party.

"**Term Loan**" is a loan made by Lender pursuant to the terms of Section 2.1.2 hereof.

"**Term Loan Amount**" is an amount equal to $4,500,000.

"**Term Loan Maturity Date**" is August 5, 2017.

"**Term Loan Note**" means a promissory note made by Borrower in favor of Lender evidencing the portion of the Term Loan made Lender, substantially in the form attached as Exhibit C-2, and any substitutes therefor, and any replacements, restatements, renewals or extension thereof, in whole or in part.

"**Trademarks**" means any trademark and servicemark rights, whether registered or not, applications to register and registrations of the same and like protections, and the entire goodwill of the business of Borrower connected with and symbolized by such trademarks.

"**Transfer**" is defined in Section 6.1.

"**Warrant**" means the warrants, dated as of July 29, 2016, to Don Nissanka.

**1.2** Terms defined in the Code which are not otherwise defined in this Agreement are used herein as defined in the Code, and if defined in more than one article of the Code shall have the meaning specified in Article 9 thereof

**1.3** As used in the Loan Documents, the word "shall" is mandatory, the word "may" is permissive, the word "or" is not exclusive, the words "includes" and "including" are not limiting, the singular includes the plural, and numbers denoting amounts that are set off in brackets are negative.

**1.4** Accounting terms not defined in this Agreement shall be construed following GAAP. Calculations and determinations must be made following GAAP.

## 2 LOAN AND TERMS OF PAYMENT

**2.1 Promise to Pay**. Borrower hereby unconditionally promises to pay Lender the outstanding principal amount of all Credit Extensions and accrued and unpaid interest thereon as and when due in accordance with this Agreement.

**2.1.1 Revolving Advances.**

(a) Availability. Subject to the terms and conditions of this Agreement, Lender shall make Advances not exceeding the Availability Amount. Advances may only be used for Projects, approved by Lender in its sole discretion, to finance Project Costs and other costs approved by Lender in its sole discretion prior to the applicable Funding Date. Advances shall only be made following Borrower's presentation of certifications of work performed by the applicable construction company or vendor, approved by Lender and, if Lender in its discretion chooses to appoint a construction consultant or certifying engineer ("**Lender's Consultant**") for any Project, Lender's Consultant, in their sole discretion. No individual Advance may exceed the lesser of (x) 70% of the Project Sale Price and (y) 100% of the aggregate actual costs incurred for the applicable Project. If any Advance would be used to finance the purchase of equipment, Borrower shall provide invoices for such equipment prior to the applicable Funding Date. Lender shall have no obligation to make more than one (1) Advance in any two-week period. Amounts borrowed under the Revolving Line may be repaid and, prior to the Revolving Line Maturity Date, reborrowed, subject to the applicable terms and conditions precedent herein. For the avoidance of doubt, Lender is not providing a commitment to provide any Advance.

Notwithstanding the foregoing, the aggregate Dollar Equivalent amount utilized for the issuance of Letters of Credit by the Issuing Party pursuant to clause (h) of the definition of Permitted Indebtedness shall at all times reduce the amount otherwise available for Advances under the Revolving Line. The aggregate Dollar Equivalent of the face amount of outstanding Letters of Credit (including drawn but unreimbursed Letters of Credit) may not exceed (i) the Revolving Line, minus (ii) the sum of all outstanding principal amounts of any Advances, minus (iii) the aggregate Dollar Equivalent of the face amount of any outstanding Letters of Credit (including drawn but unreimbursed Letters of Credit). All Letters of Credit issued by the Issuing Party shall be in form and substance acceptable to the Issuing Party in its sole discretion and shall be subject to the terms and conditions of Issuing Party's standard application and letter of Loan Agreement and, in each case, the applicable Credit Party shall pay the Issuing Party with respect to each Letter of Credit (i) an issuance fee in an amount equal to 2.5% of the Dollar Equivalent of the face amount of such letter of credit, payable at the issuance of such letter of credit, and (ii) a letter of credit fee in an amount equal to 0.40% of the Dollar Equivalent of the face amount of such letter of credit per month, payable on the first calendar day of each month

(b) Termination; Repayment. The Revolving Line terminates on the Revolving Line Maturity Date, when the principal amount of all Advances, the unpaid interest thereon, and all other Obligations relating to the Revolving Line, plus all other sums, including Lender Expenses, if any, shall be immediately due and payable.

(c) Prepayment Upon Project Sale. If, during the term of this Agreement, any Project is sold, then, on the earlier of (x) the date on which Lender has a security interest on the capital stock of the entity acquiring such Project and (y) the fifth (5) Business Day following such sale, Borrower shall pay to Lender all outstanding principal owing with respect to the Advance provided for such Project, plus accrued interest to the date of the prepayment with respect to such Advance.

**2.1.2 Term Loan.**

(a) Availability. Lender shall make one (1) term loan available to Borrower in an amount up to the Term Loan Amount on the Effective Date subject to the satisfaction of the terms and conditions of this Agreement. In Lender's sole and absolute discretion, the Term Loan shall be convertible into shares of Equity Securities as provided in Section 2.1.2(d) of this Agreement.

(b) Repayment. Borrower shall repay the Term Loan on the Term Loan Maturity Date, which payment shall include all outstanding principal and accrued and unpaid interest under the Term Loan, plus all other sums, including Lender Expenses, if any, that shall have become due and payable. Once repaid, the Term Loan may not be reborrowed.

(c) Prepayment.

