(e) Other Statements. Within five (5) days of delivery, copies of all statements, reports and notices made available to Borrower's security holders or to any holders of Subordinated Debt;

(f) Notice of Certain Events. Upon any Responsible Officer obtaining knowledge thereof, promptly (and in any event within three (3) Business Days, unless otherwise specified below) give notice in writing to Lender of:

(i) any Default or Event of Default;

(ii) any legal actions pending or threatened in writing against Borrower or any of its Subsidiaries that could result in damages or costs to Borrower or any of its Subsidiaries of, individually or in the aggregate, $50,000 or more;

(iii) the occurrence of any circumstance, event or condition that has resulted in, or could reasonably be expected to result in, a Material Adverse Effect;

(iv) any casualty loss with respect to the collateral described in any Security Document having a book value in excess of $50,000;

(v) within ten (10) days of entering or becoming bound by any Restricted License (other than over-the-counter software that is commercially available to the public);

(vi) any notice of any violation received by any Credit Party or any Subsidiary thereof from any Governmental Authority including, without limitation, any notice of violation of Environmental Laws which in any such case could reasonably be expected to have a Material Adverse Effect; and

(vii) at least thirty (30) days prior to the date that Borrower expects to be the closing date of any transaction that would result in a Change in Control, the anticipated date of the closing of such transaction and the details thereof.

(g) Other Financial Information. Other financial information reasonably requested by Lender.

**5.3 Observation Rights**. Lender or its Affiliates shall have the right to appoint one (1) non-voting board observer (the "**Board Observer**") who shall (a) have the right to attend and participate in all meetings of Borrower's Board of Directors and any committees thereof and (b) be entitled to receive copies of all notices, minutes, consents, and other materials that Borrower provides to its directors at the same time and in the same manner as provided to such directors.

**5.4 Inventory; Returns**. Keep all Inventory in good and marketable condition, free from material defects. Returns and allowances between any Credit Party and its Account Debtors shall follow such Credit Party's customary practices as they exist at the Effective Date. Borrower must promptly notify Lender of all returns, recoveries, disputes and claims that involve more than $50,000.

**5.5 Taxes; Pensions.** Timely file all required tax returns and reports and timely pay all foreign, federal, state and local taxes, assessments, deposits and contributions owed by Borrower and each of its Subsidiaries, except for deferred payment of any taxes contested pursuant to the terms of Section 4.13 hereof, and shall deliver to Lender, on demand, appropriate certificates attesting to such payments, and pay all amounts necessary to fund all present pension, profit sharing and deferred compensation plans in accordance with their terms.

**5.6 Insurance.**

(a) Keep its business and the Collateral insured for risks and in amounts standard for companies in Borrower's industry and location and as Lender may reasonably request. Insurance policies shall be in a form, with financially sound and reputable insurance companies that are not Affiliates of Borrower, and in amounts that are satisfactory to Lender. All property policies shall have a lender's loss payable endorsement showing Lender as loss payee. All liability policies shall show, or have endorsements showing, Lender as an additional insured. Lender shall be named as lender loss payee and/or additional insured with respect to any such insurance providing coverage in respect of any Collateral.

(b) Ensure that proceeds payable under any property policy are, at Lender's option, payable to Lender on account of the Obligations.

(c) At Lender's request, Borrower shall deliver certified copies of insurance policies and evidence of all premium payments. Each provider of any such insurance required under this Section 5.6 shall agree, by endorsement upon the policy or policies issued by it or by independent instruments furnished to Lender, that it will give Lender thirty (30) days prior written notice before any such policy or policies shall be materially altered or canceled. If Borrower fails to obtain insurance as required under this Section 5.6 or to pay any amount or furnish any required proof of payment to third persons and Lender, Lender may make all or part of such payment or obtain such insurance policies required in this Section 5.6, and take any action under the policies Lender deems prudent.

**5.7 Protection and Registration of Intellectual Property Rights.**

(a) (i) Protect, defend and maintain the validity and enforceability of its Intellectual Property; (ii) promptly advise Lender in writing of material infringements or any other event that could reasonably be expected to materially and adversely affect the value of its Intellectual Property; and (iii) not allow any Intellectual Property material to its business to be abandoned, forfeited or dedicated to the public without Lender's written consent.

(b) To the extent not already disclosed in writing to Lender, if any Credit Party (i) obtains any Patent, registered Trademark, registered Copyright, registered mask work, or any pending application for any of the foregoing, whether as owner, licensee or otherwise, or (ii) applies for any Patent or the registration of any Trademark, then Borrower shall immediately provide written notice thereof to Lender and the applicable Credit Party and shall execute such intellectual property security agreements and other documents and take such other actions as Lender may request in its good faith business judgment to perfect and maintain a first priority perfected security interest in favor of Lender in such property. If any Credit Party decides to

register any Copyrights or mask works in the United States Copyright Office. Borrower shall: (x) provide Lender with at least fifteen (15) days prior written notice of such Credit Party's intent to register such Copyrights or mask works together with a copy of the application it intends to file with the United States Copyright Office (excluding exhibits thereto); (y) execute or cause such Credit Party to execute an intellectual property security agreement and such other documents and take such other actions as Lender may request in its good faith business judgment to perfect and maintain a first priority perfected security interest in favor of Lender in the Copyrights or mask works intended to be registered with the United States Copyright Office; and (z) record such intellectual property security agreement with the United States Copyright Office contemporaneously with filing the Copyright or mask work application(s) with the United States Copyright Office. Borrower shall promptly provide to Lender copies of all applications that any Credit Party files for Patents or for the registration of Trademarks, Copyrights or mask works, together with evidence of the recording of the intellectual property security agreement required for Lender to perfect and maintain a first priority perfected security interest in such property.

(c) Each Credit Party shall take such steps as Lender requests to obtain the consent of, or waiver by, any person whose consent or waiver is necessary for (i) any Restricted License to be deemed "Collateral" and for Lender to have a security interest in it that might otherwise be restricted or prohibited by law or by the terms of any such Restricted License, whether now existing or entered into in the future, and (ii) Lender to have the ability in the event of a liquidation of any Collateral to dispose of such Collateral in accordance with Lender's rights and remedies under this Agreement and the other Loan Documents.

**5.8 Litigation Cooperation**. Make available to Lender, without expense to Lender, Borrower and its officers, employees and agents and each Credit Party's books and records, to the extent that Lender may deem them reasonably necessary to prosecute or defend any third-party suit or proceeding instituted by or against Lender with respect to any Collateral or relating to the Credit Parties.

**5.9 Restructuring**. Borrower shall operate in good faith and exclusively with Lender and/or its Affiliates to effect a mutually agreed and tax-efficient corporate structure for Borrower and its Subsidiaries to be effected pursuant to documentation, in form and substance reasonably acceptable to Borrower and Lender, with reasonable expenses in connection therewith to be paid by Borrower and constitute Lender Expenses.

**5.10 Access to Collateral; Books and Records**. Allow Lender, or its agents, to inspect at Borrower's expense the Collateral and audit and copy any Credit Party's Books.

**5.11 Formation or Acquisition of Subsidiaries.** Notwithstanding and without limiting the negative covenants contained in Sections 6.3 and 6.7 hereof, at the time that any Credit Party forms any direct or indirect Subsidiary or acquires any direct or indirect Subsidiary after the Effective Date, such Credit Party shall (a) cause any new Domestic Subsidiary to provide to Lender joinders to this Loan Agreement, the Security Agreement and any other Security Documents, together with such appropriate financing statements, Control Agreements and/or other Loan Documents, all in form and substance satisfactory to Lender (including being sufficient to grant Lender a first priority Lien (subject to Permitted Liens) in and to the assets of such newly formed or acquired Domestic Subsidiary), (b) provide to Lender appropriate

certificates and powers and financing statements, pledging all of the direct or beneficial ownership interest in such new Subsidiary, in form and substance satisfactory to Lender (except any such property that Borrower demonstrates to Lender's reasonable satisfaction that a pledge of more than sixty five percent (65%) of the voting power of all classes of capital stock, membership units or other securities of such Subsidiary, which is a Foreign Subsidiary, creates a present and existing adverse tax consequence to Borrower under the U.S. Internal Revenue Code, in which case such pledge shall be limited to sixty five percent (65%) of the voting power of all classes of capital stock, membership units or other securities of such Foreign Subsidiary entitled to vote (but only the portion of such capital stock, membership units or other securities in excess of sixty five percent (65%) of the voting power of such Foreign Subsidiary will be excluded) and shall include one hundred percent (100%) of the non-voting capital stock, membership units or other securities of such Foreign Subsidiary, and (c) provide to Lender all other documentation in form and substance satisfactory to Lender which in its opinion is appropriate with respect to the execution and delivery of the applicable documentation referred to above. Any document, agreement, or instrument executed or issued pursuant to this Section 5.12 shall be a Loan Document.

**5.12 Further Assurances**. Execute any further instruments and take further action as Lender reasonably requests to perfect or continue Lender's Lien in the Collateral or to effect the purposes of this Agreement. Deliver to Lender, within five (5) days after the same are sent or received, copies of all correspondence, reports, documents and other filings with any Governmental Authority regarding compliance with or maintenance of Governmental Approvals or Requirements of Law or that could reasonably be expected to have a material effect on any of the Governmental Approvals or otherwise on the operations of Borrower or any of its Subsidiaries.

**5.13 Strategic Relationship**. Borrower shall operate in good faith to explore strategic relationship with BlueNRGY Group Limited ("**BN**") and its Affiliates, including without limitation, opportunities to utilize BN tax efficiencies and attributes.

**5.14 Use of Proceeds.** Borrower shall use the proceeds of the Term Loan for the repayment of indebtedness outstanding under the Abbey Debt and the Bank of Hawaii Debt, the payment of the 2013 / 2014 Taxes and for working capital purposes. Borrower shall use the proceeds of the Advances solely to fund Project Costs and other costs necessarily incurred by Borrower and approved by Lender to complete approved Projects. The proceeds of the Credit Extensions shall not in any event be used for the repayment of indebtedness for borrowed money (other than repayment of the Abbey Debt), redemption or repurchase of securities (other than the repurchase of shares from employees pursuant to Borrower's stock option plan), dividends or payments to employees other than regular salaries, relocation expenses and reimbursements for costs incurred on behalf of Borrower in the ordinary course of business (other than the 2013 / 2014 Taxes).

**5.15 Environmental Laws**. Except where the failure to do so would not reasonably be expected to result in a Material Adverse Effect, (a) comply with, and ensure such compliance by all tenants and subtenants with all Environmental Laws and obtain and comply with and maintain, and ensure that all tenants and subtenants, if any, obtain and comply with and maintain, any and all licenses, approvals, notifications, registrations or permits required by

Environmental Laws and (b) conduct and complete all investigations, studies, sampling and testing, and all remedial, removal and other actions required under Environmental Laws, and promptly comply with all lawful orders and directives of any Governmental Authority regarding Environmental Laws.

**5.16 Compliance with Anti-Corruption Laws and Sanctions.**

(a) Refrain from doing business in a Sanctioned Country or with a Sanctioned Person in violation of the economic sanctions of the United States administered by the U.S. Department of the Treasury's Office of Foreign Assets Control and provide such information and take such actions as are reasonably requested by Lender in order to assist Lender in maintaining compliance with the PATRIOT Act; and

(b) Maintain in effect and enforce policies and procedures designed to ensure compliance by Borrower, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions.

**5.17 Additional Corporate Actions.** Upon the receipt of notice of Lender's intent to either (x) exercise the Conversion Option described in Section 2.1.2(d) or (y) exercise the Purchase Option described in Section 2.7:

(a) Borrower shall immediately enter into the Stock Purchase Agreement and the Shareholder Agreement.

(b) Borrower shall take any necessary corporate action to adopt and approve the Amended and Restated Articles attached hereto as Exhibit G (the "**Articles**"), and to and file the Articles with the Secretary of State of the State of California within three business days of the receipt of such notice.

(c) Borrower shall take any necessary corporate action to adopt and approve the Amended and Restated Bylaws attached hereto as Exhibit H.

## 6 NEGATIVE COVENANTS

Until payment in full of all Obligations (other than contingent indemnity obligations for which no claim has been made to Borrower), each Credit Party will not, and will cause its Subsidiaries to not:

**6.1 Dispositions.** Convey, sell, lease, transfer, assign, or otherwise dispose of (collectively, "**Transfer**") all or any part of its business or property, except for Transfers (a) of Inventory in the ordinary course of business; (b) of worn-out or obsolete Equipment that is, in the reasonable judgment of Borrower, no longer economically practicable to maintain or useful in the ordinary course of business of Borrower; (c) consisting of Permitted Liens and Permitted Investments; (d) consisting of the sale or issuance of any stock of Borrower permitted under Section 6.2; and (e) consisting of Borrower's use or transfer of money or Cash Equivalents in the ordinary course of its business for the payment of ordinary course business expenses in a manner that is not prohibited by the terms of this Agreement or the other Loan Documents.

**6.2 Changes in Business, Management, Ownership, or Business Locations.**

(a) (i) Engage in any business other than the businesses currently engaged in by Borrower and its Subsidiaries or reasonably related thereto; (ii) liquidate or dissolve; (iii) permit or suffer any Change in Control; or (iv) issue and/or sell any capital stock of Borrower or any options, rights, warrants or other instruments convertible into or exchangeable for capital stock of Borrower (including Common Stock, preferred stock, warrants or convertible debt) on or prior to the Purchase Notice Date without the consent of Lender (other than conversion of the Term Loan pursuant to this Agreement and/or the exercise of the Warrant).

(b) No Credit Party shall, without at least thirty (30) days prior written notice to Lender: (1) add any new offices or business locations, including warehouses (unless such new offices or business locations contain less than $50,000 in such Credit Party's assets or property) or deliver any portion of the Collateral valued, individually or in the aggregate, in excess of $50,000 to a bailee at a location other than to a bailee and at a location already disclosed in the Perfection Certificate, (2) change its jurisdiction of organization, (3) change its organizational structure or type, (4) change its legal name, or (5) change any organizational number (if any) assigned by its jurisdiction of organization. If Borrower intends to deliver any portion of the Collateral valued, individually or in the aggregate, in excess of $50,000 to a bailee, and Lender and such bailee are not already parties to a bailee agreement governing both the Collateral and the location to which Borrower intends to deliver the Collateral, then Borrower will first receive the written consent of Lender, and such bailee shall execute and deliver a bailee agreement in form and substance satisfactory to Lender.

**6.3 Mergers or Acquisitions.** Merge or consolidate with any other Person, or acquire all or substantially all of the capital stock or property of another Person (including, without limitation, by the formation of any Subsidiary); provided, however that a Subsidiary may merge or consolidate into a Credit Party so long as a Credit Party is the surviving party.

**6.4 Indebtedness.** Create, incur, assume, or be liable for any Indebtedness other than Permitted Indebtedness.

**6.5 Encumbrance.** Create, incur, allow, or suffer any Lien on any of its property, or assign or convey any right to receive income, including the sale of any Accounts, except for Permitted Liens, permit any Collateral not to be subject to the first priority security interest granted herein, or enter into any agreement, document, instrument or other arrangement (except with or in favor of Lender) with any Person which directly or indirectly prohibits or has the effect of prohibiting Borrower or any Subsidiary from assigning, mortgaging, pledging, granting a security interest in or upon, or encumbering any of Borrower's or any Subsidiary's Intellectual Property, except as is otherwise permitted in Section 6.1 hereof and the definition of "Permitted Liens" herein.

**6.6 Maintenance of Collateral Accounts.** All of Borrower's and any other Credit Party's Collateral Accounts shall be subject to Control Agreements in form and content reasonably acceptable to Lender.

**6.7 Distributions; Investments**. (a) Pay any dividends or make any distribution or payment or redeem, retire or purchase any capital stock; provided, that (i) Borrower may convert the Warrants into shares of Common Stock pursuant to the terms of the Warrants or otherwise in exchange thereof; (ii) each wholly-owned Subsidiary of Borrower may declare and make dividend payments or other distributions to Borrower or to another wholly-owned Subsidiary of Borrower and any nominal shareholder thereof, in each case to the extent not prohibited under applicable law; and (iii) Borrower may pay cash in lieu of the issuance of fractional shares; or (b) directly or indirectly make any Investment (including, without limitation, by the formation of any Subsidiary) other than Permitted Investments.

**6.8 Transactions with Affiliates**. Directly or indirectly enter into or permit to exist any material transaction with any Affiliate of any Credit Party, except for transactions that are in the ordinary course of Borrower's business, upon fair and reasonable terms that are no less favorable to any Credit Party than would be obtained in an arm's length transaction with a non-affiliated Person.

**6.9 Subordinated Debt**. (a) Make or permit any payment on any Subordinated Debt, except under the terms of the subordination, intercreditor, or other similar agreement to which such Subordinated Debt is subject, or (b) amend any provision in any document relating to the Subordinated Debt which would increase the amount thereof, provide for earlier or greater principal, interest, or other payments thereon, or adversely affect the subordination thereof to Obligations owed to Lender.

**6.10 Compliance**. Become an "investment company" or a company controlled by an "investment company", under the Investment Company Act of 1940, as amended, or undertake as one of its important activities extending credit to purchase or carry margin stock (as defined in Regulation U of the Board of Governors of the Federal Reserve System), or use the proceeds of the Credit Extensions for that purpose; fail to meet the minimum funding requirements of ERISA, permit a Reportable Event or Prohibited Transaction, as defined in ERISA, to occur; fail to comply with the Federal Fair Labor Standards Act or violate any other law or regulation, if the violation could reasonably be expected to have a Material Adverse Effect; withdraw from participation in, permit partial or complete termination of, or permit the occurrence of any other event with respect to, any present pension, profit sharing and deferred compensation plan which could reasonably be expected to result in any liability of Borrower or any of its Subsidiaries, including any liability to the Pension Benefit Guaranty Corporation or its successors or any other governmental agency.

## 7 EVENTS OF DEFAULT

Any one of the following shall constitute an event of default (an "**Event of Default**") under this Agreement:

**7.1 Payment Default**. Borrower fails to (a) make any payment of principal or interest on any Credit Extension when due, or (b) pay any other Obligations within three (3) Business Days after such Obligations are due and payable (which three (3) Business Day cure period shall not apply to payments due on the Revolving Line Maturity Date or the Term Loan Maturity Date). During the cure period, the failure to make or pay any payment specified under

clause (b) hereunder is not an Event of Default (but no Credit Extension will be made during the cure period);

**7.2 Covenant Default.**

(a) any Credit Party fails or neglects to perform any obligation in Sections 2.2.1(d), 2.7, 3.4, 5.1(a), 5.2, 5.3, 5.4, 5.5, 5.6, 5.7, 5.8, 5.9, 5.10, 5.14, 5.17 or violates any covenant in Section 6; or

(b) any Credit Party fails or neglects to perform, keep, or observe any other term, provision, condition, covenant or agreement contained in this Agreement or any Loan Documents, and as to any default (other than those specified in this Section 7) under such other term, provision, condition, covenant or agreement that can be cured, has failed to cure the default within ten (10) days after the occurrence thereof; provided, however, that if the default cannot by its nature be cured within the ten (10) day period or cannot after diligent attempts by the applicable Credit Parties be cured within such ten (10) day period, and such default is likely to be cured within a reasonable time, then the applicable Credit Parties shall have an additional period (which shall not in any case exceed thirty (30) days) to attempt to cure such default, and within such reasonable time period the failure to cure the default shall not be deemed an Event of Default (but no Credit Extensions shall be made during such cure period). Cure periods provided under this section shall not apply, among other things, to any covenants set forth in clause (a) above;

**7.3 Material Adverse Effect.** A Material Adverse Effect occurs;

**7.4 Attachment; Levy; Restraint on Business.**

(a) (i) The service of process seeking to attach, by trustee or similar process, any funds of Borrower or of any entity under the control of Borrower (including a Subsidiary), or (ii) a notice of lien or levy is filed against any of the Credit Parties' assets by any Governmental Authority, and the same under subclauses (i) and (ii) hereof are not, within ten (10) days after the occurrence thereof, discharged or stayed (whether through the posting of a bond or otherwise); provided, however, no Credit Extensions shall be made during any ten (10) day cure period; or

(b) (i) any material portion of Borrower's or any of its Subsidiaries' assets is attached, seized, levied on, or comes into possession of a trustee or receiver, or (ii) any court order enjoins, restrains, or prevents Borrower from conducting all or any material part of its business;

**7.5 Insolvency.** (a) Borrower or any of its Subsidiaries is unable to pay its debts (including trade debts) as they become due or otherwise becomes insolvent; (b) Borrower or any of its Subsidiaries begins an Insolvency Proceeding; or (c) an Insolvency Proceeding is begun against Borrower or any of its Subsidiaries and is not dismissed or stayed within thirty (30) days (but no Credit Extensions shall be made while any of the conditions described in clause (a) exist and/or until any Insolvency Proceeding is dismissed);

**7.6 Other Agreements.** There is, under any agreement to which Borrower or any of its Subsidiaries is a party with a third party or parties, (a) any default resulting in a right by such

third party or parties, whether or not exercised, to accelerate the maturity of any Indebtedness in an amount individually or in the aggregate in excess of $50,000; or (b) any breach or default by Borrower or any of its Subsidiaries, the result of which could have a Material Adverse Effect on Borrower's or any Subsidiary's business;

**7.7 Judgments; Penalties**. One or more fines, penalties or final judgments, orders or decrees for the payment of money in an amount, individually or in the aggregate, of at least $50,000 (not covered by independent third-party insurance as to which liability has been accepted by such insurance carrier) shall be rendered against Borrower or any of its Subsidiaries by any Governmental Authority, and the same are not, within ten (10) days after the entry, assessment or issuance thereof, discharged, satisfied, or paid, or after execution thereof, stayed or bonded pending appeal, or such judgments are not discharged prior to the expiration of any such stay (provided, that no Credit Extensions will be made prior to the satisfaction, payment, discharge, stay, or bonding of such fine, penalty, judgment, order or decree);

**7.8 Misrepresentations**. Borrower, any of its Subsidiaries and/or any Person acting for Borrower and/or any of its Subsidiaries makes any representation, warranty, or other statement now or later in this Agreement, any Loan Document or in any writing delivered to Lender or to induce Lender to enter this Agreement or any Loan Document, and such representation, warranty, or other statement is incorrect in any material respect when made;

**7.9 Subordinated Debt**. Any document, instrument, or agreement evidencing any Subordinated Debt shall for any reason be revoked or invalidated or otherwise cease to be in full force and effect, any Person shall be in breach thereof or contest in any manner the validity or enforceability thereof or deny that it has any further liability or obligation thereunder, or the Obligations shall for any reason be subordinated or shall not have the priority contemplated by this Agreement;

**7.10 Guaranty**. (a) Any guaranty of any Obligations terminates or ceases for any reason to be in full force and effect; (b) any Guarantor does not perform any obligation or covenant under any guaranty of the Obligations; or (c) Borrower, any of its Subsidiaries or any Person acting on behalf thereof shall assert any of the foregoing or deny or disaffirm any Credit Party's Guaranteed Obligations;

**7.11 Security**. (a) Any Security Document shall for any reason cease to be in full force and effect or cease to be effective to give Lender a valid and perfected security interest in and Lien upon the Collateral purported to be covered thereby, subject to no Liens other than Permitted Liens, in each case unless any such cessation occurs in accordance with the terms thereof or is due to any act or failure to act on the part of Lender, or (b) Borrower, any of its Subsidiaries or any Person acting on behalf thereof shall assert any of the foregoing or deny or disaffirm any Credit Party's obligations under the Security Documents; or

**7.12 Governmental Approvals.** Any Governmental Approval shall have been (a) revoked, rescinded, suspended, modified in an adverse manner or not renewed in the ordinary course for a full term or (b) subject to any decision by a Governmental Authority that designates a hearing with respect to any applications for renewal of any of such Governmental Approval or that could result in the Governmental Authority taking any of the actions described in clause (a)

above, and such decision or such revocation, rescission, suspension, modification or non-renewal (i) cause, or could reasonably be expected to cause, a Material Adverse Effect, or (ii) adversely affects the legal qualifications of Borrower or any of its Subsidiaries to hold such Governmental Approval in any applicable jurisdiction and such revocation, rescission, suspension, modification or non-renewal could reasonably be expected to affect the status of or legal qualifications of Borrower or any of its Subsidiaries to hold any Governmental Approval in any other jurisdiction.

## 8 LENDER'S RIGHTS AND REMEDIES

**8.1 Rights and Remedies**. Upon the occurrence and during the continuance of an Event of Default, Lender may, without notice or demand, do any or all of the following:

(a) declare all Obligations immediately due and payable (but if an Event of Default described in Section 7.5 occurs all Obligations are immediately due and payable without any action by Lender);

(b) stop advancing money or extending credit for Borrower's benefit under this Agreement or under any other agreement between Borrower and Lender;

(c) verify the amount of, demand payment of and performance under, and collect any Accounts and General Intangibles, settle or adjust disputes and claims directly with Account Debtors for amounts on terms and in any order that Lender considers advisable, and notify any Person owing any Credit Party money of Lender's security interest in such funds;

(d) make any payments and do any acts it considers necessary or reasonable to protect the Collateral and/or its security interest in the Collateral. Each Credit Party shall assemble the Collateral if Lender requests and make it available as Lender designates. Lender may enter premises where the Collateral is located, take and maintain possession of any part of the Collateral, and pay, purchase, contest, or compromise any Lien which appears to be prior or superior to its security interest and pay all expenses incurred. Borrower grants Lender a license to enter and occupy any of its premises, without charge, to exercise any of Lender's rights or remedies;

(e) apply to the Obligations (i) any balances and deposits of Borrower it holds, or (ii) any amount held by Lender owing to or for the credit or the account of Borrower;

(f) ship, reclaim, recover, store, finish, maintain, repair, prepare for sale, advertise for sale, and sell the Collateral. Lender is hereby granted a non-exclusive, royalty-free license or other right to use, without charge, each Credit Party's labels, Patents, Copyrights, mask works, rights of use of any name, trade secrets, trade names, Trademarks and advertising matter, or any similar property as it pertains to the Collateral, in completing production of, advertising for sale, and selling any Collateral and, in connection with Lender's exercise of its rights under this Section 8.1, each Credit Party's rights under all licenses and all franchise agreements inure to Lender's benefit;

(g) deliver a notice of exclusive control, any entitlement order, or other directions or instructions pursuant to any Control Agreement or similar agreements providing control of any Collateral;

(h) demand and receive possession of any Credit Party's Books; and

(i) exercise all rights and remedies available to Lender under the Loan Documents or at law or equity, including all remedies provided under the Code (including disposal of the Collateral pursuant to the terms thereof).

**8.2 Power of Attorney**. Each Credit Party hereby irrevocably appoints Lender as its lawful attorney-in-fact, exercisable upon the occurrence and during the continuance of an Event of Default, to: (a) endorse such Credit Party's name on any checks or other forms of payment or security; (b) sign such Credit Party's name on any invoice or bill of lading for any Account or drafts against Account Debtors; (c) settle and adjust disputes and claims about the Accounts directly with Account Debtors, for amounts and on terms Lender determines reasonable; (d) make, settle, and adjust all claims under such Credit Party's insurance policies, (e) pay, contest or settle any Lien, charge, encumbrance, security interest, and adverse claim in or to the Collateral, or any judgment based thereon, or otherwise take any action to terminate or discharge the same; and (f) transfer the Collateral into the name of Lender or a third party as the Code permits. Each Credit Party hereby appoints Lender as its lawful attorney-in-fact to sign such Credit Party's name on any documents necessary to perfect or continue the perfection of Lender's security interest in the Collateral regardless of whether an Event of Default has occurred until all Obligations have been satisfied in full and Lender is under no further obligation to make Credit Extensions hereunder. Lender's foregoing appointment as such Credit Party's attorney in fact, and all of Lender's rights and powers, coupled with an interest, are irrevocable until all Obligations have been fully repaid and performed and Lender's obligation to provide Credit Extensions terminates.

**8.3 Protective Payments**. If Borrower fails to obtain the insurance called for by Section 5.6 or fails to pay any premium thereon or fails to pay any other amount which any Credit Party is obligated to pay under this Agreement or any other Loan Document or which may be required to preserve the Collateral, Lender may obtain such insurance or make such payment, and all amounts so paid by Lender are Lender Expenses and immediately due and payable, bearing interest at the then highest rate applicable to the Obligations, and secured by the Collateral. Lender will make reasonable efforts to provide Borrower with notice of Lender obtaining such insurance at the time it is obtained or within a reasonable time thereafter. No payments by Lender are deemed an agreement to make similar payments in the future or Lender's waiver of any Event of Default.

**8.4 Application of Payments and Proceeds Upon Default**. If an Event of Default has occurred and is continuing, Lender shall have the right to apply in any order any funds in its possession, whether from Borrower account balances, payments, proceeds realized as the result of any collection of Accounts or other disposition of the Collateral, or otherwise, to the Obligations. Lender shall pay any surplus to Borrower by credit to the Designated Deposit Account or to other Persons legally entitled thereto; Borrower shall remain liable to Lender for any deficiency. If Lender, directly or indirectly, enters into a deferred payment or other credit transaction with any purchaser at any sale of Collateral, Lender shall have the option, exercisable at any time, of either reducing the Obligations by the principal amount of the purchase price or deferring the reduction of the Obligations until the actual receipt by Lender of cash therefor.

**8.5 Lender's Liability for Collateral**. So long as Lender complies with reasonable practices regarding the safekeeping of the Collateral in the possession or under the control of Lender, Lender shall not be liable or responsible for: (a) the safekeeping of the Collateral; (b) any loss or damage to the Collateral; (c) any diminution in the value of the Collateral; or (d) any act or default of any carrier, warehouseman, bailee, or other Person. The Credit Parties bear all risk of loss, damage or destruction of the Collateral.

**8.6 No Waiver; Remedies Cumulative**. Lender's failure, at any time or times, to require strict performance by any Credit Party of any provision of this Agreement or any other Loan Document shall not waive, affect, or diminish any right of Lender thereafter to demand strict performance and compliance herewith or therewith. No waiver hereunder shall be effective unless signed by the party granting the waiver and then is only effective for the specific instance and purpose for which it is given. Lender's rights and remedies under this Agreement and the other Loan Documents are cumulative. Lender has all rights and remedies provided under the Code, by law, or in equity. Lender's exercise of one right or remedy is not an election and shall not preclude Lender from exercising any other remedy under this Agreement or other remedy available at law or in equity, and Lender's waiver of any Event of Default is not a continuing waiver. Lender's delay in exercising any remedy is not a waiver, election, or acquiescence.

**8.7 Demand Waiver**. Borrower waives demand, notice of default or dishonor, notice of payment and nonpayment, notice of any default, nonpayment at maturity, release, compromise, settlement, extension, or renewal of accounts, documents, instruments, chattel paper, and guarantees held by Lender on which Borrower is liable.

## 9 GUARANTEE

**9.1 The Guarantee**. The Guarantors hereby jointly and severally guarantee, as a primary obligor and not as a surety to Lender and its successors and assigns, the prompt payment in full when due (whether at stated maturity, by required prepayment, declaration, demand, by acceleration or otherwise) of the principal of and interest (including any interest, fees, costs or charges that would accrue but for the provisions of the Title 11 of the United States Bankruptcy Code after any bankruptcy or insolvency petition under Title 11 of the United States Bankruptcy Code) on the Credit Extensions made by Lender to Borrower, and all other Obligations from time to time owing to Lender by any Credit Party under any Loan Document (such obligations being herein collectively called the "**Guaranteed Obligations**"). The Guarantors hereby jointly and severally agree that if Borrower or any other Guarantor(s) shall fail to pay in full when due (whether at stated maturity, by acceleration or otherwise) any of the Guaranteed Obligations, the Guarantors will promptly pay the same in cash, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Guaranteed Obligations, the same will be promptly paid in full when due (whether at extended maturity, by acceleration or otherwise) in accordance with the terms of such extension or renewal.

**9.2 Obligations Unconditional**. The obligations of the Guarantors under Section 9.1 shall constitute a guaranty of payment and to the fullest extent permitted by applicable Requirements of Law, are absolute, irrevocable and unconditional, joint and several, irrespective of the value, genuineness, validity, regularity or enforceability of the Guaranteed Obligations under this Agreement or any other agreement or instrument referred to herein, or any

substitution, release or exchange of any other guarantee of or security for any of the Guaranteed Obligations, and, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or Guarantor (except for payment in full). Without limiting the generality of the foregoing, it is agreed that the occurrence of any one or more of the following shall not alter or impair the liability of the Guarantors hereunder which shall remain absolute, irrevocable and unconditional under any and all circumstances as described above:

(a) at any time or from time to time, without notice to the Guarantors, the time for any performance of or compliance with any of the Guaranteed Obligations shall be extended, or such performance or compliance shall be waived;

(b) any of the acts mentioned in any of the provisions of this Agreement or any other agreement or instrument referred to herein shall be done or omitted;

(c) the maturity of any of the Guaranteed Obligations shall be accelerated, or any of the Guaranteed Obligations shall be amended in any respect, or any right under the Loan Documents or any other agreement or instrument referred to herein or therein shall be amended or waived in any respect or any other guarantee of any of the Guaranteed Obligations or any security therefor shall be released or exchanged in whole or in part or otherwise dealt with;

(d) any Lien or security interest granted to, or in favor of Lender as security for any of the Guaranteed Obligations shall fail to be perfected; or

(e) the release of any other Guarantor pursuant to Section 9.9

The Guarantors hereby expressly waive diligence, presentment, demand of payment, protest and all notices whatsoever, and any requirement that Lender exhaust any right, power or remedy or proceed against any Credit Party under this Agreement or any other agreement or instrument referred to herein, or against any other person under any other guarantee of, or security for, any of the Guaranteed Obligations. The Guarantors waive any and all notice of the creation, renewal, extension, waiver, termination or accrual of any of the Guaranteed Obligations and notice of or proof of reliance by any Secured Party upon this Guarantee or acceptance of this Guarantee, and the Guaranteed Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred in reliance upon this Guarantee, and all dealings between the Credit Parties and Lender shall likewise be conclusively presumed to have been had or consummated in reliance upon this Guarantee. This Guarantee shall be construed as a continuing, absolute, irrevocable and unconditional guarantee of payment without regard to any right of offset with respect to the Guaranteed Obligations at any time or from time to time held by Lender, and the obligations and liabilities of the Guarantors hereunder shall not be conditioned or contingent upon the pursuit by the Secured Parties or any other person at any time of any right or remedy against any Credit Party or against any other person which may be or become liable in respect of all or any part of the Guaranteed Obligations or against any collateral security or guarantee therefor or right of offset with respect thereto. This Guarantee shall remain in full force and effect and be binding in accordance with and to the extent of its terms upon the Guarantors and the successors and assigns thereof, and shall inure to the benefit of the Secured Parties, and their respective successors and assigns.