(i) Voluntary Prepayment. Borrower may not prepay the Term Loan on or prior to the Purchase Notice Date without the consent of Lender. After the Purchase Notice Date, Borrower shall have the option to prepay all, or any portion, of the Term Loan advanced by Lender under this Agreement; provided, that (A) no Default or Event of Default has occurred and is continuing; (B) Borrower delivers written notice to Lender of its election to prepay the Term Loan at least five (5) Business Days prior to such prepayment; (C) if Lender has exercised its Purchase Option on or prior to the Purchase Notice Date and/or elected to convert the Term Loan, Lender shall have received the applicable shares of Equity Securities pursuant to the terms of this Agreement; and (D) Borrower pays, on the date of such prepayment an amount equal to the sum of, (i) all outstanding principal with respect to the Term Loan, plus accrued but unpaid interest, plus (ii) all other sums, including Lender Expenses, if any, that shall have become due and payable.

(ii) Mandatory Prepayment Upon an Acceleration. If the Term Loan is accelerated following the occurrence and continuance of an Event of Default or otherwise, Borrower shall immediately pay to Lender an amount equal to the sum of (A) all outstanding principal with respect to the Term Loan, plus accrued but unpaid interest, plus (B) all other sums, including Lender Expenses, if any, that shall have become due and payable, including interest at the Default Rate with respect to any past due amounts.

(d) Conversion.

(i) Voluntary Conversion at the Option of Lender. Lender may elect on or prior to the Purchase Notice Date, in its sole and absolute discretion, to convert all, but not less than all, of the outstanding principal of the Term Loan into shares of Equity Securities at a conversion price equal to an amount such that such shares shall represent at least 45% of the combined voting power of Borrower's (or any successor or ultimate parent thereto) then outstanding securities on a fully diluted basis (the "**Conversion Option**"); provided that, so long as Lender has made such election on or prior to the Purchase Notice Date, the conversion may occur after the Purchase Notice Date. Upon conversion, Lender shall not receive any separate cash payment for accrued and unpaid interest, if any, and the issuance of Equity Securities to Lender upon conversion shall be deemed to satisfy in full Borrower's obligation to pay the principal amount of the Term Loan and accrued and unpaid interest, if any, to, but not including, the relevant date of conversion. Equity Securities issued to Lender in connection with a

conversion of the Term Loan shall be issued to Lender within five (5) Business Days of Lender's exercise of the Conversion Option pursuant to the Stock Purchase Agreement and at such time Borrower and Lender shall execute the Shareholder Agreement, in each case, together with all standard and customary ancillary documents relating thereto.

(ii) Delivery of Share Certificates. Upon conversion of the Term Loan under this Section 2.1.2(d), the Term Loan will, for all purposes, be deemed to be converted into shares of Equity Securities, at which time the Term Loan shall for all purposes be deemed cancelled and fully satisfied. Upon conversion of the Term Loan, Borrower shall issue and deliver to Lender a certificate or certificates for the number of full shares of Equity Securities to which Lender is entitled and a check or cash with respect to any fractional interest in a share of Equity Securities and any other Obligations owed to Lender under the Loan Documents, including Lender Expenses, within five (5) Business Days of Lender's exercise of the Conversion Option. Borrower covenants that all shares of Equity Securities issued upon conversion will, upon issuance, be fully paid and non-assessable and free from all taxes, Liens and charges caused or created by Borrower with respect to the issue thereof.

**2.2 Overadvances**. If, at any time, the sum of (a) the outstanding principal amount of any Advances, plus (b) the face amount of any outstanding Letters of Credit (including drawn but unreimbursed Letters of Credit) issued by the Issuing Party pursuant to clause (h) of the definition of Permitted Indebtedness, exceeds the Revolving Line, Borrower shall immediately pay to Lender in cash the amount of such excess (such excess, the "**Overadvance**"). Without limiting Borrower's obligation to repay Lender any Overadvance, Borrower agrees to pay Lender interest on the outstanding amount of any Overadvance, on demand, at the Default Rate.

**2.3 Payment of Interest on the Credit Extensions**.

(a) Interest Rate.

(i) Advances. Subject to Section 2.3(b), the principal amount outstanding under the Revolving Line shall accrue interest at a per annum rate equal to fourteen percentage points (14%), which interest shall be payable monthly in accordance with Section 2.3(c) below.

(ii) Term Loan. Subject to Section 2.3(b), the principal amount outstanding under the Term Loan shall accrue interest at a per annum rate equal to fifteen percentage points (15%), which interest shall be payable on the Term Loan Maturity Date in accordance with Section 2.3(c) below, unless Lender exercises its option to convert the Term Loan into equity as provided in Section 2.1.2(d) above.

(b) Default Rate. Immediately upon the occurrence and during the continuance of an Event of Default, Obligations shall bear interest at a rate per annum which is five percentage points (5.00%) above the rate that is otherwise applicable thereto (the "**Default Rate**"). Fees and expenses which are required to be paid by Borrower pursuant to the Loan Documents (including, without limitation, Lender Expenses) but are not paid when due shall bear interest until paid at a rate equal to the highest rate applicable to the Obligations. Payment or acceptance of the increased interest rate provided in this Section 2.3(b) is not a permitted

alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of Lender.

(c) Payment; Interest Computation. Interest under the Revolving Line is payable monthly on the first calendar day of each month and on the Revolving Line Maturity Date and interest under the Term Loan is payable on the Term Loan Maturity Date (unless converted pursuant to Section 2.1.2(d)) and, in each case, shall be computed on the basis of a 360-day year for the actual number of days elapsed. Interest shall be capitalized on an annual basis by becoming a part of the Obligations, and such interest shall thereafter accrue interest at the rate then applicable under this Agreement (including any interest accrued at the Default Rate). In computing interest, (i) all payments received after 5:00 p.m. Eastern standard time on any day shall be deemed received at the opening of business on the next Business Day, and (ii) the date of the making of any Credit Extension shall be included and the date of payment shall be excluded; provided, however, that if any Credit Extension is repaid on the same day on which it is made, such day shall be included in computing interest on such Credit Extension.