**9.3 Reinstatement**. The obligations of the Guarantors under this Section 9 shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of any Borrower or other Credit Party in respect of the Guaranteed Obligations is rescinded or must be otherwise restored by any holder of any of the Guaranteed Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise.

**9.4 Subrogation; Subordination**. Each Guarantor hereby agrees that until the indefeasible payment and satisfaction in full in cash of all Guaranteed Obligations and the expiration and termination of the commitments of Lender under this Agreement it shall waive any claim and shall not exercise any right or remedy, direct or indirect, arising by reason of any performance by it of its guarantee in Section 9.1, whether by subrogation or otherwise, against any Borrower or any other Guarantor of any of the Guaranteed Obligations or any security for any of the Guaranteed Obligations. Any Indebtedness of any Credit Party permitted pursuant to clause (g) of the definition of Permitted Indebtedness shall be subordinated to such Credit Party's Obligations.

**9.5 Remedies**. The Guarantors jointly and severally agree that, as between the Guarantors and Lender, the obligations of Borrower under this Agreement may be declared to be forthwith due and payable as provided in Section 7 (and shall be deemed to have become automatically due and payable in the circumstances provided in Section 7) for purposes of Section 9.1, notwithstanding any stay, injunction or other prohibition preventing such declaration (or such obligations from becoming automatically due and payable) as against Borrower and that, in the event of such declaration (or such obligations being deemed to have become automatically due and payable), such obligations (whether or not due and payable by Borrowers) shall forthwith become due and payable by the Guarantors for purposes of Section 9.1.

**9.6 Instrument for the Payment of Money**. Each Guarantor hereby acknowledges that the guarantee in this Section 9 constitutes an instrument for the payment of money, and consents and agrees that Lender, at its sole option, in the event of a dispute by such Guarantor in the payment of any moneys due hereunder, shall have the right to bring a motion-action under New York CPLR Section 3213.

**9.7 Continuing Guarantee**. The guarantee in this Section 9 is a continuing guarantee of payment, and shall apply to all Guaranteed Obligations whenever arising.

**9.8 General Limitation on Guarantee Obligations**. In any action or proceeding involving any state corporate limited partnership or limited liability company law, or any applicable state, federal or foreign bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of any Guarantor under Section 9.1 would otherwise be held or determined to be void, voidable, invalid or unenforceable, or subordinated to the claims of any other creditors, on account of the amount of its liability under Section 9.1, then, notwithstanding any other provision to the contrary, the amount of such liability shall, without any further action by such Guarantor, any Credit Party or any other person, be automatically limited and reduced to the highest amount (after giving effect to the right of contribution established in Section 9.10) that is valid and enforceable and not subordinated to the claims of other creditors as determined in such action or proceeding.

**9.9 Release of Guarantors**. If, in compliance with the terms and provisions of the Loan Documents, the equity securities of any Guarantor are sold or otherwise transferred such that such Guarantor no longer constitutes a Subsidiary (a "**Transferred Guarantor**") to a person or persons, none of which is Borrower or any of its Subsidiaries, such Transferred Guarantor shall, upon the consummation of such sale or transfer, be automatically released from its obligations under this Agreement and its obligations to pledge and grant any Collateral owned by it pursuant to this Agreement or any Security Document and the pledge of such equity securities to Lender pursuant to the Security Agreements shall be automatically released. and, so long as Borrower shall have provided Lender such certifications or documents as Lender shall reasonably request, Lender shall take such actions, as are necessary to effect each release described in this Section 9.9, so long as Borrower shall have provided Lender such certifications or documents as Lender shall reasonably request in order to demonstrate compliance with this Agreement.

**9.10 Right of Contribution**. Each Guarantor hereby agrees that to the extent that a Guarantor shall have paid more than its proportionate share of any payment made hereunder, such Guarantor shall be entitled to seek and receive contribution from and against any other Guarantor hereunder which has not paid its proportionate share of such payment. Each Guarantor's right of contribution shall be subject to the terms and conditions of Section 9.4. The provisions of this Section 9.10 shall in no respect limit the obligations and liabilities of any Guarantor to Lender, and each Guarantor shall remain liable to Lender for the full amount guaranteed by such Guarantor hereunder.

## 10 NOTICES

All notices, consents, requests, approvals, demands, or other communication by any party to this Agreement or any other Loan Document must be in writing and shall be deemed to have been validly served, given, or delivered: (a) upon the earlier of actual receipt and three (3) Business Days after deposit in the U.S. mail, first class, registered or certified mail return receipt requested, with proper postage prepaid; (b) upon transmission, when sent by electronic mail or facsimile transmission; (c) one (1) Business Day after deposit with a reputable overnight courier with all charges prepaid; or (d) when delivered, if hand-delivered by messenger, all of which shall be addressed to the party to be notified and sent to the address, facsimile number, or email address indicated below. Lender or Borrower may change its mailing or electronic mail address or facsimile number by giving the other party written notice thereof in accordance with the terms of this Section 10.

If to Borrower: Neighborhood Power Corporation
415 Dairy Road, Suite E-216, Kahului, HI 96732
Attn: Stephen Gates
Fax: 808-215-9040
Email: Sgates@neighborhoodpower.com
Website URL: neighborhoodpower.com

If to Lender: Fates Group LLC
110 East Broward Blvd., Suite 1900
Fort Lauderdale, FL 33301
Attn: Gilbert Armenta; President
Email: [redacted]@fatesgroup.com

## 11 <u>CHOICE OF LAW, VENUE, JURY TRIAL WAIVER, AND JUDICIAL REFERENCE</u>

This Agreement and the other Loan Documents and any claim, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement or any other Loan Document (except, as to any other Loan Document, as expressly set forth therein) and the transactions contemplated hereby and thereby shall be governed by, and construed in accordance with, the law of the State of New York. Borrower and Lender each submit to the exclusive jurisdiction of the State and Federal courts in New York County, New York; <u>provided</u>, <u>however</u>, that nothing in this Agreement shall be deemed to operate to preclude Lender from bringing suit or taking other legal action in any other jurisdiction to realize on the Collateral or any other security for the Obligations, or to enforce a judgment or other court order in favor of Lender. Borrower expressly submits and consents in advance to such jurisdiction in any action or suit commenced in any such court, and Borrower hereby waives any objection that it may have based upon lack of personal jurisdiction, improper venue, or forum non conveniens and hereby consents to the granting of such legal or equitable relief as is deemed appropriate by such court. Borrower hereby waives personal service of the summons, complaints, and other process issued in such action or suit and agrees that service of such summons, complaints, and other process may be made by registered or certified mail addressed to Borrower at the address set forth in, or subsequently provided by Borrower in accordance with, Section 10.5 of this Agreement and that service so made shall be deemed completed upon the earlier to occur of Borrower's actual receipt thereof or three (3) days after deposit in the U.S. mails, proper postage prepaid.

**BORROWER AND LENDER EACH WAIVE THEIR RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE LOAN DOCUMENTS OR ANY CONTEMPLATED TRANSACTION, INCLUDING CONTRACT, TORT, BREACH OF DUTY AND ALL OTHER CLAIMS. THIS WAIVER IS A MATERIAL INDUCEMENT FOR BOTH PARTIES TO ENTER INTO THIS AGREEMENT. EACH PARTY HAS REVIEWED THIS WAIVER WITH ITS COUNSEL. BORROWER AND LENDER EACH HERETO: (i) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER; AND (ii) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.**

This Section 11 shall survive the termination of this Agreement.

## 12 <u>GENERAL PROVISIONS</u>

**12.1 Termination Prior to Revolving Line Maturity Date; Survival.** All covenants, representations and warranties made in this Agreement continue in full force until this Agreement has terminated pursuant to its terms and all Obligations have been satisfied. So long

as Borrower has satisfied the Obligations (other than inchoate indemnity obligations and any other obligations which, by their terms, are to survive the termination of this Agreement), this Agreement may be terminated prior to the Revolving Line Maturity Date by Borrower. Those obligations that are expressly specified in this Agreement as surviving this Agreement's termination shall continue to survive notwithstanding this Agreement's termination.

**12.2 Successors and Assigns**. This Agreement binds and is for the benefit of the successors and permitted assigns of each party. Borrower may not assign this Agreement or any rights or obligations under it without Lender's prior written consent (which may be granted or withheld in Lender's discretion). Lender has the right, without the consent of or notice to Borrower, to sell, transfer, assign, negotiate, or grant participation in all or any part of, or any interest in, Lender's obligations, rights, and benefits under this Agreement and the other Loan Documents.

Lender reserves the right to secure commitments for the Credit Extensions from a syndicate of banks, financial institutions and other entities and Borrower agrees to assist Lender actively in achieving a syndication that is satisfactory to Borrower and Lender.

**12.3 Indemnification**.

(a) Borrower shall indemnify and hold harmless Lender and its affiliates and each director, officer, employee, trustee, partner, representative, agent and advisor thereof (each, an "**Indemnified Person**") from and against any and all losses, damages, liabilities or expenses (collectively, "**Costs**") as a result of or arising out of or in any way related to or resulting from the Loan Documents or any other transaction contemplated herein or therein, including any Costs arising out of any allegations, actions, suits, demands, proceedings (including any investigations or inquiries), claims (including, without limitation, any Environmental Claims) or other similar processes (each, a "**Proceeding**") asserted against or involving any Indemnified Person (whether or not any such Indemnified Person is a party to any Proceeding out of which any such Costs arise or such matter is initiated by a third party or by Borrower or any of its subsidiaries or affiliates) (a "**Claim**"), and, upon demand, to pay and reimburse each Indemnified Person for any out-of-pocket legal expenses or other out-of-pocket expenses paid or incurred in connection with investigating, defending or preparing to defend any Claim; provided, however, that (i) with respect to legal expenses, Borrower's indemnity and reimbursement obligations shall be limited to the fees and expenses of one firm of counsel for all such Indemnified Persons, taken as a whole (and, in the case of an actual, perceived or potential conflict of interest, where the Indemnified Person affected by such conflict informs Borrower of such conflict and thereafter retains its own counsel, of another firm of counsel for such affected Indemnified Person), and, if necessary (in each case), of a single local counsel and regulatory counsel in each appropriate jurisdiction (which may include a single special counsel and/or regulatory counsel acting in multiple jurisdictions) for all such Indemnified Persons, taken as a whole, and (ii) Borrower shall not have to indemnify any Indemnified Person against any loss, claim, damage, expense or liability to the extent same resulted from (x) the gross negligence or willful misconduct of such Indemnified Person or any of its affiliates, directors, officers, employees, representatives and agents (as determined by a court of competent jurisdiction in a final and non-appealable judgment), or (y) any dispute solely among Indemnified Persons (not arising as a result of any act or omission by Borrower or any of its subsidiaries or affiliates). All Costs shall be additional

Obligations under this Agreement, shall be payable on demand to the party to be indemnified and shall be secured by the Lien of the Security Agreement and the other Security Documents, subject to an undertaking to repay such amounts in the event it is ultimately determined that the Indemnified Person is not entitled to indemnity hereunder. Without limiting the foregoing, Borrower shall be obligated to pay, on demand, the costs of any investigation, monitoring, assessment, enforcement, removal, remediation, restoration or other response or corrective action undertaken by Lender or any other Indemnified Person, or their respective agents, with respect to any property owned, leased or operated by Borrower. Borrower shall not assert any claim against any Indemnified Person, on any theory of liability, for consequential, indirect, special or punitive damages arising out of or otherwise relating to this Agreement or the other Loan Documents or any transaction contemplated herein or therein or the actual or proposed use of the proceeds of the Credit Extensions. The obligations of Borrower under this Section 12.3(a) shall not be limited to any extent by payment of the Obligations and termination of this Agreement and shall remain in full force and effect until expressly terminated by Lender in writing.

(b) Borrower agrees to pay on demand all Lender Expenses. Except as contemplated by Section 2.4, it is the intention of the parties hereto that Borrower shall pay amounts referred to in this Section 12.3(b) directly. In the event Lender pays any of the amounts referred to in this Section 12.3(b) directly, Borrower will reimburse Lender for such advances and interest on such advance shall accrue until reimbursed at the Default Rate.

This Section 12.3 shall survive until all statutes of limitation with respect to the Claims, losses, and expenses for which indemnity is given shall have run.

**12.4 Time of Essence**. Time is of the essence for the performance of all Obligations in this Agreement.

**12.5 Severability of Provisions**. Each provision of this Agreement is severable from every other provision in determining the enforceability of any provision.

**12.6 Correction of Loan Documents**. Lender may correct patent errors and fill in any blanks in the Loan Documents consistent with the agreement of the parties.

**12.7 Amendments in Writing; Waiver; Integration**. No purported amendment or modification of any Loan Document, or waiver, discharge or termination of any obligation under any Loan Document, shall be enforceable or admissible unless, and only to the extent, expressly set forth in a writing signed by the party against which enforcement or admission is sought. Without limiting the generality of the foregoing, no oral promise or statement, nor any action, inaction, delay, failure to require performance or course of conduct shall operate as, or evidence, an amendment, supplement or waiver or have any other effect on any Loan Document. Any waiver granted shall be limited to the specific circumstance expressly described in it, and shall not apply to any subsequent or other circumstance, whether similar or dissimilar, or give rise to, or evidence, any obligation or commitment to grant any further waiver. The Loan Documents represent the entire agreement about this subject matter and supersede prior negotiations or agreements. All prior agreements, understandings, representations, warranties, and negotiations between the parties about the subject matter of the Loan Documents merge into the Loan Documents.

**12.8 Counterparts**. This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, is an original, and all taken together, constitute one Agreement.

**12.9 Confidentiality**. In handling any confidential information, Lender shall exercise the same degree of care that it exercises for its own proprietary information, but disclosure of information may be made: (a) to Lender's Subsidiaries or Affiliates (such Subsidiaries and Affiliates, together with Lender, collectively, "**Lender Entities**"); (b) to prospective transferees or purchasers of any interest in the Credit Extensions (provided, however, Lender shall use its best efforts to obtain any prospective transferee's or purchaser's agreement to the terms of this provision); (c) as required by law, regulation, subpoena, or other order; (d) to Lender's regulators or as otherwise required in connection with Lender's examination or audit; (e) as Lender considers appropriate in exercising remedies under the Loan Documents; and (f) to third-party service providers of Lender so long as such service providers have executed a confidentiality agreement with Lender with terms no less restrictive than those contained herein. Confidential information does not include information that is either: (i) in the public domain or in Lender's possession when disclosed to Lender, or becomes part of the public domain (other than as a result of its disclosure by Lender in violation of this Agreement) after disclosure to Lender; or (ii) disclosed to Lender by a third party, if Lender does not know that the third party is prohibited from disclosing the information.

Lender Entities may use anonymous forms of confidential information for aggregate datasets, for analyses or reporting, and for any other uses not expressly prohibited in writing by Borrower. The provisions of the immediately preceding sentence shall survive termination of this Agreement.

**12.10 Sales and Participations.** Borrower consents to Lender's negotiation, offer, and sale to other lenders (each, a "**Participant**" and collectively, the "**Participants**") of the Credit Extensions or participating interests in the Credit Extensions, to any and all discussions and agreements heretofore or hereafter made between Lender and any Participant or prospective Participant regarding the interest rate, fees, and other terms and provisions applicable to the Credit Extensions, and to Lender's disclosure to any Participant or prospective Participant, from time to time, of such financial and other information pertaining to Borrower, Borrower's Subsidiaries and the Credit Extensions as Lender and such Participant or prospective Participant may deem appropriate (whether public or non-public, confidential or non-confidential, and including information relating to any insurance required to be carried by Borrower and any financial or other information bearing on Borrower's and its Subsidiaries' creditworthiness and the value of any Collateral). Borrower acknowledges that Lender's disclosure of such information to any Participant or prospective Participant constitutes an ordinary and necessary part of the process of effectuating and servicing the Credit Extensions.

**12.11 Attorneys' Fees, Costs and Expenses**. In any action or proceeding between Borrower and Lender arising out of or relating to the Loan Documents, the prevailing party shall be entitled to recover its reasonable attorneys' fees and other costs and expenses incurred, in addition to any other relief to which it may be entitled.

**12.12 Electronic Execution of Documents**. The words "execution," "signed," "signature" and words of like import in any Loan Document shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity and enforceability as a manually executed signature or the use of a paper-based recordkeeping systems, as the case may be, to the extent and as provided for in any applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act.

**12.13 Captions**. The headings used in this Agreement are for convenience only and shall not affect the interpretation of this Agreement.

**12.14 Construction of Agreement**. The parties mutually acknowledge that they and their attorneys have participated in the preparation and negotiation of this Agreement. In cases of uncertainty this Agreement shall be construed without regard to which of the parties caused the uncertainty to exist.

**12.15 Relationship**. The relationship of the parties to this Agreement is determined solely by the provisions of this Agreement. The parties do not intend to create any agency, partnership, joint venture, trust, fiduciary or other relationship with duties or incidents different from those of parties to an arm's-length contract.

**12.16 Third Parties**. Nothing in this Agreement, whether express or implied, is intended to: (a) confer any benefits, rights or remedies under or by reason of this Agreement on any persons other than the express parties to it and their respective permitted successors and assigns; (b) relieve or discharge the obligation or liability of any person not an express party to this Agreement; or (c) give any person not an express party to this Agreement any right of subrogation or action against any party to this Agreement.

[Signature page follows]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the Effective Date.

**BORROWER**:

NEIGHBORHOOD POWER CORPORATION

By______________________________
Name: Stephen Gates
Title: President

**GUARANTOR**:

NEIGHBORHOOD GP, LLC

By______________________________
Name: Stephen Gates
Title: Manager

**LENDER**:

FATES GROUP LLC

By______________________________
Name: William C. Morro
Title: Authorized Signatory

## SCHEDULE A

Indebtedness

| Debt Description | Lender | Collateral | Projected Balance as of 6/30/2016 |
|---|---|---|---|
| Vehicle Loan | Bank of Hawaii | 2012 Toyota Tacoma | $ 23,188 |
| Vehicle Loan | Bank of Hawaii | 2010 Nissan Frontier | $ 18,509 |
| Vehicle Loan | Bank of Hawaii | 2012 Nissan NV2500SV Van | $ 19,338 |
| Vehicle Loan | Bank of Hawaii | 2012 Ford E250 Econoline Van | $ 12,904 |
| Vehicle Loan | Bank of Hawaii | 2007 Nissan Crew Cab | $ 11,044 |
| Vehicle Loan | Central Pacific Bank | 2013 Nissan NV Van | $ 22,919 |
| Vehicle Loan | First Hawaiian Bank | 2014 Toyota Prius | $ 15,093 |
| Vehicle Loan | First Hawaiian Bank | Toyota Prius | $ 16,645 |
| Vehicle Loan | First Hawaiian Bank | 2013 Nissan NV Van | $ 22,919 |
| Vehicle Loan | Nissan Motor Acceptance Corp | 2014 Nissan NV1500 Cargo Van | $ 22,507 |
| Vehicle Loan | Nissan Motor Acceptance Corp | 2014 Nissan NV1500 Cargo Van | $ 22,507 |
| Vehicle Loan | Toyota Financial Services | 2006 Chevrolet W5S042 Box Truck | $ 9,438 |
| Equipment Capital Lease | Harbour Capital | 2003 Gradall and 4X4 Aerial lift | $ 53,207 |
| Financed Software | Dell Financial Services | | $ 52,463 |
| Financed Software | Dell Financial Services | | $ 20,363 |
| 2013 Project Note Payable | CDF Engineering, LLC | | $ 137,781 |
| 2012 Project Note Payable | Haleakala Solar Inc. T1 | | $ 204,146 |
| 2012 Project Note Payable | Haleakala Solar Inc. T2 | | $ 235,112 |
| 2013 Project Note Payable | Haleakala Solar Inc. T3 | | $ 282,099 |
| 2014 Project Note Payable | Kim Westberg | | $ 100,000 |
| 2014 Project Note Payable | Luke O'Dea | | $ 134,330 |
| 2014 Project Note Payable | Renewable Energy Alternatives, LLC | | $ 321,216 |
| 2016 Project LOC – Kula Ag FIT | Renewable Energy Alternatives, LLC | | $ 509,745 |
| 2016 Project LOC – T14 | Renewable Energy Alternatives, LLC | | $ 658,162 |
| 2016 Project LOC – Wyndham CA | Renewable Energy Alternatives, LLC | | $ 99,853 |
| | | | $ 3,025,488 |

## <u>SCHEDULE B</u>

Investments

| <u>Entity /LLC Investment</u> | <u>Membership Interest %</u> |
|---|---|
| **Neighborhood Power Corporation:** | |
| Green Bridge Group, LLC | 1% pre-flip; 95% post flip |
| Terton Solar, LLC | 1% pre-flip; 95% post flip |
| Neighborhood GP, LLC | 100% - single member dis-regarded entity |
| **Neighborhood GP, LLC:** | |
| RSP HI, LLC | 50% |
| ISOLAR, LLC | 40% |
| AR Solar, LLC | 40% |
| **RSP HI, LLC:** | |
| Taki PV, LLC | 1% pre-flip; 95% post flip |
| OwensPV, LLC | 1% pre-flip; 95% post flip |
| CyanoPV, LLC | 1% pre-flip; 95% post flip |
| RPPA HI, LLC | 1% pre-flip; 95% post flip |
| T10PV, LLC | 1% pre-flip; 95% post flip |
| T12 PV, LLC | 1% pre-flip; 95% post flip |
| T13PV, LLC | 1% pre-flip; 95% post flip |
| Red River Solar LLC 3 | 1% pre-flip; 95% post flip |
| Alanui Kihei Solar, LLC | 1% pre-flip; 95% post flip |
| Alanui Kona Solar, LLC | 1% pre-flip; 95% post flip |
| S&F Building PV, LLC | 1% pre-flip; 95% post flip |
| **ISOLAR, LLC** | |
| Redstone Energy, LLC | 1% pre-flip; 95% post flip |
| BSOLAR, LLC | 1% pre-flip; 95% post flip |
| Solar Energy Equities, LLC | 1% pre-flip; 95% post flip |

## Schedule 4.7(a)

Capitalization

| **Shareholder** | **Common Stock** |
|---|---|
| Stephen Gates | 1,0000 Shares |
| | |
| Total Shares Outstanding | 1,000 Shares |

**SCHEDULE 4.7(C)**

Capitalization

Not Applicable.

**EXHIBIT A**

**FORM OF NOTICE OF BORROWING**
**NEIGHBORHOOD POWER CORPORATION**

Date: ______________

TO: **FATES GROUP LLC**
110 East Broward Blvd., Suite 1900
Fort Lauderdale, FL 33301
Attention: Gilbert Armenta; President
Email: [redacted]@fatesgroup.com

RE: Loan Agreement dated as of August 5, 2016 (as amended, restated or otherwise modified from time to time, the "**Agreement**"), by and among Neighborhood Power Corporation, a California corporation ("**Borrower**"), the Guarantors and Fates Group LLC, a Florida limited liability company (the "**Lender**").

Ladies and Gentlemen:

The undersigned refers to the Agreement, the terms defined therein and used herein as so defined, and hereby gives you notice irrevocably, pursuant to Section 3.5[(a)][(b)] of the Agreement, of the borrowing of [an Advance][a Term Loan].

**1.** The Funding Date, which shall be a Business Day, of the requested borrowing is ________________.

**2.** The aggregate amount of the requested [Advance][Term Loan] is $______________.

The undersigned hereby certifies that the following statements are true on the date hereof, and will be true on the date of the proposed [Advance][Term Loan] before and after giving effect thereto, and to the application of the proceeds therefrom, as applicable:

**(a)** all representations and warranties of the Credit Parties contained in the Loan Agreement are true, accurate and complete in all material respects as of the date hereof; provided, however, that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof; and provided further, that those representations and warranties expressly referring to a specific date shall be true, accurate and complete in all material respects as of such date; [and]

**(b)** no Default or Event of Default has occurred and is continuing, or would result from such proposed [Advance][Term Loan];

**[(c)** the requested Advance will not cause the aggregate principal amount of the outstanding Advances to exceed, as of the designated Funding Date, the Availability Amount; and

**(d)** The Advance complies with the requirements under Section 2.1.1 of the Agreement.][1]

**BORROWER** **NEIGHBORHOOD POWER CORPORATION**

By: ______________________
Name: ______________________
Title: ______________________

[1] Include only for Advances

# EXHIBIT B

## COMPLIANCE CERTIFICATE

TO: FATES GROUP LLC Date: ____________________
FROM: NEIGHBORHOOD POWER CORPORATION

The undersigned authorized officer of Neighborhood Power Corporation, a California corporation ("**Borrower**"), certifies that under the terms and conditions of the Loan Agreement, dated as of August 5, 2016 (as amended, restated or otherwise modified from time to time, the "**Agreement**"), by and among Borrower, the Guarantors and Fates Group LLC, a Florida limited liability company ("**Lender**"):

(1) Borrower is in complete compliance for the period ending ________________ with all required covenants except as noted below; (2) there are no Default or Events of Default; (3) all representations and warranties in the Agreement are true and correct in all material respects on this date except as noted below; provided, however, that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof; and provided further, that those representations and warranties expressly referring to a specific date shall be true, accurate and complete in all material respects as of such date; (4) Borrower, and each of its Subsidiaries, has timely filed all required tax returns and reports, and Borrower has timely paid all foreign, federal, state and local taxes, assessments, deposits and contributions owed by Borrower except as otherwise permitted pursuant to the terms of Section 4.14 of the Agreement; and (5) no Liens have been levied or claims made against Borrower or any of its Subsidiaries relating to unpaid employee payroll or benefits of which Borrower has not previously provided written notification to Lender.

The undersigned acknowledges that no borrowings may be requested at any time or date of determination that Borrower is not in compliance with any of the terms of the Agreement, and that compliance is determined not just at the date this certificate is delivered. Capitalized terms used but not otherwise defined herein shall have the meanings given them in the Agreement.

**Please indicate compliance status by circling Yes/No under "Complies" column.**

| **Reporting Covenants** | **Required** | **Complies** |
|---|---|---|
| | | |
| Monthly financial statements with Compliance Certificate | Monthly within 30 days | Yes No |
| Annual financial statement (CPA Audited) + CC | FYE within 270 days | Yes No |

**Other Matters**

| | | |
|---|---|---|
| Have there been any amendments of or other changes to the capitalization table of Borrower and to the Operating Documents of Borrower or any of its Subsidiaries? If yes, provide copies of any such amendments or changes with this Compliance Certificate. | Yes | No |

The following are the exceptions with respect to the certification above: (If no exceptions exist, state "No exceptions to note.")

------------------------------------------------------------------------------------------------------------------------
------------------------------------------------------------------------------------------------------------------------
-----------------------------------------------

NEIGHBORHOOD POWER CORPORATION

By: ______________________________
Name: ____________________________
Title: ____________________________

**EXHIBIT C-1**

**FORM OF REVOLVING LINE NOTE**

$______________ [Location]
[Date]

FOR VALUE RECEIVED, the undersigned, **NEIGHBORHOOD POWER CORPORATION**, a California corporation ("**Borrower**"), hereby jointly and severally promise to pay to the order of **FATES GROUP LLC**, a Florida limited liability company ("**Lender**") on the Revolving Line Maturity Date (as defined in the Loan Agreement referred to below) in lawful money of the United States and in immediately available funds, the principal amount of ____________ DOLLARS ($____________), or, if less, the aggregate unpaid principal amount of all Advances of Lender outstanding under the Loan Agreement referred to below, which sum shall be due and payable in such amounts and on such dates as are set forth in the Loan Agreement. Borrower further agrees to pay interest in like money on the unpaid principal amount hereof from time to time from the date hereof at the rates, and on the dates, specified in Sections 2.1.1 and 2.3 of such Loan Agreement.

The holder of this Revolving Line Note may endorse and attach a schedule to reflect the date, type and amount of each Advance of Lender outstanding under the Loan Agreement, the date and amount of each payment or prepayment of principal hereof; provided that the failure of Lender to make any such recordation (or any error in such recordation) shall not affect the obligations of Borrower hereunder or under the Loan Agreement.

This Revolving Line Note is one of the Revolving Line Notes referred to in the Loan Agreement dated as of August 5, 2016 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Loan Agreement**") between Borrower and Lender, is subject to the provisions thereof and is subject to optional and mandatory prepayment in whole or in part as provided therein. Terms used herein which are defined in the Loan Agreement shall have such defined meanings unless otherwise defined herein or unless the context otherwise requires.

This Revolving Line Note is secured and guaranteed as provided in the Loan Agreement and the Security Documents. Reference is hereby made to the Loan Agreement and the Security Documents for a description of the properties and assets in which a security interest has been granted, the nature and extent of the security and guarantees, the terms and conditions upon which the security interest and each guarantee was granted and the rights of the holder of this Revolving Line Note in respect thereof.

Upon the occurrence of any one or more of the Events of Default specified in the Loan Agreement, all amounts then remaining unpaid on this Revolving Line Note shall become, or may be declared to be, immediately due and payable all as provided therein.

All parties now and hereafter liable with respect to this Revolving Line Note, whether maker, principal, surety, guarantor, endorser or otherwise, hereby waive presentment, demand, protest and all other notices of any kind.

**THIS REVOLVING LINE NOTE MAY NOT BE TRANSFERRED EXCEPT IN COMPLIANCE WITH THE TERMS OF THE LOAN AGREEMENT.**

**THIS REVOLVING LINE NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES THAT WOULD REQUIRE THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.**

[Signature Page Follows]

NEIGHBORHOOD POWER CORPORATION,
as Borrower

By: ______________________________
Name:
Title:

**EXHIBIT C-2**

**FORM OF TERM LOAN NOTE**

$______________ [Location]
[Date]

FOR VALUE RECEIVED, the undersigned, **NEIGHBORHOOD POWER CORPORATION**, a California corporation ("**Borrower**"), hereby jointly and severally promise to pay to the order of **FATES GROUP LLC**, a Florida limited liability company ("**Lender**") on the Term Loan Maturity Date (as defined in the Loan Agreement referred to below) in lawful money of the United States and in immediately available funds, the principal amount of ___________ DOLLARS ($___________), or, if less, the aggregate unpaid principal amount of the Term Loan of Lender outstanding under the Loan Agreement referred to below, which sum shall be due and payable in such amounts and on such dates as are set forth in the Loan Agreement. Borrower further agrees to pay interest in like money on the unpaid principal amount hereof from time to time from the date hereof at the rates, and on the dates, specified in Sections 2.1.2 and 2.3 of such Loan Agreement.

The holder of this Term Note may endorse and attach a schedule to reflect the date, type and amount of each Term Loan of the Term Lender outstanding under the Loan Agreement, the date and amount of each payment or prepayment of principal hereof, and the date of each interest rate conversion or continuation pursuant to Section 2.08 of the Loan Agreement and the principal amount subject thereto; provided that the failure of the Term Lender to make any such recordation (or any error in such recordation) shall not affect the obligations of Borrowers hereunder or under the Loan Agreement.

This Term Loan Note is one of the Term Loan Notes referred to in the Loan Agreement dated as of August 5, 2016 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Loan Agreement**") between Borrower and Lender, is subject to the provisions thereof and is subject to optional and mandatory prepayment in whole or in part as provided therein. Terms used herein which are defined in the Loan Agreement shall have such defined meanings unless otherwise defined herein or unless the context otherwise requires.

This Term Loan Note is secured and guaranteed as provided in the Loan Agreement and the Security Documents. Reference is hereby made to the Loan Agreement and the Security Documents for a description of the properties and assets in which a security interest has been granted, the nature and extent of the security and guarantees, the terms and conditions upon which the security interest and each guarantee was granted and the rights of the holder of this Term Loan Note in respect thereof.

Upon the occurrence of any one or more of the Events of Default specified in the Loan Agreement, all amounts then remaining unpaid on this Term Loan Note shall become, or may be declared to be, immediately due and payable all as provided therein.

All parties now and hereafter liable with respect to this Term Loan Note, whether maker, principal, surety, guarantor, endorser or otherwise, hereby waive presentment, demand, protest and all other notices of any kind.

**THIS TERM LOAN NOTE MAY NOT BE TRANSFERRED EXCEPT IN COMPLIANCE WITH THE TERMS OF THE LOAN AGREEMENT.**

**THIS TERM LOAN NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES THAT WOULD REQUIRE THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.**

NEIGHBORHOOD POWER
CORPORATION,
as Borrower

By: ______________________________
Name:
Title:

## EXHIBIT D

## FORM OF SHAREHOLDER AGREEMENT

[Attached hereto]

# NEIGHBORHOOD POWER CORPORATION

## SHAREHOLDER RIGHTS AGREEMENT

**THIS SHAREHOLDER RIGHTS AGREEMENT** (the "*Agreement*") is entered into as of the ____ day of ____, by and among **NEIGHBORHOOD POWER CORPORATION**, a California corporation (the "*Company*"), Stephen Gates ("*Gates*") and the Fates Group LLC ("*Fates*" and together with Gates, the "*Major Shareholders*").

**RECITALS**

A. Gates is the holder of 1,000 shares of the Company's Common Stock;

B. Fates is purchasing shares of the Company's Common Stock (the "*Common Stock*") pursuant to that certain Common Stock Purchase Agreement (the "*Purchase Agreement*") of even date herewith;

C. The obligations in the Purchase Agreement are conditioned upon the execution and delivery of this Agreement; and

D. In connection with the consummation of the Financing, the parties desire to enter into this Agreement in order to establish certain rights and obligations of the Major Shareholders as set forth below.