**2.4 Fees**. Borrower shall pay to Lender:

(a) Funding Fee. A fully earned, non-refundable funding fee of $40,000, on the Effective Date;

(b) Commitment Fee. A fully earned, non-refundable commitment fee equal to two percent (2%) of the Revolving Line, on the Effective Date and each anniversary thereafter; and

(c) Lender Expenses. All Lender Expenses (including reasonable attorneys' fees and expenses for documentation and negotiation of this Agreement) incurred through and after the Effective Date, when due (or, if no stated due date, upon demand by Lender).

(d) Fees Fully Earned. Unless otherwise provided in this Agreement or in a separate writing by Lender, Borrower shall not be entitled to any credit, rebate, or repayment of any fees earned by Lender pursuant to this Agreement notwithstanding any termination of this Agreement or the suspension or termination of Lender's obligation to make loans and advances hereunder.

**2.5 Payments; Application of Payments.**

(a) All payments to be made by Borrower under any Loan Document shall be made in immediately available funds in Dollars, without setoff or counterclaim, before 12:00 p.m. Easter standard time on the date when due. Payments of principal and/or interest received after 12:00 p.m. Easter standard time are considered received at the opening of business on the next Business Day. When a payment is due on a day that is not a Business Day, the payment shall be due the next Business Day, and additional fees or interest, as applicable, shall continue to accrue until paid.

(b) Lender has the exclusive right to determine the order and manner in which all payments with respect to the Obligations may be applied. Borrower shall have no right to specify the order or the accounts to which Lender shall allocate or apply any payments required

to be made by Borrower to Lender or otherwise received by Lender under this Agreement when any such allocation or application is not specified elsewhere in this Agreement

**2.6 Withholding.** Payments received by Lender from Borrower under this Agreement and the other Loan Documents will be made free and clear of and without deduction for any and all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority (including any interest, additions to tax or penalties applicable thereto). Specifically, however, if at any time any Governmental Authority, applicable law, regulation or international agreement requires Borrower to make any withholding or deduction from any such payment or other sum payable hereunder to Lender, Borrower hereby covenants and agrees that the amount due from Borrower with respect to such payment or other sum payable hereunder will be increased to the extent necessary to ensure that, after the making of such required withholding or deduction, Lender receives a net sum equal to the sum which it would have received had no withholding or deduction been required, and Borrower shall pay the full amount withheld or deducted to the relevant Governmental Authority. Borrower will, upon request, furnish Lender with proof reasonably satisfactory to Lender indicating that Borrower has made such withholding payment; provided, however, that Borrower need not make any withholding payment if the amount or validity of such withholding payment is contested in good faith by appropriate and timely proceedings and as to which payment in full is bonded or reserved against by Borrower. The agreements and obligations of Borrower contained in this Section 2.6 shall survive the termination of this Agreement.

**2.7 Equity Purchase**. On or prior to the Purchase Notice Date, Lender may elect to purchase and/or acquire from Borrower shares of Equity Securities that, when combined with any shares of Equity Securities received by Lender from exercising the Conversion Option and converting the Term Loan pursuant to Section 2.1.2(d), shall represent at least 50% of the combined voting power of Borrower's (or any successor or ultimate parent thereto) then outstanding securities on a fully diluted basis (the "**Purchase Option**"); provided that, so long as Lender has made such election on or prior to the Purchase Notice Date, the purchase may occur after the Purchase Notice Date. The aggregate purchase price for such shares shall be an amount equal to $5,000,000, which amount may be offset by the aggregate principal of the Term Loan, if Lender elects to exercise the Conversion Option and convert the Term Loan pursuant to Section 2.1.2(d). Any purchase and/or acquisition of such Equity Securities by Lender shall be effected within five (5) Business Days of Lender's exercise of the Purchase Option pursuant to the Stock Purchase Agreement and at such time Borrower and Lender shall execute the Shareholder Agreement, in each case, together with all standard and customary ancillary documents relating thereto. Borrower covenants that all shares of Equity Securities issued upon purchase will, upon issuance, be fully paid and non-assessable and free from all taxes, Liens and charges caused or created by Borrower with respect to the issue thereof.

**2.8 Evidence of Indebtedness**. The Credit Extensions made by Lender shall be evidenced by one or more accounts or records maintained by Lender in the ordinary course of business. The accounts or records maintained by Lender shall be conclusive absent manifest error of the amount of the Credit Extensions made by Lender to Borrower and its Subsidiaries and the interest and payments thereon. Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of Borrower hereunder to pay any amount

owing with respect to the Obligations. Upon the request of Lender, Borrower shall execute and deliver to Lender a Revolving Line Note and/or Term Loan Note, as applicable, which shall evidence Lender's Advances and/or Term Loan, as applicable, in addition to such accounts or records. Each Lender may attach schedules to such notes and endorse thereon the date, amount and maturity of its Credit Extensions and payments with respect thereto.