In consideration of these premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## SECTION 1. GENERAL.

**1.1 Definitions.** As used in this Agreement the following terms shall have the following respective meanings:

**(a)** ***"Major Shareholder"*** shall mean each of Fates, together with its affiliates, and Gates.

**(b)** ***"Securities Act"*** shall mean the Securities Act of 1933, as amended.

**(c)** ***"Shares"*** shall mean the shares of the Company's capital stock held from time to time by the Shareholders and their permitted assigns.

**(d)** ***"Warrant"*** shall mean that certain warrant to purchase Common Stock held by Don Nissanka dated August __, 2016.

**SECTION 2. COVENANTS OF THE COMPANY.**

**2.1 Basic Financial Information and Reporting; Annual Plan of Operations.**

**(a)** The Company will maintain true books and records of account in which full and correct entries will be made of all its business transactions pursuant to a system of accounting established and administered in accordance with generally accepted accounting principles consistently applied (except as noted therein), and will set aside on its books all such proper accruals and reserves as shall be required under generally accepted accounting principles consistently applied.

**(b)** To the extent requested by a Major Shareholder, as soon as practicable after the end of each fiscal year of the Company, and in any event within 90 days thereafter, the Company will furnish such Major Shareholder a balance sheet of the Company, as at the end of such fiscal year, and a statement of income and a statement of cash flows of the Company, for such year, all prepared in accordance with generally accepted accounting principles consistently applied (except as noted therein) and setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail. Commencing in 2018, for financial statements reflecting activity in calendar year ending December 31, 2017, such financial statements shall be accompanied by a report and opinion thereon by independent public accountants selected by the Company's Board of Directors.

**(c)** To the extent requested by a Major Shareholder, the Company will furnish such Major Shareholder, as soon as practicable after the end of each calendar month in each fiscal year of the Company, and in any event within 30 days thereafter, a balance sheet of the Company as of the end of each such month period, and a statement of income and a statement of cash flows of the Company for such period and for the current fiscal year to date, prepared in accordance with generally accepted accounting principles consistently applied (except as noted therein), with the exception that no notes need be attached to such statements and year-end audit adjustments may not have been made.

**(d)** The Company will furnish each such Major Shareholder: (i) at least 30 days prior to the beginning of each fiscal year an annual budget and operating plan (the "***Annual Plan of Operations***") for such fiscal year (and as soon as available, any subsequent written revisions thereto); and (ii) as soon as practicable after the end of each month, and in any event within 30 days thereafter, a balance sheet of the Company as of the end of each such month, and a statement of income and a statement of cash flows of the Company for such month and for the current fiscal year to date, including a comparison to plan figures for such period, prepared in accordance with generally accepted accounting principles consistently applied (except as noted thereon), with the exception that no notes need be attached to such statements and year-end audit adjustments may not have been made.

**2.2 Inspection Rights.** Each Major Shareholder shall have the right, upon reasonable notice and for a legitimate business purpose, to visit and inspect any of the properties of the Company or any of its subsidiaries, and to discuss the affairs, finances and accounts of the Company or any of its subsidiaries with its officers, and to review such information as is reasonably requested all at such reasonable times and as often as may be reasonably requested; *provided, however,* that the Company shall not be obligated under this Section 2.2 with respect to a competitor of the Company or with respect to information which the Board of Directors determines in good faith is confidential or attorney-client privileged and should not, therefore, be disclosed.

**2.3 Confidentiality of Records.** Each Major Shareholder agrees to use the same degree of care as such Major Shareholder uses to protect its own confidential information to keep confidential any information furnished to such Major Shareholder that the Company identifies as being confidential or proprietary (so long as such information is not in the public domain), except that such Major Shareholder

may disclose such proprietary or confidential information (i) to any partner, subsidiary or parent of such Major Shareholder as long as such partner, subsidiary or parent is advised of and agrees or has agreed to be bound by the confidentiality provisions of this Section 2.3 or comparable restrictions; (ii) at such time as it enters the public domain through no fault of such Major Shareholder; (iii) that is communicated to it free of any obligation of confidentiality; (iv) that is developed by Major Shareholder or its agents independently of and without reference to any confidential information communicated by the Company; or (v) as required by applicable law.

**2.4 Key Man Insurance.** Subject to the approval of the Board of Directors, the Company will use its commercially reasonable efforts to obtain and maintain in full force and effect term life insurance in the amount of $5,000,000 dollars on the life of Stephen Gates, naming the Company as beneficiary.

**2.5 Director and Officer Insurance.** The Company will use its commercially reasonable efforts to obtain and maintain in full force and effect director and officer liability insurance in an amount to be determined by the Board.

**2.6 Proprietary Information and Inventions Agreement.** The Company shall require all employees and consultants to execute and deliver a Proprietary Information and Inventions Agreement substantially in a form approved by the Company's counsel or Board of Directors.

**2.7 Assignment of Right of First Refusal.** In the event the Company elects not to exercise any right of first refusal or right of first offer the Company may have on a proposed transfer of any of the Company's outstanding capital stock pursuant to the Company's charter documents, by contract or otherwise, the Company shall, to the extent it may do so, assign such right of first refusal or right of first offer to each Major Shareholder. In the event of such assignment, each Major Shareholder shall have a right to purchase its *pro rata* portion of the capital stock proposed to be transferred. Each Major Shareholder's pro rata portion shall be equal to the product obtained by multiplying (i) the aggregate number of shares proposed to be transferred by (ii) a fraction, the numerator of which is the number of shares of Common Stock held by such Major Shareholder at the time of the proposed transfer and the denominator of which is the total number of Common Stock owned by all Major Shareholders at the time of such proposed transfer. For purposes of this subsection 2.7, the number of shares of Common Stock held by any Major Shareholder shall include shares issuable upon the conversion of outstanding debt, options or other convertible securities.

**2.8 Directors' Liability and Indemnification**. The Company's Articles of Incorporation (the "***Articles***") and Bylaws shall provide (a) for elimination of the liability of director to the maximum extent permitted by law and (b) for indemnification of directors for acts on behalf of the Company to the maximum extent permitted by law. In addition, the Company shall enter into and use its commercially reasonable efforts to at all times maintain indemnification agreements with each of its directors in a form approved by the Board , to indemnify such directors to the maximum extent permissible under applicable law.

**2.9 Actions Requiring Special Approval.** The Company shall not without, the approval of the Major Shareholders, authorize or enter into any transactions with any director or officer, or any member of such director's or officer's immediate family, or any business, organization or corporation controlled by any director or officer, or any member of such director's or officer's immediate family.

**SECTION 3. RIGHTS OF FIRST REFUSAL.**

**3.1 Subsequent Offerings.** Subject to applicable securities laws, each Major Shareholder shall have a right of first refusal to purchase its Pro Rata Share of all Equity Securities, as defined below, that the Company may, from time to time, propose to sell and issue after the date of this Agreement, other than the Equity Securities excluded by Section 3.5 hereof. For purposes of this Agreement, each Major Shareholder's "***Pro Rata Share***" shall be equal to the ratio of (a) the number of shares of the Company's Common Stock of which such Major Shareholder is deemed to be a holder immediately prior to the issuance of such Equity Securities to (b) the total number of shares of the Company's outstanding Common Stock (including all shares of Common Stock issued or issuable upon the exercise of any outstanding warrants or options) immediately prior to the issuance of the Equity Securities. The term "***Equity Securities***" shall mean (i) any Common Stock, preferred stock or other security of the Company, (ii) any security convertible into or exercisable or exchangeable for, with or without consideration, any Common Stock, preferred stock or other security (including any option to purchase such a convertible security), (iii) any security carrying any warrant or right to subscribe to or purchase any Common Stock, preferred stock or other security or (iv) any such warrant or right.

**3.2 Exercise of Rights.** If the Company proposes to issue any Equity Securities, it shall give each Major Shareholder written notice of its intention, describing the Equity Securities, the price and the terms and conditions upon which the Company proposes to issue the same. Each Major Shareholder shall have 15 days from the giving of such notice to agree to purchase its Pro Rata Share of the Equity Securities for the price and upon the terms and conditions specified in the notice by giving written notice to the Company and stating therein the quantity of Equity Securities to be purchased. Notwithstanding the foregoing, the Company shall not be required to offer or sell such Equity Securities to any Major Shareholder who would cause the Company to be in violation of applicable federal securities laws by virtue of such offer or sale.

**3.3 Termination and Waiver of Rights of First Refusal.** The rights of first refusal established by this Section 4 shall not apply to, and shall terminate upon the earlier of (i) the effective date of the registration statement pertaining to the Company's Initial Offering or (ii) an Acquisition. The rights of first refusal established by this Section 4 may be amended, or any provision waived with and only with the written consent of the Company and the Major Shareholders holding a majority of the Shares held by all Major Shareholders, or as permitted by Section 6.5.

**3.4 Assignment of Rights of First Refusal.** The rights of first refusal of each Major Shareholder under this Section 3 may be assigned to the same parties to which such Major Shareholder may transfer such Shares pursuant to Section 4.5.

**3.5 Excluded Securities.** The rights of first refusal established by this Section 4 shall have no application to any of the following Equity Securities:

**(a)** shares of Common Stock and/or options, warrants or other Common Stock purchase rights and the Common Stock issued pursuant to such options, warrants or other rights (as adjusted for any stock dividends, combinations, splits, recapitalizations and the like after the date **hereof)** issued or to be issued after the date hereof to employees, officers or directors of, or consultants or advisors to the Company or any subsidiary, pursuant to stock purchase or stock option plans or other arrangements that are approved by the Board of Directors including the affirmative vote of at least one of the Fates Directors;

**(b)** stock issued or issuable pursuant to any rights or agreements, options, warrants or convertible securities outstanding as of the date of this Agreement; and stock issued pursuant to any such rights or agreements granted after the date of this Agreement, so long as the rights of first refusal established by this Section 3 were complied with, waived, or were inapplicable pursuant to any

provision of this Section 3.5 with respect to the initial sale or grant by the Company of such rights or agreements;

**(c)** any Equity Securities issued for consideration other than cash pursuant to a merger, consolidation, acquisition or similar business combination approved by the Board of Directors, including the affirmative vote of at least one of the Directors appointed by each Major Shareholder;

**(d)** any Equity Securities issued in connection with any stock split, stock dividend or recapitalization by the Company;

**(e)** any Equity Securities issued pursuant to any equipment loan or leasing arrangement, real property leasing arrangement, or debt financing from a bank or similar financial or lending institution approved by the Board of Directors, including the affirmative vote of at least one of the Directors appointed by each Major Shareholder;

**(f)** any Equity Securities that are issued by the Company pursuant to a registration statement filed under the Securities Act; and

**(g)** any Equity Securities issued in connection with strategic transactions involving the Company and other entities, including, without limitation (i) joint ventures, manufacturing, marketing or distribution arrangements or (ii) technology transfer or development arrangements; provided that the issuance of shares therein has been approved by the Company's Board of Directors, including the affirmative vote of at least one of the Fates Directors.

## SECTION 4. SHAREHOLDER TRANSFERS

**4.1 Major Shareholder.** No Shareholder shall directly or indirectly sell, assign, transfer, pledge, encumber, hypothecate, convey in trust, transfer by gift, bequest or descent, or otherwise dispose of, whether voluntarily or by operation of law (a "***Transfer***"), to any person or entity (a "***Transferee***") any shares of preferred stock, common stock, other capital stock of the Company or any securities convertible into, exchangeable for or exercisable for capital stock of the Company unless the Shareholder has complied with all of the terms of this Agreement.

Other than in connection with a Transfer excluded by Section 4.5, if a Shareholder proposes to Transfer any Shares then the Shareholder (the "***Transferor***") shall promptly give written notice (the "***Notice***") simultaneously to the Company and to each Major Shareholder at least 45 days prior to the closing of such Transfer. The Notice shall describe in reasonable detail the proposed Transfer including, without limitation, the number of Shares to be transferred, the nature of such Transfer, the consideration to be paid, and the name and address of each prospective purchaser or transferee. If such prospective purchaser or transferee is a foreign person or a US subsidiary or affiliate of a foreign parent company (a "***Foreign Investor***"), Transferor shall notify the Company of Transferor's intent to transfer or sell to such Foreign Investor.

**4.2 Company Right of First Refusal.** For a period of 10 days (the "***Company ROFR Period***") following receipt of any Notice described in Section 2.1, the Company shall have the right to purchase all or a portion of the Shares subject to such Notice on the same terms and conditions as set forth therein. The Company's purchase right shall be exercised by written notice signed by an officer of the Company (the "***Company Notice***") and delivered to the Transferor within the Company ROFR Period. The Company shall effect the purchase of the Shares, including payment of the purchase price, not more than five business days after delivery of the Company Notice or at such later time as may be agreed by the Company and the Transferor, and at such time the Transferor shall deliver to the Company the

certificate(s) representing the Shares to be purchased by the Company, each certificate to be properly endorsed for transfer. The Shares so purchased shall thereupon be cancelled and cease to be issued and outstanding shares of the Company's Common Stock.

**4.3 Major Shareholder Right of First Refusal.**

**(a)** In the event that the Company does not elect to purchase all of the Shares available pursuant to its rights under Section 4.2 within the Company ROFR Period, the Transferor shall give written notice within five days following the earlier to occur of (i) any waiver by the Company of its rights under Section 4.2 or (ii) the expiration of Company ROFR Period (the "***Second Notice***") to each of the Major Shareholders, which shall set forth the number of Shares not purchased by the Company and which shall include the terms of Notice set forth in Section 6.7. Each Major Shareholder shall then have the right, exercisable upon written notice to the Transferor (the "***Purchaser Notice***") within 10 days after the receipt of the Second Notice (the "***Shareholder ROFR Period***"), to purchase the Shares subject to the Second Notice and on the same terms and conditions as set forth therein. The Major Shareholder who so exercise their rights (the "***Purchasers***") shall effect the purchase of the Shares, including payment of the purchase price, not more than five days after delivery of the Purchaser Notice, and at such time the Transferor shall deliver to the Purchasers the certificate(s) representing the Shares to be purchased by the Purchasers, each certificate to be properly endorsed for transfer; *provided, however*, that if pursuant to Section 4.3(c) herein the Company and the Purchasers are required to purchase all of the Shares described in the Purchaser Notice, then the Purchasers shall effect their purchase of Shares concurrently with the Company's purchase of Shares.

**(b)** Each Foreign Investor shall notify the Company of its status as a Foreign Investor and the aggregate number of shares of the Company's capital stock and any security held by the Foreign Investor that is convertible into shares of the Company's capital stock.

**(c)** Notwithstanding any other provision of this Agreement, the Transferor shall be under no obligation to sell shares as described in Sections 4.2 and 4.3 unless the aggregate number of Shares purchased by the Company and/or the Purchaser as a result of the exercise of rights pursuant to Sections 4.2 and 4.3 shall constitute all of the Shares described in the Notice delivered by the Transferor pursuant to Section 4.1.

**(d)** The rights of the Major Shareholders set forth in this Section 4.3 shall also apply to the disposition or transfer of Shares held by a Major Shareholder in the event of the death or permanent disability of a Major Shareholder.

**4.4 Right of Co-Sale.**

**(a)** In the event the Company and the Major Shareholders fail to exercise their respective rights to purchase all of the Shares subject to Sections 4.2 and 4.3 hereof, following the exercise or expiration of the rights of purchase set forth in Section 4.2 and 4.3, then the Transferor shall deliver to the Company and each Major Shareholder written notice (the "***Co-Sale Notice***") that each Major Shareholder shall have the right, exercisable upon written notice to such Transferor with a copy to the Company within 10 days after receipt of the Co-Sale Notice, to participate in such Transfer of Shares on the same terms and conditions.

**(b)** Each Major Shareholder may sell all or any part of that number of shares equal to the product obtained by multiplying (i) the aggregate number of Shares covered by the Co-Sale Notice and not purchased by the Company or its assignees or Major Shareholder pursuant to Section 4.2 or 4.3 by (ii) a fraction the numerator of which is the number of shares of Common Stock issued or

issuable upon the conversion or exercise of preferred stock or other rights to acquire shares of Common Stock held by such Major Shareholder at the time of the Co-Sale Notice and the denominator of which is the total number of shares of Common Stock held by such Transferor (excluding shares purchased by the Company and/or Investors pursuant to Section 4.2 or 4.3) plus the number of shares of Common Stock issued or issuable upon the conversion or exercise of preferred stock or other rights to acquire shares of Common Stock held by all Major Shareholders at the time of the Co-Sale Notice.

**(c)** Each Major Shareholder who elects to participate in the Transfer pursuant to this Section 2 (a "***Co-Sale Participant***") shall effect its participation in the Transfer by promptly delivering to such Transferor for transfer to the prospective purchaser one or more certificates, properly endorsed for transfer, which represent the number of Shares which such Co-Sale Participant elects to sell.

**(d)** The stock certificate or certificates that the Co-Sale Participant delivers to such Transferee to Section 4.4(c) shall be transferred to the prospective purchaser in consummation of the sale of the Shares pursuant to the terms and conditions specified in the Co-Sale Notice, and the Transferee shall concurrently therewith remit to such Co-Sale Participant that portion of the sale proceeds to which such Co-Sale Participant is entitled by reason of its participation in such sale. To the extent that any prospective purchaser or purchasers prohibits such assignment or otherwise refuses to purchase shares or other securities from a Co-Sale Participant exercising its rights of co-sale hereunder, such Transferee shall not sell to such prospective purchaser or purchasers any Shares unless and until, simultaneously with such sale, such Transferee shall purchase such shares or other securities from such Co-Sale Participant on the same terms and conditions specified in the Co-Sale Notice.

**(e)** The exercise or non-exercise of the rights of any Major Shareholder hereunder to participate in one or more Transfers of Shares made by any Transferee shall not adversely affect his right to participate in subsequent Transfers of Shares subject to Section 4.

**(f)** To the extent that the Major Shareholders do not elect to participate in the sale of the Shares subject to the Co-Sale Notice, such Transferee may, not later than 60 days following delivery to the Company of the Co-Sale Notice, enter into an agreement providing for the closing of the Transfer of such Shares covered by the Co-Sale Notice within 30 days of such agreement on terms and conditions not materially more favorable to the transferor than those described in the Co-Sale Notice. Any proposed Transfer on terms and conditions materially more favorable than those described in the Co-Sale Notice, as well as any subsequent proposed Transfer of any of the Shares by a Transferee, shall again be subject to the first refusal and co-sale rights of the Company and/or Major Shareholder and shall require compliance by a Transferee with the procedures described in this Section 4.

**4.5 Exempt Transfers.** Notwithstanding the foregoing, the notice, first refusal and co-sale rights of the Company and/or the Major Shareholders set forth in Section 4 above shall not apply to (i) if the Transferor is a natural person, any transfer for bona fide estate planning purposes so long as such individual maintains all voting rights over such shares, or (ii) transfers by a Major Shareholder that is an entity to an entity that is affiliated by common control with such Major Shareholder; *provided* that in the event of any transfer made pursuant to this Section 4.5, (A) the Transferor shall inform the Major Shareholder of such pledge, transfer or gift prior to effecting it and (B) the pledgee, transferee or donee shall enter into a written agreement to be bound by and comply with all provisions of this Agreement, as if it were an original Major Shareholder hereunder, including without limitation Section 4. Such transferred Shares shall remain subject to the rights and obligations under this Agreement, and such pledgee, transferee or donee shall be treated as a "Major Shareholder" for purposes of this Agreement. Notwithstanding the foregoing, any Shares transferred shall remain subject to any right of first refusal in favor of the Company.

**4.6** Notwithstanding the foregoing, the provisions of Section 4 shall not apply to the sale of any Shares to the public pursuant to a registration statement filed with, and declared effective by, the Securities and Exchange Commission under the Securities Act.

**4.7** This Agreement is subject to, and shall in no manner limit the right which the Company may have to repurchase securities from any shareholder pursuant to (i) a stock restriction agreement or other agreement between the Company and such Shareholder and (ii) any right of first refusal set forth in the Bylaws of the Company.

**SECTION 5. VOTING.**

**5.1** **Voting of Shares.** Each Major Shareholder hereby agrees to hold all shares of voting capital stock of the Company registered in his respective names or beneficially owned by him as of the date hereof and any and all other securities of the Company legally or beneficially acquired by him after the date hereof subject to, and to vote the Shares in accordance with, the provisions of this Agreement.

**5.2** **Election of Directors.** On all matters relating to the election and removal of directors of the Company, each Major Shareholder agrees to vote all Shares held by them (or the holders thereof shall consent pursuant to an action by written consent of the holders of capital stock of the Company) so as to elect members of the Company's Board of Directors (the "***Board***") as follows:

**(a)** The size of the Board shall be set at five directors.

**(b)** Each of Fates and Gates hereby agree to vote all of their respective Shares so as to elect:

**(i)** Two individuals designated by Gates (the "***Gates Directors***"), one of whom shall be the Chief Executive Officer of the Company;

**(ii)** Two individuals designated by Fates (the "***Fates Directors***"); and

**(iii)** One individual designated by the unanimous approval of the other directors, which individual shall be unaffiliated with any other shareholder of the Company (the "***Independent Director***").

**(c)** Any vote taken to remove any director elected pursuant to Section 5.2(b), or to fill any vacancy created by the resignation, removal or death of a director elected pursuant to this Section 5.2(b), shall also be subject to the provisions of this Section 5.2(b) and the related subsection.

**5.3** **No Liability for Election of Recommended Director.** None of the parties hereto and no officer, director, shareholder, partner, employee or agent of any party makes any representation or warranty as to the fitness or competence of the nominee of any party hereunder to serve on the Board of Directors by virtue of such party's execution of this Agreement or by the act of such party in voting for such nominee pursuant to this Agreement.

**5.4** **Legend.**

**(a)** Concurrently with the execution of this Agreement, there shall be imprinted or otherwise placed, on certificates representing the Shares the following restrictive legend (the "***Legend***"):

"THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO THE TERMS AND CONDITIONS OF A SHAREHOLDER RIGHTS AGREEMENT WHICH PLACES CERTAIN RESTRICTIONS ON THE VOTING OF THE SHARES REPRESENTED HEREBY. ANY PERSON ACCEPTING ANY INTEREST IN SUCH SHARES SHALL BE DEEMED TO AGREE TO AND SHALL BECOME BOUND BY ALL THE PROVISIONS OF SUCH AGREEMENT. A COPY OF SUCH AGREEMENT WILL BE FURNISHED TO THE RECORD HOLDER OF THIS CERTIFICATE WITHOUT CHARGE UPON WRITTEN REQUEST TO THE COMPANY AT ITS PRINCIPAL PLACE OF BUSINESS."

**(b)** The Company agrees that, during the term of this Agreement, it will not remove, and will not permit to be removed (upon registration of transfer, reissuance of otherwise), the Legend from any such certificate and will place or cause to be placed the Legend on any new certificate issued to represent Shares theretofore represented by a certificate carrying the Legend. If at any time or from time to time any Shareholder holds any certificate representing shares of the Company's capital stock not bearing the aforementioned legend, such Shareholder agrees to deliver such certificate to the Company promptly to have such legend placed on such certificate.

**5.5 Successors.** The provisions of this Agreement shall be binding upon the successors in interest to any of the Shares. The Company shall not permit the transfer of any of the Shares on its books or issue a new certificate representing any of the Shares unless and until the person to whom such security is to be transferred shall have executed a written agreement, substantially in the form of this Agreement, pursuant to which such person becomes a party to this Agreement and agrees to be bound by all the provisions hereof.

**5.6 Other Rights.** Except as provided by this Agreement or any other agreement entered into with the Company or among shareholders of the Company, each Major Shareholder shall exercise the full rights of a holder of capital stock of the Company with respect to the Shares, respectively.

**5.7 Change of Control.** In the event that (a) (i) a Major Shareholder (the "***Selling Shareholder***") has identified a purchaser and (ii) the Board has approved the terms of a sale of the Company or all or substantially all of the Company's assets (an "***Approved Sale***") whether by means of a merger, consolidation or sale of stock or assets, or otherwise (each, a "***Sale of the Company***") and (b) the Shareholder other than the Selling Shareholder (the "***Non-Selling Major Shareholder***") has indicated that the Non-Selling Major Shareholder does not wish to (1) in the case of an Approved Sale, purchase the assets of the Company on substantially the same terms and conditions as the proposed purchaser or (2) in the case of a sale of stock, exercise such Non-Selling Major Shareholder's right of first refusal as described in Section 4.3 hereof, then (A) if the Approved Sale is structured as a merger or consolidation of the Company, or a sale of all or substantially all of the Company's assets, each Shareholder agrees to be present, in person or by proxy, at all meetings for the vote thereon, to vote all shares of capital stock held by such person for and raise no objections to such Approved Sale, and waive and refrain from exercising any dissenters rights, appraisal rights or similar rights in connection with such merger, consolidation or asset sale, or (B) if the Approved Sale is structured as a sale of the stock of the Company, each Shareholder shall agree to sell their Shares on the terms and conditions approved by the Selling Shareholder; provided in each case that such terms do not provide that the Shareholder would receive as a result of such Approved Sale less than the amount that would be distributed to such Shareholder in the event the proceeds of such Approved Sale of the Company were distributed in accordance with the liquidation preferences set forth in Company's Certificate of Incorporation. Each Shareholder shalltake all necessary and desirable actions in connection with the consummation of the Approved Sale, including the execution of such agreements and such instruments and other actions reasonably necessary to (i)

provide the representations, warranties, indemnities, covenants, conditions, non-compete agreements, escrow agreements and other provisions and agreements relating to such Approved Sale and (ii) effectuate the allocation and distribution of the aggregate consideration upon the Approved Sale.

**5.8 Irrevocable Proxy.** To secure the Shareholders' obligations to vote the Shares in accordance with this Agreement, each Shareholder hereby appoints the Independent Director of the Company, or either of them from time to time, or their designees, as such Shareholder's true and lawful proxy and attorney, with the power to act alone and with full power of substitution, to vote all of such Shareholder's Shares as set forth in this Agreement and to execute all appropriate instruments consistent with this Agreement on behalf of such Shareholder if, and only if, such Shareholder fails to vote all of such Shareholder Shares or execute such other instruments in accordance with the provisions of Section 5 of this Agreement. The proxy and power granted by each Shareholder pursuant to this Section are coupled with an interest and are given to secure the performance of such party's duties under Section 5 of this Agreement. Each such proxy and power will be irrevocable for the term hereof. The proxy and power, so long as any party hereto is an individual, will survive the death, incompetency and disability of such party or any other individual holder of the Shares, and, so long as any party hereto is an entity, will survive the merger or reorganization of such party or any other entity holding any Shares.

**5.9 Special Quorum Requirement.** For so long as each of Fates and Gates have the right to designate certain members of the Company's Board as set forth in Section 5.2 hereof, the Major Shareholders shall vote their shares to retain the requirement set forth in the Articles that the Company shall not take any action requiring Board approval, unless such action is approved by a majority of the Board at a meeting that includes at least one Gates Director and one Fates Director. Notwithstanding the foregoing, to the extent that any of the Fates Directors or the Gates Directors fail or refuse to participate or engage in actions of the Board in a such a way that the lack of participation limits the Company's ability to function and operate its fundamental business and operations, the Major Shareholders shall be permitted to vote their shares in order to change the provisions of the Articles described in this Section 5.9.

## SECTION 6. MISCELLANEOUS.

**6.1 Governing Law.** This Agreement shall be governed by and construed under the laws of the State of California in all respects as such laws are applied to agreements among California residents entered into and to be performed entirely within California, without reference to conflicts of laws or principles thereof. The parties agree that any action brought by either party under or in relation to this Agreement, including without limitation to interpret or enforce any provision of this Agreement, shall be brought in, and each party agrees to and does hereby submit to the jurisdiction and venue of, any state or federal court located in the County of San Francisco, California.

**6.2 Successors and Assigns.** Except as otherwise expressly provided herein, the provisions hereof shall inure to the benefit of, and be binding upon, the parties hereto and their respective successors, assigns, heirs, executors, and administrators and shall inure to the benefit of and be enforceable by each person who shall be a holder of Registrable Securities from time to time; *provided, however*, that prior to the receipt by the Company of adequate written notice of the transfer of any Registrable Securities specifying the full name and address of the transferee, the Company may deem and treat the person listed as the holder of such shares in its records as the absolute owner and holder of such shares for all purposes, including the payment of dividends or any redemption price.

**6.3 Entire Agreement.** This Agreement, the Exhibits and Schedules hereto, the Purchase Agreement and the other documents delivered pursuant thereto constitute the full and entire understanding and agreement between the parties with regard to the subjects hereof and no party shall be

liable or bound to any other in any manner by any oral or written representations, warranties, covenants and agreements except as specifically set forth herein and therein. Each party expressly represents and warrants that it is not relying on any oral or written representations, warranties, covenants or agreements outside of this Agreement.

6.4 **Severability.** In the event one or more of the provisions of this Agreement should, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provisions of this Agreement, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

6.5 **Amendment and Waiver.**

**(a)** Except as otherwise expressly provided, this Agreement may be amended or modified, and the obligations of the Company and the rights of the Major Shareholders under this Agreement may be waived, only upon the written consent of the Company, Fates and Gates.

**(b)** For the purposes of determining the number of Major Shareholders entitled to vote or exercise any rights hereunder, the Company shall be entitled to rely solely on the list of record holders of its stock as maintained by or on behalf of the Company.

6.6 **Delays or Omissions.** It is agreed that no delay or omission to exercise any right, power, or remedy accruing to any party, upon any breach, default or noncompliance by another party under this Agreement shall impair any such right, power, or remedy, nor shall it be construed to be a waiver of any such breach, default or noncompliance, or any acquiescence therein, or of any similar breach, default or noncompliance thereafter occurring. It is further agreed that any waiver, permit, consent, or approval of any kind or character on any party's part of any breach, default or noncompliance under the Agreement or any waiver on such party's part of any provisions or conditions of this Agreement must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement, by law, or otherwise afforded to any party, shall be cumulative and not alternative.

6.7 **Notices.** All notices required or permitted hereunder shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by confirmed electronic mail or facsimile if sent during normal business hours of the recipient; if not, then on the next business day, (c) 5 days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be sent to the party to be notified at the address as set forth on the signature pages hereof or Exhibit A hereto or at such other address or electronic mail address as such party may designate by 10 days advance written notice to the other parties hereto.

6.8 **Attorneys' Fees.** In the event that any suit or action is instituted under or in relation to this Agreement, including without limitation to enforce any provision in this Agreement, the prevailing party in such dispute shall be entitled to recover from the losing party all fees, costs and expenses of enforcing any right of such prevailing party under or with respect to this Agreement, including without limitation, such reasonable fees and expenses of attorneys and accountants, which shall include, without limitation, all fees, costs and expenses of appeals.

6.9 **Titles and Subtitles.** The titles of the sections and subsections of this Agreement are for convenience of reference only and are not to be considered in construing this Agreement.

**6.10 Additional Parties.** Notwithstanding anything to the contrary contained herein, if the Company shall issue additional shares of its capital stock, including upon exercise of the Warrant, then any shareholder who acquires at least 1% of the total number of shares of the Company's outstanding capital stock shall become a party to this Agreement by executing and delivering an additional counterpart signature page to this Agreement and shall be deemed a "***Shareholder***" and a party hereunder.

**6.11 Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one instrument.

**6.12 Aggregation of Stock.** All Shares held or acquired by affiliated entities or persons or persons or entities under common management or control shall be aggregated together for the purpose of determining the availability of any rights under this Agreement.

**6.13 Pronouns.** All pronouns contained herein, and any variations thereof, shall be deemed to refer to the masculine, feminine or neutral, singular or plural, as to the identity of the parties hereto may require.

**6.14 Termination.** This Agreement shall terminate and be of no further force or effect upon the earlier of (i) an Acquisition; (ii) the date that is three years following the Closing of an initial public offering of the Company's common stock; or (iii) the written consent of each of the Company, Fates and Gates.

[THIS SPACE INTENTIONALLY LEFT BLANK]

The parties hereto have executed this **SHAREHOLDER AGREEMENT** as of the date set forth in the first paragraph hereof.

**COMPANY:**

**NEIGHBORHOOD POWER CORPORATION**

______________________________________
Stephen Gates, President

**SHAREHOLDERS:**

**STEPHEN GATES**

______________________________________

**FATES GROUP LLC**

______________________________________

# EXHIBIT E

## FORM OF STOCK PURCHASE AGREEMENT

[Attached hereto]

# NEIGHBORHOOD POWER CORPORATION

# COMMON STOCK PURCHASE AGREEMENT

**THIS COMMON STOCK PURCHASE AGREEMENT** (the "***Agreement***") is made and entered into as of ___________ __, 201_, by and among **NEIGHBORHOOD POWER CORPORATION**, a California corporation (the "***Company***") and the Fates Group LLC ("***Purchaser***").

## RECITALS

**A.** The Company has authorized the sale and issuance of 1,000 shares of its Common Stock (the "***Shares***") to Purchaser.

**B.** Purchaser desires to purchase the Shares on the terms and conditions set forth herein.

**C.** The Company desires to issue and sell the Shares to Purchaser on the terms and conditions set forth herein.

## AGREEMENT

The parties hereto agree as follows:

**1. AGREEMENT TO SELL AND PURCHASE.**

**1.1 Authorization of Shares**. The Company has authorized the sale and issuance to Purchaser of the Shares. The Shares have the rights, preferences, privileges and restrictions set forth in the Amended and Restated Certificate of Incorporation (the "***Charter***") and the Amended and Restated Bylaws of the Company (the "***Bylaws***").

**1.2 Sale and Purchase**. Subject to the terms and conditions hereof, at the Closing (as hereinafter defined) the Company hereby agrees to issue and sell to Purchaser, and Purchaser agrees to purchase from the Company 1,000 Shares of Common Stock of the Company, at a purchase price of $5,000.00 per share.

**2. CLOSING, DELIVERY AND PAYMENT.**

**2.1 Closing**. The closing of the sale and purchase of the Shares under this Agreement (the "***Closing***") shall occur at the offices of the Company immediately following the execution of this Agreement or at such other time or place as the Company and Purchaser may mutually agree (such date is hereinafter referred to as the "***Closing Date***").