## 3 CONDITIONS OF LOANS

**3.1 Conditions Precedent to Initial Credit Extension.** Lender's obligation to make the initial Credit Extension is subject to the condition precedent that Lender shall have received, in form and substance satisfactory to Lender, such documents, and completion of such other matters, as Lender may reasonably deem necessary or appropriate, including, without limitation:

(a) Subject to Section 3.4(d) and (e), duly executed original signatures to this Agreement, the Security Agreement and the other Loan Documents;

(b) a legal opinion of Borrower's counsel dated as of the Effective Date together with the duly executed original signature thereto;

(c) the Operating Documents and long-form good standing certificates of each Credit Party certified by the Secretary of State (or equivalent agency) of such Credit Party's jurisdiction of organization or formation and each jurisdiction in which Borrower and each Domestic Subsidiary is qualified to conduct business, each as of a date no earlier than thirty (30) days prior to the Effective Date;

(d) duly executed original signatures to (i) a Settlement and Mutual General Release by Abbey and Borrower, in form and substance satisfactory to Lender in its sole discretion (the "**Abbey Settlement Agreement**") and (ii) a payoff letter from Bank of Hawaii in respect of the Bank of Hawaii Debt, in form and substance satisfactory to Lender in its sole discretion (the "**Bank of Hawaii Payoff Letter**");

(e) evidence that (i) the Liens securing Indebtedness owed by Borrower to Abbey and Bank of Hawaii will be terminated in accordance with the terms of the Abbey Settlement Agreement and the Bank of Hawaii Payoff Letter, as applicable, and (ii) the documents and/or filings evidencing the perfection of such Liens, including without limitation any financing statements and/or control agreements, have or will, concurrently with the initial Credit Extension, be terminated;

(f) certified copies, dated as of a recent date, of financing statement searches, as Lender may request, accompanied by written evidence (including any Uniform Commercial Code termination statements) that the Liens indicated in any such financing statements either constitute Permitted Liens or have been or, in connection with the initial Credit Extension, will be terminated or released;

(g) a certificate, signed by an authorized officer of Borrower, dated as of the Effective Date and in form and substance satisfactory to Lender, that all the conditions set forth in this Section 3.1 shall have been satisfied as required hereunder;

(h) the Perfection Certificate(s) of the Credit Parties, together with the duly executed original signatures thereto;

(i) receipt by Lender of an executed Notice of Borrowing in the form of Exhibit A attached hereto;

(j) evidence satisfactory to Lender that the insurance policies and endorsements required by Section 5.6 hereof are in full force and effect, together with appropriate evidence showing lender loss payable and/or additional insured clauses or endorsements in favor of Lender;

(k) payment of the fees and Lender Expenses then due as specified in Section 2.5 hereof.

(l) contribution of the limited liability company interests of Neighborhood GP, LLC owned by Stephen Gates to Borrower pursuant to a contribution agreement, in form and substance reasonably acceptable to Lender;

(m) the representations and warranties in this Agreement and the other Loan Documents shall be true, accurate, and complete in all material respects on and as of the Effective Date; provided, however, that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof; and provided further, that those representations and warranties expressly referring to a specific date shall be true, accurate and complete in all material respects as of such date;

(n) no Default shall have occurred and be continuing on the Effective Date or after giving effect to the initial Credit Extension to be made on such date; and

(o) Lender determines to its satisfaction that there has not been a Material Adverse Effect.

**3.2 Conditions Precedent to all Advances under the Revolving Line.** Each Advance is subject to the following conditions precedent:

(a) an Officer's Certificate executed by a Responsible Officer of Borrower, in form and substance reasonably acceptable to Lender, (i) setting forth a certified and detailed list of all Project Costs related to the Project for which the requested Advance applies; and (ii) certifying to the effect that Borrower has satisfied each of the conditions set forth in Section 2.1.1;

(b) each Credit Party shall have executed any further instruments and taken such further action as Lender shall have reasonably requested to perfect or continue Lender's Lien in the Collateral related to the Project such Advance is being provided for; and

(c) duly executed original signatures to any Security Documents reasonably requested by Lender.

**3.3 Conditions Precedent to all Credit Extensions**. Each Credit Extension, including the initial Credit Extension, is subject to the following conditions precedent:

(a) timely receipt of an executed Notice of Borrowing;

(b) the representations and warranties in this Agreement and the other Loan Documents shall be true, accurate, and complete in all material respects on the date of the Notice of Borrowing and on the Funding Date of each Credit Extension; provided, however, that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof; and provided further, that those representations and warranties expressly referring to a specific date shall be true, accurate and complete in all material respects as of such date, and no Event of Default shall have occurred and be continuing or result from the Credit Extension. Each Credit Extension is Borrower's representation and warranty on that date that the representations and warranties in this Agreement and the other Loan Documents remain true, accurate, and complete in all material respects; provided, however, that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof; and provided further, that those representations and warranties expressly referring to a specific date shall be true, accurate and complete in all material respects as of such date; and

(c) Lender determines to its satisfaction that there has not been a Material Adverse Effect.

**3.4 Post-Closing Conditions**.

(a) Unless otherwise provided in writing, within 30 days after the Effective Date, Lender shall have received, in form and substance satisfactory to Lender:

(i) duly executed original signatures to the Control Agreements; and

(ii) a landlord's consent in favor of Lender for each of (A) 415 Dairy Rd Suite E-216 Kahului HI 96732, (B) 358 Papa Pl Kahului HI 96732, (C) 2000 Mokulele Hwy Lot #2 Puenenne HI 96784, (D) 7500 Kulakula Rd Kula HI 96790 and (E) 33 Lokelau Pl Haiku, HI 96708, by the respective landlords thereof, together with the duly executed original signatures thereto.

(b) Unless otherwise provided in writing, within 60 days after the Effective Date, Lender shall have received, in form and substance satisfactory to Lender:

(i) file Borrower's 2013 and 2014 tax returns and pay the Federal and State taxes owed in connection therewith (the "**2013 / 2014 Taxes**").