**2.2 Delivery**. At the Closing, subject to the terms and conditions hereof, the Company will deliver to Purchaser a certificate representing the number of Shares to be purchased at the Closing by Purchaser, against payment of the purchase price therefor by check or wire transfer made payable to the order of the Company.

**3. REPRESENTATIONS AND WARRANTIES OF THE COMPANY.**

The Company hereby represents and warrants to Purchaser as of the date of this Agreement as set forth below.

**3.1 Organization, Good Standing and Qualification**. The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of California. The Company has all requisite corporate power and authority to own and operate its properties and assets, to execute and deliver this Agreement, to issue and sell the Shares, and to carry out the provisions of this Agreement and the Charter and to carry on its business as presently conducted and as presently proposed to be conducted. The Company is duly qualified to do business and is in good standing as a foreign corporation in all jurisdictions in which the nature of its activities and of its properties (both owned and leased) makes such qualification necessary, except for those jurisdictions in which failure to do so would not have a material adverse effect on the Company or its business.

**3.2 Authorization; Binding Obligations**. All corporate action on the part of the Company, its officers, directors and stockholders necessary for the authorization of this Agreement the performance of all obligations of the Company hereunder at the Closing and the authorization, sale, issuance and delivery of the Shares pursuant hereto has been taken. The Agreement, when executed and delivered, will be a valid and binding obligation of the Company enforceable in accordance with its terms, except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium or other laws of general application affecting enforcement of creditors' rights and (b) general principles of equity that restrict the availability of equitable remedies.

**3.3 Capitalization.** The authorized capital of the Company consists, immediately prior to the Closing, of: 20,000 shares of common stock, $0.0001 par value per share, 1,000 shares of which are issued and outstanding immediately prior to the Initial Closing. All of the outstanding shares of Common Stock have been duly authorized, are fully paid and nonassessable and were issued in compliance with all applicable federal and state securities laws.

**3.4 Changes**. Except as otherwise indicated on Schedule 3.4, since ______ __, 201_, there has not been:

(a) any change in the assets, liabilities, financial condition or operating results of the Company from that reflected in the financial statements delivered to Purchaser as of ______ __, 201_, except changes in the ordinary course of business;

(b) any damage, destruction or loss, whether or not covered by insurance;

(c) any waiver or compromise by the Company of a valuable right or of a material debt owed to it;

(d) any satisfaction or discharge of any lien, claim, or encumbrance or payment of any obligation by the Company, except in the ordinary course of business;

(e) any material change to a material contract or agreement by which the Company or any of its assets is bound or subject;

(f) any material change in any compensation arrangement or agreement with any employee, officer, director or stockholder;

(g) any resignation or termination of employment of any officer or Key Employee of the Company;

(h) any mortgage, pledge, transfer of a security interest in, or lien, created by the Company, with respect to any of its material properties or assets, except liens for taxes not yet due or

payable and liens that arise in the ordinary course of business and do not materially impair the Company's ownership or use of such property or assets;

(i) any loans or guarantees made by the Company to or for the benefit of its employees, officers or directors, or any members of their immediate families, other than travel advances and other advances made in the ordinary course of its business;

(j) any declaration, setting aside or payment or other distribution in respect of any of the Company's capital stock, or any direct or indirect redemption, purchase, or other acquisition of any of such stock by the Company;

(k) any sale, assignment or transfer of any Company Intellectual Property;

(l) receipt of notice that there has been a loss of, or material order cancellation by, any major customer of the Company;

(m) to the Company's knowledge, any other event or condition of any character, other than events affecting the economy or the Company's industry generally, or

(n) any arrangement or commitment by the Company to do any of the things described in this Subsection 3.4.

**3.5 Offering Valid**. Assuming the accuracy of the representations and warranties of Purchaser contained in Section 4.2 hereof, the offer, sale and issuance of the Shares will be exempt from the registration requirements of the Securities Act of 1933, as amended (the "***Securities Act***"), and will have been registered or qualified (or are exempt from registration and qualification) under the registration, permit or qualification requirements of all applicable state securities laws. Neither the Company nor any agent on its behalf has solicited or will solicit any offers to sell or has offered to sell or will offer to sell all or any part of the Shares to any person or persons so as to bring the sale of such Shares by the Company within the registration provisions of the Securities Act or any state securities laws.

## 4. Representations And Warranties Of Purchaser.

Purchaser hereby represents and warrants to the Company as follows (provided that such representations and warranties do not lessen or obviate the representations and warranties of the Company set forth in this Agreement):

**4.1 Requisite Power and Authority**. Purchaser has all necessary power and authority to execute and deliver this Agreement and to carry out its provisions. All action on Purchaser's part required for the lawful execution and delivery of this Agreement has been taken. Upon its execution and delivery, this Agreement will be a valid and binding obligation of Purchaser, enforceable in accordance with their terms, except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium or other laws of general application affecting enforcement of creditors' rights and (b) as limited by general principles of equity that restrict the availability of equitable remedies.

**4.2 Investment Representations**. Purchaser understands that the Shares have not been registered under the Securities Act Purchaser also understands that the Shares are being offered and sold pursuant to an exemption from registration contained in the Securities Act based in part upon Purchaser's representations contained in the Agreement. Purchaser hereby represents and warrants as follows:

**(a) Purchaser Bears Economic Risk.** Purchaser has substantial experience in evaluating and investing in private placement transactions of securities in companies similar to the Company so that it is capable of evaluating the merits and risks of its investment in the Company and has the capacity to protect its own interests. Purchaser must bear the economic risk of this investment indefinitely unless the Shares are registered pursuant to the Securities Act, or an exemption from registration is available. Purchaser understands that the Company has no present intention of registering the Shares. Purchaser also understands that there is no assurance that any exemption from registration under the Securities Act will be available and that, even if available, such exemption may not allow Purchaser to transfer all or any portion of the Shares under the circumstances, in the amounts or at the times Purchaser might propose.

**(b) Acquisition for Own Account.** Purchaser is acquiring the Shares for Purchaser's own account for investment only, and not with a view towards their distribution.

**(c) Purchaser Can Protect Its Interest.** Purchaser represents that by reason of its, or of its management's, business or financial experience, Purchaser has the capacity to protect its own interests in connection with the transactions contemplated in this Agreement. Further, Purchaser is aware of no publication of any advertisement in connection with the transactions contemplated in the Agreement.

**(d) Accredited Investor.** Purchaser represents that it is an accredited investor within the meaning of Regulation D under the Securities Act.

**(e) Company Information.** Purchaser has had an opportunity to discuss the Company's business, management and financial affairs with directors, officers and management of the Company and has had the opportunity to review the Company's operations and facilities. Purchaser has also had the opportunity to ask questions of and receive answers from, the Company and its management regarding the terms and conditions of this investment.

**(f) Rule 144.** Purchaser acknowledges and agrees that the Shares are "restricted securities" as defined in Rule 144 promulgated under the Securities Act as in effect from time to time and must be held indefinitely unless they are subsequently registered under the Securities Act or an exemption from such registration is available. Purchaser has been advised or is aware of the provisions of Rule 144, which permits limited resale of shares purchased in a private placement subject to the satisfaction of certain conditions, including, among other things: the availability of certain current public information about the Company, the resale occurring following the required holding period under Rule 144 and the number of shares being sold during any three-month period not exceeding specified limitations.

**(g) Residence.** If Purchaser is an individual, then Purchaser resides in the state or province identified in the address of Purchaser set forth beneath their signature; if Purchaser is a partnership, corporation, limited liability company or other entity, then the office or offices of Purchaser in which its investment decision was made is located at the address or addresses of Purchaser set forth beneath their signature.

**4.3 Transfer Restrictions.** Purchaser acknowledges and agrees that the Shares are subject to restrictions on transfer as set forth in the Bylaws.

5. **MISCELLANEOUS.**

5.1 **Governing Law**. This Agreement shall be governed by and construed under the laws of the State of California in all respects as such laws are applied to agreements among California residents entered into and performed entirely within California, without giving effect to conflict of law principles thereof. The parties agree that any action brought by either party under or in relation to this Agreement, including without limitation to interpret or enforce any provision of this Agreement, shall be brought in, and each party agrees to and does hereby submit to the jurisdiction and venue of, any state or federal court located in the County of San Francisco, California.

5.2 **Successors and Assigns**. This Agreement shall inure to the benefit of the successors and assigns of the Company and the Purchaser, subject to the restrictions on transfer herein set forth, be binding upon the Company, Purchaser and their respective successors and assigns.

5.3 **Entire Agreement**. This Agreement constitutes the full and entire understanding and agreement between the parties with regard to the subjects hereof.

5.4 **Severability**. In the event one or more of the provisions of this Agreement should, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions of this Agreement, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

5.5 **Amendment and Waiver**. This Agreement may be amended or modified, and the obligations of the Company and the rights of Purchaser under the Agreement may be waived, only upon the written consent of the Company and Purchaser.

5.6 **Notices**. All notices required or permitted hereunder shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the party to be notified or by electronic mail, (b) when sent by confirmed electronic mail, telex or facsimile if sent during normal business hours of the recipient, if not, then on the next business day, (c) five days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be sent to the Company at the address as set forth on the signature page hereof and to Purchaser at the address set forth on the signature page hereof or at such other address or electronic mail address as the Company or Purchaser may designate by ten days advance written notice to the other parties hereto.

5.7 **Titles and Subtitles**. The titles of the sections and subsections of the Agreement are for convenience of reference only and are not to be considered in construing this Agreement.

5.8 **Counterparts**. This Agreement may be executed in one or more counterparts, each of which shall be an original, but both of which together shall constitute one instrument.

5.9 **California Corporate Securities Law**. THE SALE OF THE SECURITIES WHICH ARE THE SUBJECT OF THIS AGREEMENT HAS NOT BEEN QUALIFIED WITH THE COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA AND THE ISSUANCE OF SUCH SECURITIES OR THE PAYMENT OR RECEIPT OF ANY PART OF THE CONSIDERATION THEREFOR PRIOR TO SUCH QUALIFICATION OR IN THE ABSENCE OF AN EXEMPTION FROM SUCH QUALIFICATION IS UNLAWFUL. PRIOR TO ACCEPTANCE OF SUCH CONSIDERATION BY THE COMPANY, THE RIGHTS OF ALL PARTIES TO THIS

AGREEMENT ARE EXPRESSLY CONDITIONED UPON SUCH QUALIFICATION BEING OBTAINED OR AN EXEMPTION FROM SUCH QUALIFICATION BEING AVAILABLE.

The parties hereto have executed the **COMMON STOCK PURCHASE AGREEMENT** as of the date set forth in the first paragraph hereof.

| | |
|---|---|
| **COMPANY:** | **PURCHASER:** |
| **NEIGHBORHOOD POWER CORPORATION** | **FATES GROUP, LLC** |
| By:________________________ | By:________________________ |
| Name: Stephen Gates | Name:______________________ |
| Title: President | Title:_______________________ |
| Address: ____________________ | Address: ____________________ |
| ____________________________ | ____________________________ |

# EXHIBIT F

## APPROVED UNITED STATES PROJECT LIST

| Project | Project Owner | Projected Location |
|---|---|---|
| Kula Ag | Kula Ag PV, LLC | 7500 Kulakula Road, Kula HI 96790 |
| S&F Basin | S&F Pond PV, LLC | 2000 Mokulele Hwy, Puunene, HI 96784 |

**Exhibit G**

**AMENDED AND RESTATED ARTICLES OF INCORPORATION**

[Attached hereto]

# AMENDED AND RESTATED ARTICLES OF INCORPORATION OF NEIGHBORHOOD POWER CORPORATION

Stephen Gates hereby certifies that:

**ONE:** He is the duly elected and acting President and Secretary of **NEIGHBORHOOD POWER CORPORATION**, a California corporation.

**TWO:** The Articles of Incorporation of this corporation are hereby amended and restated to read as follows:

**I.**

The name of this corporation is **NEIGHBORHOOD POWER CORPORATION** (the "***Company***").

**II.**

The purpose of this corporation is to engage in any lawful act or activity for which a corporation may be organized under the General Corporation Law of California other than the banking business, the trust company business or the practice of a profession permitted to be incorporated by the California Corporations Code.

**III.**

**A.** The Company is authorized to issue one class of stock to be designated "***Common Stock***." The total number of shares of Common Stock authorized 20,000 shares, no par value.

**B.** The rights, preferences, privileges, restrictions and other matters relating to the Common Stock are as follows:

**1. VOTING RIGHTS.**

**(a) Special Quorum Requirement.** For so long as each of Fates Group LLC and Stephen Gates have the right to designate certain members of the Company's Board of Directors (the "***Board***") as set forth in that certain Shareholder Rights Agreement entered into on or about ______ __, 201_ by and among Stephen Gates, Fates Group LLC and the Company, as amended from time to time (the "***Voting Agreement***"), the Company shall not take any action requiring Board approval, unless such action is approved by a majority of the Board of Directors either (i) by unanimous written consent, or (ii) at a meeting whose attendees include at least one Gates Director (as defined in the Voting Agreement) and at least one Fates Director (as defined in the Voting Agreement). Notwithstanding the foregoing, to the extent that any of the Fates Directors or the Gates Directors fail or refuse to attend or participate or engage in meetings and actions of the Board in a such a way that the lack of participation limits the Company's ability to function and operate its fundamental business and operations, the requirements of this Section 1(a) shall not apply, and any actions of the Board with respect to such decisions may be taken with the approval of a majority of the Board at a meeting at which a quorum, as required by the Company's bylaws, is present.

**(b) Election of Board of Directors.**

**(i)** Subject to the terms of the Voting Agreement, the holders of Common Stock shall be entitled to elect the members of the Board at each meeting or pursuant to each consent of the Company's shareholders for the election of directors, and to remove from office such directors and to fill any vacancy caused by the resignation, death or removal of such directors.

**(ii)** Every shareholder entitled to vote at an election for directors may cumulate such shareholder's votes and give one candidate a number of votes equal to the number of directors to be elected multiplied by the number of votes to which such shareholder's shares are otherwise entitled, or distribute the shareholder's votes on the same principle among as many candidates as such shareholder desires. No shareholder, however, shall be entitled to so cumulate such shareholder's votes unless (A) the names of such candidate or candidates have been placed in nomination prior to the voting and (B) the shareholder has given notice at the meeting, prior to the voting, of such shareholder's intention to cumulate such shareholder's votes. If any shareholder has given proper notice to cumulate votes, all shareholders may cumulate their votes for any candidates who have been properly placed in nomination. Under cumulative voting, the candidates receiving the highest number of votes, up to the number of directors to be elected, are elected.

**(c)** **Separate Vote of Majority of Board.** In addition to any other vote or consent required herein or by law, the Company shall not, either directly or indirectly by amendment, merger, consolidation or otherwise, do any of the following without the affirmative vote of a majority of the members of the Board:

**(i)** Declare or pay any dividend or make any other distribution on any shares of Common Stock;

**(ii)** Repurchase any shares of Common Stock other (A) than acquisitions of Common Stock by the Company pursuant to agreements that permit the Company to repurchase such shares upon termination of services to the Company, provided that such shares are repurchased at no more than cost, and (B) acquisitions of Common Stock in exercise of the Company's right of first refusal to repurchase such shares (each a "***Permitted Share Purchase***");

**(iii)** Issue or authorize the issuance of any shares of Common Stock or other capital stock by the Company or any subsidiary, member of any joint venture, or other entity under common control (a "***Group Company***"), other than pursuant to an approved equity incentive plan approved by the Board;

**(iv)** Create or authorize the creation of any direct or indirect subsidiary of the Company;

**(v)** Permit any additional material indebtedness of the Company, including any Group Company (excluding indebtedness between Group Companies) other than working capital obligations incurred in the ordinary course or pursuant to credit facilities approved by the Board;

**(vi)** Make any loans or other financial facilities available to any person, other than: (A) loans or other financial facilities made to Group Companies; and (B) credit afforded to customers in the ordinary course of business;

**(vii)** Prematurely repay or prepay any material term borrowings of any Group Company (excluding (i) trade debts and (ii) arrangements solely between Group Companies) or materially amend the terms of other borrowings or financial indebtedness;

**(viii)** Amend, waive, cancel, release, factor or assign any indebtedness owed to the Company (or any Group Company) or any claims held by the Company (or any Group Company) other than: (A) where required in the ordinary course of business; (B) immaterial debts of not more than $20,000 in aggregate in any financial year; (C) trade debts written off in the ordinary course of business; and (D) the amendment, waiver, cancellation or release or indebtedness as between Group Companies;

**(ix)** Enter into any guarantee or indemnity in respect of any liability or obligation of any other person (other than a liability or obligation of, or which is incurred for the benefit of, any Group Company or which is otherwise incurred in the ordinary course of business);

**(x)** Enter into any financial instrument or contract relating to derivatives or differences, or otherwise in respect of future movements of an index or rate of currency exchange or interest, or in the future price of any securities or commodities (other than foreign exchange rate hedging undertaken for the benefit of the Company, including any Group Company, in the ordinary course of business and for the purpose of reducing foreign exchange rate risk);

**(xi)** Make any change to the accounting reference date of any Group Company or terminate, appoint or otherwise change the auditors of any Group Company;

**(xii)** Make any material change to the accounting policies, bases, methods and/or practices of any Group Company (save for any change required by law or in accordance with applicable accounting standards, principles and practices generally accepted in the United States);

**(xiii)** Open or close any account with any financial institution or change any financial institution with which the Company or any Group Company holds its accounts;

**(xiv)** Incur capital expenditures above $100,000 individually or $250,000 in the aggregate other than is reasonably necessary to facilitate the continuation of the business of the Company, including any Group Company, in the ordinary course;

**(xv)** Engage (or renew or terminate any existing engagement of) any officer, director, consultant or individual holding an executive position within any Group Company;

**(xvi)** Materially vary or make any binding decisions concerning the terms of appointment of (including, without limitation, any terms as may concern salary, fees, remuneration and other benefits to be provided) of any individual holding an executive position within any Group Company;

**(xvii)** Acquire or dispose of any material freehold or leasehold property or the acquisition, grant or surrender of a material license or lease in respect of any real property;

**(xviii)** Commence, compromise, settle or waive any right in respect of, or discontinue, any legal or arbitration proceedings or other formal dispute resolution process (other than in respect of claims where the value in dispute does not exceed $100,000 and the subject matter or such claim (or its terms of settlement) are not otherwise material to the business and interests of the Company, including all Group Companies, when considered as a whole);

**(xix)** Enter into, terminate, vary or amend any agreement, arrangement or transaction: (A) that involve purchase commitments in excess of $250,000 or performance obligations in excess of $500,000 with an exceptional limit of $1,000,000 for contracts or purchase orders

originating from existing repeat customers or their affiliates; (B) is with (or for the benefit of) any shareholder or other affiliate of the Company or any director of the Company or any Group Company (or any transferee of any of the foregoing); or (C) is other than on arms' length terms (except in respect of a transaction with another Group Company);

**(xx)** Enter into, terminate, vary or amend any insurance agreement, policy or arrangement, including any key man insurance;

**(xxi)** Conduct or negotiate any sales of subsidiaries or material assets, including any all patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information and other proprietary rights and processes (***"Intellectual Property Rights"***) of the Company or any Group Company;

**(xxii)** Dispose of, release, disclaim or take any action (or fail to take any action) which otherwise prejudices any right, title or interest of the Company, including any Group Company, in any Intellectual Property Rights;

**(xxiii)** Any material amendment to the Company's Business Plan (including, but not limited to any material amendment to the annual budget set out in the Business Plan) or to the business of the Company, including any Group Company;

**(xxiv)** Cease trading, or commence any action for its liquidation or dissolution or to place it in administration, or institute any matter analogous to the foregoing (except to the extent reasonably required by any duty to protect the interests of creditors);

**(xxv)** Cease, or propose to cease, to carry on its business or take or permit any step to wind up the Company or any Group Company (except where it is unable to pay its debts within the meaning of the U.S. Bankruptcy Code or equivalent local legislation) or is otherwise insolvent and a failure to take such steps would result in a breach of the director's duties to protect creditors; or

**(xxvi)** Permit the Company or any Group Company to: (A) be placed into administration (whether by the filing of an administration application, a notice of intention to appoint an administrator or a notice of appointment); (B) propose or enter into any arrangement, scheme, moratorium, compromise or composition with its creditors under the U.S. Bankruptcy Code or equivalent local legislation or apply for interim relief from an claims of creditors; (C) have a receiver or administrative receiver appointed over all or any part of its assets or undertaking; or (D) proceedings analogous to the preceding in the relevant local jurisdiction.

**V.**

**A.** The liability of the directors of the Company for monetary damages shall be eliminated to the fullest extent under applicable law.

**B.** The Company is authorized to provide, through bylaw provisions, agreements with the agents, shareholder resolutions or otherwise, indemnification of agents (as defined in Section 317 of the California Corporations Code) for breach of duty to the Company and its shareholders in excess of the indemnification otherwise permitted by Section 317 of the California Corporations Code, subject to the limits on such excess indemnification set forth in Section 204 of the California Corporations Code.

**C.** If, after the effective date of this Article, California law is amended in a manner that permits a company to limit the monetary or other liability of its directors, or authorizes indemnification of, or advancement of such defense expenses to, its directors or other persons, in any such case to a greater extent than is permitted on such effective date, the references in this Article to "California law" shall to that extent be deemed to refer to California law as so amended.

**D.** Any repeal or modification of this Article IV shall only be prospective and shall not affect the rights or protections or increase the liability of any director under this Article IV in effect at the time of the alleged occurrence of any act or omission to act giving rise to liability or indemnification.

**IV.**

For the management of the business and for the conduct of the affairs of the Company, and in further definition, limitation and regulation of the powers of the Company, of its directors and of its shareholders or any class thereof, as the case may be, it is further *provided* that:

**A.** The management of the business and the conduct of the affairs of the Company shall be vested in its Board. The number of directors that shall constitute the whole Board shall be fixed by the Board in the manner provided in the Bylaws, subject to any restrictions which may be set forth in these Articles or in the Voting Agreement.

**B.** The Board of Directors is expressly empowered to adopt, amend or repeal the Bylaws of the Company, subject to any restrictions that may be set forth in these Articles or in the Voting Agreement. The shareholders shall also have the power to adopt, amend or repeal the Bylaws of the Company, subject to any restrictions that may be set forth in these Articles or in the Voting Agreement.

**THREE:** The foregoing amendment and restatement of the Articles of Incorporation has been duly approved by the Board of Directors of this corporation.

**FOUR:** The foregoing amendment and restatement of the Articles of Incorporation has been duly approved by the required vote of shareholders in accordance with Section 902 of the California Corporations Code. The total number of outstanding shares entitled to vote with respect to the foregoing amendment was 1,000 shares of Common Stock. The number of shares voting in favor of the foregoing amendment equaled or exceeded the vote required.

[SIGNATURE PAGE FOLLOWS]

The undersigned, Stephen Gates, the President and Secretary of **NEIGHBORHOOD POWER CORPORATION**, declare under penalty of perjury under the laws of the State of California that the matters set out in the foregoing certificate are true of our own knowledge.

Date: ______ __, 201_.

______________________________
Stephen Gates, President

______________________________
Stephen Gates, Secretary

**Exhibit H**

**AMENDED AND RESTATED BYLAWS**

[Attached hereto]

# AMENDED AND RESTATED

# BYLAWS

# OF

# NEIGHBORHOOD POWER CORPORATION

(A CALIFORNIA CORPORATION)

# AMENDED AND RESTATED BYLAWS
# OF
# NEIGHBORHOOD POWER CORPORATION
# (A CALIFORNIA CORPORATION)

## ARTICLE I

## OFFICES

**Section 1. Principal Office.** The principal executive office of the corporation shall be located at such place as the Board of Directors may from time to time authorize. If the principal executive office is located outside this state, and the corporation has one or more business offices in this state, the Board of Directors shall fix and designate a principal business office in the State of California.

**Section 2. Other Offices.** Additional offices of the corporation shall be located at such place or places, within or outside the State of California, as the Board of Directors may from time to time authorize.

## ARTICLE II

## CORPORATE SEAL

**Section 3. Corporate Seal.** If the Board of Directors adopts a corporate seal such seal shall have inscribed thereon the name of the corporation and the state and date of its incorporation. If and when a seal is adopted by the Board of Directors, such seal may be engraved, lithographed, printed, stamped, impressed upon, or affixed to any contract, conveyance, certificate for shares, or other instrument executed by the corporation.

## ARTICLE III

## SHAREHOLDERS' MEETINGS AND VOTING RIGHTS

**Section 4. Place of Meetings.** Meetings of shareholders shall be held at the principal executive office of the corporation, or at any other place, within or outside the State of California, which may be fixed either by the Board of Directors or by the written consent of all persons entitled to vote at such meeting, given either before or after the meeting and filed with the Secretary of the Corporation.

**Section 5. Annual Meeting.** The annual meeting of the shareholders of the corporation shall be held on any date and time which may from time to time be designated by the Board of Directors. At such annual meeting, directors shall be elected and any other business may be transacted which may properly come before the meeting.

**Section 5. Postponement of Annual Meeting.** The Board of Directors and the President shall each have authority to hold at an earlier date and/or time, or to postpone to a later date and/or time, the annual meeting of shareholders.

**Section 6. Special Meetings.**

**(a)** Special meetings of the shareholders, for any purpose or purposes, may be called by the Board of Directors, the Chairman of the Board of Directors, the President, or the holders of shares entitled to cast not less than ten percent (10%) of the votes at the meeting.

**(b)** Upon written request to the Chairman of the Board of Directors, the President, any vice president or the Secretary of the corporation by any person or persons (other than the Board of Directors) entitled to call a special meeting of the shareholders, such officer forthwith shall cause notice to be given to the shareholders entitled to vote, that a meeting will be held at a time requested by the person or persons calling the meeting, such time to be not less than thirty-five (35) nor more than sixty (60) days after receipt of such request. If such notice is not given within twenty (20) days after receipt of such request, the person or persons calling the meeting may give notice thereof in the manner provided by law or in these bylaws. Nothing contained in this Section 6 shall be construed as limiting, fixing or affecting the time or date when a meeting of shareholders called by action of the Board of Directors may be held.

**Section 7. Notice of Meetings.** Except as otherwise may be required by law and subject to subsection 6(b) above, written notice of each meeting of shareholders shall be given to each shareholder entitled to vote at that meeting (see Section 14 below), by the Secretary, assistant secretary or other person charged with that duty, not less than ten (10) (or, if sent by third class mail, thirty (30)) nor more than sixty (60) days before such meeting.

Notice of any meeting of shareholders shall state the date, place and hour of the meeting, the means of electronic transmission by and to the corporation (as defined in Sections 20 and 21 of the California Corporations Code) or electronic video screen communication, if any, by which shareholders may participate in that meeting, and,

**(a)** in the case of a special meeting, the general nature of the business to be transacted, and no other business may be transacted at such meeting;

**(b)** in the case of an annual meeting, the general nature of matters which the Board of Directors, at the time the notice is given, intends to present for action by the shareholders;

**(c)** in the case of any meeting at which directors are to be elected, the names of the nominees intended at the time of the notice to be presented by management for election; and

**(d)** in the case of any meeting, if action is to be taken on any of the following proposals, the general nature of such proposal:

**(1)** a proposal to approve a transaction within the provisions of California Corporations Code, Section 310 (relating to certain transactions in which a director has a direct or indirect financial interest);

**(2)** a proposal to approve a transaction within the provisions of California Corporations Code, Section 902 (relating to amending the Articles of Incorporation of the corporation);

**(3)** a proposal to approve a transaction within the provisions of California Corporations Code, Section 1152 (relating to a plan of conversion by a corporation to a domestic other business entity);

**(4)** a proposal to approve a transaction within the provisions of California Corporations Code, Section 1201 (relating to reorganization);

**(5)** a proposal to approve a transaction within the provisions of California Corporations Code, Section 1900 (winding up and dissolution);

**(6)** a proposal to approve a plan of distribution within the provisions of California Corporations Code, Section 2007 (relating to certain plans providing for distribution not in accordance with the liquidation rights of preferred shares, if any).

At a special meeting, notice of which has been given in accordance with this Section, action may not be taken with respect to business, the general nature of which has not been stated in such notice. At an annual meeting, action may be taken with respect to business stated in the notice of such meeting, given in accordance with this Section, and, subject to subsection 7(d) above, with respect to any other business as may properly come before the meeting.

**Section 8. Manner of Giving Notice.** Notice of any meeting of shareholders shall be given either personally, by electronic transmission by the corporation (as defined in Section 20 of the California Corporations Code), or by first-class mail, or, if the corporation has outstanding shares held of record by 500 or more persons (determined as provided in California Corporations Code Section 605) on the record date for such meeting, third-class mail, or other means of written communication, addressed to the shareholder at the address of that shareholder appearing on the books of the corporation or given by the shareholder to the corporation for the purpose of notice. If no such address appears on the corporation's books or is given, notice shall be deemed to have been given if sent to that shareholder at the place where the corporation's principal executive office is located, or if published at least once in a newspaper of general circulation in the county where that office is located. Notice may not be given by electronic transmission (as defined in Section 20 of the California Corporations Code) if (a) the corporation is unable to deliver two (2) consecutive notices to the shareholder by such means, or (b) the inability to deliver the notices to the shareholder becomes known to the secretary, any assistant secretary, the transfer agent or other person responsible for giving notice. Notice shall be deemed to have been given at the time when delivered personally, sent by electronic transmission by the corporation (as defined in Section 20 of the California Corporations Code), deposited in the mail or sent by other means of written communication.

If any notice addressed to a shareholder at the address of that shareholder appearing on the books of the corporation is returned to the corporation by the United States Postal Service marked to indicate that the United States Postal Service is unable to deliver the notice to the shareholder at that address, all future notices shall be deemed to have been duly given without further mailing if these shall be available to the shareholder on written demand by the shareholder at the principal executive office of the corporation for a period of one year from the date of the giving of the notice.

An affidavit of mailing of any notice or report in accordance with the provisions of this Section 8, executed by the Secretary, assistant secretary or any transfer agent, shall be prima facie evidence of the giving of the notice.

**Section 9. Quorum and Transaction of Business.**

**(a)** At any meeting of the shareholders, a majority of the shares entitled to vote, represented in person or by proxy, shall constitute a quorum. If a quorum is present, the affirmative vote of the majority of shares represented and voting at the meeting (which shares voting affirmatively also constitute at least a majority of the required quorum) shall be the act of the shareholders, unless the vote of a greater number or voting by classes is required by law or by the Articles of Incorporation, and except as provided in subsection (b) below.

**(b)** The shareholders present at a duly called or held meeting of the shareholders at which a quorum is present may continue to do business until adjournment, notwithstanding the withdrawal of enough shareholders to leave less than a quorum, provided that any action taken (other than adjournment) is approved by at least a majority of the shares required to constitute a quorum.

**(c)** In the absence of a quorum, no business other than adjournment may be transacted, except as described in subsection (b) above.

**Section 10. Adjournment and Notice of Adjourned Meetings.** Any meeting of shareholders may be adjourned from time to time, whether or not a quorum is present, by the affirmative vote of a majority of shares represented at such meeting either in person or by proxy and entitled to vote at such meeting.

In the event any meeting is adjourned, it shall not be necessary to give notice of the time and place of such adjourned meeting pursuant to Sections 7 and 8 of these bylaws; provided that if any of the following three events occur, such notice must be given:

**(a)** announcement of the adjourned meeting's time and place (or the means of electronic transmission by and to the corporation (as defined in Sections 20 and 21 of the California Corporations Code) or electronic video screen communication, if any, by which the shareholders may participate) is not made at the original meeting which it continues or

**(b)** such meeting is adjourned for more than forty- five (45) days from the date set for the original meeting or

**(c)** a new record date is fixed for the adjourned meeting.

At the adjourned meeting, the corporation may transact any business which might have been transacted at the original meeting.

**Section 11. Waiver of Notice, Consent to Meeting or Approval of Minutes.**

**(a)** Subject to subsection (b) of this Section, the transactions of any meeting of shareholders, however called and noticed, and wherever held, shall be as valid as though made at a meeting duly held after regular call and notice, if a quorum is present either in person or by proxy, and if, either before or after the meeting, each of the persons entitled to vote but not present in person or by proxy provides a waiver of notice or a consent to holding of the meeting or an approval of the minutes thereof in writing.

**(b)** A waiver of notice, consent to the holding of a meeting or approval of the minutes thereof need not specify the business to be transacted at nor the purpose of the meeting; provided that in the case of proposals described in subsection (d) of Section 7 of these bylaws, the general nature of such proposals must be described in any such waiver of notice and such proposals can only be approved by waiver of notice, not by consent to holding of the meeting or approval of the minutes.

**(c)** All waivers, consents and approvals shall be filed with the corporate records or made a part of the minutes of the meeting.

**(d)** A person's attendance at a meeting shall constitute waiver of notice of and presence at such meeting, except when such person objects at the beginning of the meeting to transaction of any business because the meeting is not lawfully called or convened and except that attendance at a

meeting is not a waiver of any right to object to the consideration of matters which are required by law or these bylaws to be in such notice (including those matters described in subsection (d) of Section 7 of these bylaws), but are not so included if such person expressly objects to consideration of such matter or matters at any time during the meeting.

**Section 12. Action by Written Consent Without a Meeting.** Any action which may be taken at any meeting of shareholders may be taken without a meeting and without prior notice if written consents setting forth the action so taken are signed by the holders of the outstanding shares having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted.

Directors may not be elected by written consent except by unanimous written consent of all shares entitled to vote for the election of directors; provided that any vacancy on the Board of Directors (other than a vacancy created by removal) which has not been filled by the board of directors may be filled by the written consent of a majority of outstanding shares entitled to vote for the election of directors.

Any written consent may be revoked pursuant to California Corporations Code Section 603(c) prior to the time that written consents of the number of shares required to authorize the proposed action have been filed with the Secretary. Such revocation must be in writing and will be effective upon its receipt by the Secretary.