(c) Unless otherwise provided in writing, within 90 days after the Effective Date, Lender shall have received, in form and substance satisfactory to Lender:

(i) updated and revised business plan for fiscal year 2016, reflecting (A) annual operating budgets (including income statements, balance sheets and cash flow statements, by month) for fiscal year 2016 of Borrower, and (B) annual financial projections for

fiscal year 2016 (on a quarterly basis) as approved by Borrower's Board of Directors, together with any related business forecasts used in the preparation of such annual financial projections.

(d) Unless otherwise provided in writing, within 60 days after the Effective Date, Lender shall have received, in form and substance satisfactory to Lender, duly executed original signatures to the Consent Agreements and Pledge Agreements with respect to the Credit Party's ownership interests in AR Solar, LLC and ISOLAR, LLC.

**3.5 Covenant to Deliver**. Except as otherwise provided in Section 3.4, Borrower agrees to deliver to Lender each item required to be delivered to Lender under this Agreement as a condition precedent to any Credit Extension. Borrower expressly agrees that a Credit Extension made prior to the receipt by Lender of any such item shall not constitute a waiver by Lender of Borrower's obligation to deliver such item, and the making of any Credit Extension in the absence of a required item shall be in Lender's sole discretion.

**3.6 Procedures for Borrowing**.

(a) Advances. Subject to the prior satisfaction of all other applicable conditions to the making of an Advance set forth in this Agreement, to obtain an Advance, Borrower shall deliver to Lender by electronic mail or facsimile by 5:00 p.m. Eastern standard time at least five (5) Business Days prior to the Funding Date of the Advance, a completed Notice of Borrowing executed by a Responsible Officer. Lender may make Advances under this Agreement based on instructions from a Responsible Officer or without instructions if the Advances are necessary to meet Obligations which have become due.

(b) Term Loan. Subject to the prior satisfaction of all other applicable conditions to the making of the Term Loan set forth in this Agreement, to obtain the Term Loan, Borrower shall deliver to Lender by electronic mail or facsimile, or telephone by 5:00 p.m. Eastern standard time at least three (3) Business Days prior to the Funding Date of the Term Loan, a completed Notice of Borrowing executed by a Responsible Officer.

## 4 REPRESENTATIONS AND WARRANTIES

Each Credit Party represents and warrants as follows:

**4.1 Organization, Good Standing and Qualification**. Each Credit Party and its Subsidiaries is a corporation, a limited liability company or other entity duly organized or formed, validly existing and in good standing under the laws of the jurisdiction of its incorporation or formation, as the case may be. Each Credit Party and its Subsidiaries has the requisite corporate or limited liability company power to own and operate its properties and assets and to carry on its business as now conducted and as proposed to be conducted. Borrower and each Subsidiary is duly qualified and is authorized to do business and is in good standing as a foreign corporation in all jurisdictions in which the nature of its activities and of its properties (both owned and leased) makes such qualification necessary, except for those jurisdictions in which failure to do so would not have a Material Adverse Effect. In connection with this Agreement, each Credit Party has delivered to Lender a completed certificate signed by such Credit Party, entitled "Perfection Certificate". Each Credit Party represents and warrants to Lender that (a) such Credit Party's exact legal name is that indicated on the Perfection Certificate

and on the signature page hereof; (b) such Credit Party's is an organization of the type and is organized in the jurisdiction set forth in the Perfection Certificate; (c) the Perfection Certificate accurately sets forth such Credit Party's organizational identification number or accurately states that such Credit Party has none; (d) the Perfection Certificate accurately sets forth such Credit Party's place of business, or, if more than one, its chief executive office as well as such Credit Party's mailing address (if different than its chief executive office); (e) such Credit Party (and each of its predecessors) has not, in the past five (5) years, changed its jurisdiction of formation, organizational structure or type, or any organizational number assigned by its jurisdiction; and (f) all other information set forth on the Perfection Certificate pertaining to such Credit Party and each of its Subsidiaries is accurate and complete (it being understood and agreed that such Credit Party may from time to time update certain information in the Perfection Certificate after the Effective Date to the extent permitted by one or more specific provisions in this Agreement).

**4.2 Corporate Power**. The execution, delivery and performance of this Agreement and the other Loan Documents by the Credit Parties and the consummation by the Credit Parties of the transactions contemplated hereby and thereby are within the corporate or limited liability company power and authority of each Credit Party. Each Credit Party's Board of Directors (or equivalent thereof) has approved the Loan Documents based upon a reasonable belief that the Credit Extensions are appropriate for Borrower after reasonable inquiry concerning Borrower's financing objectives and financial situation.

**4.3 Authorization**. All corporate or limited liability company action on the part of each Credit Party, its directors, members or managers and its stockholders necessary for the authorization, execution, delivery and performance of this Agreement and the other Loan Documents by each Credit Party and the performance of each Credit Party's obligations hereunder and thereunder, including the reservation of the equity securities issuable upon conversion of the Term Loan (collectively, the "**Conversion Securities**") has been taken or will be taken prior to the issuance of such Conversion Securities. This Agreement and the other Loan Documents, when executed and delivered by each applicable Credit Party, shall constitute valid and binding obligations of such Credit Party enforceable in accordance with their terms, subject to laws of general application relating to bankruptcy, insolvency, the relief of debtors and, with respect to rights to indemnity, subject to federal and state securities laws. The Conversion Securities, when issued in compliance with the provisions of this Agreement will be validly issued, fully paid and nonassessable and free of any liens or encumbrances and issued in compliance with all applicable federal and securities laws.