If the consents of all shareholders entitled to vote have not been solicited in writing, and if the unanimous written consent of all such shareholders shall not have been received, the Secretary shall give prompt notice of any corporate action approved by the shareholders without a meeting to those shareholders entitled to vote on such matters who have not consented thereto in writing This notice shall be given in the manner specified in Section 8 of these bylaws. In the case of approval of (i) a transaction within the provisions of California Corporations Code, Section 310 (relating to certain transactions in which a director has an interest), (ii) a transaction within the provisions of California Corporations Code, Section 317 (relating to indemnification of agents of the corporation), (iii) a transaction within the provisions of California Corporations Code, Section 1152 (relating to a plan of conversion by a corporation to a domestic other business entity), (iv) a transaction within the provisions of California Corporations Code, Section 1201 (relating to reorganization), and (v) a plan of distribution within the provisions of California Corporations Code, Section 2007 (relating to certain plans providing for distribution not in accordance with the liquidation rights of preferred shares, if any), the notice shall be given at least ten (10) days before the consummation of any action authorized by that approval.

**Section 13. Voting.** The shareholders entitled to vote at any meeting of shareholders shall be determined in accordance with the provisions of Section 14 of these bylaws, subject to the provisions of Sections 702 through 704 of the California Corporations Code (relating to voting shares held by a fiduciary, in the name of a corporation, or in joint ownership). Voting at any meeting of shareholders need not be by ballot; *provided, however,* that elections for directors must be by ballot if balloting is demanded by a shareholder at the meeting and before the voting begins.

Every person entitled to vote at an election for directors may cumulate the votes to which such person is entitled, *i.e.*, such person may cast a total number of votes equal to the number of directors to be elected multiplied by the number of votes to which such person's shares are entitled, and may cast said total number of votes for one or more candidates in such proportions as such person thinks fit; *provided, however,* no shareholder shall be entitled to so cumulate such shareholder's votes unless the candidate or candidates for which such shareholder is voting have been placed in nomination prior to the voting and a shareholder has given notice at the meeting, prior to the vote, of an intention to cumulate votes. In any

election of directors, the candidates receiving the highest number of affirmative votes of the shares entitled to be voted, up to the number of directors to be elected by such shares, are elected.

Except as may be otherwise provided in the Articles of Incorporation or by law, and subject to the foregoing provisions regarding the cumulation of votes, each shareholder shall be entitled to one vote for each share held.

Any shareholder may vote part of such shareholder's shares in favor of a proposal and refrain from voting the remaining shares or vote them against the proposal, other than elections to office, but, if the shareholder fails to specify the number of shares such shareholder is voting affirmatively, it will be conclusively presumed that the shareholder's approving vote is with respect to all shares such shareholder is entitled to vote.

No shareholder approval, other than unanimous approval of those entitled to vote, will be valid as to proposals described in subsection 7(d) of these bylaws unless the general nature of such business was stated in the notice of meeting or in any written waiver of notice.

**Section 14. Persons Entitled to Vote or Consent.** The Board of Directors may fix a record date pursuant to Section 60 of these bylaws to determine which shareholders are entitled to notice of and to vote at a meeting or consent to corporate actions, as provided in Sections 12 and 13 of these bylaws. Only persons in whose name shares otherwise entitled to vote stand on the stock records of the corporation on such date shall be entitled to vote or consent.

If no record date is fixed:

**(a)** The record date for determining shareholders entitled to notice of or to vote at a meeting of shareholders shall be at the close of business on the business day next preceding the day notice is given or, if notice is waived, at the close of business on the business day next preceding the day on which the meeting is held;

**(b)** The record date for determining shareholders entitled to give consent to corporate action in writing without a meeting, when no prior action by the Board of Directors has been taken, shall be the day on which the first written consent is given;

**(c)** The record date for determining shareholders for any other purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto, or the sixtieth (60th) day prior to the date of such other action, whichever is later.

A determination of shareholders of record entitled to notice of or to vote at a meeting of shareholders shall apply to any adjournment of the meeting unless the Board of Directors fixes a new record date for the adjourned meeting; *provided, however,* that the Board of Directors shall fix a new record date if the meeting is adjourned for more than forty-five (45) days from the date set for the original meeting.

Shares of the corporation held by its subsidiary or subsidiaries (as defined in California Corporations Code, Section 189(b)) are not entitled to vote in any matter.

**Section 15. Proxies.** Every person entitled to vote shares or execute consents may do so either in person or by one or more agents authorized to act by a written proxy executed by the person or such person's duly authorized agent and filed with the Secretary of the corporation; provided that no such proxy shall be valid after the expiration of eleven (11) months from the date of its execution unless

otherwise provided in the proxy. The manner of execution, suspension, revocation, exercise and effect of proxies is governed by applicable law.

**Section 16. Inspectors of Election.** Before any meeting of shareholders, the Board of Directors may appoint any persons, other than nominees for office, to act as inspectors of election at the meeting or its adjournment. If no inspectors of election are so appointed, the chairman of the meeting may, and on the request of any shareholder or a shareholder's proxy shall, appoint inspectors of election at the meeting. The number of inspectors shall be either one (1) or three (3). If inspectors are appointed at a meeting on the request of one or more shareholders or proxies, the majority of shares represented in person or proxy shall determine whether one (1) or three (3) inspectors are to be appointed. If any person appointed as inspector fails to appear or fails or refuses to act, the chairman of the meeting may, and upon the request of any shareholder or a shareholder's proxy shall, appoint a person to fill that vacancy.

These inspectors shall:

**(a)** Determine the number of shares outstanding and the voting power of each, the shares represented at the meeting, the existence of a quorum, and the authenticity, validity, and effect of proxies;

**(b)** Receive votes, ballots, or consents;

**(c)** Hear and determine all challenges and questions in any way arising in connection with the right to vote;

**(d)** Count and tabulate all votes or consents;

**(e)** Determine when the polls shall close;

**(f)** Determine the result; and

**(g)** Do any other acts that may be proper to conduct the election or vote with fairness to all shareholders.

## ARTICLE IV

## BOARD OF DIRECTORS

**Section 17. Powers.** Subject to the provisions of law or any limitations in the Articles of Incorporation or these bylaws, as to action required to be approved by the shareholders or by the outstanding shares, the business and affairs of the corporation shall be managed and all corporate powers shall be exercised, by or under the direction of the Board of Directors. The Board of Directors may delegate the management of the day-to-day operation of the business of the corporation to a management company or other person, provided that the business and affairs of the corporation shall be managed and all corporate powers shall be exercised under the ultimate direction of the Board of Directors.

**Section 18. Number of Directors.** The authorized number of directors of the corporation shall be not less than a minimum of three (3) nor more than a maximum of five (5) (which maximum number in no case shall be greater than two times said minimum, minus one) and the number of directors presently authorized is five (5). The exact number of directors shall be set within these limits from time to time (a) by approval of the Board of Directors, or (b) by the affirmative vote of a majority of the shares represented and voting at a duly held meeting at which a quorum is present (which shares voting

affirmatively also constitute at least a majority of the required quorum) or by the written consent of shareholders pursuant to Section 12 hereinabove.

Any amendment of these bylaws changing the maximum or minimum number of directors may be adopted only by the affirmative vote of a majority of the outstanding shares entitled to vote; provided, an amendment reducing the minimum number of directors to less than five (5), cannot be adopted if votes cast against its adoption at a meeting or the shares not consenting to it in the case of action by written consent are equal to more than 16-2/3 percent of the outstanding shares entitled to vote.

No reduction of the authorized number of directors shall remove any director prior to the expiration of such director's term of office.

**Section 19. Election Of Directors, Term, Qualifications.** The directors shall be elected at each annual meeting of shareholders to hold office until the next annual meeting. Each director, including a director elected or appointed to fill a vacancy, shall hold office until the expiration of the term for which elected or appointed and until a successor has been elected and qualified, or until his death, resignation or removal. Directors need not be shareholders of the corporation.

**Section 20. Resignations.** Any director of the corporation may resign effective upon giving written notice to the Chairman of the Board, the President, the Secretary or the Board of Directors of the corporation, unless the notice specifies a later time for the effectiveness of such resignation. If the resignation specifies effectiveness at a future time, a successor may be elected pursuant to Section 23 of these bylaws to take office on the date that the resignation becomes effective.

**Section 21. Removal.** The Board of Directors may declare vacant the office of a director who has been declared of unsound mind by an order of court or who has been convicted of a felony.

The entire Board of Directors or any individual director may be removed from office without cause by the affirmative vote of a majority of the outstanding shares entitled to vote on such removal; *provided, however,* that unless the entire Board is removed, no individual director may be removed when the votes cast against such director's removal, or not consenting in writing to such removal, would be sufficient to elect that director if voted cumulatively at an election at which the same total number of votes cast were cast (or, if such action is taken by written consent, all shares entitled to vote were voted) and the entire number of directors authorized at the time of such director's most recent election were then being elected.

**Section 22. Vacancies.** A vacancy or vacancies on the Board of Directors shall be deemed to exist in case of the death, resignation or removal of any director, or upon increase in the authorized number of directors or if shareholders fail to elect the full authorized number of directors at an annual meeting of shareholders or if, for whatever reason, there are fewer directors on the Board of Directors, than the full number authorized. Subject to the provisions of the Voting Agreement, such vacancy or vacancies may be filled by a majority of the remaining directors, though less than a quorum, or by a sole remaining director. The shareholders may elect a director at any time to fill any vacancy not filled by the directors. Any such election by written consent, other than to fill a vacancy created by removal, requires the consent of a majority of the outstanding shares entitled to vote. Any such election by written consent to fill a vacancy created by removal requires the consent of all of the outstanding shares entitled to vote.

If, after the filling of any vacancy by the directors, the directors then in office who have been elected by the shareholders constitute less than a majority of the directors then in office, any holder or holders of an aggregate of ten percent (10%) or more of the shares outstanding at that time and having the

right to vote for such directors may call a special meeting of shareholders to be held to elect the entire Board of Directors. The term of office of any director shall terminate upon such election of a successor.

**Section 23. Regular Meetings.** Regular meetings of the Board of Directors shall be held at such times, places and dates as fixed in these bylaws or by the Board of Directors; *provided, however,* that if the date for such a meeting falls on a legal holiday, then the meeting shall be held at the same time on the next succeeding full business day. Regular meetings of the Board of Directors held pursuant to this Section 23 may be held without notice.

**Section 24. Electronic Participation.** So long as permitted by statute, directors may participate in a meeting through use of conference telephone, electronic video screen communication, or by electronic transmission by and to the corporation (as defined in Sections 20 and 21 of the California Corporations Code). Participating in a meeting through the use of conference telephone or through electronic video screen communication pursuant to this section constitutes presence in person at that meeting as long as all members participating in the meeting are able to hear one another. Participation in a meeting through electronic transmission by and to the corporation (as defined in Sections 20 and 21 of the California Corporations Code) (other than conference telephone and electronic video screen communication) pursuant to this section constitutes presence in person at the meeting if (a) each member participating in the meeting can communicate with all of the other members concurrently; and (b) each member is provided the means of participating in all matters before the Board of Directors, including, without limitation, the capacity to propose, or to interpose an objection to, a specific action to be taken by the corporation.

**Section 25. Special Meetings.** Special meetings of the Board of Directors for any purpose may be called by the Chairman of the Board or the President or any vice president or the Secretary of the corporation or any two (2) directors.

**Section 26. Notice of Meetings.** Regular meetings of the Board of Directors may be held without notice if the time and place of the meetings are fixed by these Bylaws or the Board of Directors. Special meetings of the Board of Directors, shall be held upon four days' notice by mail or 48 hours notice delivered personally or by telephone, including a voice messaging system or by electronic transmission by the corporation (as defined in Section 20 of the California Corporations Code). A notice, or waiver of notice, need not specify the purpose of any regular or special meeting. Such notice may be given by the Secretary of the corporation or by the person or persons who called a meeting. Notice of any meeting of the Board of Directors need not be given to any director who provides a waiver of notice of such meeting, or a consent to holding the meeting or an approval of the minutes thereof in writing, either before or after the meeting, or who attends the meeting without protesting prior thereto or at its commencement such director's lack of notice. All such waivers, consents and approvals shall be filed with the corporate records or made a part of the minutes of the meeting.

**Section 27. Place of Meetings.** Meetings of the Board of Directors may be held at any place within or without the state which has been designated in the notice of the meeting or, if not stated in the notice or there is no notice, designated in the bylaws or by resolution of the Board of Directors.

**Section 28. Action by Written Consent Without a Meeting.** Any action required or permitted to be taken by the Board of Directors may be taken without a meeting, if all members of the Board of Directors individually or collectively consent in writing to such action. Such written consent or consents shall be filed with the minutes of the proceedings of the Board of Directors. Such action by written consent shall have the same force and effect as a unanimous vote of such directors.

**Section 29. Quorum and Transaction of Business.** A majority of the authorized number of directors shall constitute a quorum for the transaction of business. Every act or decision done or made by a majority of the directors present at a meeting duly held at which a quorum is present shall be the act of the Board of Directors, unless the law, the Articles of Incorporation or these bylaws specifically require a greater number. A meeting at which a quorum is initially present may continue to transact business, notwithstanding withdrawal of directors, if any action taken is approved by at least a majority of the number of directors constituting a quorum for such meeting. In the absence of a quorum at any meeting of the Board of Directors, a majority of the directors present may adjourn the meeting, as provided in Section 31 of these bylaws.

**Section 30. Special Quorum Requirement.** For so long as each of Fates Group LLC and Stephen Gates have the right to designate certain members of the Company's Board of Directors (the "***Board***") as set forth in that certain Shareholder Rights Agreement entered into on or about _____ __, 201_ by and among Stephen Gates, Fates Group LLC and the Company, as amended from time to time (the "***Voting Agreement***"), the Company shall not take any action requiring Board approval, unless such action is approved by a majority of the Board of Directors either (i) by unanimous written consent, or (ii) at a meeting whose attendees include at least one Gates Director (as defined in the Voting Agreement) and at least one Fates Director (as defined in the Voting Agreement). Notwithstanding the foregoing, to the extent that any of the Fates Directors or the Gates Directors fail or refuse to attend or participate or engage in meetings and actions of the Board in a such a way that the lack of participation limits the Company's ability to function and operate its fundamental business and operations, the requirements of this Section 30 shall not apply, and any actions of the Board with respect to such decisions may be taken with the approval of a majority of the Board at a meeting at which a quorum, as described by Section 29, is present.

**Section 31. Adjournment.** Any meeting of the Board of Directors, whether or not a quorum is present, may be adjourned to another time and place by the affirmative vote of a majority of the directors present. If the meeting is adjourned for more than twenty-four (24) hours, notice of such adjournment to another time or place shall be given prior to the time of the adjourned meeting to the directors who were not present at the time of the adjournment.

**Section 32. Organization.** The Chairman of the Board shall preside at every meeting of the Board of Directors, if present. If there is no Chairman of the Board or if the Chairman is not present, a Chairman chosen by a majority of the directors present shall act as chairman. The Secretary of the corporation or, in the absence of the Secretary, any person appointed by the Chairman shall act as secretary of the meeting.

**Section 33. Compensation.** Directors and members of committees may receive such compensation, if any, for their services, and such reimbursement for expenses, as may be fixed or determined by the Board of Directors.

**Section 34. Committees.** The Board of Directors may, by resolution adopted by a majority of the authorized number of directors, designate one or more committees, each consisting of two (2) or more directors, to serve at the pleasure of the Board of Directors. The Board of Directors, by a vote of the majority of authorized directors, may designate one or more directors as alternate members of any committee, to replace any absent member at any meeting of such committee. Any such committee shall have authority to act in the manner and to the extent provided in the resolution of the Board of Directors, and may have all the authority of the Board of Directors in the management of the business and affairs of the corporation, except with respect to:

**(a)** the approval of any action for which shareholders' approval or approval of the outstanding shares also is required by the California Corporations Code;

**(b)** the filling of vacancies on the Board of Directors or any of its committees;

**(c)** the fixing of compensation of directors for serving on the Board of Directors or any of its committees;

**(d)** the adoption, amendment or repeal of these bylaws;

**(e)** the amendment or repeal of any resolution of the Board of Directors which by its express terms is not so amendable or repealable;

**(f)** a distribution to shareholders, except at a rate or in a periodic amount or within a price range set forth in the Articles of Incorporation determined by the Board of Directors; or

**(g)** the appointment of other committees of the Board of Directors or the members thereof.

Any committee may from time to time provide by resolution for regular meetings at specified times and places. If the date of such a meeting falls on a legal holiday, then the meeting shall be held at the same time on the next succeeding full business day. No notice of such a meeting need be given. Such regular meetings need not be held if the committee shall so determine at any time before or after the time when such meeting would otherwise have taken place. Special meetings may be called at any time in the same manner and by the same persons as stated in Sections 26 and 27 of these bylaws for meetings of the Board of Directors. The provisions of Sections 25, 28, 29, 30, 31 and 32 of these bylaws shall apply to committees, committee members and committee meetings as if the words "committee" and "committee member" were substituted for the word "Board of Directors", and "director", respectively, throughout such sections.

## ARTICLE V

## OFFICERS

**Section 35. Officers.** The corporation shall have a Chairman of the Board or a President or both, a Secretary, a Chief Financial Officer and such other officers with such titles and duties as the Board of Directors may determine. Any two or more offices may be held by the same person.

**Section 36. Appointment.** All officers shall be chosen and appointed by the Board of Directors. All officers shall serve at the pleasure of the Board of Directors, subject to the rights, if any, of an officer under a contract of employment.

**Section 37. Inability to Act.** In the case of absence or inability to act of any officer of the corporation or of any person authorized by these bylaws to act in such officer's place, the Board of Directors may from time to time delegate the powers or duties of such officer to any other officer, or any director or other person whom it may select, for such period of time as the Board of Directors deems necessary.

**Section 38. Resignations.** Any officer may resign at any time upon written notice to the corporation, without prejudice to the rights, if any, of the corporation under any contract to which such officer is a party. Such resignation shall be effective upon its receipt by the Chairman of the Board, the

President, the Secretary or the Board of Directors, unless a different time is specified in the notice for effectiveness of such resignation. The acceptance of any such resignation shall not be necessary to make it effective unless otherwise specified in such notice.

**Section 39. Removal.** Any officer may be removed from office at any time, with or without cause, but subject to the rights, if any, of such officer under any contract of employment, by the Board of Directors or by any committee to whom such power of removal has been duly delegated, or, by the Chief Executive Officer or by any other superior officer upon whom such power of removal may be conferred by the Board of Directors.

**Section 40. Vacancies.** A vacancy occurring in any office for any cause may be filled by the Board of Directors, in the manner prescribed by this Article of the bylaws for initial appointment to such office.

**Section 41. Chairman of the Board.** The Chairman of the Board, if there be such an officer, shall, if present, preside at all meetings of the shareholders and of the Board of Directors and shall exercise and perform such other powers and duties as may be assigned from time to time by the Board of Directors or prescribed by these bylaws. If no President is appointed, the Chairman of the Board is the general manager and chief executive officer of the corporation, and shall exercise all powers of the President described in Section 42 below.

**Section 42. President.** Subject to such powers, if any, as may be given by the Board of Directors to the Chairman of the Board, if there be such an officer, the President shall be the general manager and chief executive officer of the corporation and shall have general supervision, direction, and control over the business and affairs of the corporation, subject to the control of the Board of Directors. The President may sign and execute, in the name of the corporation, any instrument authorized by the Board of Directors, except when the signing and execution thereof shall have been expressly delegated by the Board of Directors or by these bylaws to some other officer or agent of the corporation. The President shall have all the general powers and duties of management usually vested in the president of a corporation, and shall have such other powers and duties as may be prescribed from time to time by the Board of Directors or these bylaws. The President shall have discretion to prescribe the duties of other officers and employees of the corporation in a manner not inconsistent with the provisions of these bylaws and the directions of the Board of Directors. The President shall preside at all meetings of the shareholders and of the Board of Directors, unless the Chairman of the Board has been appointed and is present.

**Section 43. Vice Presidents.** In the absence or disability of the President, in the event of a vacancy in the office of President, or in the event such officer refuses to act, the Vice President shall perform all the duties of the President and, when so acting, shall have all the powers of, and be subject to all the restrictions on, the President. If at any such time the corporation has more than one vice president, the duties and powers of the President shall pass to each vice president in order of such vice president's rank as fixed by the Board of Directors or, if the vice presidents are not so ranked, to the vice president designated by the Board of Directors. The vice presidents shall have such other powers and perform such other duties as may be prescribed for them from time to time by the Board of Directors or the President.

**Section 44. Secretary.** The Secretary shall:

**(a)** Keep, or cause to be kept, minutes of all meetings of the corporation's shareholders, Board of Directors, and committees of the Board of Directors, if any. Such minutes shall be kept in written form.

**(b)** Keep, or cause to be kept, at the principal executive office of the corporation, or at the office of its transfer agent or registrar, if any, a record of the corporation's shareholders, showing the names and addresses of all shareholders, and the number and classes of shares held by each. Such records shall be kept in written form or any other form capable of being converted into written form.

**(c)** Keep, or cause to be kept, at the principal executive office of the corporation, or if the principal executive office is not in California, at its principal business office in California, an original or copy of these bylaws, as amended.

**(d)** Give, or cause to be given, notice of all meetings of shareholders, directors and committees of the Board of Directors, as required by law or by these bylaws.

**(e)** Keep the seal of the corporation, if any, in safe custody.

**(f)** Exercise such powers and perform such duties as are usually vested in the office of secretary of a corporation, and exercise such other powers and perform such other duties as may be prescribed from time to time by these bylaws or by the Board of Directors or by the President.

If any assistant secretaries are appointed, the assistant secretary, or other officer, in the absence or disability of the Secretary or in the event of such officer's refusal to act or if a vacancy exists in the office of Secretary, shall perform the duties and exercise the powers of the Secretary and discharge such duties as may be assigned from time to time pursuant to these bylaws or by the Board of Directors.

**Section 45.** **Chief Financial Officer.** The Chief Financial Officer shall:

**(a)** Be responsible for all functions and duties of the treasurer of the corporation.

**(b)** Keep and maintain, or cause to be kept and maintained, adequate and correct books and records of account for the corporation.

**(c)** Receive or be responsible for receipt of all monies due and payable to the corporation from any source whatsoever; have charge and custody of, and be responsible for, all monies and other valuables of the corporation and be responsible for deposit of all such monies in the name and to the credit of the corporation with such depositaries as may be designated by the Board of Directors or a duly appointed and authorized committee of the Board of Directors.

**(d)** Disburse or be responsible for the disbursement of the funds of the corporation as may be ordered by the Board of Directors or a duly appointed and authorized committee of the Board of Directors.

**(e)** Render to the chief executive officer and the Board of Directors a statement of the financial condition of the corporation if called upon to do so.

**(f)** Exercise such powers and perform such duties as are usually vested in the office of chief financial officer of a corporation, and exercise such other powers and perform such other duties as may be prescribed by the Board of Directors or these bylaws.

If any assistant financial officer is appointed, the assistant financial officer, or the Controller or Assistant Controller, shall, in the absence or disability of the Chief Financial Officer or in the event of such officer's refusal to act, perform the duties and exercise the powers of the Chief Financial Officer,

and shall have such powers and discharge such duties as may be assigned from time to time pursuant to these bylaws or by the Board of Directors or by the President.

**Section 46. Compensation.** The compensation of the officers shall be fixed from time to time by the Board of Directors, and no officer shall be prevented from receiving such compensation by reason of the fact that such officer is also a director of the corporation.

## ARTICLE VI

## CONTRACTS, LOANS, BANK ACCOUNTS, CHECKS AND DRAFTS

**Section 47. Execution of Contracts and Other Instruments.** Except as these bylaws may otherwise provide, the Board of Directors or its duly appointed and authorized committee may authorize any officer or officers, agent or agents, to enter into any contract or execute and deliver any instrument in the name of and on behalf of the corporation, and such authorization may be general or confined to specific instances. Except as so authorized or otherwise expressly provided in these bylaws, no officer, agent, or employee shall have any power or authority to bind the corporation by any contract or engagement or to pledge its credit or to render it liable for any purpose or in any amount

**Section 48. Loans.** No loans shall be contracted on behalf of the corporation and no negotiable paper shall be issued in its name, unless and except as authorized by the Board of Directors or its duly appointed and authorized committee. When so authorized by the Board of Directors or such committee, any officer or agent of the corporation may effect loans and advances at any time for the corporation from any bank, trust company, or other institution, or from any firm, corporation or individual, and for such loans and advances may make, execute and deliver promissory notes, bonds or other evidences of indebtedness of the corporation and, when authorized as aforesaid, may mortgage, pledge, hypothecate or transfer any and all stocks, securities and other property, real or personal, at any time held by the corporation, and to that end endorse, assign and deliver the same as security for the payment of any and all loans, advances, indebtedness, and liabilities of the corporation. Such authorization may be general or confined to specific instances.

**Section 49. Bank Accounts.** The Board of Directors or its duly appointed and authorized committee from time to time may authorize the opening and keeping of general and/or special bank accounts with such banks, trust companies, or other depositaries as may be selected by the Board of Directors, its duly appointed and authorized committee or by any officer or officers, agent or agents, of the corporation to whom such power may be delegated from time to time by the Board of Directors. The Board of Directors or its duly appointed and authorized committee may make such rules and regulations with respect to said bank accounts, not inconsistent with the provisions of these bylaws, as are deemed advisable.

**Section 50. Checks, Drafts, Etc.** All checks, drafts or other orders for the payment of money, notes, acceptances or other evidences of indebtedness issued in the name of the corporation shall be signed by such officer or officers, agent or agents, of the corporation, and in such manner, as shall be determined from time to time by resolution of the Board of Directors or its duly appointed and authorized committee. Endorsements for deposit to the credit of the corporation in any of its duly authorized depositaries may be made, without counter-signature, by the President or any vice president or the Chief Financial Officer or any assistant financial officer or by any other officer or agent of the corporation to whom the Board of Directors or its duly appointed and authorized committee, by resolution, shall have delegated such power or by hand-stamped impression in the name of the corporation.

## ARTICLE VII

## CERTIFICATES FOR SHARES AND THEIR TRANSFER

**Section 51. Certificate for Shares.** Every holder of shares in the corporation shall be entitled to have a certificate signed in the name of the corporation by the Chairman or Vice Chairman of the Board or the President or a Vice President and by the Chief Financial Officer or an assistant financial officer or by the Secretary or an assistant secretary, certifying the number of shares and the class or series of shares owned by the shareholder. Any or all of the signatures on the certificate may be facsimile. In case any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the corporation with the same effect as if such person were an officer, transfer agent or registrar at the date of issue. Notwithstanding the aforementioned provisions, the corporation may adopt a system of issuance, recordation and transfer of its shares by electronic or other means not involving any issuance of certificates in accordance with applicable law.

In the event that the corporation shall issue any shares as only partly paid, the certificate issued to represent such partly paid shares shall have stated thereon the total consideration to be paid for such shares and the amount paid thereon.

**Section 52. Transfer on the Books.** Upon surrender to the Secretary or transfer agent (if any) of the corporation of a certificate for shares of the corporation duly endorsed, with reasonable assurance that the endorsement is genuine and effective, or accompanied by proper evidence of succession, assignment or authority to transfer and upon compliance with applicable federal and state securities laws and if the corporation has no statutory duty to inquire into adverse claims or has discharged any such duty and if any applicable law relating to the collection of taxes has been complied with, it shall be the duty of the corporation, by its Secretary or transfer agent, to cancel the old certificate, to issue a new certificate to the person entitled thereto and to record the transaction on the books of the corporation.

**Section 53. Lost, Destroyed and Stolen Certificates.** The holder of any certificate for shares of the corporation alleged to have been lost, destroyed or stolen shall notify the corporation by making a written affidavit or affirmation of such fact. Upon receipt of said affidavit or affirmation the Board of Directors, or its duly appointed and authorized committee or any officer or officers authorized by the Board so to do, may order the issuance of a new certificate for shares in the place of any certificate previously issued by the corporation and which is alleged to have been lost, destroyed or stolen. However, the Board of Directors or such authorized committee, officer or officers may require the owner of the allegedly lost, destroyed or stolen certificate, or such owner's legal representative, to give the corporation a bond or other adequate security sufficient to indemnify the corporation and its transfer agent and/or registrar, if any, against any claim that may be made against it or them on account of such allegedly lost, destroyed or stolen certificate or the replacement thereof. Said bond or other security shall be in such amount, on such terms and conditions and, in the case of a bond, with such surety or sureties as may be acceptable to the Board of Directors or to its duly appointed and authorized committee or any officer or officers authorized by the Board of Directors to determine the sufficiency thereof. The requirement of a bond or other security may be waived in particular cases at the discretion of the Board of Directors or its duly appointed and authorized committee or any officer or officers authorized by the Board of Directors so to do.

**Section 54. Issuance, Transfer and Registration of Shares.** The Board of Directors may make such rules and regulations, not inconsistent with law or with these bylaws, as it may deem advisable concerning the issuance, transfer and registration of certificates for shares of the capital stock of the

corporation. The Board of Directors may appoint a transfer agent or registrar of transfers, or both, and may require all certificates for shares of the corporation to bear the signature of either or both.

## ARTICLE VIII

## INSPECTION OF CORPORATE RECORDS

**Section 55. Inspection by Directors.** Every director shall have the absolute right at any reasonable time to inspect and copy all books, records, and documents of every kind of the corporation and any of its subsidiaries and to inspect the physical properties of the corporation and any of its subsidiaries. Such inspection may be made by the director in person or by agent or attorney, and the right of inspection includes the right to copy and make extracts.

**Section 56. Inspection by Shareholders.**

**(a) Inspection of Corporate Records.**

**(1)** A shareholder or shareholders holding at least five (5%) percent in the aggregate of the outstanding voting shares of the corporation or who hold at least one percent (1%) of such voting shares and have filed a Schedule 14B with the United States Securities and Exchange Commission relating to the election of directors of the corporation shall have an absolute right to do either or both of the following:

**(i)** Inspect and copy the record of shareholders' names and addresses and shareholdings during usual business hours upon five (5) business days' prior written demand upon the corporation; or

**(ii)** Obtain from the transfer agent, if any, for the corporation, upon five business days' prior written demand and upon the tender of its usual charges for such a list (the amount of which charges shall be stated to the shareholder by the transfer agent upon request), a list of the shareholders' names and addresses who are entitled to vote for the election of directors and their shareholdings, as of the most recent record date for which it has been compiled or as of a date specified by the shareholder subsequent to the date of demand.

**(2)** The record of shareholders shall also be open to inspection and copying by any shareholder or holder of a voting trust certificate at any time during usual business hours upon written demand on the corporation, for a purpose reasonably related to such holder's interest as a shareholder or holder of a voting trust certificate.

**(3)** The accounting books and records and minutes of proceedings of the shareholders and the Board of Directors and of any committees of the Board of Directors of the corporation and of each of its subsidiaries shall be open to inspection, copying upon written demand on the corporation of any shareholder or holder of a voting trust certificate at any reasonable time during usual business hours, for a purpose reasonably related to such holder's interests as a shareholder or as a holder of such voting trust certificate.

**(4)** Any inspection and copying under this subsection (a) may be done in person or by agent or attorney.

**(b) Inspection of Bylaws.** The original or a copy of these bylaws shall be kept as provided in Section 44 of these bylaws and shall be open to inspection by the shareholders at all

reasonable times during office hours. If the principal executive office of the corporation is not in California, and the corporation has no principal business office in the state of California, a current copy of these bylaws shall be furnished to any shareholder upon written request.

**Section 57. Written Form.** If any record subject to inspection pursuant to Section 56 above is not maintained in written form, a request for inspection is not complied with unless and until the corporation at its expense makes such record available in written form.

## ARTICLE IX

## MISCELLANEOUS

**Section 58. Fiscal Year.** Unless otherwise fixed by resolution of the Board of Directors, the fiscal year of the corporation shall end on the 31st day of December in each calendar year.

**Section 59. Annual Report.**

**(a)** Subject to the provisions of Section 59(b) below, the Board of Directors shall cause an annual report to be sent to each shareholder of the corporation in the manner provided in Section 8 of these bylaws not later than one hundred twenty (120) days after the close of the corporation's fiscal year. Such report shall include a balance sheet as of the end of such fiscal year and an income statement and statement of changes in financial position for such fiscal year, accompanied by any report thereon of independent accountants or, if there is no such report, the certificate of an authorized officer of the corporation that such statements were prepared without audit from the books and records of the corporation. When there are more than 100 shareholders of record of the corporation's shares, as determined by Section 605 of the California Corporations Code, additional information as required by Section 1501(b) of the California Corporations Code shall also be contained in such report, provided that if the corporation has a class of securities registered under Section 12 of the United States Securities Exchange Act of 1934, that Act shall take precedence. Such report shall be sent to shareholders at least fifteen (15) (or, if sent by third-class mail, thirty-five (35)) days prior to the next annual meeting of shareholders after the end of the fiscal year to which it relates.

**(b)** If and so long as there are fewer than 100 holders of record of the corporation's shares, the requirement of sending of an annual report to the shareholders of the corporation is hereby expressly waived.

**Section 60. Record Date.** The Board of Directors may fix a time in the future as a record date for the determination of the shareholders entitled to notice of or to vote at any meeting or entitled to receive payment of any dividend or other distribution or allotment of any rights or entitled to exercise any rights in respect of any change, conversion or exchange of shares or entitled to exercise any rights in respect of any other lawful action. The record date so fixed shall not be more than sixty (60) days nor less than ten (10) days prior to the date of the meeting nor more than sixty (60) days prior to any other action or event for the purpose of which it is fixed. If no record date is fixed, the provisions of Section 15 of these bylaws shall apply with respect to notice of meetings, votes, and consents and the record date for determining shareholders for any other purpose shall be at the close of business on the day on which the Board of Directors adopts the resolutions relating thereto, or the sixtieth (60th) day prior to the date of such other action or event, whichever is later.

Only shareholders of record at the close of business on the record date shall be entitled to notice and to vote at a meeting or to receive the dividend, distribution or allotment of rights or to exercise the

rights, as the case may be, notwithstanding any transfer of any shares on the books of the corporation after the record date, except as otherwise provided in the Articles of Incorporation, by agreement or by law.