**4.4 Governmental Consents**. All consents, approvals, orders, or authorizations of, or registrations, qualifications, designations, declarations, or filings with, any governmental authority, required on the part of any Credit Party in connection with the valid execution and delivery of this Agreement and the other Loan Documents, the offer, sale or issuance of the Conversion Securities issuable upon conversion of the Term Loan or the consummation of any other transaction contemplated hereby shall have been obtained and will be effective as of the Effective Date.

**4.5 Compliance with Laws**. To each Credit Party's knowledge, no Credit Party or any Subsidiary thereof is in violation of any applicable statute, rule, regulation, order or restriction of any domestic or foreign government or any instrumentality or agency thereof in

respect of the conduct of its business or the ownership of its properties, which violation of which would materially and adversely affect the business, assets, liabilities, financial condition, operations or prospects of such Credit Party.

**4.6 Compliance with Other Instruments**. No Credit Party is in violation or default of any term of its certificate of incorporation or formation, its bylaws or operating agreement, or other applicable formation or organizational documents, or of any provision of any mortgage, indenture or contract to which it is a party and by which it is bound or of any judgment, decree, order or writ, other than such violation(s) that would not have a Material Adverse Effect on such Credit Party or any Subsidiary thereof. The execution, delivery and performance of this Agreement and the other Loan Documents, and the consummation of the transactions contemplated hereby or thereby will not result in any such violation or be in conflict with, or constitute, with or without the passage of time and giving of notice, either a default under any such provision, instrument, judgment, decree, order or writ or an event that results in the creation of any lien, charge or encumbrance upon any assets of any Credit Party or any Subsidiary thereof or the suspension, revocation, impairment, forfeiture, or nonrenewal of any material permit, license, authorization or approval applicable to any Credit Party, its business or operations or any of its assets or properties. Without limiting the foregoing, each Credit Party or any Subsidiary thereof has obtained all waivers reasonably necessary with respect to any preemptive rights, rights of first refusal or similar rights, including any notice or offering periods provided for as part of any such rights, in order for such Credit Party to consummate the transactions contemplated hereunder without any third party obtaining any rights to cause such Credit Party to offer or issue any securities of Borrower as a result of the consummation of the transactions contemplated hereunder.

**4.7 Capitalization.** The authorized and outstanding capital of Borrower consists, or will consist, immediately prior to the Effective Date, of:

(a) As set forth on Schedule 4.7(a), the authorized capital stock of Borrower as of immediately prior to the Effective Date consists of 20,000 shares of Borrower's common stock (the "**Common Stock**"), no par value ("Common Stock"), of which 1,000 shares are issued and outstanding.

(b) As of immediately prior to the Effective Date, (i) all of the issued and outstanding shares of capital stock of Borrower will have been duly authorized, validly issued, fully paid and non-assessable, and will be owned of record and beneficially as set forth on Schedule 4.7(a), (ii) all of the issued and outstanding shares of capital stock of Borrower will have been issued in compliance with all applicable federal and state securities laws, and (iii) none of the issued and outstanding shares of capital stock of Borrower will have been issued in violation of any agreement, arrangement or commitment to which Borrower or any of its Affiliates is a party or is subject to or in violation of any preemptive or similar rights of any Person.

(c) Schedule 4.7(c) sets forth, as of immediately prior to the Effective Date, all outstanding or authorized warrants, convertible securities or other rights, agreements, arrangements or commitments of any character relating to the capital stock of Borrower or obligating Borrower to issue or sell any shares of capital stock of, or any other interest in,

Borrower, in each case, including the number and kind of securities reserved for issuance on exercise or conversion of any such securities or other rights, the exercise or conversion price of any such securities or other rights and any applicable vesting schedule for any such securities or other rights. Except as set forth on Schedule 4.7(c), Borrower does not have outstanding, authorized, or in effect any stock appreciation, phantom stock, profit participation or similar rights. Except as set forth on Schedule 4.7(c), there are no voting trusts, stockholder agreements, proxies or other agreements, understandings or obligations in effect with respect to the voting, transfer or sale (including any rights of first refusal, rights of first offer or drag-along rights), issuance (including any pre-emptive or anti-dilution rights), redemption or repurchase (including any put or call or buy-sell rights), or registration (including any related lock-up or market standoff agreements) of any shares of capital stock or other securities of Borrower.

**4.8 Collateral.**

(a) Each Credit Party has good title to, rights in, and the power to transfer each item of the Collateral upon which it purports to grant a Lien hereunder, free and clear of any and all Liens except Permitted Liens. Each Credit Party has no Collateral Accounts except for the Collateral Accounts described in the Perfection Certificate delivered to Lender in connection herewith and which such Credit Party has taken such actions as are necessary to give Lender a perfected security interest therein, pursuant to the terms of the Security Agreement. The Accounts are bona fide, existing obligations of the Account Debtors.

(b) The Security Agreement, upon execution and delivery thereof by the parties thereto, will create in favor of Lender a valid and enforceable security interest in the Collateral described therein, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar state or federal debtor relief laws from time to time in effect which affect the enforcement of creditors' rights in general and the availability of equitable remedies and (i) when the Pledged Debt and Pledged Equity Interests (each as defined in the Security Agreement) are delivered to Lender, the Lien created under the Security Agreement shall constitute a fully perfected first priority Lien on, and security interest in, all right, title and interest of the Credit Parties in such Pledged Debt and Pledged Equity Interests, in each case prior and superior in right to any other Person, (ii) when financing statements in appropriate form are filed in the offices specified on Schedule 3 of the Security Agreement, the Liens created under the Security Agreement will constitute fully perfected Liens on, and security interests in, all right, title and interest of the Credit Parties in such Collateral (other than Intellectual Property and Collateral Accounts), in each case prior and superior in right to any other Person, other than with respect to Permitted Liens and (iii) when the Control Agreements are executed and delivered to Lender, the Lien created under the Security Agreement shall constitute a fully perfected first priority Lien on, and security interest, all right, title and interest of the Credit Parties in each Collateral Account of the Credit Parties that is subject to a Control Agreement.