**Section 61. Bylaw Amendments.** Except as otherwise provided by law or Section 18 of these bylaws, these bylaws may be amended or repealed by the Board of Directors or by the affirmative vote of a majority of the outstanding shares entitled to vote, including, if applicable, the affirmative vote of a majority of the outstanding shares of each class or series entitled by law or the Articles of Incorporation to vote as a class or series on the amendment or repeal or adoption of any bylaw or bylaws; *provided, however,* after issuance of shares, a bylaw specifying or changing a fixed number of directors or the maximum or minimum number or changing from a fixed to a variable board or vice versa may only be adopted by approval of the outstanding shares as provided herein.

**Section 62. Construction and Definition.** Unless the context requires otherwise, the general provisions, rules of construction, and definitions contained in the California Corporations Code shall govern the construction of these bylaws.

Without limiting the foregoing, "shall" is mandatory and "may" is permissive.

## ARTICLE X

## INDEMNIFICATION

**Section 63. Indemnification of Directors, Officers, Employees And Other Agents.**

**(a) Directors and Executive Officers.** The corporation shall indemnify its directors and executive officers to the fullest extent not prohibited by the California Corporations Code; *provided, however,* that the corporation may limit the extent of such indemnification by individual contracts with its directors and executive officers; and, *provided, further,* that the corporation shall not be required to indemnify any director or executive officer in connection with any proceeding (or part thereof) initiated by such person or any proceeding by such person against the corporation or its directors, officers, employees or other agents unless (i) such indemnification is expressly required to be made by law, (ii) the proceeding was authorized by the board of directors of the corporation or (iii) such indemnification is provided by the corporation, in its sole discretion, pursuant to the powers vested in the corporation under the California Corporations Code.

**(b) Other Officers, Employees and Other Agents.** The corporation shall have the power to indemnify its other officers, employees and other agents as set forth in the California Corporations Code.

**(c) Determination by the Corporation.** Promptly after receipt of a request for indemnification hereunder (and in any event within ninety (90) days thereof) a reasonable, good faith determination as to whether indemnification of the director or executive officer is proper under the circumstances because such director or executive officer has met the applicable standard of care shall be made by:

**(1)** a majority vote of a quorum consisting of directors who are not parties to such proceeding;

**(2)** if such quorum is not obtainable, by independent legal counsel in a written opinion; or

**(3)** approval or ratification by the affirmative vote of a majority of the shares of this corporation represented and voting at a duly held meeting at which a quorum is present (which shares voting affirmatively also constitute at least a majority of the required quorum) or by written consent of a majority of the outstanding shares entitled to vote; where in each case the shares owned by the person to be indemnified shall not be considered entitled to vote thereon.

**(d) Good Faith.**

**(1)** For purposes of any determination under this bylaw, a director or executive officer shall be deemed to have acted in good faith and in a manner he reasonably believed to be in the best interests of the corporation and its shareholders, and, with respect to any criminal action or proceeding, to have had no reasonable cause to believe that his conduct was unlawful, if his action is based on information, opinions, reports and statements, including financial statements and other financial data, in each case prepared or presented by:

**(i)** one or more officers or employees of the corporation whom the director or executive officer believed to be reliable and competent in the matters presented;

**(ii)** counsel, independent accountants or other persons as to matters which the director or executive officer believed to be within such person's professional competence; and

**(iii)** with respect to a director, a committee of the Board upon which such director does not serve, as to matters within such committee's designated authority, which committee the director believes to merit confidence; so long as, in each case, the director or executive officer acts without knowledge that would cause such reliance to be unwarranted.

**(2)** The termination of any proceeding by judgment, order, settlement, conviction or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that the person did not act in good faith and in a manner which he reasonably believed to be in the best interests of the corporation and its shareholders or that he had reasonable cause to believe that his conduct was unlawful.

**(3)** The provisions of this paragraph (d) shall not be deemed to be exclusive or to limit in any way the circumstances in which a person may be deemed to have met the applicable standard of conduct set forth by the California Corporations Code.

**(e) Expenses.** The corporation shall advance, prior to the final disposition of any proceeding, promptly following request therefor, all expenses incurred by any director or executive officer in connection with such proceeding upon receipt of an undertaking by or on behalf of such person to repay said amounts if it shall be determined ultimately that such person is not entitled to be indemnified under this bylaw or otherwise.

Notwithstanding the foregoing, unless otherwise determined pursuant to paragraph (f) of this bylaw, no advance shall be made by the corporation if a determination is reasonably and promptly made by the Board of Directors by a majority vote of a quorum consisting of directors who were not parties to the proceeding (or, if no such quorum exists, by independent legal counsel in a written opinion) that the facts known to the decision making party at the time such determination is made demonstrate clearly and convincingly that such person acted in bad faith or in a manner that such person did not believe to be in the best interests of the corporation and its shareholders.

**(f) Enforcement.** Without the necessity of entering into an express contract, all rights to indemnification and advances to directors and executive officers under this bylaw shall be deemed to be contractual rights and be effective to the same extent and as if provided for in a contract between the corporation and the director or executive officer. Any right to indemnification or advances granted by this bylaw to a director or executive officer shall be enforceable by or on behalf of the person holding such right in the forum in which the proceeding is or was pending or, if such forum is not available or a determination is made that such forum is not convenient, in any court of competent jurisdiction if (i) the claim for indemnification or advances is denied, in whole or in part, or (ii) no disposition of such claim is made within ninety (90) days of request therefor. The claimant in such enforcement action, if successful in whole or in part, shall be entitled to be paid also the expense of prosecuting his claim. The corporation shall be entitled to raise as a defense to any such action that the claimant has not met the standards of conduct that make it permissible under the California Corporations Code for the corporation to indemnify the claimant for the amount claimed. Neither the failure of the corporation (including its board of directors, independent legal counsel or its shareholders) to have made a determination prior to the commencement of such action that indemnification of the claimant is proper in the circumstances because he has met the applicable standard of conduct set forth in the California Corporations Code, nor an actual determination by the corporation (including its board of directors, independent legal counsel or its shareholders) that the claimant has not met such applicable standard of conduct, shall be a defense to the action or create a presumption that claimant has not met the applicable standard of conduct.

**(g) Non-Exclusivity of Rights.** To the fullest extent permitted by the corporation's Articles of Incorporation and the California Corporations Code, the rights conferred on any person by this bylaw shall not be exclusive of any other right which such person may have or hereafter acquire under any statute, provision of the Articles of Incorporation, bylaws, agreement, vote of shareholders or disinterested directors or otherwise, both as to action in his official capacity and as to action in another capacity while holding office. The corporation is specifically authorized to enter into individual contracts with any or all of its directors, officers, employees or agents respecting indemnification and advances, to the fullest extent permitted by the California Corporations Code and the corporation's Articles of Incorporation.

**(h) Survival of Rights.** The rights conferred on any person by this bylaw shall continue as to a person who has ceased to be a director or executive officer and shall inure to the benefit of the heirs, executors and administrators of such a person.

**(i) Insurance.** The corporation, upon approval by the board of directors, may purchase insurance on behalf of any person required or permitted to be indemnified pursuant to this bylaw.

**(j) Amendments.** Any repeal or modification of this bylaw shall only be prospective and shall not affect the rights under this bylaw in effect at the time of the alleged occurrence of any action or omission to act that is the cause of any proceeding against any agent of the corporation.

**(k) Employee Benefit Plans.** The corporation shall indemnify the directors and officers of the corporation who serve at the request of the corporation as trustees, investment managers or other fiduciaries of employee benefit plans to the fullest extent permitted by the California Corporations Code.

**(l) Saving Clause.** If this bylaw or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the corporation shall nevertheless indemnify each

director and executive officer to the fullest extent permitted by any applicable portion of this bylaw that shall not have been invalidated, or by any other applicable law.

**(m)** **Certain Definitions.** For the purposes of this bylaw, the following definitions shall apply:

**(1)** The term **"proceeding"** shall be broadly construed and shall include, without limitation, the investigation, preparation, prosecution, defense, settlement and appeal of any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative or investigative.

**(2)** The term **"expenses"** shall be broadly construed and shall include, without limitation, court costs, attorneys' fees, witness fees, fines, amounts paid in settlement or judgment and any other costs and expenses of any nature or kind incurred in connection with any proceeding, including expenses of establishing a right to indemnification under this bylaw or any applicable law.

**(3)** The term the **"corporation"** shall include, in addition to the resulting corporation, any constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger which, if its separate existence had continued, would have had power and authority to indemnify its directors, officers, and employees or agents, so that any person who is or was a director, officer, employee or agent of such constituent corporation, or is or was serving at the request of such constituent corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, shall stand in the same position under the provisions of this bylaw with respect to the resulting or surviving corporation as he would have with respect to such constituent corporation if its separate existence had continued.

**(4)** References to a **"director,"** **"officer,"** **"employee,"** or **"agent"** of the corporation shall include, without limitation, situations where such person is or was serving at the request of the corporation as a director, officer, employee, trustee or agent of another corporation, partnership, joint venture, trust or other enterprise.

## ARTICLE XI

## RIGHT OF FIRST REFUSAL

**Section 64.** **Right of First Refusal.** No shareholder shall sell, assign, pledge, or in any manner transfer any of the shares of Common Stock of the corporation or any right or interest therein, whether voluntarily or by operation of law, or by gift or otherwise, except by a transfer which meets the requirements hereinafter set forth in this bylaw:

**(a)** If the shareholder desires to sell or otherwise transfer any of his shares of stock subject to the right of first refusal as provided above, then the shareholder shall first give written notice thereof to the corporation. The notice shall name the proposed transferee and state the number of shares to be transferred, the proposed consideration, and all other terms and conditions of the proposed transfer.

**(b)** For forty-five (45) days following receipt of such notice, the corporation shall have the option to purchase all of the shares specified in the notice at the price and upon the terms set forth in such notice; *provided, however,* that, with the consent of the transferring shareholder, the corporation shall have the option to purchase a lesser portion of the shares specified in said notice at the price and upon the terms set forth therein. In the event of a gift, property settlement or other transfer in which the proposed transferee is not paying the full price for the shares, and that is not otherwise

exempted from the provisions of this Section 64, the price shall be deemed to be the fair market value of the stock at such time as determined in good faith by the Board of Directors. In the event the corporation elects to purchase all of the shares or, with consent of the transferring shareholder, a lesser portion of the shares, it shall give written notice to the transferring shareholder of its election and settlement for said shares shall be made as provided below in paragraph (d).

**(c)** The corporation may assign its rights hereunder.

**(d)** In the event the corporation and/or its assignee(s) elect to acquire any of the shares of the transferring shareholder as specified in said transferring shareholder's notice, the Secretary of the corporation shall so notify the transferring shareholder and settlement thereof shall be made in cash within thirty (30) days after the Secretary of the corporation receives said transferring shareholder's notice; provided that if the terms of payment set forth in said transferring shareholder's notice were other than cash against delivery, the corporation and/or its assignee(s) shall pay for said shares on the same terms and conditions set forth in said transferring shareholder's notice.

**(e)** In the event the corporation and/or its assignees(s) do not elect to acquire all of the shares specified in the transferring shareholder's notice, said transferring shareholder may, within the sixty-day period following the expiration of the option rights granted to the corporation and/or its assignees(s) herein, transfer the shares specified in said transferring shareholder's notice which were not acquired by the corporation and/or its assignees(s) as specified in said transferring shareholder's notice. All shares so sold by said transferring shareholder shall continue to be subject to the provisions of this bylaw in the same manner as before said transfer.

**(f)** Anything to the contrary contained herein notwithstanding, the following transactions shall be exempt from the provisions of this bylaw:

**(1)** A shareholder's transfer of any or all shares held either during such shareholder's lifetime or on death by will or intestacy to such shareholder's immediate family or to any custodian or trustee for the account of such shareholder or such shareholder's immediate family or to any limited partnership of which the shareholder, members of such shareholder's immediate family or any trust for the account of such shareholder or such shareholder's immediate family will be the general of limited partner(s) of such partnership. "Immediate family" as used herein shall mean spouse, lineal descendant, father, mother, brother, or sister of the shareholder making such transfer.

**(2)** A shareholder's bona fide pledge or mortgage of any shares with a commercial lending institution, provided that any subsequent transfer of said shares by said institution shall be conducted in the manner set forth in this bylaw.

**(3)** A shareholder's transfer of any or all of such shareholder's shares to the corporation or to any other shareholder of the corporation.

**(4)** A shareholder's transfer of any or all of such shareholder's shares to a person who, at the time of such transfer, is an officer or director of the corporation.

**(5)** A corporate shareholder's transfer of any or all of its shares pursuant to and in accordance with the terms of any merger, consolidation, reclassification of shares or capital reorganization of the corporate shareholder, or pursuant to a sale of all or substantially all of the stock or assets of a corporate shareholder.

**(6)** A corporate shareholder's transfer of any or all of its shares to any or all of its shareholders.

**(7)** A transfer by a shareholder which is a limited or general partnership to any or all of its partners or former partners.

In any such case, the transferee, assignee, or other recipient shall receive and hold such stock subject to the provisions of this bylaw, and there shall be no further transfer of such stock except in accord with this bylaw.

**(g)** The provisions of this bylaw may be waived with respect to any transfer either by the corporation, upon duly authorized action of its Board of Directors, or by the shareholders, upon the express written consent of the owners of a majority of the voting power of the corporation (excluding the votes represented by those shares to be transferred by the transferring shareholder). Subject to the Voting Agreement, this bylaw may be amended or repealed either by a duly authorized action of the Board of Directors or by the shareholders, upon the express written consent of the owners of a majority of the voting power of the corporation.

**(h)** Any sale or transfer, or purported sale or transfer, of securities of the corporation shall be null and void unless the terms, conditions, and provisions of this bylaw are strictly observed and followed.

**(i)** The foregoing right of first refusal shall terminate on either of the following dates, whichever shall first occur:

**(1)** On July __, 2026; or

**(2)** Upon the date securities of the corporation are first offered to the public pursuant to a registration statement filed with, and declared effective by, the United States Securities and Exchange Commission under the Securities Act of 1933, as amended.

**(j)** The certificates representing shares of stock of the corporation shall bear on their face the following legend so long as the foregoing right of first refusal remains in effect:

> "The shares represented by this Certificate are subject to a right of first refusal option in favor of the Corporation and/or its Assignee(s), as provided in the Bylaws of the Corporation."

## ARTICLE XII

## LOANS OF OFFICERS AND OTHERS

**Section 65. Certain Corporate Loans and Guaranties.** If the corporation has outstanding shares held of record by 100 or more persons on the date of approval by the Board of Directors, the corporation may make loans of money or property to, or guarantee the obligations of, any officer of the corporation or its parent or any subsidiary, whether or not a director of the corporation or its parent or any subsidiary, or adopt an employee benefit plan or plans authorizing such loans or guaranties, upon the approval of the Board of Directors alone, by a vote sufficient without counting the vote of any interested director or directors, if the Board of Directors determines that such a loan or guaranty or plan may reasonably be expected to benefit the corporation. Notwithstanding the foregoing, the corporation shall have the power to make loans permitted by the California Corporations Code.

# EXHIBIT E

*Execution Version*

**FIRST AMENDMENT TO LOAN AGREEMENT**

THIS **FIRST AMENDMENT TO LOAN AGREEMENT** (this "**Amendment**"), dated as of November 8, 2016 (the "**Amendment Effective Date**"), is made among NEIGHBORHOOD POWER CORPORATION, a California corporation (the "**Borrower**"), NEIGHBORHOOD GP, LLC, a Hawaiian limited liability company ("**Guarantor**"), and FATES GROUP LLC, a Florida limited liability company (the "**Lender**").

The Borrower, the Guarantor and the Lender are parties to a Loan Agreement dated as of August 5, 2016 (the "**Loan Agreement**").

The Borrower has requested that the Lender agree to make certain amendments to the Loan Agreement, as more fully described herein. Although the Lender is under no obligation to do so, it has agreed to such requests, subject to the terms and conditions hereof.

Accordingly, the parties hereto agree as follows:

**SECTION 1 Definitions; Interpretation.**

(a) **Terms Defined in Loan Agreement**. All capitalized terms used in this Amendment (including in the recitals hereof) and not otherwise defined herein shall have the meanings assigned to them in the Loan Agreement.

(b) **Interpretation**. The rules of interpretation set forth in Sections 1.2, 1.3 and 1.4 of the Loan Agreement shall be applicable to this Amendment and are incorporated herein by this reference.

**SECTION 2 Amendments to the Loan Agreement.**

(a) The Loan Agreement shall be amended as follows effective as of the Amendment Effective Date:

(i) New Definitions. The following definitions are added to Section 1 of the Loan Agreement in their proper alphabetical order:

"Amendment" means that certain First Amendment to Loan Agreement, dated as of the Amendment Effective Date, by and among the Borrower, the Guarantor and the Lender.

"Amendment Effective Date" means November 8, 2016.

(ii) Section 2.3(a)(i). Section 2.3(a)(ii) is hereby amended and restated as follows:

"(ii) Term Loan. Subject to Section 2.3(b), the principal amount outstanding under the Term Loan shall accrue interest from, and including, the Amendment Effective Date at a per annum rate equal to fifteen percentage points (15%), which interest shall be payable on the Term Loan Maturity Date in accordance with Section 2.3(c) below, unless Lender exercises its option to convert the Term Loan into equity as provided in Section 2.1.2(d) above."

(iii) Section 2.4(b). Section 2.4(b) is hereby amended and restated as follows:

"(ii) Commitment Fee. A fully earned, non-refundable commitment fee equal to two percent (2%) of the maximum aggregate principal amount of Advances outstanding under the Revolving Line during the preceding 12 months, beginning on the first anniversary of Amendment Effective Date and each anniversary thereafter; provided, however, that on the Revolving Line Maturity Date or the date of any other termination of the Revolving Line, such commitment fee shall equal two percent (2%) of the maximum aggregate principal amount of Advances outstanding under the Revolving Line during the period from the preceding

anniversary of the Amendment Effective Date to the Revolving Line Maturity Date or such date of termination, as applicable."

(iv) Section 3.4(a). Section 3.4(a) is hereby amended and restated as follows:

"(a) Unless otherwise provided in writing, within 120 days after the Effective Date, Lender shall have received, in form and substance satisfactory to Lender:

(i) duly executed original signatures to the Control Agreements; and

(ii) a landlord's consent in favor of Lender for each of (A) 415 Dairy Rd Suite E-216 Kahului HI 96732, (B) 358 Papa Pl Kahului HI 96732, (C) 2000 Mokulele Hwy Lot #2 Puenenne HI 96784, (D) 7500 Kulakula Rd Kula HI 96790 and (E) 33 Lokelau Pl Haiku, HI 96708, by the respective landlords thereof, together with the duly executed original signatures thereto.

(v) Section 3.4(c)(ii). Section 3.4(c)(ii) is hereby amended and restated as follows:

"(ii) Unless otherwise provided in writing, within 90 days after the Effective Date, Lender shall have received, in form and substance satisfactory to Lender, duly executed original signatures to the Consent Agreements and Pledge Agreements with respect to the Credit Party's ownership interests in AR Solar, LLC and ISOLAR, LLC."

(b) **References Within Loan Agreement**. Each reference in the Loan Agreement to "this Agreement" and the words "hereof," "herein," "hereunder," or words of like import, shall mean and be a reference to the Loan Agreement as amended by this Amendment.

**SECTION 3 Conditions of Effectiveness.** The effectiveness of Section 2 of this Amendment shall be subject to the satisfaction of each of the following conditions precedent:

(a) **Fees and Expenses**. The Borrower shall have paid (i) all invoiced costs and expenses then due in accordance with Section 6(c), and (ii) all other fees, costs and expenses, if any, due and payable as of the Amendment Effective Date under the Loan Agreement; provided, that such fees, costs and expenses to Lender's counsel shall not exceed $125,000.

(b) **This Amendment**. The Lender shall have received this Amendment, executed by the Borrower, the Guarantor and the Lender.

(c) **Pledge Agreements**. The Lender shall have received, in form and substance satisfactory to the Lender, duly executed original signatures to the Consent Agreements and Pledge Agreements with respect to the Credit Party's ownership interests in AR Solar, LLC and ISOLAR, LLC.

(d) **Secretary's Certificate**. The Lender shall have received a certificate of the secretary or an assistant secretary of each Credit Party, dated as of the Amendment Effective Date and in form and substance reasonably satisfactory to the Lender, certifying (i) that attached thereto is a true and complete copy of the articles or certificate of incorporation, certificate of formation or other organizational document and all amendments thereto of such party, certified as of a recent date by the Secretary of State (or comparable Governmental Authority) of its jurisdiction of organization, and that the same has not been amended since the date of such certification, (ii) that attached thereto is a true and complete copy of the bylaws, operating agreement or similar governing document of such party, as then in effect and as in effect at all times from the date on which the resolutions referred to in clause (iii) below were adopted to and including the date of such certificate, and (iii) that attached thereto is a true and complete copy of resolutions adopted by the board of directors (or similar governing body) of such party, authorizing the execution, delivery and performance of this Amendment and the other Loan Documents to which it is a party, and attaching all such copies of the documents described above.

(e) **Funds Flow**. The Lender shall have received, in form and substance satisfactory to the Lender, duly executed original signatures to the funds flow memorandum, a copy of which is attached hereto as Exhibit A (the "**Funds Flow**").

(f) **Amendment**. The Lender shall have received executed copies, in form and substance satisfactory to the Lender, of (i) the Amendment 1 to that certain Settlement and Mutual General Release, dated as of June 30, 2016, by and between the Borrower and Stephen Abbey, including the exhibits thereto, a copy of which is attached hereto as Exhibit B; and (ii) the Letter of Escrow Instructions, dated as of the date hereof, by and among Aliso Escrow, Borrower, Stephen Abbey, Stephen Gates, Deyla Gates and Lender, including the exhibits thereto, a copy of which is attached hereto as Exhibit C.

(g) **Consents**. The Lender shall have received copies of resolutions of the governing body for each of the Borrower and the Guarantor evidencing approval of this Amendment and the transactions contemplated herein.

(h) **Representations and Warranties; No Default**. On the Amendment Effective Date, after giving effect to the amendment of the Loan Agreement contemplated hereby:

(i) The representations and warranties contained in Section 4 shall be true and correct on and as of the Amendment Effective Date as though made on and as of such date except to the extent any representations and warranties which relate solely to an earlier date shall be true, correct and complete as of such earlier date; and

(ii) There exist no Events of Default.

**SECTION 4 Representations and Warranties**. To induce the Lender to enter into this Amendment, the Borrower and the Guarantor each hereby confirms, as of the date hereof, (a) that the representations and warranties made by it in Section 4 of the Loan Agreement and in the other Loan Documents are true and correct in all material respects; *provided, however*, that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof. For the purposes of this Section 4, (i) each reference in Section 4 of the Loan Agreement to "this Agreement," and the words "hereof," "herein," "hereunder," or words of like import in such Section, shall mean and be a reference to the Loan Agreement as amended by this Amendment, and (ii) any representations and warranties which relate solely to an earlier date shall not be deemed confirmed and restated as of the date hereof (provided that such representations and warranties shall be true, correct and complete as of such earlier date); (b) that there has not been and there does not exist a Material Adverse Effect; and (c) that the information included in the Perfection Certificate delivered to Lender on the Effective Date remains true and correct in all material respects.

**SECTION 5 Release.**

(a) To the extent permitted by applicable law, each of the Borrower and the Guarantor, for itself and on behalf of its respective heirs, legal representatives, and successors and assigns, as applicable, hereby releases Lender and all of its affiliates, shareholders, partners, predecessors, employees, officers, directors, attorneys, parent corporations, subsidiaries, agents, participants, assignees, servicers and receivers (collectively, the "**Released Parties**"), except for claims, disputes, liabilities, differences and obligations arising under this Amendment and the other Loan Documents after the Amendment Effective Date, from any and all known and unknown claims, disputes, differences, liabilities and obligations of any and every nature whatsoever that the Borrower, the Guarantor or any of them may have or claim, as of the Amendment Effective Date or as of any prior date, against any one or more of the Released Parties arising from, based upon or related to the Loan Documents, or any other agreement, understanding, action or inaction whatsoever with regard to the Loan Documents or any transaction or matter solely related thereto (collectively, the "**Released Claims**").

(b) Other than as provided above, each of the Borrower and the Guarantor further acknowledges and agrees that the Released Claims include, among other things, all claims arising out of or with respect to any and all transactions relating to the Loan Documents based on any fact, act, inaction, or other occurrence or nonoccurrence on or prior to the Amendment Effective Date, including, without limitation, any breach of fiduciary duty or duty of

fair dealing, breach of confidence, undue influence, duress, economic coercion, conflict of interest, negligence, bad faith, malpractice, violation of the Racketeer Influenced and Corrupt Organizations Act, violation of any other statute, ordinance or regulation, intentional or negligent infliction of mental or emotional distress, tortious interference with contractual relations or prospective business advantage, tortious interference with corporate governance, breach of contract, bad practices, unfair competition, libel, slander or conspiracy and all statutory claims and causes of action of every nature.

(c) In connection with the release contained in this Section (the "**Release**"), each of the Borrower and the Guarantor acknowledges that it is aware that it may hereafter discover facts in addition to or different from those that it now knows or believes to be true with respect to the Released Claims, but that it is each of the Borrower's and the Guarantor's intention, subject to applicable law, hereby fully, finally and forever to settle and release all claims, disputes, differences, liabilities and obligations, known or unknown, suspected or unsuspected, that now exist, may exist or heretofore have existed by the Borrower and/or the Guarantor against any one or more of the Released Parties, subject in each case to the specific terms of this Section. In furtherance of that intention, the Release contained in this Amendment shall be and remain in effect as a full and complete release notwithstanding the discovery of the existence of any such additional or different facts, subject in each case to the specific terms of this Section.

(d) The Release contained in this Amendment shall be effective and irrevocable upon the execution of this Amendment by the Borrower, the Guarantor and the Lender shall be deemed affirmed and restated upon, and effective as of, the Amendment Effective Date without any further documentation.

(e) Without limiting the generality of the foregoing, each of the Borrower and the Guarantor hereby waives the provisions of any statute or doctrine that prevents a general release from extending to claims unknown by the releasing party, including, without limitation, Section 1542 of the California Civil Code which provides: A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor. Each of the Borrower and the Guarantor acknowledges that the agreements in this Section are intended to be in full satisfaction of all or any alleged injuries or damages arising in connection with the Released Claims. Each of the Borrower and the Guarantor acknowledges that the Release constitutes a material inducement to the Lender to enter into this Amendment and that the Lender would not have done so but for the Lender's expectation that the Release is valid and enforceable in all events.

(f) EACH OF THE BORROWER AND THE GUARANTOR AGREES AND ACKNOWLEDGES THAT THE RELEASED CLAIMS ARE NOT LIMITED TO MATTERS THAT ARE KNOWN OR DISCLOSED TO THE BORROWER AND THAT THE RELEASED CLAIMS INCLUDE ALL CLAIMS, DISPUTES, DIFFERENCES, LIABILITIES AND OBLIGATIONS THAT THE BORROWER AND/OR THE GUARANTOR DOES NOT KNOW OR SUSPECT TO EXIST. EACH OF THE BORROWER AND THE GUARANTOR UNDERSTANDS THAT IT IS GIVING UP ALL RIGHTS AND CLAIMS AGAINST THE LENDER AND THE OTHER RELEASED PARTIES, KNOWN OR UNKNOWN, THAT ARE IN ANY WAY RELATED TO THE PROPERTY OR THE ADVANCES SUBJECT IN EACH CASE TO THE SPECIFIC TERMS OF THIS SECTION.

(g) THE PARTIES SPECIFICALLY ALLOCATE THE RISK OF ANY MISTAKE IN ENTERING INTO THE RELEASE TO THE PARTY OR PARTIES CLAIMING TO HAVE BEEN MISTAKEN.

**SECTION 6 Miscellaneous.**

(a) **Loan Documents Otherwise Not Affected; Reaffirmation**. Except as expressly amended pursuant hereto, the Loan Agreement and the other Loan Documents shall remain unchanged and in full force and effect and are hereby ratified and confirmed in all respects. The Lender's execution and delivery of, or acceptance of, this Amendment shall not be deemed to create a course of dealing or otherwise create any express or implied duty by any of them to provide any other or further amendments, consents or waivers in the future. Each of the Borrower and the Guarantor hereby reaffirms the grant of security under the Security Agreement and hereby reaffirms that such grant of security in the Collateral secures all Obligations under the Loan Agreement, including without limitation any Advances funded on or after the Amendment Effective Date, as of the date hereof. The

Borrower hereby confirms receipt of the funds pursuant to the Funds Flow attached as Exhibit A hereto, setting forth the $4,500,000 Term Loan received on the Effective Date and the $1,355,000 of Advances under Revolving Line received on the Amendment Effective Date.

(b) **No Reliance**. Each of the Borrower and the Guarantor hereby acknowledges and confirms to the Lender that each of the Borrower and the Guarantor is executing this Amendment on the basis of its own investigation and for its own reasons without reliance upon any agreement, representation, understanding or communication by or on behalf of any other Person.

(c) **Costs and Expenses**. The Borrower agrees to pay to the Lender within ten (10) days of its receipt of an invoice (or on the Amendment Effective Date to the extent invoiced on or prior to the Amendment Effective Date), the out-of-pocket costs and expenses of the Lender party hereto, and the fees and disbursements of counsel to the Lender party hereto (including allocated costs of internal counsel), in connection with the negotiation, preparation, execution and delivery of this Amendment and any other documents to be delivered in connection herewith on the Amendment Effective Date or after such date, subject to the $125,000 limitation for fees, costs and expenses to Lender's counsel set forth in Section 3(a).

(d) **Binding Effect**. This Amendment binds and is for the benefit of the successors and permitted assigns of each party.

(e) **Governing Law**. **THIS AMENDMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER AND THEREUNDER SHALL IN ALL RESPECTS BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK (WITHOUT REGARD TO THE CONFLICT OF LAWS PRINCIPLES OF SUCH STATE), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, REGARDLESS OF THE LOCATION OF THE COLLATERAL, PROVIDED, HOWEVER, THAT IF THE LAWS OF ANY JURISDICTION OTHER THAN NEW YORK SHALL GOVERN IN REGARD TO THE VALIDITY, PERFECTION OR EFFECT OF PERFECTION OF ANY LIEN OR IN REGARD TO PROCEDURAL MATTERS AFFECTING ENFORCEMENT OF ANY LIENS IN COLLATERAL, SUCH LAWS OF SUCH OTHER JURISDICTIONS SHALL CONTINUE TO APPLY TO THAT EXTENT.**

(f) **Complete Agreement; Amendments**. This Amendment and the Loan Documents represent the entire agreement about this subject matter and supersede prior negotiations or agreements with respect to such subject matter. All prior agreements, understandings, representations, warranties, and negotiations between the parties about the subject matter of this Amendment and the Loan Documents merge into this Agreement and the Loan Documents.

(g) **Severability of Provisions.** Each provision of this Amendment is severable from every other provision in determining the enforceability of any provision.

(h) **Counterparts**. This Amendment may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, is an original, and all taken together, constitute one Agreement. Delivery of an executed counterpart of a signature page of this Amendment by facsimile, portable document format (.pdf) or other electronic transmission will be as effective as delivery of a manually executed counterpart hereof.

(i) **Loan Documents**. This Amendment and the other documents related thereto shall constitute Loan Documents.

*[Balance of Page Intentionally Left Blank; Signature Pages Follow]*

IN WITNESS WHEREOF, the parties hereto have duly executed this Amendment, as of the date first above written.

**BORROWER:**

**NEIGHBORHOOD POWER CORPORATION**,
as Borrower

By: ______________________
Name: Stephen Gates
Title: President

**GUARANTOR:**

**NEIGHBORHOOD GP, LLC**,
as Guarantor

By: ______________________
Name: Stephen Gates
Title: Manager

**THE LENDER:**

**FATES GROUP LLC**,
as Lender

By: ______________________
Name: William C. Morro
Title: Authorized Representative

Exhibit A

Funds Flow Memorandum

NYSCEF DOC. NO. 7

RECEIVED NYSCEF: 09/03/202

**Neighborhood Power Corporation**
**Flow of Funds Schedule**
**As of November 3, 2016**

**Term Loan**

| | | | |
|---|---|---|---|
| Reserved For Estimated Income Tax Liability and Fees | | - | Funds held by Lender for disbursement when taxes filed |
| Cooley Transaction Legal Fees | | 125,000.00 | Paid direct to Cooley |
| Neighborhood GP, LLC Membership Unit Acquisition | | 250,000.00 | Paid to S. Gates - by WHI, Inc on behlaf of Fates (8/4) |
| Bank of Hawaii | | 480,540.80 | Paid to Bank of Hawaii |
| Existing Project Expenses | | 585,000.00 | Fates wire direct to Neighborhood Power (Approx 8/9) |
| Abbey Settlement Payment | 2,500,000.00 | | |
| Less: $200,000 pre-payment | (200,000.00) | | |
| Less: 50% Cooley Transaction Legal Fees | (40,000.00) | | |
| Abbey | (11,000.00) | | |
| Less: NPC Employee Bonus | (50,000.00) | | |
| **Payable to Abbey by company or from escrow** | 2,199,000.00 | | |
| Actual Payment Earmarked to Abbey from escrow | | 989,000.00 | Wired to Cooley Account 10/7 for settlement at "Closing" |
| Working Capital | | 560,459.20 | Fates wire direct to Neighborhood Power (Approx 8/9) |
| " | | 500,000.00 | Fates Wire direct to Neighborhood Power by Fates (9/15) |
| " | | 1,010,000.00 | Application of Pre-Close Promissory Notes to Bridge Loan |
| Total Proceeds | | 4,500,000.00 | |

**Revolving Loan**

| | | |
|---|---|---|
| Facility Fee (Annual) | - | 2% of maximum revolver balance payable on amount drawn on 1st anniversary or maturity (if earlier) |
| Application of Pre-Close Advances to Revolver | 355,000.00 | Paid by WHI, Inc. as Escrow Agent for Air Desert Rose (on behalf of Fates) |
| Final Closing Payment from Escrow | 1,000,000.00 | |
| | 1,355,000.00 | |

NPC Pre-Close Advances documented as promissory note and applied at closing to Term and Revolver Loans

| Date | Amount | Note # |
|---|---|---|
| | 375,000 | 1 |
| 5-May | 190,000 | 2 |
| 20-May | 100,000 | 3 |
| 6-Jun | 100,000 | 4 |
| 8-Jun | 100,000 | 5 |
| 9-Jun | 100,000 | 6 |
| 15-Jun | 400,000 | 7 |
| 25-Jul | | |
| Total | 1,365,000 | |

Exhibit B

Amendment 1

## Amendment 1 to Settlement and Mutual General Release

This Amendment 1 (this "Amendment 1"), dated as of November 2, 2016, to that certain Settlement and Mutual General Release dated as of June 30, 2016 (the "Agreement"), is made by and among **Neighborhood Power Corporation** ("NPC"), **Stephen Abbey** ("ABBEY"), **Stephen Gates** ("S. Gates") and **Deyla Gates** ("D. Gates" and together with NPC, ABBEY, and S. Gates, each a "Party" and collectively, the "Parties").