(c) Upon the recordation of the Security Agreement (or applicable IP Agreements in form and substance reasonably satisfactory to Borrower and Lender) with the United States Patent and Trademark Office and the United States Copyright Office, together with the financing statements in appropriate form filed in the offices specified on Schedule 3 of the Security Agreement, the Liens created under the Security Agreement shall constitute fully

perfected Liens on, and security interests in, all right, title and interest of the Credit Parties in the Intellectual Property in which a security interest may be perfected by filing in the United States and its territories and possessions, in each case prior and superior in right to any other Person (it being understood that (i) subsequent recordings in the United States Patent and Trademark Office and the United States Copyright Office may be necessary to perfect a Lien on registered trademarks and Patents, Trademark and registered Copyrights acquired by the Credit Parties after the date hereof and (ii) any "intent to use" trademark or service applications are excluded from the Collateral), other than with respect to Permitted Liens.

(d) The Collateral is not in the possession of any third party bailee (such as a warehouse) except as otherwise provided in the Perfection Certificate. None of the components of the Collateral shall be maintained at locations other than as provided in the Perfection Certificate or as permitted pursuant to Section 6.2.

(e) Each Credit Party is the sole owner of the Intellectual Property which it owns or purports to own except for (a) non-exclusive licenses granted to its customers in the ordinary course of business, (b) over-the-counter software that is commercially available to the public, and (c) material Intellectual Property licensed to such Credit Party and noted on the Perfection Certificate. Each Patent which it owns or purports to own and which is material to such Credit Party's business is valid and enforceable, and no part of the Intellectual Property which such Credit Party owns or purports to own and which is material to such Credit Party's business has been judged invalid or unenforceable, in whole or in part. To the best of each Credit Party's knowledge, no claim has been made that any part of the Intellectual Property violates the rights of any third party except to the extent such claim would not reasonably be expected to have a Material Adverse Effect.

(f) Except as noted on the Perfection Certificate, no Credit Party is a party to, or is it bound by, any Restricted License.

**4.9 Litigation**. There are no actions or proceedings pending or, to the knowledge of any Responsible Officer, threatened in writing by or against Borrower or any of its Subsidiaries involving more than, individually or in the aggregate, $50,000.

**4.10 Financial Statements; Financial Condition**. All consolidated financial statements for Borrower and any of its Subsidiaries delivered to Lender fairly present in all material respects Borrower's consolidated financial condition and Borrower's consolidated results of operations. There has not been any material deterioration in Borrower's consolidated financial condition since the date of the most recent financial statements submitted to Lender.

**4.11 Solvency**. The fair salable value of Borrower's consolidated assets (including goodwill minus disposition costs) exceeds the fair value of Borrower's liabilities; Borrower is not left with unreasonably small capital after the transactions in this Agreement; and Borrower is able to pay its debts (including trade debts) as they mature.

**4.12 Regulatory Compliance**. No Credit Party is an "investment company" or a company "controlled" by an "investment company" under the Investment Company Act of 1940, as amended. None of Borrower or any of its Subsidiaries is engaged as one of its important

activities in extending credit for margin stock (under Regulations X, T and U of the Federal Reserve Board of Governors). Borrower and each of its Subsidiaries (a) has complied in all material respects with all Requirements of Law, and (b) has not violated any Requirements of Law the violation of which could reasonably be expected to have a Material Adverse Effect on its business. None of Borrower's or any of its Subsidiaries' properties or assets has been used by Borrower or any Subsidiary or, to the best of Borrower's knowledge, by previous Persons, in disposing, producing, storing, treating, or transporting any hazardous substance other than legally. Borrower and each of its Subsidiaries have obtained all consents, approvals and authorizations of, made all declarations or filings with, and given all notices to, all Governmental Authorities that are necessary to continue their respective businesses as currently conducted.

**4.13 Subsidiaries; Investments**. Borrower does not own any stock, partnership, or other ownership interest or other equity securities except for Permitted Investments.

**4.14 Tax Returns and Payments; Pension Contributions**. Except for the 2013 / 2014 Taxes, Borrower has timely filed all required tax returns and reports, and Borrower has timely paid all foreign, federal, state and local taxes, assessments, deposits and contributions owed by Borrower except (a) to the extent such taxes are being contested in good faith by appropriate proceedings promptly instituted and diligently conducted, so long as such reserve or other appropriate provision, if any, as shall be required in conformity with GAAP shall have been made therefor, or (b) if such taxes, assessments, deposits and contributions do not, individually or in the aggregate, which could reasonably be expected to have a Material Adverse Effect on its business.

To the extent Borrower defers payment of any contested taxes, Borrower shall (i) notify Lender in writing of the commencement of, and any material development in, the proceedings, and (ii) post bonds or take any other steps required to prevent the governmental authority levying such contested taxes from obtaining a Lien upon any of the Collateral that is other than a "Permitted Lien." Except for approximately $300,000 in Federal and State taxes owed pursuant to the 2013 / 2014 Taxes, Borrower is unaware of any claims or adjustments proposed for any of Borrower's prior tax years which could result in additional taxes becoming due and payable by Borrower. Borrower has paid all amounts necessary to fund all present pension, profit sharing and deferred compensation plans in accordance with their terms, and Borrower has not withdrawn from participation in, and has not permitted partial or complete termination of, or permitted the occurrence of any other event with respect to, any such plan which could reasonably be expected to result in any liability of Borrower, including any liability to the Pension Benefit Guaranty Corporation or its successors or any other governmental agency.