## RECITALS

A. Concurrent with this Amendment 1, the Parties have established an escrow (the "Escrow") pursuant to the terms of that certain Letter of Escrow Instructions, dated as of the date hereof, by and among Aliso Escrow (the "Escrow Agent"), ABBEY, NPC, Stephen Gates, Deyla Gates and Fates Group, LLC ("Fates Group"), in substantially the form attached hereto as Exhibit "A" (as amended, restated or otherwise modified from time to time, the "Escrow Agreement").

## STATEMENT OF AGREEMENT

**NOW, THEREFORE,** in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1. In the event of a conflict between the provisions of the Agreement and the provisions of this Amendment 1, the provisions of this Amendment 1 shall govern. Unless otherwise provided herein, all capitalized terms herein shall have the meaning given to such terms in the Agreement.

2. Each of ABBEY and NPC acknowledge that ABBEY withdrew $1,435,000 from the Bank of Hawaii NPC bank account (No. 0084 007617) (the "BofH Account") on Septebmer 13, 2016 and returned $225,000 on September 21, 2016 to the [BofH Account] so that NPC could pay taxes. Therefore, at the "close of escrow" (as set forth in the Escrow Agreement), the $1,210,000 that ABBEY holds and that remains from the amounts ABBEY withdrew from the BofH Account (the "Credit Amount") shall be credited against the $2,299,000 due ABBEY under the Agreement, with the remaining $989,000 coming from funds to be held in the Escrow Account pursuant to the terms of the Escrow Agreement. The result of the credit of the Credit Amount shall be that NPC only owes ABBEY $989,000.

3. Section 3.0 of the Agreement is hereby amended and restated in its entirety to read as follows:

"3.0 <u>TERMS OF PAYMENT</u>:

3.1 NPC originally owed ABBEY the total sum of $2,500,000.00 to be allocated as follows:

a. Purchase of Abbey's interest in Terton Solar, LLC $305,740.87

| | | |
|---|---|---|
| | effective 1/1/15 | |
| b. | Purchase of Abbey's interest in Green Bridge Group, LLC effective 1/1/15 | $244,636.60 |
| c. | Repayment of the principal amount owed under the Promissory Notes | $1,569,968.31 |
| d. | Repayment of the interest owed on the Promissory Notes | $167,469.92 |
| e. | Past Due Consulting Fees | $212,184.30 |

3.2 NPC shall receive a credit against the $2,500,000 in the amount of $1,511,000, calculated as follows:

| | | |
|---|---|---|
| a. | Amount previously received by ABBEY | $200,000.00 |
| b. | The Credit Amount | $1,210,000.00 |
| c. | ½ of the legal fees for the refinancing of the Promissory Notes | $40,000.00 |
| d. | Attorney fees and consulting fees paid by NPC on behalf of ABBEY | $11,000.00 |
| e. | Amount to be paid as an employee bonus | $50,000.00 |

3.3 Abbey shall receive the amounts held in the Escrow Account in the amount of $[989,000] pursuant to the terms of the Escrow Agreement."

4. Section 4.0 of the Agreement is hereby amended and restated in its entirety to read as follows:

"Upon receipt by ABBEY of (x) wire transfers of immediately available funds in the aggregate amount of $989,000.00 (as detailed in Section 3.0 above) in accordance with the wire instructions listed on Annex I hereto and (y) the acknowledgement attached hereto as Exhibit "B" executed by an authorized representative of the Fates Group, LLC, then (a) all of the Obligations shall be automatically paid and satisfied in full and irrevocably and without further action by any party hereto immediately discharged, terminated and released; (b) the Mutual Release provided for in Section 1.0 and the waiver of Civil Code section 1542 in Section 2.0 shall automatically take effect without further action by any party hereto; (c) ABBEY agrees that (i) all of ABBEY's security interests in and liens on any and all properties and assets of the NPC Entities, whether personal, real or mixed, tangible or intangible, granted by or arising under the Promissory Notes, the Security Agreement or any other agreement, contract, instrument or similar document (collectively, the "Loan Documents") shall be, without further action, automatically and immediately released and discharged; (ii) the Promissory Notes, the Security Agreement and the other Loan Documents shall, without further action, automatically and immediately terminate and be of no further force or effect, except for those provisions of the Promissory Notes, the Security Agreement and the other Loan Documents that by their terms survive such termination; (iii) the NPC Entities and any person they authorize may prepare and file such Uniform Commercial

Code termination statements and other similar termination statements as the NPC Entities may reasonably deem necessary or desirable in connection with the termination of the security interests and liens set forth in paragraph (i) above and/or included in the escrow established pursuant to the terms of that certain Letter of Escrow Instructions, dated as of November 2, 2016, by and among Aliso Escrow, ABBEY, NPC, Stephen Gates, Deyla Gates and Fates Group, LLC, without the signature or consent of ABBEY, to the extent permitted by law; (iv) ABBEY will promptly deliver to NPC (and/or to the person designated pursuant to NPC's instruction) any physical collateral, currently held by ABBEY as collateral for the Obligations; and (v) at the reasonable request of NPC (such request to be reasonable in all respects, including, without limitation, with respect to the form and substance of such additional instruments or writings), to promptly execute such additional instruments and other writings, and take such other action, as NPC may reasonably request to effect or evidence the satisfaction of the Obligations, the termination of the effectiveness of the Promissory Notes, the Security Agreement, the other Loan Documents or any instruments executed pursuant thereto (other than those provisions that by their terms expressly survive such termination) or the release of any liens or security interests in favor of ABBEY, described in paragraph (i) above or that now or hereafter arise under the Promissory Notes, the Security Agreement, or the other Loan Documents."

5. All fees and costs associated with the Escrow Agreement shall be shared equally by ABBEY and NPC.

6. Upon execution of this Amendment 1 by all Parties:

   a. ABBEY shall deposit into Escrow the following documents prepared by ABBEY's counsel, unsigned copies of which are attached hereto as composite Exhibit "B": (i) UCC-3 Termination Statements to release any liens or encumbrances ABBEY placed on the assets of NPC (the "Lien Release") and a signed letter of direction authorizing NPC to file the Lien Release, (ii) a signed Request for Dismissal (form CIV-110) with the Superior Court of California, County of Santa Barbara (the "Court") for the Voluntary Dismissal with Prejudice (the "ABBEY Dismissal") of the lawsuit filed by ABBEY against Mr. Gates, D. Gates and NPC (Case No. 16CV04189, Superior Court Santa Barbara County); (iii) a signed Statement of Change of Officers and Directors (on such form as required by the Hawaii Department of Commerce and Consumer Affairs, and the California Secretary of State) to be submitted to the appropriate authorities in California and Hawaii removing ABBEY as an officer and director of NPC and appointing Stephen Gates as the sole officer and director; (iv) a signed letter to Bank of Hawaii indicating that ABBEY is no longer an officer or director of NPC and has no signing authority on any NPC bank accounts (including the BofH Account); and (v) a "to whom it may concern" letter signed by ABBEY confirming that he is no longer an owner, officer or director of NPC.

   b. The Parties hereby direct Fates Group or its agent to deliver to the Escrow Agent the sum of $989,000 (the "Final Settlement Payment") into the Escrow Account.

   c. ABBEY shall file the ABBEY Dismissal and the court clerk for the Court, shall have

filled out the bottom portion of the ABBEY Dismissal as required, providing for the effectiveness of the ABBEY Dismissal and the Voluntary Dismissal with Prejudice of the lawsuit filed by ABBEY against Mr. Gates, D. Gates and NPC (Case No. 16CV04189, Superior Court Santa Barbara County).

d. ABBEY shall deposit into Escrow the completed and executed Notice of Entry of Dismissal and Proof of Service (CIV-120) relating to the ABBEY Dismissal, attaching the Request for Dismissal (CIV-110) (i.e. the ABBEY Dismissal) that has been filed by ABBEY and entered by the court clerk for the Court (the "Dismissal Notice").

As used herein, the term ABBEY Escrow Materials shall mean the documents in Section 6(a), 6(c) and 6(d).

Each Party waives any costs in connection with the ABBEY Dismissal and the related Dismissal Notice, except as set forth in Section 5 of this Amendment 1. The Parties acknowledge that the ABBEY Dismissal is the result of a settlement of a disputed claim and shall not for any purposes be considered favorable termination for any other legal proceedings.

e. The Parties will also deposit with the Escrow Agent a fully executed copy of this Amendment 1.

7. The Escrow Agreement shall provide that (a) the amounts held in the Escrow Account shall only be released to ABBEY upon ABBEY's delivery of the ABBEY Escrow Materials to the Escrow Agent and into Escrow; (b) the close of escrow shall only occur upon (i) ABBEY's delivery of the ABBEY Escrow Materials to the Escrow Agent and into Escrow and (ii) the release of the amounts held in the Escrow Account to ABBEY and/or his designee, (c) upon the close of escrow, the ABBEY Escrow Materials shall be delivered to NPC and/or its designee and (d) the failure of ABBEY to deliver the ABBEY Dismissal (as entered by the court clerk for the Court) and the Dismissal Notice to the Escrow Agent and/or into Escrow within 5 business days of the delivery of the Final Settlement Payment into the Escrow Account by the Fates Group and/or its agent shall result in the immediate return of all amounts held in the Escrow Account to Fates Group and/or its designee and the termination of the Escrow Agreement.

8. The releases contained in Section 1.0 of the Agreement and the amendment and restatements of Sections 3.0 and 4.0 of the Agreement are hereby updated to be effective as of the date of the close of escrow (the "Effective Date").

9. ABBEY hereby waives, effective as of the Effective Date, any right to any ownership interest in NPC, including but not limited to the two shares allegedly purchased by ABBEY on or about September 13, 2016.

10. Effective as of the Effective Date, ABBEY hereby rescinds all corporate actions taken by him since June 30, 2016, including but not limited to (a) the purchase of two shares of common stock in NPC; (b) the purported removal of Stephen Gates as an officer and

director of NPC; and (c) the purported election of Stephen Abbey as an officer and director of NPC. ABBEY hereby agrees that on and after the Effective Date, ABBEY will execute such other documents reasonably requested by NPC to effectuate rescission of the corporate actions taken by ABBEY.

11. The Parties acknowledge and agree that the identity of the officers of NPC is in dispute. For the purposes of this Amendment only, the parties ratify the actions of Stephen Gates entering into this Amendment as President and on behalf of NPC.

12. [Intentionally omitted].

13. Fates Group is not a party to the contract. However, the Parties hereby acknowledge that Fates Group is a third-party beneficiary to this Amendment 1 and the Agreement, as amended by this Amendment 1, and is entitled to the rights and benefits hereunder and may enforce the provisions hereof as if it were a party hereto. Fates Group may be entitled to damages from NPC for breach of contract if it proves that NPC intended for Fates Group to benefit from this Amendment 1 and the Agreement, as amended by this Amendment 1.

14. This Amendment may be executed in one or more counterparts, each of which is an original, but all of which together constitute one and the same instrument. Confirmation of execution by fax or email of a facsimile or electronic signature page is binding upon any party to such confirmation.

15. Except as expressly amended pursuant hereto, the Agreement shall remain unchanged and in full force and effect and is hereby ratified and confirmed in all respects.

16. Each of the Parties hereby acknowledges and confirms that each of the Parties is executing this Amendment on the basis of its own investigation and for its own reasons without reliance upon any agreement, representation, understanding or communication by or on behalf of any other person.

17. This Amendment 1 has been negotiated and entered into in the State of California, and shall be governed by, construed and enforced in accordance with the internal laws of the State of California, applied to contracts made in California by California domiciliaries to be wholly performed in California. Venue for any action hereunder shall be the State of California, County of Santa Barbara.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties have executed this Amendment 1 as of the 2nd day of November, 2016.

Neighborhood Power Corporation

By: ______________________
Stephen Gates, President

______________________
Deyla Gates, individually

By: ______________________
Stephen Gates, individually

______________________
Stephen Abbey

IN WITNESS WHEREOF, the parties have executed this Amendment 1 as of the 2nd day of November, 2016.

Neighborhood Power Corporation

By: ______________________________
Stephen Gates, President

______________________________
Deyla Gates, individually

By: ______________________________
Stephen Gates, individually

______________________________
Stephen Abbey

**Exhibit "A"**

**Form of Escrow Agreement**

**Aliso Escrow a division of Fidelity National Title**
4522 Market St., Ventura, CA 93003
Phone: (805) 650-7887 • Fax: (805) 650-1447

**Aliso Escrow a division of Fidelity National Title conducts escrow business under a Certificate of Authority No. 305 issued by the California Department of Insurance.**

**LETTER OF ESCROW INSTRUCTIONS**

Escrow Officer: Rhonda Wharton

Date: November 2, 2016
Escrow No.: [redacted]

The undersigned delivers herewith, or will cause to be delivered, to Aliso Escrow a division of Fidelity National Title, hereinafter called Escrow Holder, the papers, money or property hereinafter described to be held and disposed of by Escrow Holder in accordance with the following instructions and upon the terms and conditions hereinafter set forth, to which the undersigned hereby agree:

The terms and conditions hereinabove referred to and to which the undersigned hereby agree for themselves, their heirs, and assigns are the following:

---

**THIS ESCROW IS BY AND BETWEEN:**

First Party: STEPHEN ABBEY

whose address is: 3307 Madrona Drive, Santa Barbara, CA 93105
(hereinafter referred to as "First Party")

Second Party: NEIGHBORHOOD POWER CORPORATION, a California corporation and STEPHEN GATES, individually
whose address is: 358 Papa Place, Kahului, HI 96732
(hereinafter referred to as "Second Party")

Third Party: FATES GROUP, LLC, a Florida limited liability company

whose address is: 110 East Broward Blvd, Suite 1900, Fort Lauderdale, FL 33301
(hereinafter referred to as "Third Party")

**AND PERTAINING TO:**

SETTLEMENT AND MUTUAL GENERAL RELEASE DATED JUNE 30, 2016 AND FIRST AMENDMENT TO SETTLEMENT AND MUTUAL GENERAL RELEASE DATED NOVEMBER 2, 2016
(hereinafter referred to as the "AGREEMENT")

---

**THE PURPOSE(S) OF THIS ESCROW IS FOR:** Third Party, for the benefit of Second Party, to deposit funds herein, in exchange for receipt of documents, from First Party, as are reasonably necessary to; (a) release any liens or encumbrances First Party placed on the Assets of Neighborhood Power Corporation, (b) dismiss, with prejudice, the lawsuit filed against Second Party, (c) change the public records in California and Hawaii to reflect that Stephen Gates is the sole officer and director of Neighborhood Power Corporation, and (d) to advise Bank of Hawaii, and all third parties, that Stephen Gates is the sole owner, officer and director of Neighborhood Power Corporation, and that Stephen Abbey has no interest in Neighborhood Power Corporation.

**ON OR ABOUT NOVEMBER 2, 2016:**

Initials: ________ / ________ Initials: ________ / ________

(Instructions continued)

First Party will hand, or cause to be handed to Escrow Holder in executed form, the following documents (which documents, other than the Lien Release (as defined below), shall be executed versions of the "form of" documents attached hereto as Exhibit A with no changes from such documents other than date and signature):

(i) UCC-3 Termination Statements to release any liens or encumbrances ABBEY placed on the assets of NPC (the "Lien Release") and a signed letter of direction authorizing NPC to file the Lien Release;
(ii) a signed Request for Dismissal (form CIV-110) with the Superior Court of California, County of Santa Barbara (the "Court") for the Voluntary Dismissal with Prejudice (the "ABBEY Dismissal") of the lawsuit filed by ABBEY against Mr. Gates, D. Gates and NPC (Case No. [redacted]4189, Superior Court Santa Barbara County);
(iii) a signed Statement of Change of Officers and Directors (on such form as required by the Hawaii Department of Commerce and Consumer Affairs, and the California Secretary of State) to be submitted to the appropriate authorities in California and Hawaii removing ABBEY as an officer and director of NPC and appointing Stephen Gates as the sole officer and director.
(iv) a signed letter to Bank of Hawaii indicating that ABBEY is no longer an officer or director of NPC and has no signing authority on any NPC bank accounts (including the Bank of Hawaii NPC bank account (No. [redacted]7617)); and
(v) a "to whom it may concern" letter signed by ABBEY confirming that he is no longer an owner, officer or director of NPC.

The items in (i) – (v) above, are referred to collectively as the "First Party Documents".

Second Party will hand, or cause to be handed to Escrow Holder, the following:
1) Copy of Articles of Incorporation for Neighborhood Power Corporation
2) Statement of Information
3) Business Entity Detail Sheet from the Secretary of State's Website, acknowledging that Neighborhood Power Corporation is an "Active" entity.

Third Party will hand, or cause to be handed to Escrow Holder, the following:
1) Funds in the amount of $989,000.00 in the form of a wire transfer (the "Third Party Deposit").
2) Copy of Articles of Organization for Fates Group, LLC
3) Copy of Operating Agreement
4) LLC-1 (Statement of Information)
5) Business Entity Detail Sheet from the Florida Secretary of State's Website, acknowledging that Fates Group, LLC is an "Active" entity.

**ON OR AROUND NOVEMBER 3, 2016:**

First Party shall deposit into Escrow a completed and executed Notice of Entry of Dismissal and Proof of Service (CIV-120) relating to the ABBEY Dismissal, attaching the ABBEY Dismissal that has been filed by ABBEY and entered by the court clerk for the Court, as evidenced by the court clerk completing the bottom portion of the first page of the ABBEY Dismissal (collectively, the "Dismissal Notice").

---

**CLOSE OF ESCROW:** This escrow is to be considered CLOSED when Escrow Holder is in receipt of all required documents and monies.

At close of escrow, Escrow Holder is to:
1) Wire $989,000.00 to First Party per Wire Transfer Instructions to be deposited herein prior to close, and
2) Hand the First Party Documents and the Dismissal Notice deposited herein by First Party to Second Party by way of Second Party's Counsel (Andrew R. Friedman).

(Instructions continued)

Parties herein acknowledge that Escrow Holder's sole responsibility is to obtain and disburse documents / monies per these instructions. Escrow Holder is released from any and all responsibility and/or liability in connection with the filing and/or recording of said documents, if any, as same will be handled outside of escrow by Second Party or Second Party's Council.

---

**FEES AND CHARGES:** For its ordinary services hereunder, and upon acceptance of this escrow, Escrow Holder is entitled to a "Set Up" fee of $750.00 non-refundable, payable by First Party and Second Party (1/2 each), which shall be deposited herein and paid to Escrow Holder concurrently with First Party and Second Party's signatures hereon.

Additional monthly maintenance fees of $50.00 per month shall be paid to Escrow Holder from funds on deposit beginning on the 1st day of December, 2016, and shall continue each and every month thereafter until the close of this escrow.

Notwithstanding anything in these instructions, (1) no amounts may be deducted, set off, charged or applied to the Third Party Deposit for fees, costs, and/or expenses in connection with these Instructions, including the fees and expenses of Escrow Holder and its affiliates; and (2) all fees and expenses (other than the $750.00 escrow fee) in connection with these Instructions shall be payable solely by Second Party.

In the event this escrow is not closed by January 1, 2017, Escrow Holder is to; (a) consider this escrow cancelled, and (b) return any and all funds and/or documents on deposit, if any, to the depositing party.

## GENERAL PROVISIONS

THESE INSTRUCTIONS HAVE BEEN PREPARED BASED ON THE INFORMATION GIVEN TO ESCROW HOLDER BY THE PARTIES HEREIN. FIRST PARTY, SECOND PARTY, AND THIRD PARTY, UNDERSTAND AND ACKNOWLEDGE THAT THE DUTIES OF THE ESCROW HOLDER ARE LIMITED SOLELY TO THE SPECIFIC PROVISIONS INCORPORATED IN THESE ESCROW INSTRUCTIONS, AND ESCROW HOLDER IS TO COMPLY WITH SAID INSTRUCTIONS IN ORDER TO CLOSE ESCROW IN THE MANNER PRESCRIBED HEREIN. ESCROW HOLDER IS NOT AN ATTORNEY, REAL ESTATE AGENT/ BROKER, OR TAX ACCOUNTANT. ESCROW HOLDER WILL NOT BE ASKED, OR REQUIRED, TO PERFORM ANY DUTIES NORMALLY HANDLED BY SAID PROFESSIONALS. FIRST PARTY AND SECOND PARTY ACKNOWLEDGE THAT THEY HAVE BEEN ADVISED TO SEEK OUTSIDE COUNSEL BEFORE THE EXECUTION OF THESE INSTRUCTIONS.

OTHER AGREEMENTS. Escrow Holder is not a party to, or bound by any agreement which may be deposited under, evidenced by or arise out of these instructions.

AGENCY RESPONSIBILITY. Escrow Holder acts as a depository only and is not responsible or liable in any manner whatever for the sufficiency, correctness, genuineness or validity of any instrument deposited with it hereunder, or with respect to form or execution of the same, or the identity, authority, or right of any person executing or depositing the same.

DEFAULTS. Escrow Holder shall not be required to take or be bound by notice of any default of any person, or to take any action with respect to such default involving any expense or liability, unless notice in writing is given to the Escrow Holder at the office above named, of such default by the undersigned or any of them, and unless it is indemnified in a manner satisfactory to it against such expense or liability. These instructions shall not be subject to recession or modification except of receipt by Escrow Holder at the office above named of the written instructions of all of the parties hereto or their successors in interest, and no such modification shall be effective unless and until consented to in writing by Aliso Escrow a division of Fidelity National Title.

NOTICES. Escrow Holder shall be protected in acting upon any notice, request, waiver, consent, receipt or other paper or document believed by Escrow Holder to be signed by the proper party or parties.

JUDGMENT. Escrow Holder shall not be liable for any error of judgment or for any act done or step taken or omitted by it in good faith or for any mistake of fact of law, or for anything which it may do or refrain from doing in connection herewith, except its own willful misconduct, and Escrow Holder shall have no duties to anyone except those signing these instructions.

Initials: ________ / ________ Initials: ________ / ________

(Instructions continued)

COUNSEL. Escrow Holder may advise with legal counsel in the event of any dispute or question as to the construction of the foregoing instructions, or Escrow Holder's duties hereunder, and Escrow Holder shall incur no liability and shall be fully protected in acting in accordance with the opinion and instructions of counsel.

DISAGREEMENTS. In the event of any disagreement between the undersigned and/or the person or persons named in the foregoing instructions, and/or any other person, resulting in adverse claims and demands being made in connection with or for any papers, money or property involved herein or affected hereby, Escrow Holder shall be entitled at its option to refuse to comply with any such claim or demand, so long as such disagreement shall continue, and in so doing Escrow Holder shall not be or become liable for damages or interest to the undersigned or any of them or to any person named in the foregoing instructions for its failure or refusal to comply with such conflicting or adverse demands; and Escrow Holder shall be entitled to continue so to refrain and refuse so to act until:

1. The rights of the adverse claimants have been finally adjudicated in a court assuming and having jurisdiction of the parties and the money, papers, and property involved herein or affect hereby; and/or
2. All differences shall have been adjusted by agreement and Escrow Holder shall have been notified thereof in writing by all of the persons interested.
3. In the event of such disagreement, Escrow Holder in its discretion, may file a suit in interpleader for the purpose of having the respective rights of the claimants adjudicated, and deposit with the court all documents and property held hereunder, and the undersigned agree to pay all costs and counsel fees incurred by Escrow Holder in such action and said costs and fees be included in the judgment in any such action.

RIGHT OF RESIGNATION. Escrow Holder has the right to resign upon written notice delivered to the principals herein. If such right is exercised, all funds and documents shall be returned to the party who deposited them and Escrow Holder shall have no liability hereunder.

FEES AND CHARGES. In the event that Escrow Holder performs any service not specifically provided hereinabove, or that there is any assignment or attachment of any interest in the subject matter of this escrow or modification thereof, or that any controversy arises hereunder, or that Escrow Holder is named a party to, or intervenes in, any litigation pertaining to this escrow or the subject matter thereof, Escrow Holder shall be reasonably compensated therefor and reimbursed for all costs and expenses, including attorney's fees, occasioned thereby solely by Second Party. Escrow Holder shall have a first lien on the property and papers held by it hereunder for such compensation and expenses, (other than the Third Party Deposit), and Second Party agrees to pay the same, and to indemnify Escrow Holder against any loss, liability or expense incurred in any act or thing done hereunder.

CANCELLATION. In the event this escrow is cancelled, the undersigned First Party and Second Party will nevertheless pay the escrow fee plus Second Party will pay all additional costs and expenses of Escrow Holder. Notwithstanding anything in these instructions to the contrary, Escrow Holder may, at is discretion, upon ten (10) days written notice to the undersigned parties, resign from this escrow and shall be entitled to reimbursement from the Second Party only for those costs and expenses incurred by Escrow Holder to the date of such resignation. Upon cancellation by the parties or resignation of Escrow Holder, after deducting the Escrow Holder's fee and/or costs and expenses, the balance of funds and documents shall be returned to the parties who shall have deposited the same; provided, however, that no fees, costs and/or expenses may be deducted from the Third Party Deposit.

SIGNATURES. These instructions may be executed in counterparts, each of which so executed shall be deemed as original, irrespective of the date of its execution and delivery; and said counterparts together shall constitute one and the same instrument.

DEPOSIT OF FUNDS. The law dealing with the disbursement of funds requires that all funds be available for withdrawal as a matter of right by the title entity's escrow and/or sub escrow account prior to disbursement of any funds. Only wire-transferred funds can be given immediate availability upon deposit. Cashier's checks, teller's checks and Certified checks may be available one business day after deposit. All other funds such as personal, corporate or partnership checks and drafts are subject to mandatory holding periods which may cause material delays in disbursement of funds in this escrow. In order to avoid delays, all fundings should be wire transferred. Outgoing wire transfers will not be authorized until confirmation of the respective incoming wire transfer or of availability of deposited checks.

Initials: ____________ / ____________ Initials: ____________ / ____________

(Instructions continued)

Deposit of funds into general escrow trust account unless instructed otherwise. You may instruct Escrow Holder to deposit your funds into an interest bearing account by signing and returning the "Escrow Instructions - Interest Bearing Account", which has been provided to you. If you do not so instruct us, then all funds received in this escrow shall be deposited with other escrow funds in one or more general escrow trust accounts, which include both non-interest bearing demand accounts and other depository accounts of Escrow Holder, in any state or national bank or savings and loan association insured by the Federal Deposit Insurance Corporation (the "depository institutions") and may be transferred to any other such escrow trust accounts of Escrow Holder or one of its affiliates, either within or outside the State of California. A general escrow trust account is restricted and protected against claims by third parties and creditors of Escrow Holder and its affiliates.

Receipt of benefits by Escrow Holder and affiliates. The parties to this escrow acknowledge that the maintenance of such general escrow trust accounts with some depository institutions may result in Escrow Holder or its affiliates being provided with an array of bank services, accommodations or other benefits by the depository institution. Some or all of these benefits may be considered interest due you under California Insurance Code Section 12413.5. Escrow Holder or its affiliates also may elect to enter into other business transactions with or obtain loans for investment or other purposes from the depository institution. All such services, accommodations, and other benefits shall accrue to Escrow Holder or its affiliates and Escrow Holder shall have no obligation to account to the parties to this escrow for the value of such services, accommodations, interest or other benefits.

Said funds will not earn interest unless the instructions otherwise specifically state that funds shall be deposited in an interest-bearing account. All disbursements shall be made by check of Aliso Escrow a division of Fidelity National Title. The principals to this escrow are hereby notified that the funds deposited herein are insured only to the limit provided by the Federal Deposit Insurance Corporation. Any instruction for bank wire will provide reasonable time or notice for Escrow Holder's compliance with such instruction. Escrow Holder's sole duty and responsibility shall be to place said wire transfer instructions with its wiring bank upon confirmation of (1) satisfaction of conditions precedent or (2) document recordation at close of escrow. Escrow Holder will NOT be held responsible for lost interest due to wire delays caused by any bank or the Federal Reserve System, and recommends that all parties make themselves aware of banking regulations with regard to placement of wires.

In the event there is insufficient time to place a wire upon any such confirmation or the wires have closed for the day, the parties agree to provide written instructions for an alternative method of disbursement. WITHOUT AN ALTERNATIVE DISBURSEMENT INSTRUCTION, FUNDS WILL BE HELD IN TRUST IN A NON-INTEREST BEARING ACCOUNT UNTIL THE NEXT OPPORTUNITY FOR WIRE PLACEMENT.

AUTHORIZATION TO FURNISH COPIES. You are authorized to furnish copies of these instructions, supplements, amendments, notices of cancellation and closing statements, to the Real Estate Broker(s) and Lender(s) named in this escrow.

DELIVERY/RECEIPT. Delivery to principals as used in these instructions unless otherwise stated herein is to be by hand in person to the principal, regular mail, email or fax to any of the contact information provided in these instructions. If delivered by regular mail receipt is determined to be 72 hours after such mailing. All documents, balances and statements due to the undersigned may be delivered to the contact information shown herein. All notices, change of instructions, communications and documents are to be delivered in writing to the office of Aliso Escrow a division of Fidelity National Title as set forth herein.

NON-RESIDENT ALIEN. The Foreign Investment in Real Property Tax Act (FIRPTA), Title 26 U.S.C., Section 1445, and the regulations there under, provide in part, that a transferee (buyer) of a U.S. real property interest from a foreign person must withhold a statutory percentage of the amount realized on the disposition, report the transaction and remit the withholding to the Internal Revenue Service (IRS) within twenty (20) days after the transfer. Aliso Escrow a division of Fidelity National Title will not determine nor aid in the determination of whether the FIRPTA withholding provisions are applicable to the subject transaction, nor act as a Qualified Substitute under state or federal law, nor furnish tax advice to any party to the transaction. Aliso Escrow a division of Fidelity National Title will not determine nor aid in the determination of whether the transaction will qualify for an exception or an exemption and is not responsible for the filing of any tax forms with the IRS as they relate to FIRPTA, nor responsible for collecting and holding of any documentation from the buyer or seller on the buyer's behalf for the purpose of supporting a claim of an exception or exemption. Aliso Escrow a division of Fidelity National Title is not an agent for the buyer for the purposes of receiving and analyzing any evidence or documentation that the seller in the subject transaction is a U.S. citizen or resident alien. Aliso Escrow a division of Fidelity National Title is not responsible for the payment of this tax and/or penalty and/or interest incurred in connection therewith and such taxes are not a matter covered by the Owner's Policy of Title Insurance to be issued to the buyer. Aliso Escrow a division of Fidelity National Title is not responsible for the completion of any IRS documents or related forms related to the

Initials: __________ / __________ Initials: __________ / __________

(Instructions continued)

referenced statute. The buyer is advised: they must independently make a determination of whether the contemplated transaction is subject to the withholding requirement; bear full responsibility for compliance with the withholding requirement if applicable and/or for payment of any tax, interest, penalties and/or other expenses that may be due on the subject transaction; and they are responsible for the completion of any and all forms, including but not limited to applicable IRS documentation, and the mailing of those forms. The Buyer is advised any forms, documents, or information received from Aliso Escrow a division of Fidelity National Title is not tax or legal advice and should not be construed as such nor treated as a complete representation of FIRPTA requirements. Buyer should seek outside counsel from a qualified individual to determine any and all implications of the referenced statute.

FACSIMILE/ELECTRONIC SIGNATURE. Escrow Holder is hereby authorized and instructed that, in the event any party utilizes electronic or "facsimile" transmitted signed documents or instructions to Escrow Holder, you are to rely on the same for all escrow instructions purposes and the closing of escrow as if they bore original signatures. "Electronic Signature" means, as applicable, an electronic copy or signature complying with California Law.

CLARIFICATION OF DUTIES

Aliso Escrow a division of Fidelity National Title serves ONLY as an Escrow Holder in connection with these instructions and cannot give legal advice to any party hereto.

Escrow Holder is not to be accountable or liable for the sufficiency or correctness as to form, manner of execution, or validity of any instrument deposited in this escrow, nor as to the identity, authority or rights of any person executing the same. Escrow Holder's duties hereunder shall be limited to the proper handling of such money and the proper safekeeping of such instruments, or other documents received by Escrow Holder, and for the disposition of same in accordance with the written instructions accepted by Escrow Holder.

The agency and duties of Escrow Holder commence only upon receipt of copies of these Escrow Instructions executed by all parties.

---

THIS AGREEMENT IN ALL PARTS APPLIES TO, INURES TO THE BENEFIT OF, AND BINDS ALL PARTIES HERETO, THEIR HEIRS, LEGATEES, DEVISEES, ADMINISTRATORS, EXECUTORS, SUCCESSORS AND ASSIGNS, AND WHENEVER THE CONTEXT SO REQUIRES THE MASCULINE GENDER INCLUDES THE FEMININE AND NEUTER, AND THE SINGULAR NUMBER INCLUDES THE PLURAL. THESE INSTRUCTIONS AND ANY OTHER AMENDMENTS MAY BE EXECUTED IN ANY NUMBER OF COUNTERPARTS, EACH OF WHICH SHALL BE CONSIDERED AS AN ORIGINAL AND BE EFFECTIVE AS SUCH.