**4.15 Environmental Matters**.

(a) Except as, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect, none of the properties owned, leased or operated by any Credit Party, any Subsidiary or any of their predecessors in interest thereof, now or in the past, contain, or to their knowledge have previously contained, any Hazardous Materials in amounts or concentrations which constitute or constituted a violation of Environmental Laws or which could reasonably be expected to result in liability under Environmental Laws;

(b) Each Credit Party and each Subsidiary thereof and such properties and all operations conducted in connection therewith are in compliance, and have been in compliance with all Environmental Laws and have obtained, maintained and are in compliance with all permits, licenses and other approvals as required under any Environmental Law.

(c) There are no Environmental Claims pending, or to the knowledge of Borrower, overtly threatened in writing, by or against Borrower or any of its Subsidiaries or against any of their respective properties or revenues that allege any liability under any Environmental Laws; and

(d) There are no facts, circumstances, conditions or occurrences which could reasonably be expected to result in liability under Environmental Laws for any Credit Party or any Subsidiary.

**4.16 Use of Proceeds**. Borrower shall use the proceeds of the Term Loan for the repayment of indebtedness outstanding under the Abbey Debts and the Bank of Hawaii Debt, the payment of the 2013 / 2014 Taxes and for working capital purposes. Borrower shall use the proceeds of the Advances solely to fund Project Costs and other costs necessarily incurred by Borrower and approved by Lender to complete each approved Project.

**4.17 Full Disclosure**. No written representation, warranty or other statement of Borrower or any other Credit Party in any certificate or written statement given to Lender, as of the date such representation, warranty, or other statement was made, taken together with all such written certificates and written statements given to Lender, contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained in the certificates or statements not misleading (it being recognized by Lender that the projections and forecasts provided by Borrower in good faith and based upon reasonable assumptions are not viewed as facts and that actual results during the period or periods covered by such projections and forecasts may differ from the projected or forecasted results).

**4.18 Shares.** Each Credit Party has full power and authority to create a first lien on the Shares and no disability or contractual obligation exists that would prohibit such Credit Party from pledging the Shares pursuant to this Agreement. To each Credit Party's knowledge, there are no subscriptions, warrants, rights of first refusal or other restrictions on transfer relative to, or options exercisable with respect to the Shares. The Shares have been and will be duly authorized and validly issued, and are fully paid and non-assessable. To each Credit Party's knowledge, the Shares are not the subject of any present or threatened suit, action, arbitration, administrative or other proceeding, and such Credit Party knows of no reasonable grounds for the institution of any such proceedings.

**4.19 Anti-Corruption Laws and Sanctions.** None of: (a) Borrower, any Subsidiary or, to the knowledge of the Borrower or such Subsidiary, any of their respective directors, officers, employees or affiliates; or (b) to the knowledge of Borrower, any agent or representative of Borrower or any Subsidiary that will act in any capacity in connection with or benefit from the proceeds of the Credit Extensions or Equity Securities: (i) is, or is owned or controlled by, a Sanctioned Person or currently the subject or target of any Sanctions; (ii) has taken any action, directly or indirectly, that would result in a violation by such Persons of the

PATRIOT Act; or (iii) has taken any action, directly or indirectly, that would result in a violation by such Persons of any Anti-Corruption Laws or Sanctions.

## 5 AFFIRMATIVE COVENANTS

Until payment in full of all Obligations (other than contingent indemnity obligations for which no claim has been made to Borrower), each Credit Party will, and will cause each of its Subsidiaries to:

**5.1 Government Compliance.**

(a) Maintain its and all its Subsidiaries' legal existence and good standing in their respective jurisdictions of formation and maintain qualification in each jurisdiction in which the failure to so qualify would reasonably be expected to have a Material Adverse Effect. Each Credit Party shall comply, and have each Subsidiary comply, in all material respects, with all laws, ordinances and regulations to which it is subject.

(b) Obtain all of the Governmental Approvals necessary for the performance by each Credit Party of its obligations under the Loan Documents to which it is a party and the grant of a security interest to Lender in all of its property. Each Credit Party shall promptly provide copies of any such obtained Governmental Approvals to Lender.

**5.2 Financial Statements, Reports, Certificates.** Provide Lender with the following:

(a) Monthly Financial Statements. As soon as available, but no later than thirty (30) days after the last day of each month, a company prepared consolidated balance sheet and income statement covering Borrower's consolidated operations for such month certified by a Responsible Officer and in a form acceptable to Lender (the "**Monthly Financial Statements**");

(b) Monthly Compliance Certificate. Within thirty (30) days after the last day of each month and together with the Monthly Financial Statements, a duly completed Compliance Certificate signed by a Responsible Officer, certifying that as of the end of such month, Borrower was in full compliance with all of the terms and conditions of this Agreement;

(c) Annual Operating Budget and Financial Projections. Prior to the end of each fiscal year of Borrower, (i) annual operating budgets (including income statements, balance sheets and cash flow statements, by month) for the upcoming fiscal year of Borrower, and (ii) annual financial projections for the following fiscal year (on a quarterly basis) as approved by Borrower's Board of Directors, together with any related business forecasts used in the preparation of such annual financial projections;

(d) Annual Audited Financial Statements. As soon as available, but no later than two hundred seventy (270) days after the last day of Borrower's fiscal year (other than for Borrower's fiscal year ended December 31, 2015), audited consolidated financial statements prepared under GAAP, consistently applied, together with an unqualified opinion on the financial statements from an independent certified public accounting firm reasonably acceptable to Lender;