MY SIGNATURE HERETO CONSTITUTES INSTRUCTION TO ESCROW HOLDER OF ALL TERMS AND CONDITIONS CONTAINED IN THIS AND ALL PRECEDING PAGES AND FURTHER SIGNIFIES THAT I HAVE READ AND UNDERSTAND THESE GENERAL PROVISIONS.

Parties agree to pay funds required to close escrow upon demand. Parties herein further agree to hand Escrow Holder all instruments and documents necessary to enable Escrow Holder to comply with the instructions as set forth herein.

Each of the undersigned parties states that he has read the foregoing instructions, understands, agrees to them and acknowledges receipt of a copy of same.

**NEIGHBORHOOD POWER CORPORATION, a California corporation**

______________________________
**STEPHEN ABBEY**

______________________________
**By: STEPHEN GATES, President**

**FATES GROUP, LLC, a Florida limited liability company**

______________________________
**STEPHEN GATES, Individually**

______________________________
**By:**
**Its:**

**Exhibit "B"**

**Dismissal, UCC-3 Termination Statement(s), Statement of Change of Officers and Directors, and letter to Bank of Hawaii**

**For faster processing and reduced filing fees, UCC financing statement amendments can be filed electronically at https://uccconnect.sos.ca.gov.**

**Fees:** If submitting online, the filing fee for a financing statement is $5. If submitting on paper, the Financing Statement Amendment (Form UCC-3) must be accompanied by a $10 fee if less than 3 pages. If 3 pages or more, the fee is $20. (Government Code section 12194)

If submitting the statement on paper, please use this fillable form. The information must be legible for digital imaging. Read and follow all Instructions, especially Instruction 1a; correct file number of initial financing statement is crucial. Fill the form very carefully; mistakes may have important legal consequences. If you have questions, consult your legal counsel. The Secretary of State's office cannot give legal advice. Filing statutes can be found in California Uniform Commercial Code sections 9501-9528. Completed forms along with the applicable fees can be mailed to Secretary of State, UCC Section, P.O. Box 942835, Sacramento, CA 94235-0001 or delivered in person (drop off) to the Sacramento office, 1500 11th Street, Sacramento, CA 95814.

Do not insert anything in the open space in the upper portion of this form; it is reserved for filing office use only.

**Complete the UCC Financing Statement Amendment (Form UCC-3) as follows:**

**A and B.** To assist filing offices that might wish to communicate with filer, filer may provide information in item A and item B. These items are optional.

**C.** Complete item C if filer desires an acknowledgment sent.

**1a. File Number.** Enter file number of initial financing statement to which this Amendment relates. Enter only one file number. In some states, the file number is not unique; in those states, also enter in item 1a, after the file number, the date that the initial financing statement was filed.

**1b.** If this Amendment is to be filed in the real estate records or in any other filing office where the name of current Debtor is required for indexing purposes, check the box in item 1b and enter Debtor name in item 13 of Amendment Addendum (Form UCC3Ad). Complete item 13 in accordance with instructions on Amendment Addendum (Form UCC3Ad). If Debtor does not have an interest of record, enter the name and address of the record owner in item 16 of Amendment Addendum (Form UCC3Ad).

***Note:*** Show purpose of this Amendment by checking box 2, 3, 4, 5, or 8 (in items 5 and 8 you must check additional boxes), also complete items 6, 7, and/or 8 as appropriate. Some, but not all filing offices accept multiple actions on an Amendment. Filing offices that accept multiple actions may charge an additional fee. Some filing offices that accept multiple actions may only index one of the actions requested. Consult the administrative rules of the designated filing office to determine the extent to which multiple actions will be accepted, indexed, and the applicable filing fees for multiple actions.

**2. Termination.** To terminate the effectiveness of the identified financing statement with respect to the security interest(s) of authorizing Secured Party, check box in item 2. See Instruction 9 below.

**3. Assignment.** To assign (1) some or all of Assignor's right to amend the identified financing statement, or (2) the Assignor's right to amend the identified financing statement with respect to some (but not all) of the collateral covered by the identified financing statement: Check box in item 3 and enter name of Assignee in item 7a or 7b; always enter the Assignee's mailing address in item 7c. Also enter name of Assignor in item 9. If assignment affects the right to amend the financing statement with respect to some (but not all) of the collateral covered by the identified financing statement, check the ASSIGN collateral box and indicate the particular collateral covered in item 8.

**4. Continuation.** To continue the effectiveness of the identified financing statement with respect to the security interest(s) of authorizing Secured Party, check box in item 4. See Instruction 9 below.

**5-7. Party Information Change.** To indicate a party information change, check this box; also check additional boxes (as applicable) and complete items 5, 6, and/or 7 as appropriate.

To change the name and/or address of a party (items 5, 6, and 7): Check box in item 5 to indicate whether this Amendment relates to a Debtor or Secured Party of record; and check the CHANGE name and/or mailing address box in item 5 and enter name of affected party (current record name) in item 6a or 6b; and repeat or enter the new name in item 7a or 7b; always enter the party's mailing address in item 7c.

To add a party (items 5 and 7): Check box in item 5 to indicate whether this Amendment relates to a Debtor or Secured Party of record; and check the ADD name box in item 5 and enter the added party's name in item 7a or 7b; always enter the party's mailing address in item 7c. For additional Debtors or Secured Parties, attach Amendment Additional Party (Form UCC3AP), using correct name format.

To delete a party (items 5 and 6): Check box in item 5 to indicate whether this Amendment relates to a Debtor or Secured Party of record; and check the DELETE name box in item 5 and enter the deleted party's name in item 6a or 6b.

**8. Collateral Change.** To indicate a collateral change, check this box; also check additional box (as applicable) and describe the change in item 8. If space in item 8 is insufficient, continue collateral description in item 14 of Amendment Addendum (Form UCC3Ad). Do not include social security numbers or other personally identifiable information.

To add collateral: Check the ADD collateral box in item 8 and indicate the additional collateral.
To delete collateral: Check the DELETE collateral box in item 8 and indicate the deleted collateral. A partial release is a DELETE collateral change.
To restate covered collateral description: Check the RESTATE covered collateral box in item 8 and indicate the restated collateral.
To assign the right to amend the financing statement with respect to part (but not all) of the collateral covered by the identified financing statement: Comply with Instruction 3 above and check the ASSIGN collateral box in item 8.

If, due to a full release of collateral, filer no longer claims a security interest under the identified financing statement, check box in item 2 (Termination) and not a box in item 8 (Collateral Change).

**9. Name of Authorizing Party.** Enter name of party of record authorizing this Amendment. In most cases, the authorizing party is the Secured Party of record. If this is an Amendment (Assignment), enter Assignor's name in item 9a or 9b. If this is an Amendment (Termination) authorized by a Debtor, check the box in item 9 and enter the name of the Debtor authorizing this Amendment in item 9a or 9b. If this Amendment (Termination) is to be filed or recorded in the real estate records, also enter, in item 12 of Amendment Addendum (Form UCC3Ad), the name of Secured Party of record. If there is more than one authorizing Secured Party or Debtor, enter additional name(s) in item 14 of Amendment Addendum (Form UCC3Ad).

**10. Optional Filer Reference Data.** This item is optional and is for filer's use only. For filer's convenience of reference, filer may enter in item 10 any identifying information that filer may find useful. Do not include social security numbers or other personally identifiable information.

# Instructions for UCC Financing Statement Amendment Addendum (Form UCC3Ad)

Please type or laser-print this form. Be sure it is completely legible. Read and follow all Instructions; use of the correct name for the Debtor is crucial. Fill in form very carefully; mistakes may have important legal consequences. If you have questions, consult your attorney. The filing office cannot give legal advice.

**ITEM INSTRUCTIONS**

11. **File Number.** Enter file number of initial financing statement as shown in item 1a of Amendment (Form UCC3) to which this Amendment Addendum relates.

12. **Name of Authorizing Party.** Enter information exactly as shown in item 9 on Amendment (Form UCC3).

13. **Name of Debtor on related Financing Statement.** If this Amendment (Form UCC3) is to be filed in the real estate records or in any other filing office where the name of a current Debtor of record is required for indexing purposes, enter Debtor name in item 13a or 13b. Item 13 is intended to cross-reference the Amendment (Form UCC3) and Amendment Addendum with the related Financing Statement (Form UCC1). If more than one current Debtor, enter additional name(s) in item 14 or on additional Amendment Addendum (Form UCC3Ad). Do not use item 13 to change, add, or delete a Debtor name.

14. **Additional Space for Item 8 (Collateral).** If space in item 8 of Amendment (Form UCC3) is insufficient or additional information must be provided, enter additional information in item 14 or attach additional page(s) and incorporate by reference in item 14 (e.g. See Exhibit A). Do not include social security numbers or other personally identifiable information.

15-17. **Real Estate Record Information.** If this Amendment (Form UCC3) is to be filed in the real estate records, complete the required information (items 15, 16, and 17). If this Amendment (Form UCC3) covers timber to be cut, covers as-extracted collateral, and/or is filed as a fixture filing, check appropriate box in item 15. If the Debtor does not have an interest of record, enter the name and address of the record owner in item 16. Provide a sufficient description of real estate in accordance with the applicable law of the jurisdiction where the real estate is located in item 17. If space in items 16 or 17 is insufficient, attach additional page(s) and incorporate by reference in items 16 or 17 (e.g., See Exhibit A), and continue the real estate information. Do not include social security numbers or other personally identifiable information.

18. **Miscellaneous.** Under certain circumstances, additional information not provided on the Financing Statement Amendment (Form UCC3) may be required. Also, some states have non-uniform requirements. Use this space or attach additional page(s) and incorporate by reference in item 18 (e.g., See Exhibit A) to provide such additional information or to comply with such requirements; otherwise, leave blank. Do not include social security numbers or other personally identifiable information.

[redacted]

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Andrew R. Friedman 859-255-1944

B. E-MAIL CONTACT AT FILER (optional)
arfatty@gmail.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

Andrew R. Friedman
Friedman, Rosenwasser & Goldbaum, P.A.
284 Hutchison Road
Paris, KY 40361

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE NUMBER
[redacted]8126

1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS
Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

2. ☑ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ ASSIGNMENT (full or partial): Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☐ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ PARTY INFORMATION CHANGE:

Check one of these two boxes:
This Change affects ☐ Debtor or ☐ Secured Party of record

AND Check one of these three boxes to:
☐ CHANGE name and/or address: Complete item 6a or 6b, and item 7a or 7b and item 7c
☐ ADD name: Complete item 7a or 7b, and item 7c
☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. CURRENT RECORD INFORMATION: Complete for Party Information Change - provide only one name (6a or 6b)

6a. ORGANIZATION'S NAME

OR

| 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

7. CHANGED OR ADDED INFORMATION: Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

7a. ORGANIZATION'S NAME

OR

7b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

8. ☐ COLLATERAL CHANGE: Also check one of these four boxes: ☐ ADD collateral ☐ DELETE collateral ☐ RESTATE covered collateral ☐ ASSIGN collateral

Indicate collateral:

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT: Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

9a. ORGANIZATION'S NAME

OR

| 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| Abbey | Stephen | M | |

10. OPTIONAL FILER REFERENCE DATA:
CA-SOS Debtor: Neighborhood Power Corporation

# UCC FINANCING STATEMENT AMENDMENT ADDENDUM

FOLLOW INSTRUCTIONS

11. INITIAL FINANCING STATEMENT FILE NUMBER: Same as item 1a on Amendment form
[redacted]8126

12. NAME OF PARTY AUTHORIZING THIS AMENDMENT: Same as item 9 on Amendment form

12a. ORGANIZATION'S NAME

OR

12b. INDIVIDUAL'S SURNAME
Abbey

FIRST PERSONAL NAME
Stephen

ADDITIONAL NAME(S)/INITIAL(S)
M

SUFFIX

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

13. Name of DEBTOR on related financing statement (Name of a current Debtor of record required for indexing purposes only in some filing offices - see Instruction item 13): Provide only one Debtor name (13a or 13b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); see Instructions if name does not fit

13a. ORGANIZATION'S NAME
Neighborhood Power Corporation

OR

| 13b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

14. ADDITIONAL SPACE FOR ITEM 8 (Collateral):

15. This FINANCING STATEMENT AMENDMENT:
☐ covers timber to be cut ☐ covers as-extracted collateral ☐ is filed as a fixture filing

16. Name and address of a RECORD OWNER of real estate described in item 17 (if Debtor does not have a record interest):

17. Description of real estate:

18. MISCELLANEOUS:

Date: November 2, 2016

Neighborhood Power Corporation
ATTN: Stephen Gates

Re: UCC-1 Financing Statement [redacted]8126 (the "Financing Statement")

Dear Stephen:

Upon the close of the escrow contemplated by the Letter of Escrow Instructions dated concurrently herewith, you are authorized to file the attached Form UCC-3 terminating the Financing Statement, and take any other action necessary to terminate the lien created by the Financing Statement.

Regards,

Stephen M. Abbey

**CIV-110**

ATTORNEY OR PARTY WITHOUT ATTORNEY: STATE BAR NO: 195955
NAME: Jack T Humes
FIRM NAME: Law Office of Jack T Humes
STREET ADDRESS: 28720 Canwood St., Suite 105
CITY: Agoura Hills, STATE: CA ZIP CODE: 91301
TELEPHONE NO.: 818-707-1277 FAX NO.: 818-735-3811
E-MAIL ADDRESS: [redacted]
ATTORNEY FOR (Name): Plaintiff, Stephen Abbey

*FOR COURT USE ONLY*

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** SANTA BARBARA
STREET ADDRESS: 1100 Anacapa St.,
MAILING ADDRESS: 1100 Anacapa St.
CITY AND ZIP CODE: Santa Barbara, California 93101
BRANCH NAME: Santa Barbara Courthouse

Plaintiff/Petitioner: Abbey
Defendant/Respondent: Gates, et al.

## REQUEST FOR DISMISSAL

CASE NUMBER: [redacted]4189

**A conformed copy will not be returned by the clerk unless a method of return is provided with the document.**

**This form may not be used for dismissal of a derivative action or a class action or of any party or cause of action in a class action. (Cal. Rules of Court, rules 3.760 and 3.770.)**

1. TO THE CLERK: Please **dismiss** this action as follows:
   a. (1) [x] With prejudice (2) [ ] Without prejudice
   b. (1) [x] Complaint (2) [ ] Petition
   (3) [ ] Cross-complaint filed by *(name):* on *(date):*
   (4) [ ] Cross-complaint filed by *(name):* on *(date):*
   (5) [x] Entire action of all parties and all causes of action
   (6) [ ] Other *(specify):**
2. *(Complete in all cases except family law cases.)*
   The court [ ] did [x] did not waive court fees and costs for a party in this case. *(This information may be obtained from the clerk. If court fees and costs were waived, the declaration on the back of this form must be completed).*

Date: October 25, 2016
Jack T. Humes
(TYPE OR PRINT NAME OF [x] ATTORNEY [ ] PARTY WITHOUT ATTORNEY) ▶ (SIGNATURE)

*If dismissal requested is of specified parties only of specified causes of action only, or of specified cross-complaints only, so state and identify the parties, causes of action, or cross-complaints to be dismissed.

Attorney or party without attorney for:
[x] Plaintiff/Petitioner [ ] Defendant/Respondent
[ ] Cross Complainant

3. **TO THE CLERK:** Consent to the above dismissal is hereby given.**

Date:
(TYPE OR PRINT NAME OF [ ] ATTORNEY [ ] PARTY WITHOUT ATTORNEY) ▶ (SIGNATURE)

** If a cross-complaint – or Response (Family Law) seeking affirmative relief – is on file, the attorney for cross-complainant (respondent) must sign this consent if required by Code of Civil Procedure section 581 (i) or (j).

Attorney or party without attorney for:
[ ] Plaintiff/Petitioner [ ] Defendant/Respondent
[ ] Cross Complainant

*(To be completed by clerk)*

4. [ ] Dismissal entered as requested on *(date):*
5 [ ] Dismissal entered on *(date):* as to only *(name):*
6. [ ] Dismissal **not entered** as requested for the following reasons *(specify):*

7. a. [ ] Attorney or party without attorney notified on *(date):*
   b. [ ] Attorney or party without attorney not notified. Filing party failed to provide
   [ ] a copy to be conformed [ ] means to return conformed copy

Date: Clerk, by ______________________, Deputy

CIV-110

| | |
|---|---|
| Plaintiff/Petitioner: Abbey<br>Defendant/Respondent: Gates, et al. | [redacted]BER:<br>[redacted]4189 |

**COURT'S RECOVERY OF WAIVED COURT FEES AND COSTS**

If a party whose court fees and costs were initially waived has recovered or will recover $10,000 or more in value by way of settlement, compromise, arbitration award, mediation settlement, or other means, the court has a statutory lien on that recovery. The court may refuse to dismiss the case until the lien is satisfied. (Gov. Code, § 68637.)

## Declaration Concerning Waived Court Fees

1. The court waived court fees and costs in this action for *(name)*:
2. The person named in item 1 is *(check one below)*:
   a. ☐ not recovering anything of value by this action.
   b. ☐ recovering less than $10,000 in value by this action.
   c. ☐ recovering $10,000 or more in value by this action. *(If item 2c is checked, item 3 must be completed.)*
3. ☐ All court fees and court costs that were waived in this action have been paid to the court *(check one)*: Yes No

I declare under penalty of perjury under the laws of the State of California that the information above is true and correct.

Date:

(TYPE OR PRINT NAME OF ☐ ATTORNEY ☐ PARTY MAKING DECLARATION) ▶ (SIGNATURE)

CIV-120

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*:
Jack T Humes SB#195955
28720 Canwood St., Suite 105, Agoura Hills, CA 91301
TELEPHONE NO.: 818-707-1277 FAX NO.: 818-735-3811
E-MAIL ADDRESS: [redacted]
ATTORNEY FOR *(Name)*: Plaintiff, Stephen Abbey

FOR COURT USE ONLY

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA BARBARA
STREET ADDRESS: 1100 Anacapa St.
MAILING ADDRESS: 1100 Anacapa St.
CITY AND ZIP CODE: Santa Barbara, California 03101
BRANCH NAME: Santa Barbara Courthouse

PLAINTIFF/PETITIONER: Abbey
DEFENDANT/RESPONDENT: Gates, et al.

**NOTICE OF ENTRY OF DISMISSAL AND PROOF OF SERVICE**

☐ Personal Injury, Property Damage, or Wrongful Death
☐ Motor Vehicle ☐ Other
☐ Family Law
☐ Eminent Domain
☑ Other *(specify)*: Breach of Contract; Declaratory Relief

CASE NUMBER: [redacted]4189

**TO ATTORNEYS AND PARTIES WITHOUT ATTORNEYS:** A dismissal was entered in this action by the clerk as shown on the *Request for Dismissal. (Attach a copy completed by the clerk.)*

Date:

(TYPE OR PRINT NAME OF ☐ ATTORNEY ☐ PARTY WITHOUT ATTORNEY) ▶ (SIGNATURE)

## PROOF OF SERVICE

1. I am over the age of 18 and not a party to this cause. My residence or business address is:

2. ☑ I am a resident of or employed in the county where the mailing occurred. I served a copy of the *Notice of Entry of Dismissal* and *Request for Dismissal* by mailing them, in a sealed envelope with postage fully prepaid, as follows:
   a. ☐ I deposited the envelope with the United States Postal Service.
   b. ☑ I placed the envelope for collection and processing for mailing following this business's ordinary practice with which I am readily familiar. On the same day correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service.
   c. Date of deposit: d. Place of deposit *(city and state)*:
   e. Addressed as follows *(name and address)*:
   See Attachment for Neighborhood Power Corporation, Stephen Gates and Deyla Gates

3. ☐ I served a copy of the *Notice of Entry of Dismissal and Request for Dismissal* by personally delivering copies as shown below:
   a. Name of person served:
   b. Address at which person served:
   c. On *(date)*: d. At *(time)*:

4. ☐ I served a copy of the *Notice of Entry of Dismissal* and *Request for Dismissal* by electronically serving copies as shown below *(complete if electronic service is used based on a court order or agreement of the parties)*:
   a. Name of person served:
   b. Electronic service address of person served:
   c. On *(date)*: d. At *(time)*:
   e. Electronic service address from which I served the documents:
   ☐ Proof of electronic service is attached.

5. ☐ Proof of service on additional parties is attached.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:

(TYPE OR PRINT NAME) ▶ (SIGNATURE OF DECLARANT)



Form Adopted for Mandatory Use
Judicial Council of California
CIV-120 [Rev. January 1, 2012]

**NOTICE OF ENTRY OF DISMISSAL AND PROOF OF SERVICE**

Code of Civil Procedure, § 581 et seq.;
Cal. Rules of Court, rule 3.1390
www.courts.ca.gov

ATTACHMENT TO CIV-120

**Addresses For Service:**

**Stephen and Deyla Gates**
**33 Lokelau Place**
**Haiku, HI 96708**

**Neighborhood Power Corporation**
**358 Papa Place**
**Kahului, HI 96732**

Filing fees:

Profit Corporation/LLC $25
Non Profit Corporation $10
Optional expedite fee $25
Archives Fee $1

* This letter is to be signed by at least one of the remaining or **NEW** officers, members or managers of the above named entity.

October 24, 2016
Date

Department of Commerce and Consumer Affairs
Business Registration Division
P O Box 40
Honolulu, Hawaii 96810

Re: Neighborhood Power Corporation
(Name of Entity)

The above named entity has **changed** its officers/directors/members/managers:

From:

| Offics Held | Full Name | Address |
|---|---|---|
| CEO/P/D/CFO | Abbey, Stephen | 3307 Madrona Dr. Santa Barbara, CA 93105 |

To (Include: Names, titles and Addresses):

| Offices Held | Full Name | Address |
|---|---|---|
| CEO/P/D | Gates, Stephen | 415 Dairy Road Suite E216 Kahului, HI 96732 |

I certify under the penalties of the Hawaii Revised Statutes that I am authorized to make this change for the entity and the statements herein are true and correct in all material respects.

Sincerely,

Stephen Abbey, Authorized Person
* Signature and Office Title Held

Print Name

PHONE/FAX/MAIL ORDERS
(Required information to complete for credit card transactions)

MASTERCARD VISA

CREDIT CARD NUMBER: ______________________________

VERIFICATION NUMBER: ____________ EXPIRATION DATE: __________

AMOUNT CHARGED: ______________

CARDHOLDER'S NAME: ________________________________ PHONE NUMBER: ____________

CARDHOLDER'S BILLING ADDRESS: ________________________________________

________________________________________

________________________________________

[redacted]

# State of California
## Secretary of State

S

### Statement of Information
**(Domestic Stock and Agricultural Cooperative Corporations)**
**FEES (Filing and Disclosure): $25.00.**
**If this is an amendment, see instructions.**
**IMPORTANT – READ INSTRUCTIONS BEFORE COMPLETING THIS FORM**

1. CORPORATE NAME
Neighborhood Power Corporation

2. CALIFORNIA CORPORATE NUMBER
[redacted]0520

This Space for Filing Use Only

**No Change Statement** (Not applicable if agent address of record is a P.O. Box address. See instructions.)

3. **If there have been any changes to the information contained in the last Statement of Information filed with the California Secretary of State, or no statement of information has been previously filed, this form must be completed in its entirety.**
☐ If there has been no change in any of the information contained in the last Statement of Information filed with the California Secretary of State, check the box and proceed to **Item 17.**

**Complete Addresses for the Following** (Do not abbreviate the name of the city. Items 4 and 5 cannot be P.O. Boxes.)

| | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 4. STREET ADDRESS OF PRINCIPAL EXECUTIVE OFFICE<br>358 Papa Place | Kahului | HI | 96732 |
| 5. STREET ADDRESS OF PRINCIPAL BUSINESS OFFICE IN CALIFORNIA, IF ANY<br>323 E. Matilija Street, #110-104 | Ojai | CA | 93023 |
| 6. MAILING ADDRESS OF CORPORATION, IF DIFFERENT THAN ITEM 4 | | | |

**Names and Complete Addresses of the Following Officers** (The corporation must list these three officers. A comparable title for the specific officer may be added; however, the preprinted titles on this form must not be altered.)

| | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 7. CHIEF EXECUTIVE OFFICER/<br>Stephen Gates | 358 Papa Place | Kahului | HI | 96732 |
| 8. SECRETARY<br>Stephen Gates | 358 Papa Place | Kahului | HI | 96732 |
| 9. CHIEF FINANCIAL OFFICER/<br>Stephen Gates | 358 Papa Place | Kahului | HI | 96732 |

**Names and Complete Addresses of All Directors, Including Directors Who are Also Officers** (The corporation must have at least one director. Attach additional pages, if necessary.)

| | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 10. NAME<br>Stephen Gates | 358 Papa Place | Kahului | HI | 96732 |
| 11. NAME | | | | |
| 12. NAME | | | | |

13. NUMBER OF VACANCIES ON THE BOARD OF DIRECTORS, IF ANY:

**Agent for Service of Process** If the agent is an individual, the agent must reside in California and Item 15 must be completed with a California street address, a P.O. Box address is not acceptable. If the agent is another corporation, the agent must have on file with the California Secretary of State a certificate pursuant to California Corporations Code section 1505 and Item 15 must be left blank.

14. NAME OF AGENT FOR SERVICE OF PROCESS
Stephen Gates

| 15. STREET ADDRESS OF AGENT FOR SERVICE OF PROCESS IN CALIFORNIA, IF AN INDIVIDUAL | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 323 E. Matilija Street, #110-104 | Ojai | CA | 93023 |

**Type of Business**

16. DESCRIBE THE TYPE OF BUSINESS OF THE CORPORATION
Environmental Consulting

17. BY SUBMITTING THIS STATEMENT OF INFORMATION TO THE CALIFORNIA SECRETARY OF STATE, THE CORPORATION CERTIFIES THE INFORMATION CONTAINED HEREIN, INCLUDING ANY ATTACHMENTS, IS TRUE AND CORRECT.

| 11- -16 | Stephen Abbey | Authorized E... | [signature] |
|---|---|---|---|
| DATE | TYPE/PRINT NAME OF PERSON COMPLETING FORM | TITLE | SIGNATURE |

SI-200 (REV 01/2013)

APPROVED BY SECRETARY OF STATE

Neighborhood Power Corporation
415 Dairy Road, Suite E216
Kahului, Hawaii'

November 2, 2016

Bank of Hawaii
P.O. Box 2900
Honolulu, HI 96846-6000
Attn: Rod Peroff, VP Corporate Banking

Re: Neighborhood Power Corporation

Dear Mr. Peroff:

As acknowledged in your letter dated October 7, 2016, Bank of Hawaii received conflicting demands regarding the ownership and control of Bank of Hawaii checking accounts (******7617), (******9217), (******5667), and (******8605) under the account name "Neighborhood Power Corporation" (collectively, the "Account").

Due to the conflicting demands raised and pursuant to Neighborhood Power Corporation's Business Deposit Account Agreement, the Bank has frozen the account and required any future withdrawals or transfers be made only with the joint instruction of Mr. Stephen Abbey and Mr. Stephen Gates. This letter constitutes that joint instruction.

The undersigned have resolved their differences with regard to NPC and the accounts.

Effective immediately:

- Mr. Stephen Abbey is no longer an owner, director or officer (president, treasurer, secretary or otherwise) of Neighborhood Power Corporation.
- Mr. Stephen Gates is now the sole owner, director and officer of the Company.
- Please remove Mr. Abbey's name from the Account, he is no longer an authorized signatory and disclaims any and all ownership and control of the Account.
- From the date of this letter, you may rely on the instructions of Mr. Gates without any further instruction from or notice to Mr. Abbey with respect to the Account.

The parties hereto agree that this instrument may be executed in counterparts, each of which shall be deemed an original, and said counterparts shall together constitute one and the same agreement, binding all of the parties hereto, notwithstanding all of the parties are not signatories to the original or the same counterparts.

*[signature page follows]*

If you have any questions or need anything else, please do not hesitate to call the undersigned.

Respectfully,

Stephen Abbey

Stephen Gates

**Neighborhood Power Corporation**,
a California corporation

Stephen Gates, President and CEO

Stephen Abbey
3307 Madrona Drive
Santa Barbara, CA 93105

November 2, 2016

To Whom it May Concern:

This letter shall serve to certify that I, **Stephen Abbey**, am no longer an owner, officer or director of Neighborhood Power Corporation, a California corporation, nor am I an owner or manager of Neighborhood GP, LLC, a Hawaii limited liability company, effective as of the ___ day of November, 2016.

Sincerely,

____________________________

Stephen Abbey

Exhibit C

Escrow Agreement

**Aliso Escrow a division of Fidelity National Title**
4522 Market St., Ventura, CA 93003
Phone: (805) 650-7887 • Fax: (805) 650-1447

**Aliso Escrow a division of Fidelity National Title conducts escrow business under a Certificate of Authority No. 305 issued by the California Department of Insurance.**

**LETTER OF ESCROW INSTRUCTIONS**

Escrow Officer: Rhonda Wharton

Date: November 2, 2016
Escrow No.: [redacted]21-RW

The undersigned delivers herewith, or will cause to be delivered, to Aliso Escrow a division of Fidelity National Title, hereinafter called Escrow Holder, the papers, money or property hereinafter described to be held and disposed of by Escrow Holder in accordance with the following instructions and upon the terms and conditions hereinafter set forth, to which the undersigned hereby agree:

The terms and conditions hereinabove referred to and to which the undersigned hereby agree for themselves, their heirs, and assigns are the following:

---

**THIS ESCROW IS BY AND BETWEEN:**

First Party: STEPHEN ABBEY
whose address is: 3307 Madrona Drive, Santa Barbara, CA 93105
(hereinafter referred to as "First Party")

Second Party: NEIGHBORHOOD POWER CORPORATION, a California corporation and STEPHEN GATES, individually
whose address is: 358 Papa Place, Kahului, HI 96732
(hereinafter referred to as "Second Party")

Third Party: FATES GROUP, LLC, a Florida limited liability company
whose address is: 110 East Broward Blvd, Suite 1900, Fort Lauderdale, FL 33301
(hereinafter referred to as "Third Party")

**AND PERTAINING TO:**

SETTLEMENT AND MUTUAL GENERAL RELEASE DATED JUNE 30, 2016 AND FIRST AMENDMENT TO SETTLEMENT AND MUTUAL GENERAL RELEASE DATED NOVEMBER 2, 2016
(hereinafter referred to as the "AGREEMENT")

---

**THE PURPOSE(S) OF THIS ESCROW IS FOR:** Third Party, for the benefit of Second Party, to deposit funds herein, in exchange for receipt of documents, from First Party, as are reasonably necessary to; (a) release any liens or encumbrances First Party placed on the Assets of Neighborhood Power Corporation, (b) dismiss with prejudice, the lawsuit filed against Second Party, (c) change the public records in California and Hawaii to reflect that Stephen Gates is the sole officer and director of Neighborhood Power Corporation, and (d) to advise Bank of Hawaii, and all third parties, that Stephen Gates is the sole owner, officer and director of Neighborhood Power Corporation, and that Stephen Abbey has no interest in Neighborhood Power Corporation.

**ON OR ABOUT NOVEMBER 2, 2016:**

Initials: ________ / ________ Initials: ________ / ________

(Instructions continued)

First Party will hand, or cause to be handed to Escrow Holder in executed form, the following documents (which documents, other than the Lien Release (as defined below), shall be executed versions of the "form of" documents attached hereto as Exhibit A with no changes from such documents other than date and signature):

(i) UCC-3 Termination Statements to release any liens or encumbrances ABBEY placed on the assets of NPC (the "Lien Release") and a signed letter of direction authorizing NPC to file the Lien Release;

(ii) a signed Request for Dismissal (form CIV-110) with the Superior Court of California, County of Santa Barbara (the "Court") for the Voluntary Dismissal with Prejudice (the "ABBEY Dismissal") of the lawsuit filed by ABBEY against Mr. Gates, D. Gates and NPC (Case No. 16CV04189, Superior Court Santa Barbara County);

(iii) a signed Statement of Change of Officers and Directors (on such form as required by the Hawaii Department of Commerce and Consumer Affairs, and the California Secretary of State) to be submitted to the appropriate authorities in California and Hawaii removing ABBEY as an officer and director of NPC and appointing Stephen Gates as the sole officer and director.

(iv) a signed letter to Bank of Hawaii indicating that ABBEY is no longer an officer or director of NPC and has no signing authority on any NPC bank accounts (including the Bank of Hawaii NPC bank account (No.[redacted]7617)); and

(v) a "to whom it may concern" letter signed by ABBEY confirming that he is no longer an owner, officer or director of NPC.

The items in (i) – (v) above, are referred to collectively as the "First Party Documents"

Second Party will hand, or cause to be handed to Escrow Holder, the following:
1) Copy of Articles of Incorporation for Neighborhood Power Corporation
2) Statement of Information
3) Business Entity Detail Sheet from the Secretary of State's Website, acknowledging that Neighborhood Power Corporation is an "Active" entity.

Third Party will hand, or cause to be handed to Escrow Holder, the following:
1) Funds in the amount of $989,000.00 in the form of a wire transfer (the "Third Party Deposit").
2) Copy of Articles of Organization for Fates Group, LLC
3) Copy of Operating Agreement
4) LLC-1 (Statement of Information)
5) Business Entity Detail Sheet from the Florida Secretary of State's Website, acknowledging that Fates Group, LLC is an "Active" entity.

**ON OR AROUND NOVEMBER 3, 2016:**

First Party shall deposit into Escrow a completed and executed Notice of Entry of Dismissal and Proof of Service (CIV-120) relating to the ABBEY Dismissal, attaching the ABBEY Dismissal that has been filed by ABBEY and entered by the court clerk for the Court, as evidenced by the court clerk completing the bottom portion of the first page of the ABBEY Dismissal (collectively, the "Dismissal Notice").

---

**CLOSE OF ESCROW:** This escrow is to be considered CLOSED when Escrow Holder is in receipt of all required documents and monies.

At close of escrow, Escrow Holder is to:
1) Wire $989,000.00 to First Party per Wire Transfer Instructions to be deposited herein prior to close, and
2) Hand the First Party Documents and the Dismissal Notice deposited herein by First Party to Second Party by way of Second Party's Counsel (Andrew R. Friedman).

Initials: ______ / ______ Initials: ______ / ______