(Instructions continued)

Parties herein acknowledge that Escrow Holder's sole responsibility is to obtain and disburse documents / monies per these instructions. Escrow Holder is released from any and all responsibility and/or liability in connection with the filing and/or recording of said documents, if any, as same will be handled outside of escrow by Second Party or Second Party's Council.

---

**FEES AND CHARGES:** For its ordinary services hereunder, and upon acceptance of this escrow, Escrow Holder is entitled to a "Set Up" fee of $750.00 non-refundable, payable by First Party and Second Party (1/2 each), which shall be deposited herein and paid to Escrow Holder concurrently with First Party and Second Party's signatures hereon.

Additional monthly maintenance fees of $50.00 per month shall be paid to Escrow Holder from funds on deposit beginning on the 1st day of December, 2016, and shall continue each and every month thereafter until the close of this escrow.

Notwithstanding anything in these instructions, (1) no amounts may be deducted, set off, charged or applied to the Third Party Deposit for fees, costs, and/or expenses in connection with these Instructions, including the fees and expenses of Escrow Holder and its affiliates; and (2) all fees and expenses (other than the $750.00 escrow fee) in connection with these Instructions shall be payable solely by Second Party.

In the event this escrow is not closed by January 1, 2017, Escrow Holder is to; (a) consider this escrow cancelled, and (b) return any and all funds and/or documents on deposit, if any, to the depositing party.

## GENERAL PROVISIONS

THESE INSTRUCTIONS HAVE BEEN PREPARED BASED ON THE INFORMATION GIVEN TO ESCROW HOLDER BY THE PARTIES HEREIN. FIRST PARTY, SECOND PARTY, AND THIRD PARTY, UNDERSTAND AND ACKNOWLEDGE THAT THE DUTIES OF THE ESCROW HOLDER ARE LIMITED SOLELY TO THE SPECIFIC PROVISIONS INCORPORATED IN THESE ESCROW INSTRUCTIONS, AND ESCROW HOLDER IS TO COMPLY WITH SAID INSTRUCTIONS IN ORDER TO CLOSE ESCROW IN THE MANNER PRESCRIBED HEREIN. ESCROW HOLDER IS NOT AN ATTORNEY, REAL ESTATE AGENT/ BROKER, OR TAX ACCOUNTANT. ESCROW HOLDER WILL NOT BE ASKED, OR REQUIRED, TO PERFORM ANY DUTIES NORMALLY HANDLED BY SAID PROFESSIONALS. FIRST PARTY AND SECOND PARTY ACKNOWLEDGE THAT THEY HAVE BEEN ADVISED TO SEEK OUTSIDE COUNSEL BEFORE THE EXECUTION OF THESE INSTRUCTIONS.

OTHER AGREEMENTS. Escrow Holder is not a party to, or bound by any agreement which may be deposited under, evidenced by or arise out of these instructions.

AGENCY RESPONSIBILITY. Escrow Holder acts as a depository only and is not responsible or liable in any manner whatever for the sufficiency, correctness, genuineness or validity of any instrument deposited with it hereunder, or with respect to form or execution of the same, or the identity, authority, or right of any person executing or depositing the same.

DEFAULTS. Escrow Holder shall not be required to take or be bound by notice of any default of any person, or to take any action with respect to such default involving any expense or liability, unless notice in writing is given to the Escrow Holder at the office above named, of such default by the undersigned or any of them, and unless it is indemnified in a manner satisfactory to it against such expense or liability. These instructions shall not be subject to recession or modification except of receipt by Escrow Holder at the office above named of the written instructions of all of the parties hereto or their successors in interest, and no such modification shall be effective unless and until consented to in writing by Aliso Escrow a division of Fidelity National Title.

NOTICES. Escrow Holder shall be protected in acting upon any notice, request, waiver, consent, receipt or other paper or document believed by Escrow Holder to be signed by the proper party or parties.

JUDGMENT. Escrow Holder shall not be liable for any error of judgment or for any act done or step taken or omitted by it in good faith or for any mistake of fact of law, or for anything which it may do or refrain from doing in connection herewith, except its own willful misconduct, and Escrow Holder shall have no duties to anyone except those signing these instructions.

Initials: ________ / ________ Initials: ________ / ________

(Instructions continued)

COUNSEL. Escrow Holder may advise with legal counsel in the event of any dispute or question as to the construction of the foregoing instructions, or Escrow Holder's duties hereunder, and Escrow Holder shall incur no liability and shall be fully protected in acting in accordance with the opinion and instructions of counsel.

DISAGREEMENTS. In the event of any disagreement between the undersigned and/or the person or persons named in the foregoing instructions, and/or any other person, resulting in adverse claims and demands being made in connection with or for any papers, money or property involved herein or affected hereby, Escrow Holder shall be entitled at its option to refuse to comply with any such claim or demand, so long as such disagreement shall continue, and in so doing Escrow Holder shall not be or become liable for damages or interest to the undersigned or any of them or to any person named in the foregoing instructions for its failure or refusal to comply with such conflicting or adverse demands; and Escrow Holder shall be entitled to continue so to refrain and refuse so to act until:

1. The rights of the adverse claimants have been finally adjudicated in a court assuming and having jurisdiction of the parties and the money, papers, and property involved herein or affect hereby; and/or

2. All differences shall have been adjusted by agreement and Escrow Holder shall have been notified thereof in writing by all of the persons interested.

3. In the event of such disagreement, Escrow Holder in its discretion, may file a suit in interpleader for the purpose of having the respective rights of the claimants adjudicated, and deposit with the court all documents and property held hereunder, and the undersigned agree to pay all costs and counsel fees incurred by Escrow Holder in such action and said costs and fees be included in the judgment in any such action.

RIGHT OF RESIGNATION. Escrow Holder has the right to resign upon written notice delivered to the principals herein. If such right is exercised, all funds and documents shall be returned to the party who deposited them and Escrow Holder shall have no liability hereunder.

FEES AND CHARGES. In the event that Escrow Holder performs any service not specifically provided hereinabove, or that there is any assignment or attachment of any interest in the subject matter of this escrow or modification thereof, or that any controversy arises hereunder, or that Escrow Holder is named a party to, or intervenes in, any litigation pertaining to this escrow or the subject matter thereof, Escrow Holder shall be reasonably compensated therefor and reimbursed for all costs and expenses, including attorney's fees, occasioned thereby solely by Second Party. Escrow Holder shall have a first lien on the property and papers held by it hereunder for such compensation and expenses, (other than the Third Party Deposit), and Second Party agrees to pay the same, and to indemnify Escrow Holder against any loss, liability or expense incurred in any act or thing done hereunder.

CANCELLATION. In the event this escrow is cancelled, the undersigned First Party and Second Party will nevertheless pay the escrow fee plus Second Party will pay all additional costs and expenses of Escrow Holder. Notwithstanding anything in these instructions to the contrary, Escrow Holder may, at is discretion, upon ten (10) days written notice to the undersigned parties, resign from this escrow and shall be entitled to reimbursement from the Second Party only for those costs and expenses incurred by Escrow Holder to the date of such resignation. Upon cancellation by the parties or resignation of Escrow Holder, after deducting the Escrow Holder's fee and/or costs and expenses, the balance of funds and documents shall be returned to the parties who shall have deposited the same; provided, however, that no fees, costs and/or expenses may be deducted from the Third Party Deposit.

SIGNATURES. These instructions may be executed in counterparts, each of which so executed shall be deemed as original, irrespective of the date of its execution and delivery, and said counterparts together shall constitute one and the same instrument.

DEPOSIT OF FUNDS. The law dealing with the disbursement of funds requires that all funds be available for withdrawal as a matter of right by the title entity's escrow and/or sub escrow account prior to disbursement of any funds. Only wire-transferred funds can be given immediate availability upon deposit. Cashier's checks, teller's checks and Certified checks may be available one business day after deposit. All other funds such as personal, corporate or partnership checks and drafts are subject to mandatory holding periods which may cause material delays in disbursement of funds in this escrow. In order to avoid delays, all fundings should be wire transferred. Outgoing wire transfers will not be authorized until confirmation of the respective incoming wire transfer or of availability of deposited checks.

Initials: ________ / ________ Initials: ________ / ________

(Instructions continued)

Deposit of funds into general escrow trust account unless instructed otherwise. You may instruct Escrow Holder to deposit your funds into an interest bearing account by signing and returning the "Escrow Instructions - Interest Bearing Account", which has been provided to you. If you do not so instruct us, then all funds received in this escrow shall be deposited with other escrow funds in one or more general escrow trust accounts, which include both non-interest bearing demand accounts and other depository accounts of Escrow Holder, in any state or national bank or savings and loan association insured by the Federal Deposit Insurance Corporation (the "depository institutions") and may be transferred to any other such escrow trust accounts of Escrow Holder or one of its affiliates, either within or outside the State of California. A general escrow trust account is restricted and protected against claims by third parties and creditors of Escrow Holder and its affiliates.

Receipt of benefits by Escrow Holder and affiliates. The parties to this escrow acknowledge that the maintenance of such general escrow trust accounts with some depository institutions may result in Escrow Holder or its affiliates being provided with an array of bank services, accommodations or other benefits by the depository institution. Some or all of these benefits may be considered interest due you under California Insurance Code Section 12413.5. Escrow Holder or its affiliates also may elect to enter into other business transactions with or obtain loans for investment or other purposes from the depository institution. All such services, accommodations, and other benefits shall accrue to Escrow Holder or its affiliates and Escrow Holder shall have no obligation to account to the parties to this escrow for the value of such services, accommodations, interest or other benefits.

Said funds will not earn interest unless the instructions otherwise specifically state that funds shall be deposited in an interest-bearing account. All disbursements shall be made by check of Aliso Escrow a division of Fidelity National Title. The principals to this escrow are hereby notified that the funds deposited herein are insured only to the limit provided by the Federal Deposit Insurance Corporation. Any instruction for bank wire will provide reasonable time or notice for Escrow Holder's compliance with such instruction. Escrow Holder's sole duty and responsibility shall be to place said wire transfer instructions with its wiring bank upon confirmation of (1) satisfaction of conditions precedent or (2) document recordation at close of escrow. Escrow Holder will NOT be held responsible for lost interest due to wire delays caused by any bank or the Federal Reserve System, and recommends that all parties make themselves aware of banking regulations with regard to placement of wires.

In the event there is insufficient time to place a wire upon any such confirmation or the wires have closed for the day, the parties agree to provide written instructions for an alternative method of disbursement. WITHOUT AN ALTERNATIVE DISBURSEMENT INSTRUCTION, FUNDS WILL BE HELD IN TRUST IN A NON-INTEREST BEARING ACCOUNT UNTIL THE NEXT OPPORTUNITY FOR WIRE PLACEMENT.

AUTHORIZATION TO FURNISH COPIES. You are authorized to furnish copies of these instructions, supplements, amendments, notices of cancellation and closing statements, to the Real Estate Broker(s) and Lender(s) named in this escrow.

DELIVERY/RECEIPT. Delivery to principals as used in these instructions unless otherwise stated herein is to be by hand in person to the principal, regular mail, email or fax to any of the contact information provided in these instructions. If delivered by regular mail receipt is determined to be 72 hours after such mailing. All documents, balances and statements due to the undersigned may be delivered to the contact information shown herein. All notices, change of instructions, communications and documents are to be delivered in writing to the office of Aliso Escrow a division of Fidelity National Title as set forth herein.

NON-RESIDENT ALIEN. The Foreign Investment in Real Property Tax Act (FIRPTA), Title 26 U.S.C., Section 1445, and the regulations there under, provide in part, that a transferee (buyer) of a U.S. real property interest from a foreign person must withhold a statutory percentage of the amount realized on the disposition, report the transaction and remit the withholding to the Internal Revenue Service (IRS) within twenty (20) days after the transfer. Aliso Escrow a division of Fidelity National Title will not determine nor aid in the determination of whether the FIRPTA withholding provisions are applicable to the subject transaction, nor act as a Qualified Substitute under state or federal law, nor furnish tax advice to any party to the transaction. Aliso Escrow a division of Fidelity National Title will not determine nor aid in the determination of whether the transaction will qualify for an exception or an exemption and is not responsible for the filing of any tax forms with the IRS as they relate to FIRPTA, nor responsible for collecting and holding of any documentation from the buyer or seller on the buyer's behalf for the purpose of supporting a claim of an exception or exemption. Aliso Escrow a division of Fidelity National Title is not an agent for the buyer for the purposes of receiving and analyzing any evidence or documentation that the seller in the subject transaction is a U.S. citizen or resident alien. Aliso Escrow a division of Fidelity National Title is not responsible for the payment of this tax and/or penalty and/or interest incurred in connection therewith and such taxes are not a matter covered by the Owner's Policy of Title Insurance to be issued to the buyer. Aliso Escrow a division of Fidelity National Title is not responsible for the completion of any IRS documents or related forms related to the

Initials: ________ / ________ Initials: ________ / ________

(Instructions continued)

referenced statute. The buyer is advised: they must independently make a determination of whether the contemplated transaction is subject to the withholding requirement; bear full responsibility for compliance with the withholding requirement if applicable and/or for payment of any tax, interest, penalties and/or other expenses that may be due on the subject transaction; and they are responsible for the completion of any and all forms, including but not limited to applicable IRS documentation, and the mailing of those forms. The Buyer is advised any forms, documents, or information received from Aliso Escrow a division of Fidelity National Title is not tax or legal advice and should not be construed as such nor treated as a complete representation of FIRPTA requirements. Buyer should seek outside counsel from a qualified individual to determine any and all implications of the referenced statute.

FACSIMILE/ELECTRONIC SIGNATURE. Escrow Holder is hereby authorized and instructed that in the event any party utilizes electronic or "facsimile" transmitted signed documents or instructions to Escrow Holder, you are to rely on the same for all escrow instructions purposes and the closing of escrow as if they bore original signatures. "Electronic Signature" means, as applicable, an electronic copy or signature complying with California Law.

CLARIFICATION OF DUTIES

Aliso Escrow a division of Fidelity National Title serves ONLY as an Escrow Holder in connection with these instructions and cannot give legal advice to any party hereto.

Escrow Holder is not to be accountable or liable for the sufficiency or correctness as to form, manner of execution, or validity of any instrument deposited in this escrow, nor as to the identity, authority or rights of any person executing the same. Escrow Holder's duties hereunder shall be limited to the proper handling of such money and the proper safekeeping of such instruments, or other documents received by Escrow Holder, and for the disposition of same in accordance with the written instructions accepted by Escrow Holder.

The agency and duties of Escrow Holder commence only upon receipt of copies of these Escrow Instructions executed by all parties.

---

THIS AGREEMENT IN ALL PARTS APPLIES TO, INURES TO THE BENEFIT OF, AND BINDS ALL PARTIES HERETO, THEIR HEIRS, LEGATEES, DEVISEES, ADMINISTRATORS, EXECUTORS, SUCCESSORS AND ASSIGNS, AND WHENEVER THE CONTEXT SO REQUIRES THE MASCULINE GENDER INCLUDES THE FEMININE AND NEUTER, AND THE SINGULAR NUMBER INCLUDES THE PLURAL. THESE INSTRUCTIONS AND ANY OTHER AMENDMENTS MAY BE EXECUTED IN ANY NUMBER OF COUNTERPARTS, EACH OF WHICH SHALL BE CONSIDERED AS AN ORIGINAL AND BE EFFECTIVE AS SUCH.

MY SIGNATURE HERETO CONSTITUTES INSTRUCTION TO ESCROW HOLDER OF ALL TERMS AND CONDITIONS CONTAINED IN THIS AND ALL PRECEDING PAGES AND FURTHER SIGNIFIES THAT I HAVE READ AND UNDERSTAND THESE GENERAL PROVISIONS.

Parties agree to pay funds required to close escrow upon demand. Parties herein further agree to hand Escrow Holder all instruments and documents necessary to enable Escrow Holder to comply with the instructions as set forth herein.

Each of the undersigned parties states that he has read the foregoing instructions, understands, agrees to them and acknowledges receipt of a copy of same.

**NEIGHBORHOOD POWER CORPORATION, a California corporation**

______________________________
**By: STEPHEN GATES, President**

______________________________
**STEPHEN GATES, Individually**

______________________________
**STEPHEN ABBEY**

**FATES GROUP, LLC, a Florida limited liability company**

______________________________
**By:**
**Its:**

**Aliso Escrow a division of Fidelity National Title**
4522 Market St., Ventura, CA 93003
Phone: (805) 650-7887 • Fax: (805) 650-1447

**Aliso Escrow a division of Fidelity National Title conducts escrow business under a Certificate of Authority No. 305 issued by the California Department of Insurance.**

## LETTER OF ESCROW INSTRUCTIONS

Escrow Officer: Rhonda Wharton

Date: November 2, 2016
Escrow No.: [redacted]21-RW

The undersigned delivers herewith, or will cause to be delivered, to Aliso Escrow a division of Fidelity National Title, hereinafter called Escrow Holder, the papers, money or property hereinafter described to be held and disposed of by Escrow Holder in accordance with the following instructions and upon the terms and conditions hereinafter set forth, to which the undersigned hereby agree:

The terms and conditions hereinabove referred to and to which the undersigned hereby agree for themselves, their heirs, and assigns are the following:

---

**THIS ESCROW IS BY AND BETWEEN:**

First Party: STEPHEN ABBEY

whose address is: 3307 Madrona Drive, Santa Barbara, CA 93105
(hereinafter referred to as "First Party")

Second Party: NEIGHBORHOOD POWER CORPORATION, a California corporation and STEPHEN GATES, individually
whose address is: 358 Papa Place, Kahului, HI 96732
(hereinafter referred to as "Second Party")

Third Party: FATES GROUP, LLC, a Florida limited liability company

whose address is: 110 East Broward Blvd, Suite 1900, Fort Lauderdale, FL 33301
(hereinafter referred to as "Third Party")

**AND PERTAINING TO:**

SETTLEMENT AND MUTUAL GENERAL RELEASE DATED JUNE 30, 2016 AND FIRST AMENDMENT TO SETTLEMENT AND MUTUAL GENERAL RELEASE DATED NOVEMBER 2, 2016
(hereinafter referred to as the "AGREEMENT")

---

**THE PURPOSE(S) OF THIS ESCROW IS FOR:** Third Party, for the benefit of Second Party, to deposit funds herein, in exchange for receipt of documents, from First Party, as are reasonably necessary to; (a) release any liens or encumbrances First Party placed on the Assets of Neighborhood Power Corporation, (b) dismiss, with prejudice, the lawsuit filed against Second Party, (c) change the public records in California and Hawaii to reflect that Stephen Gates is the sole officer and director of Neighborhood Power Corporation, and (d) to advise Bank of Hawaii, and all third parties, that Stephen Gates is the sole owner, officer and director of Neighborhood Power Corporation, and that Stephen Abbey has no interest in Neighborhood Power Corporation.

**ON OR ABOUT NOVEMBER 2, 2016:**

Initials: ________ / ________ Initials: ________ / S.A.

(Instructions continued)

First Party will hand, or cause to be handed to Escrow Holder in executed form, the following documents (which documents, other than the Lien Release (as defined below), shall be executed versions of the "form of" documents attached hereto as Exhibit A with no changes from such documents other than date and signature):

(i) UCC-3 Termination Statements to release any liens or encumbrances ABBEY placed on the assets of NPC (the "Lien Release") and a signed letter of direction authorizing NPC to file the Lien Release;
(ii) a signed Request for Dismissal (form CIV-110) with the Superior Court of California, County of Santa Barbara (the "Court") for the Voluntary Dismissal with Prejudice (the "ABBEY Dismissal") of the lawsuit filed by ABBEY against Mr. Gates, D. Gates and NPC (Case No. 16CV04189, Superior Court Santa Barbara County);
(iii) a signed Statement of Change of Officers and Directors (on such form as required by the Hawaii Department of Commerce and Consumer Affairs, and the California Secretary of State) to be submitted to the appropriate authorities in California and Hawaii removing ABBEY as an officer and director of NPC and appointing Stephen Gates as the sole officer and director.
(iv) a signed letter to Bank of Hawaii indicating that ABBEY is no longer an officer or director of NPC and has no signing authority on any NPC bank accounts (including the Bank of Hawaii NPC bank account (No. 0084 007617)); and
(v) a "to whom it may concern" letter signed by ABBEY confirming that he is no longer an owner, officer or director of NPC.

The items in (i) – (v) above, are referred to collectively as the "First Party Documents".

Second Party will hand, or cause to be handed to Escrow Holder, the following:
1) Copy of Articles of Incorporation for Neighborhood Power Corporation
2) Statement of Information
3) Business Entity Detail Sheet from the Secretary of State's Website, acknowledging that Neighborhood Power Corporation is an "Active" entity.

Third Party will hand, or cause to be handed to Escrow Holder, the following:
1) Funds in the amount of $989,000.00 in the form of a wire transfer (the "Third Party Deposit").
2) Copy of Articles of Organization for Fates Group, LLC
3) Copy of Operating Agreement
4) LLC-1 (Statement of Information)
5) Business Entity Detail Sheet from the Florida Secretary of State's Website, acknowledging that Fates Group, LLC is an "Active" entity.

**ON OR AROUND NOVEMBER 3, 2016:**

First Party shall deposit into Escrow a completed and executed Notice of Entry of Dismissal and Proof of Service (CIV-120) relating to the ABBEY Dismissal, attaching the ABBEY Dismissal that has been filed by ABBEY and entered by the court clerk for the Court, as evidenced by the court clerk completing the bottom portion of the first page of the ABBEY Dismissal (collectively, the "Dismissal Notice").

---

**CLOSE OF ESCROW:** This escrow is to be considered CLOSED when Escrow Holder is in receipt of all required documents and monies.

At close of escrow, Escrow Holder is to:
1) Wire $989,000.00 to First Party per Wire Transfer Instructions to be deposited herein prior to close, and
2) Hand the First Party Documents and the Dismissal Notice deposited herein by First Party to Second Party by way of Second Party's Counsel (Andrew R. Friedman).

Initials: ________ / ________ Initials: ________ / S.A.

(Instructions continued)

Parties herein acknowledge that Escrow Holder's sole responsibility is to obtain and disburse documents / monies per these instructions, Escrow Holder is released from any and all responsibility and/or liability in connection with the filing and/or recording of said documents, if any, as same will be handled outside of escrow by Second Party or Second Party's Council.

---

**FEES AND CHARGES:** For its ordinary services hereunder, and upon acceptance of this escrow, Escrow Holder is entitled to a "Set Up" fee of $750.00 non-refundable, payable by First Party and Second Party (1/2 each), which shall be deposited herein and paid to Escrow Holder concurrently with First Party and Second Party's signatures hereon.

Additional monthly maintenance fees of $50.00 per month shall be paid to Escrow Holder from funds on deposit beginning on the 1st day of December, 2016, and shall continue each and every month thereafter until the close of this escrow.

Notwithstanding anything in these instructions, (1) no amounts may be deducted, set off, charged or applied to the Third Party Deposit for fees, costs, and/or expenses in connection with these Instructions, including the fees and expenses of Escrow Holder and its affiliates; and (2) all fees and expenses (other than the $750.00 escrow fee) in connection with these Instructions shall be payable solely by Second Party.

In the event this escrow is not closed by January 1, 2017, Escrow Holder is to; (a) consider this escrow cancelled, and (b) return any and all funds and/or documents on deposit, if any, to the depositing party.

## GENERAL PROVISIONS

THESE INSTRUCTIONS HAVE BEEN PREPARED BASED ON THE INFORMATION GIVEN TO ESCROW HOLDER BY THE PARTIES HEREIN. FIRST PARTY, SECOND PARTY, AND THIRD PARTY, UNDERSTAND AND ACKNOWLEDGE THAT THE DUTIES OF THE ESCROW HOLDER ARE LIMITED SOLELY TO THE SPECIFIC PROVISIONS INCORPORATED IN THESE ESCROW INSTRUCTIONS, AND ESCROW HOLDER IS TO COMPLY WITH SAID INSTRUCTIONS IN ORDER TO CLOSE ESCROW IN THE MANNER PRESCRIBED HEREIN. ESCROW HOLDER IS NOT AN ATTORNEY, REAL ESTATE AGENT/ BROKER, OR TAX ACCOUNTANT. ESCROW HOLDER WILL NOT BE ASKED, OR REQUIRED, TO PERFORM ANY DUTIES NORMALLY HANDLED BY SAID PROFESSIONALS. FIRST PARTY AND SECOND PARTY ACKNOWLEDGE THAT THEY HAVE BEEN ADVISED TO SEEK OUTSIDE COUNSEL BEFORE THE EXECUTION OF THESE INSTRUCTIONS.

OTHER AGREEMENTS. Escrow Holder is not a party to, or bound by any agreement which may be deposited under, evidenced by or arise out of these instructions.

AGENCY RESPONSIBILITY. Escrow Holder acts as a depository only and is not responsible or liable in any manner whatever for the sufficiency, correctness, genuineness or validity of any instrument deposited with it hereunder, or with respect to form or execution of the same, or the identity, authority, or right of any person executing or depositing the same.

DEFAULTS. Escrow Holder shall not be required to take or be bound by notice of any default of any person, or to take any action with respect to such default involving any expense or liability, unless notice in writing is given to the Escrow Holder at the office above named, of such default by the undersigned or any of them, and unless it is indemnified in a manner satisfactory to it against such expense or liability. These instructions shall not be subject to recession or modification except of receipt by Escrow Holder at the office above named of the written instructions of all of the parties hereto or their successors in interest, and no such modification shall be effective unless and until consented to in writing by Aliso Escrow a division of Fidelity National Title.

NOTICES. Escrow Holder shall be protected in acting upon any notice, request, waiver, consent, receipt or other paper or document believed by Escrow Holder to be signed by the proper party or parties.

JUDGMENT. Escrow Holder shall not be liable for any error of judgment or for any act done or step taken or omitted by it in good faith or for any mistake of fact of law, or for anything which it may do or refrain from doing in connection herewith, except its own willful misconduct, and Escrow Holder shall have no duties to anyone except those signing these instructions.

Initials: ________ / ________ Initials: ________ / S.A.

(Instructions continued)

COUNSEL. Escrow Holder may advise with legal counsel in the event of any dispute or question as to the construction of the foregoing instructions, or Escrow Holder's duties hereunder, and Escrow Holder shall incur no liability and shall be fully protected in acting in accordance with the opinion and instructions of counsel.

DISAGREEMENTS. In the event of any disagreement between the undersigned and/or the person or persons named in the foregoing instructions, and/or any other person, resulting in adverse claims and demands being made in connection with or for any papers, money or property involved herein or affected hereby, Escrow Holder shall be entitled at its option to refuse to comply with any such claim or demand, so long as such disagreement shall continue, and in so doing Escrow Holder shall not be or become liable for damages or interest to the undersigned or any of them or to any person named in the foregoing instructions for its failure or refusal to comply with such conflicting or adverse demands; and Escrow Holder shall be entitled to continue so to refrain and refuse so to act until:

1. The rights of the adverse claimants have been finally adjudicated in a court assuming and having jurisdiction of the parties and the money, papers, and property involved herein or affect hereby; and/or
2. All differences shall have been adjusted by agreement and Escrow Holder shall have been notified thereof in writing by all of the persons interested.
3. In the event of such disagreement, Escrow Holder in its discretion, may file a suit in interpleader for the purpose of having the respective rights of the claimants adjudicated, and deposit with the court all documents and property held hereunder, and the undersigned agree to pay all costs and counsel fees incurred by Escrow Holder in such action and said costs and fees be included in the judgment in any such action.

RIGHT OF RESIGNATION. Escrow Holder has the right to resign upon written notice delivered to the principals herein. If such right is exercised, all funds and documents shall be returned to the party who deposited them and Escrow Holder shall have no liability hereunder.

FEES AND CHARGES. In the event that Escrow Holder performs any service not specifically provided hereinabove, or that there is any assignment or attachment of any interest in the subject matter of this escrow or modification thereof, or that any controversy arises hereunder, or that Escrow Holder is named a party to, or intervenes in, any litigation pertaining to this escrow or the subject matter thereof, Escrow Holder shall be reasonably compensated therefor and reimbursed for all costs and expenses, including attorney's fees, occasioned thereby solely by Second Party. Escrow Holder shall have a first lien on the property and papers held by it hereunder for such compensation and expenses, (other than the Third Party Deposit), and Second Party agrees to pay the same, and to indemnify Escrow Holder against any loss, liability or expense incurred in any act or thing done hereunder.

CANCELLATION. In the event this escrow is cancelled, the undersigned First Party and Second Party will nevertheless pay the escrow fee plus Second Party will pay all additional costs and expenses of Escrow Holder. Notwithstanding anything in these instructions to the contrary, Escrow Holder may, at is discretion, upon ten (10) days written notice to the undersigned parties, resign from this escrow and shall be entitled to reimbursement from the Second Party only for those costs and expenses incurred by Escrow Holder to the date of such resignation. Upon cancellation by the parties or resignation of Escrow Holder, after deducting the Escrow Holder's fee and/or costs and expenses, the balance of funds and documents shall be returned to the parties who shall have deposited the same; provided, however, that no fees, costs and/or expenses may be deducted from the Third Party Deposit.

SIGNATURES. These instructions may be executed in counterparts, each of which so executed shall be deemed as original, irrespective of the date of its execution and delivery; and said counterparts together shall constitute one and the same instrument.

DEPOSIT OF FUNDS. The law dealing with the disbursement of funds requires that all funds be available for withdrawal as a matter of right by the title entity's escrow and/or sub escrow account prior to disbursement of any funds. Only wire-transferred funds can be given immediate availability upon deposit. Cashier's checks, teller's checks and Certified checks may be available one business day after deposit. All other funds such as personal, corporate or partnership checks and drafts are subject to mandatory holding periods which may cause material delays in disbursement of funds in this escrow. In order to avoid delays, all fundings should be wire transferred. Outgoing wire transfers will not be authorized until confirmation of the respective incoming wire transfer or of availability of deposited checks.

Initials: ________ / ________ Initials: ________ / S.A.

(Instructions continued)

Deposit of funds into general escrow trust account unless instructed otherwise. You may instruct Escrow Holder to deposit your funds into an interest bearing account by signing and returning the "Escrow Instructions - Interest Bearing Account", which has been provided to you. If you do not so instruct us, then all funds received in this escrow shall be deposited with other escrow funds in one or more general escrow trust accounts, which include both non-interest bearing demand accounts and other depository accounts of Escrow Holder, in any state or national bank or savings and loan association insured by the Federal Deposit Insurance Corporation (the "depository institutions") and may be transferred to any other such escrow trust accounts of Escrow Holder or one of its affiliates, either within or outside the State of California. A general escrow trust account is restricted and protected against claims by third parties and creditors of Escrow Holder and its affiliates.

Receipt of benefits by Escrow Holder and affiliates. The parties to this escrow acknowledge that the maintenance of such general escrow trust accounts with some depository institutions may result in Escrow Holder or its affiliates being provided with an array of bank services, accommodations or other benefits by the depository institution. Some or all of these benefits may be considered interest due you under California Insurance Code Section 12413.5. Escrow Holder or its affiliates also may elect to enter into other business transactions with or obtain loans for investment or other purposes from the depository institution. All such services, accommodations, and other benefits shall accrue to Escrow Holder or its affiliates and Escrow Holder shall have no obligation to account to the parties to this escrow for the value of such services, accommodations, interest or other benefits.

Said funds will not earn interest unless the instructions otherwise specifically state that funds shall be deposited in an interest-bearing account. All disbursements shall be made by check of Aliso Escrow a division of Fidelity National Title. The principals to this escrow are hereby notified that the funds deposited herein are insured only to the limit provided by the Federal Deposit Insurance Corporation. Any instruction for bank wire will provide reasonable time or notice for Escrow Holder's compliance with such instruction. Escrow Holder's sole duty and responsibility shall be to place said wire transfer instructions with its wiring bank upon confirmation of (1) satisfaction of conditions precedent or (2) document recordation at close of escrow. Escrow Holder will NOT be held responsible for lost interest due to wire delays caused by any bank or the Federal Reserve System, and recommends that all parties make themselves aware of banking regulations with regard to placement of wires.

In the event there is insufficient time to place a wire upon any such confirmation or the wires have closed for the day, the parties agree to provide written instructions for an alternative method of disbursement. WITHOUT AN ALTERNATIVE DISBURSEMENT INSTRUCTION, FUNDS WILL BE HELD IN TRUST IN A NON-INTEREST BEARING ACCOUNT UNTIL THE NEXT OPPORTUNITY FOR WIRE PLACEMENT.

AUTHORIZATION TO FURNISH COPIES. You are authorized to furnish copies of these instructions, supplements, amendments, notices of cancellation and closing statements, to the Real Estate Broker(s) and Lender(s) named in this escrow.

DELIVERY/RECEIPT. Delivery to principals as used in these instructions unless otherwise stated herein is to be by hand in person to the principal, regular mail, email or fax to any of the contact information provided in these instructions. If delivered by regular mail receipt is determined to be 72 hours after such mailing. All documents, balances and statements due to the undersigned may be delivered to the contact information shown herein. All notices, change of instructions, communications and documents are to be delivered in writing to the office of Aliso Escrow a division of Fidelity National Title as set forth herein.

NON-RESIDENT ALIEN. The Foreign Investment in Real Property Tax Act (FIRPTA), Title 26 U.S.C., Section 1445, and the regulations there under, provide in part, that a transferee (buyer) of a U.S. real property interest from a foreign person must withhold a statutory percentage of the amount realized on the disposition, report the transaction and remit the withholding to the Internal Revenue Service (IRS) within twenty (20) days after the transfer. Aliso Escrow a division of Fidelity National Title will not determine nor aid in the determination of whether the FIRPTA withholding provisions are applicable to the subject transaction, nor act as a Qualified Substitute under state or federal law, nor furnish tax advice to any party to the transaction. Aliso Escrow a division of Fidelity National Title will not determine nor aid in the determination of whether the transaction will qualify for an exception or an exemption and is not responsible for the filing of any tax forms with the IRS as they relate to FIRPTA, nor responsible for collecting and holding of any documentation from the buyer or seller on the buyer's behalf for the purpose of supporting a claim of an exception or exemption. Aliso Escrow a division of Fidelity National Title is not an agent for the buyer for the purposes of receiving and analyzing any evidence or documentation that the seller in the subject transaction is a U.S. citizen or resident alien. Aliso Escrow a division of Fidelity National Title is not responsible for the payment of this tax and/or penalty and/or interest incurred in connection therewith and such taxes are not a matter covered by the Owner's Policy of Title Insurance to be issued to the buyer. Aliso Escrow a division of Fidelity National Title is not responsible for the completion of any IRS documents or related forms related to the

Initials: ____________ / ____________ Initials: ____________ / S.A.

(Instructions continued)

referenced statute. The buyer is advised: they must independently make a determination of whether the contemplated transaction is subject to the withholding requirement; bear full responsibility for compliance with the withholding requirement if applicable and/or for payment of any tax, interest, penalties and/or other expenses that may be due on the subject transaction; and they are responsible for the completion of any and all forms, including but not limited to applicable IRS documentation, and the mailing of those forms. The Buyer is advised any forms, documents, or information received from Aliso Escrow a division of Fidelity National Title is not tax or legal advice and should not be construed as such nor treated as a complete representation of FIRPTA requirements. Buyer should seek outside counsel from a qualified individual to determine any and all implications of the referenced statute.

FACSIMILE/ELECTRONIC SIGNATURE. Escrow Holder is hereby authorized and instructed that, in the event any party utilizes electronic or "facsimile" transmitted signed documents or instructions to Escrow Holder, you are to rely on the same for all escrow instructions purposes and the closing of escrow as if they bore original signatures. "Electronic Signature" means, as applicable, an electronic copy or signature complying with California Law.

CLARIFICATION OF DUTIES

Aliso Escrow a division of Fidelity National Title serves ONLY as an Escrow Holder in connection with these instructions and cannot give legal advice to any party hereto.

Escrow Holder is not to be accountable or liable for the sufficiency or correctness as to form, manner of execution, or validity of any instrument deposited in this escrow, nor as to the identity, authority or rights of any person executing the same. Escrow Holder's duties hereunder shall be limited to the proper handling of such money and the proper safekeeping of such instruments, or other documents received by Escrow Holder, and for the disposition of same in accordance with the written instructions accepted by Escrow Holder.

The agency and duties of Escrow Holder commence only upon receipt of copies of these Escrow Instructions executed by all parties.

---

THIS AGREEMENT IN ALL PARTS APPLIES TO, INURES TO THE BENEFIT OF, AND BINDS ALL PARTIES HERETO, THEIR HEIRS, LEGATEES, DEVISEES, ADMINISTRATORS, EXECUTORS, SUCCESSORS AND ASSIGNS, AND WHENEVER THE CONTEXT SO REQUIRES THE MASCULINE GENDER INCLUDES THE FEMININE AND NEUTER, AND THE SINGULAR NUMBER INCLUDES THE PLURAL. THESE INSTRUCTIONS AND ANY OTHER AMENDMENTS MAY BE EXECUTED IN ANY NUMBER OF COUNTERPARTS, EACH OF WHICH SHALL BE CONSIDERED AS AN ORIGINAL AND BE EFFECTIVE AS SUCH.

MY SIGNATURE HERETO CONSTITUTES INSTRUCTION TO ESCROW HOLDER OF ALL TERMS AND CONDITIONS CONTAINED IN THIS AND ALL PRECEDING PAGES AND FURTHER SIGNIFIES THAT I HAVE READ AND UNDERSTAND THESE GENERAL PROVISIONS.

Parties agree to pay funds required to close escrow upon demand. Parties herein further agree to hand Escrow Holder all instruments and documents necessary to enable Escrow Holder to comply with the instructions as set forth herein.

Each of the undersigned parties states that he has read the foregoing instructions, understands, agrees to them and acknowledges receipt of a copy of same.

**STEPHEN ABBEY**

**FATES GROUP, LLC, a Florida limited liability company**

**By:**
**Its:**

**NEIGHBORHOOD POWER CORPORATION, a California corporation**

**By: STEPHEN GATES, President**

**STEPHEN GATES, Individually**

**Aliso Escrow a division of Fidelity National Title**
4522 Market St., Ventura, CA 93003
Phone: (805) 650-7887 • Fax: (805) 650-1447

**Aliso Escrow a division of Fidelity National Title conducts escrow business under a Certificate of Authority No. 305 issued by the California Department of Insurance.**

## LETTER OF ESCROW INSTRUCTIONS

Escrow Officer: Rhonda Wharton

Date: November 2, 2016
Escrow No.: [redacted]21-RW

The undersigned delivers herewith, or will cause to be delivered, to Aliso Escrow a division of Fidelity National Title, hereinafter called Escrow Holder, the papers, money or property hereinafter described to be held and disposed of by Escrow Holder in accordance with the following instructions and upon the terms and conditions hereinafter set forth, to which the undersigned hereby agree:

The terms and conditions hereinabove referred to and to which the undersigned hereby agree for themselves, their heirs, and assigns are the following:

---

**THIS ESCROW IS BY AND BETWEEN:**

First Party: STEPHEN ABBEY

whose address is: 3307 Madrona Drive, Santa Barbara, CA 93105
(hereinafter referred to as "First Party")

Second Party: NEIGHBORHOOD POWER CORPORATION, a California corporation and STEPHEN GATES, individually
whose address is: 358 Papa Place, Kahului, HI 96732
(hereinafter referred to as "Second Party")

Third Party: FATES GROUP, LLC, a Florida limited liability company

whose address is: 110 East Broward Blvd, Suite 1900, Fort Lauderdale, FL 33301
(hereinafter referred to as "Third Party")

**AND PERTAINING TO:**

SETTLEMENT AND MUTUAL GENERAL RELEASE DATED JUNE 30, 2016 AND FIRST AMENDMENT TO SETTLEMENT AND MUTUAL GENERAL RELEASE DATED NOVEMBER 2, 2016
(hereinafter referred to as the "AGREEMENT")

---

**THE PURPOSE(S) OF THIS ESCROW IS FOR:** Third Party, for the benefit of Second Party, to deposit funds herein, in exchange for receipt of documents, from First Party, as are reasonably necessary to; (a) release any liens or encumbrances First Party placed on the Assets of Neighborhood Power Corporation, (b) dismiss, with prejudice, the lawsuit filed against Second Party, (c) change the public records in California and Hawaii to reflect that Stephen Gates is the sole officer and director of Neighborhood Power Corporation, and (d) to advise Bank of Hawaii, and all third parties, that Stephen Gates is the sole owner, officer and director of Neighborhood Power Corporation, and that Stephen Abbey has no interest in Neighborhood Power Corporation.

**ON OR ABOUT NOVEMBER 2, 2016:**

Initials: ________ / ________ Initials: [initials] / ________

(Instructions continued)

First Party will hand, or cause to be handed to Escrow Holder in executed form, the following documents (which documents, other than the Lien Release (as defined below), shall be executed versions of the "form of" documents attached hereto as Exhibit A with no changes from such documents other than date and signature):

(i) UCC-3 Termination Statements to release any liens or encumbrances ABBEY placed on the assets of NPC (the "Lien Release") and a signed letter of direction authorizing NPC to file the Lien Release;
(ii) a signed Request for Dismissal (form CIV-110) with the Superior Court of California, County of Santa Barbara (the "Court") for the Voluntary Dismissal with Prejudice (the "ABBEY Dismissal") of the lawsuit filed by ABBEY against Mr. Gates, D. Gates and NPC (Case No. 16CV04189, Superior Court Santa Barbara County);
(iii) a signed Statement of Change of Officers and Directors (on such form as required by the Hawaii Department of Commerce and Consumer Affairs, and the California Secretary of State) to be submitted to the appropriate authorities in California and Hawaii removing ABBEY as an officer and director of NPC and appointing Stephen Gates as the sole officer and director.
(iv) a signed letter to Bank of Hawaii indicating that ABBEY is no longer an officer or director of NPC and has no signing authority on any NPC bank accounts (including the Bank of Hawaii NPC bank account (No. [redacted]7617)); and
(v) a "to whom it may concern" letter signed by ABBEY confirming that he is no longer an owner, officer or director of NPC.

The items in (i) – (v) above, are referred to collectively as the "First Party Documents".

Second Party will hand, or cause to be handed to Escrow Holder, the following:
1) Copy of Articles of Incorporation for Neighborhood Power Corporation
2) Statement of Information
3) Business Entity Detail Sheet from the Secretary of State's Website, acknowledging that Neighborhood Power Corporation is an "Active" entity.

Third Party will hand, or cause to be handed to Escrow Holder, the following:
1) Funds in the amount of $989,000.00 in the form of a wire transfer (the "Third Party Deposit").
2) Copy of Articles of Organization for Fates Group, LLC
3) Copy of Operating Agreement
4) LLC-1 (Statement of Information)
5) Business Entity Detail Sheet from the Florida Secretary of State's Website, acknowledging that Fates Group, LLC is an "Active" entity.

**ON OR AROUND NOVEMBER 3, 2016:**

First Party shall deposit into Escrow a completed and executed Notice of Entry of Dismissal and Proof of Service (CIV-120) relating to the ABBEY Dismissal, attaching the ABBEY Dismissal that has been filed by ABBEY and entered by the court clerk for the Court, as evidenced by the court clerk completing the bottom portion of the first page of the ABBEY Dismissal (collectively, the "Dismissal Notice").

---

**CLOSE OF ESCROW:** This escrow is to be considered CLOSED when Escrow Holder is in receipt of all required documents and monies.

At close of escrow, Escrow Holder is to:
1) Wire $989,000.00 to First Party per Wire Transfer Instructions to be deposited herein prior to close, and
2) Hand the First Party Documents and the Dismissal Notice deposited herein by First Party to Second Party by way of Second Party's Counsel (Andrew R. Friedman).

Initials: ________ / ________ Initials: ________ / ________

(Instructions continued)

Parties herein acknowledge that Escrow Holder's sole responsibility is to obtain and disburse documents / monies per these instructions, Escrow Holder is released from any and all responsibility and/or liability in connection with the filing and/or recording of said documents, if any, as same will be handled outside of escrow by Second Party or Second Party's Council.

---

**FEES AND CHARGES:** For its ordinary services hereunder, and upon acceptance of this escrow, Escrow Holder is entitled to a "Set Up" fee of $750.00 non-refundable, payable by First Party and Second Party (1/2 each), which shall be deposited herein and paid to Escrow Holder concurrently with First Party and Second Party's signatures hereon.

Additional monthly maintenance fees of $50.00 per month shall be paid to Escrow Holder from funds on deposit beginning on the 1st day of December, 2016, and shall continue each and every month thereafter until the close of this escrow.

Notwithstanding anything in these instructions, (1) no amounts may be deducted, set off, charged or applied to the Third Party Deposit for fees, costs, and/or expenses in connection with these Instructions, including the fees and expenses of Escrow Holder and its affiliates; and (2) all fees and expenses (other than the $750.00 escrow fee) in connection with these Instructions shall be payable solely by Second Party.

In the event this escrow is not closed by January 1, 2017, Escrow Holder is to; (a) consider this escrow cancelled, and (b) return any and all funds and/or documents on deposit, if any, to the depositing party.

## GENERAL PROVISIONS

THESE INSTRUCTIONS HAVE BEEN PREPARED BASED ON THE INFORMATION GIVEN TO ESCROW HOLDER BY THE PARTIES HEREIN. FIRST PARTY, SECOND PARTY, AND THIRD PARTY, UNDERSTAND AND ACKNOWLEDGE THAT THE DUTIES OF THE ESCROW HOLDER ARE LIMITED SOLELY TO THE SPECIFIC PROVISIONS INCORPORATED IN THESE ESCROW INSTRUCTIONS, AND ESCROW HOLDER IS TO COMPLY WITH SAID INSTRUCTIONS IN ORDER TO CLOSE ESCROW IN THE MANNER PRESCRIBED HEREIN. ESCROW HOLDER IS NOT AN ATTORNEY, REAL ESTATE AGENT/ BROKER, OR TAX ACCOUNTANT. ESCROW HOLDER WILL NOT BE ASKED, OR REQUIRED, TO PERFORM ANY DUTIES NORMALLY HANDLED BY SAID PROFESSIONALS. FIRST PARTY AND SECOND PARTY ACKNOWLEDGE THAT THEY HAVE BEEN ADVISED TO SEEK OUTSIDE COUNSEL BEFORE THE EXECUTION OF THESE INSTRUCTIONS.

OTHER AGREEMENTS. Escrow Holder is not a party to, or bound by any agreement which may be deposited under, evidenced by or arise out of these instructions.

AGENCY RESPONSIBILITY. Escrow Holder acts as a depository only and is not responsible or liable in any manner whatever for the sufficiency, correctness, genuineness or validity of any instrument deposited with it hereunder, or with respect to form or execution of the same, or the identity, authority, or right of any person executing or depositing the same.

DEFAULTS. Escrow Holder shall not be required to take or be bound by notice of any default of any person, or to take any action with respect to such default involving any expense or liability, unless notice in writing is given to the Escrow Holder at the office above named, of such default by the undersigned or any of them, and unless it is indemnified in a manner satisfactory to it against such expense or liability. These instructions shall not be subject to recession or modification except of receipt by Escrow Holder at the office above named of the written instructions of all of the parties hereto or their successors in interest, and no such modification shall be effective unless and until consented to in writing by Aliso Escrow a division of Fidelity National Title.

NOTICES. Escrow Holder shall be protected in acting upon any notice, request, waiver, consent, receipt or other paper or document believed by Escrow Holder to be signed by the proper party or parties.

JUDGMENT. Escrow Holder shall not be liable for any error of judgment or for any act done or step taken or omitted by it in good faith or for any mistake of fact of law, or for anything which it may do or refrain from doing in connection herewith, except its own willful misconduct, and Escrow Holder shall have no duties to anyone except those signing these instructions.

Initials: ________ / ________ Initials: ________ / ________

(Instructions continued)

COUNSEL. Escrow Holder may advise with legal counsel in the event of any dispute or question as to the construction of the foregoing instructions, or Escrow Holder's duties hereunder, and Escrow Holder shall incur no liability and shall be fully protected in acting in accordance with the opinion and instructions of counsel.

DISAGREEMENTS. In the event of any disagreement between the undersigned and/or the person or persons named in the foregoing instructions, and/or any other person, resulting in adverse claims and demands being made in connection with or for any papers, money or property involved herein or affected hereby, Escrow Holder shall be entitled at its option to refuse to comply with any such claim or demand, so long as such disagreement shall continue, and in so doing Escrow Holder shall not be or become liable for damages or interest to the undersigned or any of them or to any person named in the foregoing instructions for its failure or refusal to comply with such conflicting or adverse demands; and Escrow Holder shall be entitled to continue so to refrain and refuse so to act until:

1. The rights of the adverse claimants have been finally adjudicated in a court assuming and having jurisdiction of the parties and the money, papers, and property involved herein or affect hereby; and/or
2. All differences shall have been adjusted by agreement and Escrow Holder shall have been notified thereof in writing by all of the persons interested.
3. In the event of such disagreement, Escrow Holder in its discretion, may file a suit in interpleader for the purpose of having the respective rights of the claimants adjudicated, and deposit with the court all documents and property held hereunder, and the undersigned agree to pay all costs and counsel fees incurred by Escrow Holder in such action and said costs and fees be included in the judgment in any such action.

RIGHT OF RESIGNATION. Escrow Holder has the right to resign upon written notice delivered to the principals herein. If such right is exercised, all funds and documents shall be returned to the party who deposited them and Escrow Holder shall have no liability hereunder.

FEES AND CHARGES. In the event that Escrow Holder performs any service not specifically provided hereinabove, or that there is any assignment or attachment of any interest in the subject matter of this escrow or modification thereof, or that any controversy arises hereunder, or that Escrow Holder is named a party to, or intervenes in, any litigation pertaining to this escrow or the subject matter thereof, Escrow Holder shall be reasonably compensated therefor and reimbursed for all costs and expenses, including attorney's fees, occasioned thereby solely by Second Party. Escrow Holder shall have a first lien on the property and papers held by it hereunder for such compensation and expenses, (other than the Third Party Deposit), and Second Party agrees to pay the same, and to indemnify Escrow Holder against any loss, liability or expense incurred in any act or thing done hereunder.

CANCELLATION. In the event this escrow is cancelled, the undersigned First Party and Second Party will nevertheless pay the escrow fee plus Second Party will pay all additional costs and expenses of Escrow Holder. Notwithstanding anything in these instructions to the contrary, Escrow Holder may, at is discretion, upon ten (10) days written notice to the undersigned parties, resign from this escrow and shall be entitled to reimbursement from the Second Party only for those costs and expenses incurred by Escrow Holder to the date of such resignation. Upon cancellation by the parties or resignation of Escrow Holder, after deducting the Escrow Holder's fee and/or costs and expenses, the balance of funds and documents shall be returned to the parties who shall have deposited the same; provided, however, that no fees, costs and/or expenses may be deducted from the Third Party Deposit.

SIGNATURES. These instructions may be executed in counterparts, each of which so executed shall be deemed as original, irrespective of the date of its execution and delivery; and said counterparts together shall constitute one and the same instrument.

DEPOSIT OF FUNDS. The law dealing with the disbursement of funds requires that all funds be available for withdrawal as a matter of right by the title entity's escrow and/or sub escrow account prior to disbursement of any funds. Only wire-transferred funds can be given immediate availability upon deposit. Cashier's checks, teller's checks and Certified checks may be available one business day after deposit. All other funds such as personal, corporate or partnership checks and drafts are subject to mandatory holding periods which may cause material delays in disbursement of funds in this escrow. In order to avoid delays, all fundings should be wire transferred. Outgoing wire transfers will not be authorized until confirmation of the respective incoming wire transfer or of availability of deposited checks.

Initials: ____________ / ____________ Initials: ____________ / ____________

(Instructions continued)

Deposit of funds into general escrow trust account unless instructed otherwise. You may instruct Escrow Holder to deposit your funds into an interest bearing account by signing and returning the "Escrow Instructions - Interest Bearing Account", which has been provided to you. If you do not so instruct us, then all funds received in this escrow shall be deposited with other escrow funds in one or more general escrow trust accounts, which include both non-interest bearing demand accounts and other depository accounts of Escrow Holder, in any state or national bank or savings and loan association insured by the Federal Deposit Insurance Corporation (the "depository institutions") and may be transferred to any other such escrow trust accounts of Escrow Holder or one of its affiliates, either within or outside the State of California. A general escrow trust account is restricted and protected against claims by third parties and creditors of Escrow Holder and its affiliates.

Receipt of benefits by Escrow Holder and affiliates. The parties to this escrow acknowledge that the maintenance of such general escrow trust accounts with some depository institutions may result in Escrow Holder or its affiliates being provided with an array of bank services, accommodations or other benefits by the depository institution. Some or all of these benefits may be considered interest due you under California Insurance Code Section 12413.5. Escrow Holder or its affiliates also may elect to enter into other business transactions with or obtain loans for investment or other purposes from the depository institution. All such services, accommodations, and other benefits shall accrue to Escrow Holder or its affiliates and Escrow Holder shall have no obligation to account to the parties to this escrow for the value of such services, accommodations, interest or other benefits.

Said funds will not earn interest unless the instructions otherwise specifically state that funds shall be deposited in an interest-bearing account. All disbursements shall be made by check of Aliso Escrow a division of Fidelity National Title. The principals to this escrow are hereby notified that the funds deposited herein are insured only to the limit provided by the Federal Deposit Insurance Corporation. Any instruction for bank wire will provide reasonable time or notice for Escrow Holder's compliance with such instruction. Escrow Holder's sole duty and responsibility shall be to place said wire transfer instructions with its wiring bank upon confirmation of (1) satisfaction of conditions precedent or (2) document recordation at close of escrow. Escrow Holder will NOT be held responsible for lost interest due to wire delays caused by any bank or the Federal Reserve System, and recommends that all parties make themselves aware of banking regulations with regard to placement of wires.

In the event there is insufficient time to place a wire upon any such confirmation or the wires have closed for the day, the parties agree to provide written instructions for an alternative method of disbursement. WITHOUT AN ALTERNATIVE DISBURSEMENT INSTRUCTION, FUNDS WILL BE HELD IN TRUST IN A NON-INTEREST BEARING ACCOUNT UNTIL THE NEXT OPPORTUNITY FOR WIRE PLACEMENT.

AUTHORIZATION TO FURNISH COPIES. You are authorized to furnish copies of these instructions, supplements, amendments, notices of cancellation and closing statements, to the Real Estate Broker(s) and Lender(s) named in this escrow.

DELIVERY/RECEIPT. Delivery to principals as used in these instructions unless otherwise stated herein is to be by hand in person to the principal, regular mail, email or fax to any of the contact information provided in these instructions. If delivered by regular mail receipt is determined to be 72 hours after such mailing. All documents, balances and statements due to the undersigned may be delivered to the contact information shown herein. All notices, change of instructions, communications and documents are to be delivered in writing to the office of Aliso Escrow a division of Fidelity National Title as set forth herein.

NON-RESIDENT ALIEN. The Foreign Investment in Real Property Tax Act (FIRPTA), Title 26 U.S.C., Section 1445, and the regulations there under, provide in part, that a transferee (buyer) of a U.S. real property interest from a foreign person must withhold a statutory percentage of the amount realized on the disposition, report the transaction and remit the withholding to the Internal Revenue Service (IRS) within twenty (20) days after the transfer. Aliso Escrow a division of Fidelity National Title will not determine nor aid in the determination of whether the FIRPTA withholding provisions are applicable to the subject transaction, nor act as a Qualified Substitute under state or federal law, nor furnish tax advice to any party to the transaction. Aliso Escrow a division of Fidelity National Title will not determine nor aid in the determination of whether the transaction will qualify for an exception or an exemption and is not responsible for the filing of any tax forms with the IRS as they relate to FIRPTA, nor responsible for collecting and holding of any documentation from the buyer or seller on the buyer's behalf for the purpose of supporting a claim of an exception or exemption. Aliso Escrow a division of Fidelity National Title is not an agent for the buyer for the purposes of receiving and analyzing any evidence or documentation that the seller in the subject transaction is a U.S. citizen or resident alien. Aliso Escrow a division of Fidelity National Title is not responsible for the payment of this tax and/or penalty and/or interest incurred in connection therewith and such taxes are not a matter covered by the Owner's Policy of Title Insurance to be issued to the buyer. Aliso Escrow a division of Fidelity National Title is not responsible for the completion of any IRS documents or related forms related to the

(Instructions continued)

referenced statute. The buyer is advised: they must independently make a determination of whether the contemplated transaction is subject to the withholding requirement; bear full responsibility for compliance with the withholding requirement if applicable and/or for payment of any tax, interest, penalties and/or other expenses that may be due on the subject transaction; and they are responsible for the completion of any and all forms, including but not limited to applicable IRS documentation, and the mailing of those forms. The Buyer is advised any forms, documents, or information received from Aliso Escrow a division of Fidelity National Title is not tax or legal advice and should not be construed as such nor treated as a complete representation of FIRPTA requirements. Buyer should seek outside counsel from a qualified individual to determine any and all implications of the referenced statute.

FACSIMILE/ELECTRONIC SIGNATURE. Escrow Holder is hereby authorized and instructed that, in the event any party utilizes electronic or "facsimile" transmitted signed documents or instructions to Escrow Holder, you are to rely on the same for all escrow instructions purposes and the closing of escrow as if they bore original signatures. "Electronic Signature" means, as applicable, an electronic copy or signature complying with California Law.

CLARIFICATION OF DUTIES

Aliso Escrow a division of Fidelity National Title serves ONLY as an Escrow Holder in connection with these instructions and cannot give legal advice to any party hereto.

Escrow Holder is not to be accountable or liable for the sufficiency or correctness as to form, manner of execution, or validity of any instrument deposited in this escrow, nor as to the identity, authority or rights of any person executing the same. Escrow Holder's duties hereunder shall be limited to the proper handling of such money and the proper safekeeping of such instruments, or other documents received by Escrow Holder, and for the disposition of same in accordance with the written instructions accepted by Escrow Holder.

The agency and duties of Escrow Holder commence only upon receipt of copies of these Escrow Instructions executed by all parties.

---

THIS AGREEMENT IN ALL PARTS APPLIES TO, INURES TO THE BENEFIT OF, AND BINDS ALL PARTIES HERETO, THEIR HEIRS, LEGATEES, DEVISEES, ADMINISTRATORS, EXECUTORS, SUCCESSORS AND ASSIGNS, AND WHENEVER THE CONTEXT SO REQUIRES THE MASCULINE GENDER INCLUDES THE FEMININE AND NEUTER, AND THE SINGULAR NUMBER INCLUDES THE PLURAL. THESE INSTRUCTIONS AND ANY OTHER AMENDMENTS MAY BE EXECUTED IN ANY NUMBER OF COUNTERPARTS, EACH OF WHICH SHALL BE CONSIDERED AS AN ORIGINAL AND BE EFFECTIVE AS SUCH.

MY SIGNATURE HERETO CONSTITUTES INSTRUCTION TO ESCROW HOLDER OF ALL TERMS AND CONDITIONS CONTAINED IN THIS AND ALL PRECEDING PAGES AND FURTHER SIGNIFIES THAT I HAVE READ AND UNDERSTAND THESE GENERAL PROVISIONS.

Parties agree to pay funds required to close escrow upon demand. Parties herein further agree to hand Escrow Holder all instruments and documents necessary to enable Escrow Holder to comply with the instructions as set forth herein.

Each of the undersigned parties states that he has read the foregoing instructions, understands, agrees to them and acknowledges receipt of a copy of same.

**NEIGHBORHOOD POWER CORPORATION, a California corporation**

______________________________
**By: STEPHEN GATES, President**

______________________________
**STEPHEN GATES, Individually**

______________________________
**STEPHEN ABBEY**

**FATES GROUP, LLC, a Florida limited liability company**

______________________________
**By:** William C. Morro
**Its:** Authorized Representative

Instructions for UCC Financing Statement Amendment (Form UCC3)

**For faster processing and reduced filing fees, UCC financing statement amendments can be filed electronically at https://uccconnect.sos.ca.gov.**

**Fees:** If submitting online, the filing fee for a financing statement is $5. If submitting on paper, the Financing Statement Amendment (Form UCC-3) must be accompanied by a $10 fee if less than 3 pages. If 3 pages or more, the fee is $20. (Government Code section 12194)

If submitting the statement on paper, please use this fillable form. The information must be legible for digital imaging. Read and follow all Instructions, especially Instruction 1a; correct file number of initial financing statement is crucial. Fill the form very carefully; mistakes may have important legal consequences. If you have questions, consult your legal counsel. The Secretary of State's office cannot give legal advice. Filing statutes can be found in California Uniform Commercial Code sections 9501-9528. Completed forms along with the applicable fees can be mailed to Secretary of State, UCC Section, P.O. Box 942835, Sacramento, CA 94235-0001 or delivered in person (drop off) to the Sacramento office, 1500 11th Street, Sacramento, CA 95814.

Do not insert anything in the open space in the upper portion of this form; it is reserved for filing office use only.

**Complete the UCC Financing Statement Amendment (Form UCC-3) as follows:**

**A and B.** To assist filing offices that might wish to communicate with filer, filer may provide information in item A and item B. These items are optional.

**C.** Complete item C if filer desires an acknowledgment sent.

**1a. File Number.** Enter file number of initial financing statement to which this Amendment relates. Enter only one file number. In some states, the file number is not unique; in those states, also enter in item 1a, after the file number, the date that the initial financing statement was filed.

**1b.** If this Amendment is to be filed in the real estate records or in any other filing office where the name of current Debtor is required for indexing purposes, check the box in item 1b and enter Debtor name in item 13 of Amendment Addendum (Form UCC3Ad). Complete item 13 in accordance with instructions on Amendment Addendum (Form UCC3Ad). If Debtor does not have an interest of record, enter the name and address of the record owner in item 16 of Amendment Addendum (Form UCC3Ad).

***Note:*** Show purpose of this Amendment by checking box 2, 3, 4, 5, or 8 (in items 5 and 8 you must check additional boxes); also complete items 6, 7, and/or 8 as appropriate. Some, but not all filing offices accept multiple actions on an Amendment. Filing offices that accept multiple actions may charge an additional fee. Some filing offices that accept multiple actions may only index one of the actions requested. Consult the administrative rules of the designated filing office to determine the extent to which multiple actions will be accepted, indexed, and the applicable filing fees for multiple actions.

**2. Termination.** To terminate the effectiveness of the identified financing statement with respect to the security interest(s) of authorizing Secured Party, check box in item 2. See Instruction 9 below.

**3. Assignment.** To assign (1) some or all of Assignor's right to amend the identified financing statement, or (2) the Assignor's right to amend the identified financing statement with respect to some (but not all) of the collateral covered by the identified financing statement. Check box in item 3 and enter name of Assignee in item 7a or 7b; always enter the Assignee's mailing address in item 7c. Also enter name of Assignor in item 9. If assignment affects the right to amend the financing statement with respect to some (but not all) of the collateral covered by the identified financing statement, check the ASSIGN collateral box and indicate the particular collateral covered in item 8.

**4. Continuation.** To continue the effectiveness of the identified financing statement with respect to the security interest(s) of authorizing Secured Party, check box in item 4. See Instruction 9 below.

**5-7. Party Information Change.** To indicate a party information change, check this box; also check additional boxes (as applicable) and complete items 5, 6, and/or 7 as appropriate.

To change the name and/or address of a party (items 5, 6, and 7): Check box in item 5 to indicate whether this Amendment relates to a Debtor or Secured Party of record; and check the CHANGE name and/or mailing address box in item 5 and enter name of affected party (current record name) in item 6a or 6b; and repeat or enter the new name in item 7a or 7b; always enter the party's mailing address in item 7c.

To add a party (items 5 and 7): Check box in item 5 to indicate whether this Amendment relates to a Debtor or Secured Party of record; and check the ADD name box in item 5 and enter the added party's name in item 7a or 7b; always enter the party's mailing address in item 7c. For additional Debtors or Secured Parties, attach Amendment Additional Party (Form UCC3AP), using correct name format.

To delete a party (items 5 and 6): Check box in item 5 to indicate whether this Amendment relates to a Debtor or Secured Party of record; and check the DELETE name box in item 5 and enter the deleted party's name in item 6a or 6b.

**8. Collateral Change.** To indicate a collateral change, check this box; also check additional box (as applicable) and describe the change in item 8. If space in item 8 is insufficient, continue collateral description in item 14 of Amendment Addendum (Form UCC3Ad). Do not include social security numbers or other personally identifiable information.

To add collateral: Check the ADD collateral box in item 8 and indicate the additional collateral.
To delete collateral: Check the DELETE collateral box in item 8 and indicate the deleted collateral. A partial release is a DELETE collateral change.
To restate covered collateral description: Check the RESTATE covered collateral box in item 8 and indicate the restated collateral.
To assign the right to amend the financing statement with respect to part (but not all) of the collateral covered by the identified financing statement: Comply with Instruction 3 above and check the ASSIGN collateral box in item 8.

If, due to a full release of collateral, filer no longer claims a security interest under the identified financing statement, check box in item 2 (Termination) and not a box in item 8 (Collateral Change).

**9. Name of Authorizing Party.** Enter name of party of record authorizing this Amendment. In most cases, the authorizing party is the Secured Party of record. If this is an Amendment (Assignment), enter Assignor's name in item 9a or 9b. If this is an Amendment (Termination) authorized by a Debtor, check the box in item 9 and enter the name of the Debtor authorizing this Amendment in item 9a or 9b. If this Amendment (Termination) is to be filed or recorded in the real estate records, also enter, in item 12 of Amendment Addendum (Form UCC3Ad), the name of Secured Party of record. If there is more than one authorizing Secured Party or Debtor, enter additional name(s) in item 14 of Amendment Addendum (Form UCC3Ad).

**10. Optional Filer Reference Data.** This item is optional and is for filer's use only. For filer's convenience of reference, filer may enter in item 10 any identifying information that filer may find useful. Do not include social security numbers or other personally identifiable information.

# Instructions for UCC Financing Statement Amendment Addendum (Form UCC3Ad)

Please type or laser-print this form. Be sure it is completely legible. Read and follow all Instructions; use of the correct name for the Debtor is crucial. Fill in form very carefully; mistakes may have important legal consequences. If you have questions, consult your attorney. The filing office cannot give legal advice.

**ITEM INSTRUCTIONS**

11. **File Number.** Enter file number of initial financing statement as shown in item 1a of Amendment (Form UCC3) to which this Amendment Addendum relates.

12. **Name of Authorizing Party.** Enter information exactly as shown in item 9 on Amendment (Form UCC3).

13. **Name of Debtor on related Financing Statement.** If this Amendment (Form UCC3) is to be filed in the real estate records or in any other filing office where the name of a current Debtor of record is required for indexing purposes, enter Debtor name in item 13a or 13b. Item 13 is intended to cross-reference the Amendment (Form UCC3) and Amendment Addendum with the related Financing Statement (Form UCC1). If more than one current Debtor, enter additional name(s) in item 14 or on additional Amendment Addendum (Form UCC3Ad). Do not use item 13 to change, add, or delete a Debtor name.

14. **Additional Space for Item 8 (Collateral).** If space in item 8 of Amendment (Form UCC3) is insufficient or additional information must be provided, enter additional information in item 14 or attach additional page(s) and incorporate by reference in item 14 (e.g., See Exhibit A). Do not include social security numbers or other personally identifiable information.

15-17. **Real Estate Record Information.** If this Amendment (Form UCC3) is to be filed in the real estate records, complete the required information (items 15, 16, and 17). If this Amendment (Form UCC3) covers timber to be cut, covers as-extracted collateral, and/or is filed as a fixture filing, check appropriate box in item 15. If the Debtor does not have an interest of record, enter the name and address of the record owner in item 16. Provide a sufficient description of real estate in accordance with the applicable law of the jurisdiction where the real estate is located in item 17. If space in items 16 or 17 is insufficient, attach additional page(s) and incorporate by reference in items 16 or 17 (e.g., See Exhibit A), and continue the real estate information. Do not include social security numbers or other personally identifiable information.

18. **Miscellaneous.** Under certain circumstances, additional information not provided on the Financing Statement Amendment (Form UCC3) may be required. Also, some states have non-uniform requirements. Use this space or attach additional page(s) and incorporate by reference in item 18 (e.g., See Exhibit A) to provide such additional information or to comply with such requirements; otherwise, leave blank. Do not include social security numbers or other personally identifiable information.

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Andrew R. Friedman 859-255-1944

B. E-MAIL CONTACT AT FILER (optional)
arfatty@gmail.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

Andrew R. Friedman
Friedman, Rosenwasser & Goldbaum, P.A.
284 Hutchison Road
Paris, KY 40361

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE NUMBER
[redacted]3126

1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS
Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

2. ☑ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ ASSIGNMENT (full or partial): Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☐ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ PARTY INFORMATION CHANGE:

Check one of these two boxes: This Change affects ☐ Debtor or ☐ Secured Party of record

AND Check one of these three boxes to: ☐ CHANGE name and/or address: Complete item 6a or 6b, and item 7a or 7b and item 7c ☐ ADD name: Complete item 7a or 7b, and item 7c ☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. CURRENT RECORD INFORMATION: Complete for Party Information Change - provide only one name (6a or 6b)

6a. ORGANIZATION'S NAME

OR

| 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

7. CHANGED OR ADDED INFORMATION: Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

7a. ORGANIZATION'S NAME

OR

7b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) — SUFFIX

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

8. ☐ COLLATERAL CHANGE: Also check one of these four boxes: ☐ ADD collateral ☐ DELETE collateral ☐ RESTATE covered collateral ☐ ASSIGN collateral

Indicate collateral:

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT: Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

9a. ORGANIZATION'S NAME

OR

| 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| Abbey | Stephen | M | |

10. OPTIONAL FILER REFERENCE DATA:
CA-SOS Debtor: Neighborhood Power Corporation

# UCC FINANCING STATEMENT AMENDMENT ADDENDUM

FOLLOW INSTRUCTIONS

11. INITIAL FINANCING STATEMENT FILE NUMBER: Same as item 1a on Amendment form
[redacted]8126

12. NAME OF PARTY AUTHORIZING THIS AMENDMENT: Same as item 9 on Amendment form

12a. ORGANIZATION'S NAME

OR

12b. INDIVIDUAL'S SURNAME
Abbey

FIRST PERSONAL NAME
Stephen

ADDITIONAL NAME(S)/INITIAL(S)
M

SUFFIX

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

13. Name of DEBTOR on related financing statement (Name of a current Debtor of record required for indexing purposes only in some filing offices - see Instruction item 13): Provide only one Debtor name (13a or 13b) (use exact, full name, do not omit, modify, or abbreviate any part of the Debtor's name); see Instructions if name does not fit

13a. ORGANIZATION'S NAME
Neighborhood Power Corporation

OR

| 13b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

14. ADDITIONAL SPACE FOR ITEM 8 (Collateral)

15. This FINANCING STATEMENT AMENDMENT:

☐ covers timber to be cut ☐ covers as-extracted collateral ☐ is filed as a fixture filing

16. Name and address of a RECORD OWNER of real estate described in item 17 (if Debtor does not have a record interest):

17. Description of real estate:

18. MISCELLANEOUS:

Date: November 2, 2016

Neighborhood Power Corporation
ATTN: Stephen Gates

Re: UCC-1 Financing Statement [redacted]8126 (the "Financing Statement")

Dear Stephen:

Upon the close of the escrow contemplated by the Letter of Escrow Instructions dated concurrently herewith, you are authorized to file the attached Form UCC-3 terminating the Financing Statement, and take any other action necessary to terminate the lien created by the Financing Statement.

Regards,

Stephen M. Abbey

**CIV-110**

| ATTORNEY OR PARTY WITHOUT ATTORNEY: STATE BAR NO: 195955<br>NAME: Jack T Humes<br>FIRM NAME: Law Office of Jack T Humes<br>STREET ADDRESS: 28720 Canwood St., Suite 105<br>CITY: Agoura Hills, STATE: CA ZIP CODE: 91301<br>TELEPHONE NO.: 818-707-1277 FAX NO.: 818-735-3811<br>E-MAIL ADDRESS: [redacted]<br>ATTORNEY FOR (*Name*): Plaintiff, Stephen Abbey | *FOR COURT USE ONLY* |
|---|---|
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF** SANTA BARBARA<br>STREET ADDRESS: 1100 Anacapa St.,<br>MAILING ADDRESS: 1100 Anacapa St.<br>CITY AND ZIP CODE: Santa Barbara, California 93101<br>BRANCH NAME: Santa Barbara Courthouse | |
| Plaintiff/Petitioner: Abbey<br>Defendant/Respondent: Gates, et al. | |
| **REQUEST FOR DISMISSAL** | CASE NUMBER:<br>16CV04189 |

**A conformed copy will not be returned by the clerk unless a method of return is provided with the document.**

**This form may not be used for dismissal of a derivative action or a class action or of any party or cause of action in a class action. (Cal. Rules of Court, rules 3.760 and 3.770.)**

1. TO THE CLERK: Please **dismiss** this action as follows:
   a. (1) [x] With prejudice (2) [ ] Without prejudice
   b. (1) [x] Complaint (2) [ ] Petition
   (3) [ ] Cross-complaint filed by *(name):* on *(date):*
   (4) [ ] Cross-complaint filed by *(name):* on *(date):*
   (5) [x] Entire action of all parties and all causes of action
   (6) [ ] Other *(specify):**
2. *(Complete in all cases except family law cases.)*
   The court [ ] did [x] did not waive court fees and costs for a party in this case. *(This information may be obtained from the clerk. If court fees and costs were waived, the declaration on the back of this form must be completed).*

Date: October 25, 2016
Jack T. Humes
(TYPE OR PRINT NAME OF [x] ATTORNEY [ ] PARTY WITHOUT ATTORNEY)

▶ ______________________
(SIGNATURE)

*If dismissal requested is of specified parties only of specified causes of action only, or of specified cross-complaints only, so state and identify the parties, causes of action, or cross-complaints to be dismissed.

Attorney or party without attorney for:
[x] Plaintiff/Petitioner [ ] Defendant/Respondent
[ ] Cross Complainant

3. **TO THE CLERK:** Consent to the above dismissal is hereby given.**

Date:
(TYPE OR PRINT NAME OF [ ] ATTORNEY [ ] PARTY WITHOUT ATTORNEY)

▶ ______________________
(SIGNATURE)

** If a cross-complaint – or Response (Family Law) seeking affirmative relief – is on file, the attorney for cross-complainant (respondent) must sign this consent if required by Code of Civil Procedure section 581 (i) or (j).

Attorney or party without attorney for:
[ ] Plaintiff/Petitioner [ ] Defendant/Respondent
[ ] Cross Complainant

*(To be completed by clerk)*

4. [ ] Dismissal entered as requested on *(date):*
5 [ ] Dismissal entered on *(date):* as to only *(name):*
6. [ ] Dismissal **not entered** as requested for the following reasons *(specify):*

7. a. [ ] Attorney or party without attorney notified on *(date):*
   b. [ ] Attorney or party without attorney not notified. Filing party failed to provide
   [ ] a copy to be conformed [ ] means to return conformed copy

Date: Clerk, by ______________________, Deputy

**CIV-110**

| Plaintiff/Petitioner: Abbey<br>Defendant/Respondent: Gates, et al. | CASE NUMBER:<br>16CV04189 |
|---|---|

**COURT'S RECOVERY OF WAIVED COURT FEES AND COSTS**

If a party whose court fees and costs were initially waived has recovered or will recover $10,000 or more in value by way of settlement, compromise, arbitration award, mediation settlement, or other means, the court has a statutory lien on that recovery. The court may refuse to dismiss the case until the lien is satisfied. (Gov. Code, § 68637.)

## Declaration Concerning Waived Court Fees

1. The court waived court fees and costs in this action for *(name)*:

2. The person named in item 1 is *(check one below)*:
   a. ☐ not recovering anything of value by this action.
   b. ☐ recovering less than $10,000 in value by this action.
   c. ☐ recovering $10,000 or more in value by this action. *(If item 2c is checked, item 3 must be completed.)*

3. ☐ All court fees and court costs that were waived in this action have been paid to the court *(check one)*: Yes No

I declare under penalty of perjury under the laws of the State of California that the information above is true and correct.

Date:

(TYPE OR PRINT NAME OF ☐ ATTORNEY ☐ PARTY MAKING DECLARATION) ▶ (SIGNATURE)

CIV-120

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| Jack T Humes SB#195955<br>28720 Canwood St., Suite 105, Agoura Hills, CA 91301<br>TELEPHONE NO.: 818-707-1277 FAX NO.: 818-735-3811<br>E-MAIL ADDRESS: [redacted]<br>ATTORNEY FOR *(Name)*: Plaintiff, Stephen Abbey | |
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA BARBARA<br>STREET ADDRESS: 1100 Anacapa St.<br>MAILING ADDRESS: 1100 Anacapa St.<br>CITY AND ZIP CODE: Santa Barbara, California 03101<br>BRANCH NAME: Santa Barbara Courthouse | |
| PLAINTIFF/PETITIONER: Abbey<br>DEFENDANT/RESPONDENT: Gates, et al. | |
| **NOTICE OF ENTRY OF DISMISSAL AND PROOF OF SERVICE**<br>☐ Personal Injury, Property Damage, or Wrongful Death<br>☐ Motor Vehicle ☐ Other<br>☐ Family Law<br>☐ Eminent Domain<br>☑ Other *(specify)*: Breach of Contract; Declaratory Relief | CASE NUMBER:<br>16CV04189 |

**TO ATTORNEYS AND PARTIES WITHOUT ATTORNEYS:** A dismissal was entered in this action by the clerk as shown on the *Request for Dismissal. (Attach a copy completed by the clerk.)*

Date:

(TYPE OR PRINT NAME OF ☐ ATTORNEY ☐ PARTY WITHOUT ATTORNEY) ▶ (SIGNATURE)

## PROOF OF SERVICE

1. I am over the age of 18 and not a party to this cause. My residence or business address is:

2. ☑ I am a resident of or employed in the county where the mailing occurred. I served a copy of the *Notice of Entry of Dismissal* and *Request for Dismissal* by mailing them, in a sealed envelope with postage fully prepaid, as follows:
   a. ☐ I deposited the envelope with the United States Postal Service.
   b. ☑ I placed the envelope for collection and processing for mailing following this business's ordinary practice with which I am readily familiar. On the same day correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service.
   c. Date of deposit: d. Place of deposit *(city and state)*:
   e. Addressed as follows *(name and address)*:
   See Attachment for Neighborhood Power Corporation, Stephen Gates and Deyla Gates

3. ☐ I served a copy of the *Notice of Entry of Dismissal and Request for Dismissal* by personally delivering copies as shown below:
   a. Name of person served:
   b. Address at which person served:
   c. On *(date)*: d. At *(time)*:

4. ☐ I served a copy of the *Notice of Entry of Dismissal* and *Request for Dismissal* by electronically serving copies as shown below *(complete if electronic service is used based on a court order or agreement of the parties)*:
   a. Name of person served:
   b. Electronic service address of person served:
   c. On *(date)*: d. At *(time)*:
   e. Electronic service address from which I served the documents:
   ☐ Proof of electronic service is attached.

5. ☐ Proof of service on additional parties is attached.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:

(TYPE OR PRINT NAME) ▶ (SIGNATURE OF DECLARANT)

ATTACHMENT TO CIV-120

**Addresses For Service:**

**Stephen and Deyla Gates**
**33 Lokelau Place**
**Haiku, HI 96708**

**Neighborhood Power Corporation**
**358 Papa Place**
**Kahului, HI 96732**

808-586-2733 02:52:53 p.m. 09-12-2016 1 /2

Filing fees:

Profit Corporation/LLC $25
Non Profit Corporation $10
Optional expedite fee $25
Archives Fee $1

* This letter is to be signed by at least one of the remaining or NEW officers, members or managers of the above named entity.

October 24, 2016
Date

Department of Commerce and Consumer Affairs
Business Registration Division
P O Box 40
Honolulu, Hawaii 96810

Re: Neighborhood Power Corporation
(Name of Entity)

The above named entity has **changed** its officers/directors/members/managers:

From:

| Offics Held | Full Name | Address |
|---|---|---|
| CEO/P/D/CFO | Abbey, Stephen | 3307 Madrona Dr. Santa Barbara, CA 93105 |

To (include: Names, titles and Addresses):

| Offices Held | Full Name | Address |
|---|---|---|
| CEO/P/D | Gates, Stephen | 415 Dairy Road Suite E216 Kahului, HI 96732 |

I certify under the penalties of the Hawaii Revised Statutes that I am authorized to make this change for the entity and the statements herein are true and correct in all material respects.

Sincerely,

Stephen Abbey, Authorized Person
* Signature and Office Title Held

Print Name

PHONE/FAX/MAIL ORDERS
(Required information to complete for credit card transactions)

MASTERCARD VISA

CREDIT CARD NUMBER: ______________________

VERIFICATION NUMBER: __________ EXPIRATION DATE: __________

AMOUNT CHARGED: __________

CARDHOLDER'S NAME: ______________________ PHONE NUMBER: __________

CARDHOLDER'S BILLING ADDRESS: ______________________

______________________

______________________

[redacted]

# State of California
## Secretary of State

S

## Statement of Information
(Domestic Stock and Agricultural Cooperative Corporations)
FEES (Filing and Disclosure): $25.00.
If this is an amendment, see instructions.
IMPORTANT – READ INSTRUCTIONS BEFORE COMPLETING THIS FORM

1. CORPORATE NAME
Neighborhood Power Corporation

2. CALIFORNIA CORPORATE NUMBER
[redacted]0520

This Space for Filing Use Only

**No Change Statement** (Not applicable if agent address of record is a P.O. Box address. See instructions.)

3. If there have been any changes to the information contained in the last Statement of Information filed with the California Secretary of State, or no statement of information has been previously filed, this form must be completed in its entirety.
☐ If there has been no change in any of the information contained in the last Statement of Information filed with the California Secretary of State, check the box and proceed to Item 17.

**Complete Addresses for the Following** (Do not abbreviate the name of the city. Items 4 and 5 cannot be P.O. Boxes.)

| Item | City | State | Zip Code |
|---|---|---|---|
| 4. STREET ADDRESS OF PRINCIPAL EXECUTIVE OFFICE<br>358 Papa Place | Kahului | HI | 96732 |
| 5. STREET ADDRESS OF PRINCIPAL BUSINESS OFFICE IN CALIFORNIA, IF ANY<br>323 E. Matilija Street, #110-104 | Ojai | CA | 93023 |
| 6. MAILING ADDRESS OF CORPORATION, IF DIFFERENT THAN ITEM 4 | | | |

**Names and Complete Addresses of the Following Officers** (The corporation must list these three officers. A comparable title for the specific officer may be added; however, the preprinted titles on this form must not be altered.)

| Officer | Address | City | State | Zip Code |
|---|---|---|---|---|
| 7. CHIEF EXECUTIVE OFFICER/<br>Stephen Gates | 358 Papa Place | Kahului | HI | 96732 |
| 8. SECRETARY<br>Stephen Gates | 358 Papa Place | Kahului | HI | 96732 |
| 9. CHIEF FINANCIAL OFFICER/<br>Stephen Gates | 358 Papa Place | Kahului | HI | 96732 |

**Names and Complete Addresses of All Directors, Including Directors Who are Also Officers** (The corporation must have at least one director. Attach additional pages, if necessary.)

| Name | Address | City | State | Zip Code |
|---|---|---|---|---|
| 10. NAME<br>Stephen Gates | 358 Papa Place | Kahului | HI | 96732 |
| 11. NAME | | | | |
| 12. NAME | | | | |

13. NUMBER OF VACANCIES ON THE BOARD OF DIRECTORS, IF ANY:

**Agent for Service of Process** If the agent is an individual, the agent must reside in California and Item 15 must be completed with a California street address, a P.O. Box address is not acceptable. If the agent is another corporation, the agent must have on file with the California Secretary of State a certificate pursuant to California Corporations Code section 1505 and Item 15 must be left blank.

14. NAME OF AGENT FOR SERVICE OF PROCESS
Stephen Gates

| 15. STREET ADDRESS OF AGENT FOR SERVICE OF PROCESS IN CALIFORNIA, IF AN INDIVIDUAL | City | State | Zip Code |
|---|---|---|---|
| 323 E. Matilija Street, #110-104 | Ojai | CA | 93023 |

**Type of Business**

16. DESCRIBE THE TYPE OF BUSINESS OF THE CORPORATION
Environmental Consulting

17. BY SUBMITTING THIS STATEMENT OF INFORMATION TO THE CALIFORNIA SECRETARY OF STATE, THE CORPORATION CERTIFIES THE INFORMATION CONTAINED HEREIN, INCLUDING ANY ATTACHMENTS, IS TRUE AND CORRECT.

| DATE | TYPE/PRINT NAME OF PERSON COMPLETING FORM | TITLE | SIGNATURE |
|---|---|---|---|
| 11- -16 | Stephen Abbey | Authorized F... | [signature] |

SI-200 (REV 01/2013) APPROVED BY SECRETARY OF STATE

Neighborhood Power Corporation
415 Dairy Road, Suite E216
Kahului, Hawaii'

November 2, 2016

Bank of Hawaii
P.O. Box 2900
Honolulu, HI 96846-6000
Attn: Rod Peroff, VP Corporate Banking

Re: Neighborhood Power Corporation

Dear Mr. Peroff:

As acknowledged in your letter dated October 7, 2016, Bank of Hawaii received conflicting demands regarding the ownership and control of Bank of Hawaii checking accounts (******7617), (******9217), (******5667), and (******8605) under the account name "Neighborhood Power Corporation" (collectively, the "Account").

Due to the conflicting demands raised and pursuant to Neighborhood Power Corporation's Business Deposit Account Agreement, the Bank has frozen the account and required any future withdrawals or transfers be made only with the joint instruction of Mr. Stephen Abbey and Mr. Stephen Gates. This letter constitutes that joint instruction.

The undersigned have resolved their differences with regard to NPC and the accounts.

Effective immediately:

- Mr. Stephen Abbey is no longer an owner, director or officer (president, treasurer, secretary or otherwise) of Neighborhood Power Corporation.
- Mr. Stephen Gates is now the sole owner, director and officer of the Company.
- Please remove Mr. Abbey's name from the Account, he is no longer an authorized signatory and disclaims any and all ownership and control of the Account.
- From the date of this letter, you may rely on the instructions of Mr. Gates without any further instruction from or notice to Mr. Abbey with respect to the Account.

The parties hereto agree that this instrument may be executed in counterparts, each of which shall be deemed an original, and said counterparts shall together constitute one and the same agreement, binding all of the parties hereto, notwithstanding all of the parties are not signatories to the original or the same counterparts.

[*signature page follows*]

If you have any questions or need anything else, please do not hesitate to call the undersigned.

Respectfully,

Stephen Abbey

Stephen Gates

**Neighborhood Power Corporation**,
a California corporation

Stephen Gates, President and CEO

Stephen Abbey
3307 Madrona Drive
Santa Barbara, CA 93105

November 2, 2016

To Whom it May Concern:

This letter shall serve to certify that I, **Stephen Abbey**, am no longer an owner, officer or director of Neighborhood Power Corporation, a California corporation, nor am I an owner or manager of Neighborhood GP, LLC, a Hawaii limited liability company, effective as of the ___ day of November, 2016.

Sincerely,

____________________________
Stephen Abbey

# EXHIBIT F

# EXHIBIT A

## List of Assets and Associated Tax Credits Pledged to Fates Group, LLC

**Neighborhood Power Corporation:**

- Green Bridge Group, LLC
- Terton Solar, LLC
- Neighborhood GP, LLC

**Neighborhood GP, LLC:**

- RSP HI, LLC 50%
- ISOLAR, LLC 40%
- AR Solar, LLC 40%

**RSP HI, LLC:**

- Taki PV, LLC
- OwensPV, LLC
- CyanoPV, LLC
- RPPA HI, LLC
- T10PV, LLC
- T12 PV, LLC
- T13PV, LLC
- Red River Solar LLC
- Alanui Kihei Solar, LLC
- Alanui Kona Solar, LLC
- S&F Building PV, LLC

**ISOLAR, LLC**

- Redstone Energy, LLC
- BSOLAR, LLC
- Solar Energy Equities, LLC

**Owned Individually and Pledged as Collateral by Stephen Gates and Deyla Gates**

- 415 Dairy Road, Suite E-216, Kahului, HI 96732
- 358 Papa P1, Kahului, HI 96732
- 2000 Mokulele Hwy Lot #2, Puenenne, HI 96784
- 7500 Kulakula Rd, Kula, HI 96790
- 33 Lokelau P1, Haiku, HI 96708 (Gates personal residence)

# EXHIBIT G

**Electronic mail of Don Nissanka to Gilbert Armenta and William C. Morro, 28 March and 9 April 2019**

From: Don Nissanka <[redacted]@exergonix.com>

Date: Tuesday, April 9, 2019 at 11:27 AM

To: Gilbert Armenta <[redacted]@fatesgroup.com>; [redacted]@interamerican-group.com <[redacted]@interamerican-group.com>

Cc: Stephen Daniel Gates <[redacted]@neighborhoodpower.com>

Subject: RE: update from Don

Bill/Gilbert,

Just a quick update from this end.

We had the call on Monday as scheduled with Dr. Simburger.

He reported to us that the funds from the pre-existing account were received by the paymaster last Thursday. We are now waiting for confirmation that the funds are ready to transfer at HSBC London, once sub-accounts are set up by the banker. They will open sub-accounts for the individual investments and place funds to be managed. The attorney has confirm that HSBC has all the information to open the sub-accounts and looks like the bank has already started the process to set the accounts up. Once the sub-accounts are open and funded, the investments can be paid directly from the sub-accounts and managed accordingly.

We have our next call set for Wednesday and they hope to have everything ready by then.

Thanks,

Don

From: Gilbert Armenta <[redacted]@fatesgroup.com>

Sent: Thursday, March 28, 2019 7:32 PM

To: Don Nissanka <[redacted]@exergonix.com>

Cc: Stephen Daniel Gates <[redacted]@neighborhoodpower.com>; [redacted]@interamerican-group.com; [redacted]@essolo.com

Subject: Re: update from Don

Don,

I appreciate the note, let's have call in the morning please.

Giselle,

Please coordinate with Don, thanks!

All the best,

Gilbert Armenta

On Mar 28, 2019, at 6:25 PM, Don Nissanka
<[redacted]@exergonix.com<mailto [redacted]@exergonix.com>> wrote:

Hi Gilbert,

Sorry I missed your call. I have been scrambling whole day to get some bridge funds due to the delays.

As Stephen pointed out, the delays is due to getting the tax cleared through the European Central Bank on the custodial account. The trade that was made has been cleared and the funds are in the account according to the attorney that is managing the transaction. They have paid the tax and are waiting for the ECB to clear it in the system, giving the release of the funds to the custodian. I'm in touch daily. Let you know if I know more.

Happy to jump on the phone tomorrow for a call.

Thanks,

Don

From: Stephen Daniel Gates
<[redacted]@neighborhoodpower.com<mailto [redacted]@neighborhoodpower.com>>

Sent: Thursday, March 28, 2019 4:32 PM

To: Gilbert Armenta <[redacted]@fatesgroup.com<mailto [redacted]@fatesgroup.com>>; [redacted]@interamerican-group.com<mailto [redacted]@interamerican-group.com>

Cc: Don Nissanka <[redacted]@exergonix.com<mailto [redacted]@exergonix.com>>

Subject: update from Don

Hello Gilbert & Bill,

I just got off the phone with Don. His latest update is that the funds are being held up pending tax clearance from the central bank. His understanding is that the taxes have been paid but the clearance is still in process. If you would like to propose a time tomorrow for a call I will set up a conference line.

All the Best,

Stephen Daniel Gates

President, Neighborhood Power Corporation

(808) 268-8090

Skype: sgates888

www.neighborhoodpower.com<http://www.neighborhoodpower.com/>

**Electronic mail of Don Nissanka to Gilbert Armenta and William C. Morro, copied to Stephen Gates, 26 July 2019, with reply**

From: William Morro <[redacted]@interamerican-group.com>

Date: Friday, July 26, 2019 at 3:22 PM

To: Gilbert Armenta <[redacted]@zala-group.com>; Don Nissanka <[redacted]@exergonix.com>

Cc: Stephen Daniel Gates <[redacted]@neighborhoodpower.com>

Subject: Re: Update

Thanks Don. Would you please give me a call? Thanks - Bill

William C. Morro

InterAmerican Group

Office Direct: 312-957-4172

Mobile: 312-953-4882

Fax: 866-357-5886

e-mail: [redacted]@interamerican-group.com

On Friday, July 26, 2019, 1:53:42 PM CDT, Don Nissanka
<[redacted]@exergonix.com> wrote:

Gilbert/Bill,

We have made significant progress on the funding with Dr. Simburger. The subaccounts are done and they expect funds in the accounts today, lasts Monday morning.

I have been working with Lankan Bal and Dr. Simburger on the payment details and I expect a schedule to be finalized Monday. Once we have a signoff on the draw schedule, we can submit wire requests to the subaccount. I have already sent NPC detail to them and we should expect to have a discussion with their appointed board member, who will engage with us Monday to finalize everything.

I will be working though the weekend to get everything ready for Monday.

Have a great weekend.

Thanks.

Don

# EXHIBIT H

**From:** Don Nissanka <[redacted]@exergonix.com>
**Sent:** Thursday, July 23, 2020 7:17 PM
**To:** Saba Pogosov <[redacted]@fatesgroup.com>
**Cc:** Stephen Daniel Gates <sgates@neighborhoodpower.com>
**Subject:** RE: Fates update call

Saba,

I have been in touch with Simburger and the attorney. As I mentioned when we last spoke, they are pushing to get a resolution as quickly as possible. HSBC's last communication was that they are doing everything to get this issue resolved, but with limited staff and other priorities due to COVID, they have indicated that there will be delays in getting the funds released. We are all frustrated and to be honest, its not what I want to hear either. All I can do is stay cordial to Simburger and see if he can get this pulled through.

Stephen and I are focused on the alternative paths we discussed to bring in funds. We have made progress on the work with the new investors and we keep moving forward day by day. I'm confident on the alternative funding path, than I'm with Simburger. So, the focus is to close this in a timely manner and get us whole.

We are in the last leg of their requirements to bring the three companies under one roof and complete the funding round. Stephen may have told you that I'm spending 99% of my time on this and pushing to get this done as quickly as possible.

Here is a list of what has been done:

1. Structure – formation of Newco and what elements go into it
2. Term Sheets – we have agreed the terms, exception of the vehicle company
3. Business Plan – completed the full plan
4. Financial Plan – completed
5. Placement Memorandum – completed
6. Licenses/regulatory approvals – completed
7. Appoint regulatory agents - appointed
8. Bank accounts – done

These are the things that need to be completed before funds can move:

1. Execute vehicle TS
2. Refine financial plan to reflect capital raise
3. Refine pitch deck and issue initial doc pack

4. Issue offering memorandums
5. Roadshows/Zoom calls to initiate investments Q&A
6. Issue SPA's
7. Secure capital

Saba, I'm not sure how much exposure you have in raising institutional capital, but these activities are normal course of business if you are setting up institutional funding. It has to be done methodically and to the point. We cannot skip steps or expedite anything.

Rest assured that both Stephen and I are working day and night to get us there as quickly as possible, because both our livelihood depends on it. The alternative is to file bankruptcy and walk away, which you know is happening with many companies under the current COVID situation. In the past few weeks we know of several of our industry partners shutting down. If we go down that path, that would not help Fates get their money back nor would it help Stephen and I survive. I ask that you please stay patient until we complete our work and get us through this.

Thanks,
Don

**From:** Saba Pogosov <[redacted]@fatesgroup.com>
**Sent:** Thursday, July 23, 2020 2:23 AM
**To:** Stephen Daniel Gates <[redacted]@neighborhoodpower.com>
**Cc:** Don Nissanka <[redacted]@exergonix.com>
**Subject:** Re: Fates update call

Stephen you realize that NP already defaulted on Fates Loan.

The rest is just the noise

Sent from my iPhone

> On Jul 22, 2020, at 21:28, Stephen Daniel Gates <[redacted]@neighborhoodpower.com> wrote:
>
> Don, have you heard any updates from HSBC?
>
> Saba, I understand the priorities of paying off the Fates Loan, we are just in a short term fire drill to get these projects on so we do not go in default on the project side, which could collapse everything.
>
> All the Best,
> Stephen Daniel Gates
> President, Neighborhood Power Corporation
> [redacted]
> www.neighborhoodpower.com

**From:** [redacted]@fatesgroup.com <[redacted]@fatesgroup.com>
**Sent:** Wednesday, July 22, 2020 10:19 AM
**To:** Stephen Daniel Gates <[redacted]@neighborhoodpower.com>; Don Nissanka <[redacted]@exergonix.com>
**Subject:** RE: Fates update call

Hi Stephen, Don,

Still "today-tomorrow" regarding HSBC.....?

Please do not forget of priorities concerning paying the dues.

Thanks,
Saba

**From:** Stephen Daniel Gates <[redacted]@neighborhoodpower.com>
**Sent:** Wednesday, July 22, 2020 8:37 PM
**To:** Don Nissanka <[redacted]@exergonix.com>; Saba Pogosov <[redacted]@fatesgroup.com>
**Cc:** Saba Pogosov <[redacted]@essolo.com>
**Subject:** Re: Fates update call

Hello Saba,

Our team's highest priority currently is filling up our Community Solar subscriptions so we can turn on 4 large but ideal projects. I will be in the field soliciting subscribers during our call today. I do not have any meaningful updates this week.

All the Best,

Stephen Daniel Gates
President, Neighborhood Power Corporation
[redacted]
www.neighborhoodpower.com

**From:** Stephen Daniel Gates
**Sent:** Wednesday, May 13, 2020 6:56 AM
**To:** Don Nissanka <[redacted]@exergonix.com>; Saba Pogosov <[redacted]@fatesgroup.com>
**Cc:** Saba Pogosov <[redacted]@essolo.com>
**Subject:** Fates update call
**When:** Wednesday, July 22, 2020 10:30 AM-11:00 AM.

**Where:**

---

Join Microsoft Teams Meeting

+1 808-800-2867 United States, Honolulu (Toll)

Conference ID: 452 155 347#

Local numbers | Reset PIN | Learn more about Teams | Meeting options

---

# EXHIBIT I

**neighborhoodpower**

BE THE SOLUTIOI

September 4th, 2020

Fates Group, LLC
Attn: Gilbert Armeta
828 SE 4th St
Ft. Lauderdale, FL 33301

Dear Mr. Armeta:

This letter is to confirm the terms of two loans our company, Neighborhood Power Corporation (NPC) has with your company Fates Group, LLC (Fates).

The first loan or Term Loan has a principle amount of $4,500,000:

| Item/ Payee | Initial Principal Amount | Interest Start Date |
|---|---|---|
| Advances | 1,365,000 | 11/8/2016 |
| Remaining Principal | 3,135,000 | 11/8/2016 |
| **Term Loan Total** | 4,500,000 | |

The second loan or Revolver has a principle amount of $2,892,417:

| Term Loan Balance | | |
|---|---|---|
| **Revolver** | | |
| Advance 1 | 1,570,000 | 11/8/2016 |
| Advance 2 | 700,000 | 11/8/2016 |
| Advance 3 | 150,000.00 | 7/12/2017 |
| Advance 4 | 250,000.00 | 7/19/2017 |
| Advance 5 | 222,416.63 | 7/26/2017 |

The total principle of both loans is $7,392,417. If both loans were paid off in full by the end of September 2020 including all interest the pay off amount would be $12,176,547. NPC is currently working on an equity raise to secure the funds to pay off this loan and we plan to have these funds by the end of September 2020.

Sincerely,

Stephen Gates
President



BBB ACCREDITED BUSINESS A+

# EXHIBIT J

ELITE
CROWN DIAMOND

November 12th, 2020

Fates Group, LLC
Attn: Gilbert Armenta
828 SE 4th St
Ft. Lauderdale, FL 33301

Dear Mr. Armenta:

This letter is to confirm the intention of Elite Crown Diamond Ltd. (ECD), a UK based investment company, to purchase the two loans your company Fates Group, LLC (Fates) has with Neighborhood Power Corporation (NPC).

It is ECD's intention to issue a formal offer to purchase these loans upon completion of our latest funding round that has been in the works for the past few months. Once this funding round is completed our intention is to take the following steps to complete a loan purchase agreement with Fates:

1. Issue a formal offer in the form of a Loan Purchase Term Sheet
2. Retain the attorney who drafted the original loan documents, Jason Savich of Cooley LLP, to draft a very simple loan purchase agreement to facilitate this transaction and ensure that all UCC's remain in effect and the ownership of both the loans and the UUC's are transferred properly.
3. Upon completion of these documents prior to closing ECD will deposit the funds needed to complete this transaction into a Cooley trust account.
4. At final closing the funds would be released to Fates and the ownership of the loan would be transferred to ECD.

EDC is in the process of setting up a fully regulated Fund to make several directed investments. The Fund is pending final release from the regulatory authorities and once completed, we will proceed to engage on the Fates loan settlement. We anticipate the approval to come before the end of this year (2020) and within three days of the approval, ECD will issue a formal offer to Fates.

ECD is issuing this letter upon the request of NPC. Please continue to work with NPC and get updates from NPC directly on this issue.

Sincerely,

Lankan Bal
Executive Director

# EXHIBIT K

_Verified Correct Copy of Original 12/5/2025._

**EXHIBIT 3**

**MUTUAL GENERAL RELEASE**

This **MUTUAL GENERAL RELEASE** (this "Agreement") is made and entered into on 11.01.2022, by and between Stephen Gates, including all companies listed on Exhibit A ("NPC) and Deyla Tappan ("DEYLA")

**Recitals**

**A.** **WHEREAS**, while married to Deyla, NPC started several companies, listed on Exhibit A

**B.** **WHEREAS.** The parties are now separating through a formal divorce proceeding where Deyla wishes to be released from any obligations or liabilities associated with any and all NPC companies (Exhibit A) and to release to NPC any actual or implied ownership in these companies in return for the payments outlined in section 2.0 and they now wish to release each other from all known and unknown claims.

**NOW, THEREFORE, IN CONSIDERATION OF** the payment specified in Section 2.0 herein below, and in consideration of the foregoing, the promises and covenants herein contained and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each and all of the parties to this-Agreement agree as follows:

**1.0 RELEASE**

1.1 **RELEASE BY DEYLA:** In consideration of the promises and covenants herein, DEYLA does hereby (a) forever release and discharge Stephen Gates, NPC and each of the other NPC Entities, all related entities (including but not limited to those companies called out in Exhibit A and their respective affiliates and each of their directors, officers, partners, members, agents, servants, employees, successors, assigns, advisors, and attorneys from any and all claims, demands, controversies, actions, causes of action, duties, obligations, liabilities, accounts, expenses, costs, attorneys fees and damages, of whatsoever character, nature and kind, at law or in equity, past or present, known or unknown, suspected or unsuspected including, but not limited to, all claims which in any way relate to or arise out of the ownership in any Exhibit A companies, save and except only the obligations and liabilities created by this agreement; and (b) waives, as to each and every claim released hereunder, the benefit of each other similar provision of applicable federal or state law (including, without limitation, the laws of the State of California), if any, pertaining to general releases after having been advised by their legal counsel with respect thereto..

1.2 **RELEASE BY NPC:** In consideration of the promises and covenants herein, NPC does hereby (a) forever release and discharge DEYLA, including any and all agents, servants, employees, successors, assigns, advisors, and attorneys of said parties from any and all claims, demands, controversies, actions, causes of action, duties, obligations, liabilities, accounts, expenses, costs, attorneys fees and damages, of whatsoever character, nature and kind, at law or in equity, past or present, known or unknown, suspected or unsuspected including, but not limited to, all claims which in any way relate to or arise out of the ownership or management in any Exhibit A company, save and except only the obligations and liabilities created by this agreement ; and (b) waives, as to each and every claim released hereunder, the benefit of each other similar provision of applicable federal or state law (including, without limitation, the laws of the State of California), if any, pertaining to general releases after having been advised by their legal counsel with respect thereto.

**2.0 TERMS OF PAYMENT:**

Verified Correct Copy of Original 12/5/2025.

NPC shall pay DEYLA based on the terms in Stipulated General Judgment.

**3.0 GENERAL TERMS**

3.1 **REPRESENTATIONS, COVENANTS AND WARRANTIES:** The Parties admit, acknowledge and declare that they have been fully and completely informed by independent counsel as to their rights and as to all of the obligations hereby assumed and undertaken and the rights hereby extinguished or created by the execution of this Agreement. This Agreement is given voluntarily, free of undue influence, coercion, duress, menace or fraud of any kind. No party, nor any officer, agent, employee, representative or attorney of or for any party has made any statement or representation to any other party regarding any fact relied upon in entering this Agreement, and no party is relying upon any statement, representation or promise of any other party, nor of any officer, agent, employee, representative or attorney of or for any party, in executing this Agreement or in making the settlement provided herein, except as expressly stated in this Agreement. This Agreement and each and every paragraph and every part thereof has been carefully read by the Parties, and the Parties fully and completely understand and are cognizant of all the terms and conditions and the effect of each and all the terms and conditions contained in this Agreement. Each party represents and warrants that they have the right, power, legal capacity, and authority to enter into and perform the obligations under this Agreement on their behalf, and on behalf of anyone they represent, and that no further approval or consent of any person or entity is necessary for them to enter into and perform such obligations. Each party warrants and represents that it has made such investigation of the facts pertaining to this Agreement and of all of the matters pertaining thereto as it deems necessary. Each party represents and warrants that it has cooperated and participated in the drafting and preparation of the Agreement. Each party acknowledges that this Agreement and its reduction to final written form is the result of extensive good faith negotiations. Accordingly, the parties hereby acknowledge and agree that the Agreement shall not be construed or interpreted in favor of or against any of the parties by virtue of the identity of its preparer.

3.2 **GOVERNING LAW:** This agreement has been negotiated and entered into in the State of Oregon, and shall be governed by, construed and enforced in accordance with the internal laws of the State of Oregon. Venue for any action hereunder shall be the State of Oregon, County of Clackamas.

3.3 **INTERPRETATION:** No provision of this agreement is to be interpreted for or against either party because that party or that party's equal representative drafted such provision

3.4 **INTEGRATION:** This agreement sets forth the entire agreement between the parties with regard to the subject matter hereof. All agreements, covenants, representations, warranties, expressed and implied, oral and written, of the parties with regard to the subject matter hereof or contained herein. No other agreements, covenants, representations or warranties, expressed or implied, oral or written, have been made by either party to the other with respect to the subject matter of this agreement All prior and contemporaneous conversations, negotiations, possible and alleged agreements and representations, covenants, and warranties with respect to the subject matter hereof

_Verified Correct Copy of Original 12/5/2025._

or waived, merged herein and therein and superseded hereby and thereby. This is an integrated agreement.

<u>3.5 **SEVERABILITY**</u>: In the event that any covenant, condition or other provision herein contained is held to be invalid, void or illegal by any court of competent jurisdiction, the same shall be deemed severable for the remainder of this agreement and shall in no way effect, impair or invalidate any other covenant, condition, or other provision herein contained. If such condition, covenant or other provision shall be deemed invalid due to its scope or breadth, such covenant, condition or other provision shall be deemed valid to the extent of the scope or breadth permitted by law. <u>**NUMBER AND GENDER:**</u> Whenever the singular number is used herein and when required by the context, the same shall include the plural and the masculine, feminine and neuter gender shall each include the other.

<u>3.6 **CAPTIONS:**</u> Titles or captions contained herein are inserted as a matter of convenience and for reference, and in no way define, limit, extend or describe the scope of this agreement or any provision thereof.

<u>3.7 **SUCCESSORS AND ASSIGNS:**</u> This agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, representatives, successors and permissible assigns.

<u>3.8 **SURVIVAL OF WARRANTIES**:</u> The representations and warranties of the Parties as set forth in this Agreement shall not expire with or be terminated and extinguished by the execution of this Agreement, but shall thereafter continue and remain in full force and effect without time limitations.

<u>3.9 **PARTIES TO BEAR OWN COSTS**:</u> Each Party to this Agreement shall bear its own attorneys' fees and costs in connection with the negotiation and execution of this Agreement..

<u>3.10 **ATTORNEYS' FEES**</u>: In the event any action is brought to enforce any term of this Agreement or to recover any sum due under this Agreement, the prevailing party shall be entitled to recover, in addition to all other remedies, the reasonable costs incurred in such action, including attorneys' fees.

<u>3.11 **EXECUTION IN COUNTERPARTS:**</u> This agreement may be executed in two or more counterparts, each of which shall be an original, but all of which shall constitute one and the same instrument.

<u>3.12 **INDEMNITY:**</u> In the event that any party violates the terms of this agreement, then the party violating this agreement shall indemnify and hold harmless the non-breaching parties from any and all liability, costs, expenses and fees, including attorneys' fees, arising from said violation of this agreement.

<u>3.13 **NO CONTINUING WAIVER.**</u> Any waiver by any party of any breach of term or provision of this Agreement shall neither be, nor be construed as being, a waiver of any proceeding, concurrent or succeeding breach of the same or any other term or provision hereof. No waiver shall be binding on the part or on behalf of, any other party entering into this Agreement.

<u>3.14 **WRITTEN MODIFICATION**:</u> This Agreement may not be altered, amended, modified except in writing signed by both parties

_Verified Correct Copy of Original 12/5/2025._

**READ CAREFULLY BEFORE SIGNING**
**DO NOT SIGN UNTIL READ AND FULLY UNDERSTOOD.**

**In witness thereof the parties hereto have executed this MUTUAL GENERAL RELEASE to be effective as of the date and year first written above.**

Dated: 12/7/2022, 2022

Stephen Gates (Dec 8, 2022 09:54 HST)

Stephen Gates
Title: Individual and either President, Officer or Manager of all companies listed on Exhibit A

Dated: 12/7/ , 2022

Deyla Tappan Gates
Deyla Tappan Gates (Dec 7, 2022 14:39 PST)

Deyla

_Verified Correct Copy of Original 12/5/2025._

Exhibit
A

List of
Compa
nies

The following is an non-exhaustive list of all companies NPC started while married to Deyla, any missed companies are an error and shall be included if ever discovered:

Neighborhood Power Corporation
Neighborhood Farms Maui, LLC (all Neighborhood Farms)
Neighborhood Power & Water, LLC
Neighborhood Team Fund, LLC
Neighborhood Power, LLC
Neighborhood Power OR, LLC
Neighborhood GP, LLC
Neighborhood PM, LLC
RSP HI, LLC
RSP OR,LLC
RSP PR,LLC
RSP MO,LLC
RSP MM,LLC
RPPA HI,LLC
Griffin Investments Inc.
Griffin EV, LLC
Elite Crown Diamond ltk
Elite Global Equity Fund
Elite Crown Cayman LTD
Solar Tree Capital, LLC
Windsor Carports PV, LLC
Waihee Water, LLC
Volcano Solar, LLC
Tickle Creek Solar, LLC
Thomas Creek Solar, LLC
Terton Solar, LLC
Taki PV, LLC
T20 PV, LLC
T18 PV, LLC
T16 PV, LLC
T15, LLC
T14 PV, LLC
T13 PV, LLC
T12 PV, LLC
T11 PV, LLC
T10 PV, LLC
FOM PV, LLC
St Louis Solar, LLC
SPP1, LLC
S&FBuilding FIT, LLC
S&F Pond, LLC
Red River Solar 3&4, LLC
Rancho Vistoso PV, LLC

_Verified Correct Copy of Original 12/5/2025._

Ralphs PV, LLC
PR Outlets PV, LLC
Plaza PV, LLC
Paso Robles PV, LLC
Owens PV, LLC
Notre Dame PV, LLC
Mission PV, LLC
Metro PV, LLC
LimeTree PV, LLC
Kula Ag PV, LLC
iSolar, LLC
Hilo Hotel PV, LLC
Hilo Golf PV, LLC
Hawaii SPP1, LLC
Green Energy Solar, LLC
Green Bridge Group, LLC
CyanoPV, LLC
Clear Lake PV, LLC
Big Bear PV, LLC
Bass Lake Solar Holdings, LLC
AR Solar, LLC
Aloha Renewables, LLC
Alanui Kona, LLC
Alanui Kihei, LLC
DG PV, LLC
Yarak Trading, LLC
Kawela CBRE PV, LLC
Bali PV, LLC

# EXHIBIT L

Egan-Jones
RATINGS

Aug 19, 2025

# Rule 17g-7 Disclosure Form

## ELITE GLOBAL EQUITY FUND

**Ratings Group**
ratings@egan-jones.com
+1 (212) 425-0460
www.egan-jones.com

Egan-Jones
RATINGS

# U.S. SEC Rule 17G-7(A) Disclosure

## ITEM 1

**Credit Rating Score and (2) Name of the Obligor, or the Identity and Description of the Security or Money Market Instrument as required by Paragraph (a)(1)(ii)(A) of Rule 17g-7**

| Rated Entity / Instrument / Security | Rating Action | Rating (curr./proj.) |
|---|---|---|
| Senior Secured Notes (USD1,500M)<br>CUSIP(s): 28661XAB4, G3002XAB8 | Assign | BBB / BBB |

1. Egan-Jones' rating is valid for one year from the issuance date. Egan-Jones will provide annual surveillance on the rating per the request.

## ITEM 2

**Version of the Methodology used to Determine the Rating as required by Paragraph (a)(1)(ii) B) of Rule 17g-7**

We used version #16 of the Methodologies for Determining Credit Ratings (Main Methodology), a copy of which is available at egan-jones.com.

## ITEM 3

**Main Assumptions and Principles Used to Construct the Rating Methodology Used to Determine the Credit Rating as required by Paragraph (a)(1)(ii)(C) of rule 17g-7 (includes qualitative methodologies and quantitative inputs, and, where appropriate, assumptions about correlations of defaults across the underlying assets)**

Egan-Jones follows standardized procedures for conducting analysis and rating committees. What follows summarizes Egan-Jones' credit rating processes, procedures, and policies.

Proprietary Models: Egan-Jones uses proprietary models to obtain preliminary assessments of issuer credit quality. Egan-Jones generally uses Loan-to-Value Ratio (LTV) as the qualitative model inputs. In addition, Egan-Jones reviews the credit profile of the counterparties, the asset quality and valuation, liquidity management, the economic and regulatory framework, potential credit support etc.

Qualitative and Quantitative Models and Metrics and Credit Quality Ratios: Egan-Jones analysts apply their best judgment, based on their expertise and experience, to arrive at a rating. Models alone, while very useful, cannot completely accurately capture current or projected credit quality. Regarding the credit ratios Egan-Jones uses for its analysis, they vary by asset type but generally are included in Egan-Jones' rating analysis report.

## ITEM 4

**Potential Limitations of the Credit Rating, including the Types of Risks Excluded from the Credit Rating that Egan-Jones does not Comment on (e.g., liquidity, market, and other risks) as required by Paragraph (a)(1)(ii)(D) of Rule 17g-7**

Our credit ratings reflect our opinion regarding the future credit risk of entities, securities, obligors, or money market instruments, including the risk that an entity may not meet its financial obligations as they come due. Credit ratings do not address liquidity, market, prepayment, and other risks. Credit ratings do not address the adequacy of market price, marketability, the suitability of any investment, loan or security for a particular investor (including, but not limited to, any accounting and/or regulatory treatment), or the tax-exempt nature or taxability of payments made in respect of any investment, loan or security. Credit ratings are not recommendations to purchase, sell or hold securities, and Egan-Jones expects that each investor will make thorough and independent evaluations of securities that are under consideration for purchase, holding or sale.

# ITEM 5

**Item 5(a): Information on the Uncertainty of the Credit Rating including Information on the Reliability, Accuracy, and Quality of the Data as required by Paragraph (a)(1)(ii)(E)(1) of Rule 17g-7**

Our rating is dependent on numerous factors including the reliability, accuracy, and quality of the data relied upon in determining the credit rating. The data/ information (collectively "Information") is sourced from non-public sources although information on peer companies (and the rated company if it is publicly traded) is sourced from publicly-available 10Q and 10K statements, quarterly reports, 8K filings, earnings reports, and other similar sources. In some cases, the Information is limited because of issues such as short operating histories, lack of reported data, delay in reporting data, restatements, inaccurate accounting, and other issues. Such shortcomings are not always readily apparent. In the case of Information from non-public sources, there are additional limitations such as lack of scrutiny via government filings (e.g., the SEC in the case of the United States), lack of attestations regarding the veracity of Information (such as those normally required in connection with SEC filings) and difficulty in verifying accuracy of information.

**Item 5(b): A Statement Relating to the Extent that Data Essential to the Determination of the Credit Rating were Reliable or Limited including any limits on the Scope of Historical Data as required by Paragraph (a)(1)(ii)(E)(2)(i) of Rule 17g-7**

Egan-Jones considers the data and scope of historical data essential to the determination of the credit rating to be reliable and sufficient.

**Note:** Egan-Jones adopts all measures reasonably designed to obtain information that is reliable and that emanates from reliable sources, including when appropriate, independent third-party sources. However, Egan-Jones cannot in every instance provide independent verification or validation of the information it receives during the rating process. Egan-Jones' policy is to not assign credit ratings for entities, securities, obligors, or money market instruments for which it believes it has insufficient data essential for the determination of a credit rating.

**Item 5(c): A Statement Relating to the Extent that Data Essential to the Determination of the Credit Rating were Reliable or Limited including any limits on the Accessibility to Certain Documents or other Types of Information as required by Paragraph (a)(1)(ii)(E)(2)(ii) of Rule 17g-7**

Egan-Jones considers the data essential to the determination of the credit rating to be reliable and the access to pertinent documents and other types of information sufficient.

**Note:** Egan-Jones adopts all measures reasonably designed to obtain information that is reliable and that emanates from reliable sources, including when appropriate, independent third-party sources. However, Egan-Jones cannot in every instance provide independent verification or validation of the information it receives during the rating process. Egan-Jones' policy is to not assign credit ratings for entities, securities, obligors, or money market instruments for which it believes it has insufficient data essential for the determination of a credit rating.

## ITEM 6

**Whether and to what extent Egan-Jones used Due Diligence Services of a Third Party Provider and, if used, either (i) a Description of the Information Reviewed and Conclusions as required by Paragraph (a)(1)(ii)(F)(1) of Rule 17g-7 or (ii) a cross-reference to Form ABS Due Diligence 15E executed by the Third Party provided the Form contains a description of the information that the Third Party Reviewed and a Summary of their Findings as Required by Paragraph (a)(1)(ii)(F)(2) of Rule 17g-7**

In taking this credit rating action, Egan-Jones did not use the due diligence services of a third-party provider.

## ITEM 7

**Whether Servicer or Remittance Reports were used and if so, how and with what Frequency to Conduct Surveillance of the Credit Rating as required by Paragraph (a)(1)(ii)(G) of Rule 17g-7.**

Not applicable.

## ITEM 8

**Description of the Types of Data about any Obligor, Issuer, Security or Money Market Instrument that were Relied upon for Determining the Credit Rating as required by Paragraph (a)(1)(ii)(H) of Rule 17g-7**

- Regulatory filings
- Public information
- Historical performance data
- Asset Portfolio data
- Operating data
- Economic and demographic information
- Financial data
- Stress tests
- Pro forma financials

## ITEM 9

**Statement Containing an Overall Assessment of the Quality of Information Available and Considered in Determining the Credit Rating in relation to the Quality of Information Available to Egan-Jones in similar Credit Ratings as required by Paragraph (a)(1)(ii)(I) of Rule 17g-7.**

Egan-Jones considers the information made available to it regarding the entity, security, obligor or money market instrument to have been of satisfactory quality and was appropriate relative to that available for similar entities or instruments.

## ITEM 10

**Item 10(a): Statement that Egan-Jones was (i) paid by the obligor being rated or the issuer, underwriters or sponsor of the security being rated; (ii) paid by a third-party entity (not the obligor or issuer) or (iii) not paid as required by Paragraph (a)(1)(ii)(J)(1)(i), (ii), and (iii) of Rule 17g-7**

Egan-Jones is paid by the obligor, issuer, underwriter, depositor or sponsor to determine this credit rating.

**Item 10(b): If applicable, a Statement that Egan-Jones was also Paid for Services other than Determining Credit Ratings during the most recently ended Fiscal Year by the Entity/Person who paid Egan-Jones for the Credit Rating as required by Paragraph (a)(1)(ii)(J)(2) of Rule 17g-7**

Egan-Jones was not paid for services other than determining credit ratings by the obligor, issuer, underwriters, or sponsor during the most recently ended fiscal year.

**Item 10(c): If applicable, a Statement that Egan-Jones rating action results from a review conducted pursuant to section 15E(h)(4)(A) of the Act and CFR § 240.17g-8(c), the following information (as applicable): (i) If the rating action is a revision of a credit rating pursuant to Rule 17g-8(c)(2)(i)(A), an explanation that the reason for the action is the discovery that a credit rating assigned to the obligor, security, or money market instrument in one or more prior rating actions was influenced by a conflict of interest, including a description of the nature of the conflict, the date and associated credit rating of each prior rating action that the nationally recognized statistical rating organization has determined was influenced by the conflict, and a description of the impact the conflict had on the prior rating action or actions; or (ii) If the rating action is an affirmation of a credit rating pursuant to Rule 17g-8(c)(2)(i)(B), an explanation that the reason for the action is the discovery that a credit rating assigned to the obligor, security, or money market instrument in one or more prior rating actions was influenced by a conflict of interest, including a description of the nature of the conflict, an explanation of why no rating action was taken to revise the credit rating notwithstanding the presence of the conflict, the date and associated credit rating of each prior rating action the nationally recognized statistical rating organization has determined was influenced by the conflict, and a description of the impact the conflict had on the prior rating action or actions as required 17g-7(a)(1)(ii)(J)(3)(i) and (ii).**

Not applicable

## ITEM 11

**Item 11(a): Explanation or Measure of the Potential Volatility of the Credit Rating including any Factors Reasonably likely to Lead to a Change in the Credit Rating as required by Paragraph (a)(1)(ii) (K)(1) of Rule 17g-7**

Several variables that influence Egan-Jones' credit ratings may include, but are not limited to, revenue levels, margins, interest rates, inflation, global/national/regional economic stress, unemployment, consumer debt levels, performance of counterparties, performance of seller/servicer and originator, leverage levels, credit spreads, significant or sustained changes in price levels, supply/demand and margins, operating margins, issuer-specific changes in capital structure, changes in regulation, changes in fiancial condition of seller/servicer, industry specific changes of event, competitive positioning, governance, risk profile, liquidity, and profitability. Unexpected changes in any of these variables may result in changes to the credit rating, and in some cases, a movement of several notches.

**Item 11(b): Explanation or Measure of the Potential Volatility of the Credit Rating including the Magnitude of the Change that could Occur under various Market Conditions Determined by Egan-Jones to the relevant to the Rating as required by Paragraph (a)(1)(ii)(K)(2)**

The methodologies and/or rating reports discuss how various market conditions can affect a credit rating. Please refer to the relevant rating methodologies and/or the rating reports on the Egan-Jones website at https://www.egan-jones.com for more information. For information regarding the sensitivity of the credit rating to specific assumptions, please refer to Item 13 of this form.

## ITEM 12

**Information on the Content of the Credit Rating including (1) Historical Performance of the Credit Rating (where applicable) (2) the Expected Probability of Default and Expected Loss in the event of Default as required by Paragraph (a)(1)(ii)(L)(1) and (2)**

**Historical performance of credit ratings:**

| Rated Item | Rating | Issued Date |
|---|---|---|
| Senior Secured Notes | BBB | 06/16/25 |

(1) For the historical performance of the credit rating(s) associated with this Information Disclosure Form, please refer to the relevant sector page on Egan-Jones' website: https://www.egan-jones.com/regulatory/form-nrsro/credit-ratings-performance-measurement-statistics/. For unpublished ratings, please see the attached appendix where applicable.

(2) Egan-Jones' credit ratings do not reflect an absolute probability of default or an absolute expected loss. Egan-Jones' credit ratings reflect a relative ranking of credit risk. For more information, please refer to Egan-Jones' Ratings Scales Page.

## ITEM 13

**Item 13(a) Information on the sensitivity of the credit rating to assumptions as required by Paragraph (a)(1)(ii)(M) of Rule 17g-7**

Below is a summary of the import of the assumptions which independently would have the greatest impact on our "ratio-implied rating":

| | Tranche | Base(*A) | Optimistic(*A) | Pessimistic(*A) | Base(*R) | Optimistic(*R) | Pessimistic(*R) |
|---|---|---|---|---|---|---|---|
| Loan to Value (%) | None | 68 | 59.9 | 69.9 | BBB | BBB+ | BBB- |

| | Tranche | Base(*A) | Optimistic(*A) | Pessimistic(*A) | Base(*R) | Optimistic(*R) | Pessimistic(*R) |
|---|---|---|---|---|---|---|---|
| Pledged Asset Collateral Value ($MM) | None | 2290 | 4000 | 2000 | BBB | BBB+ | BBB- |
| Asset AUM Growth (%) | None | 5 | 15 | 2 | BBB | BBB | BBB- |

*A = Assumptions *R = Resulting Ratio-Implied Rating

**Item 13(b) An Analysis - citing specific examples - of how the Assumptions Identified in Item 13(a) Impact the Credit Rating as required by Paragraph (a)(1)(ii)(M)(2)**

For specific data that illustrate potential ratings movement, please refer to the relevant rating methodologies in the Methodologies section and/or the rating reports in the Research section of the Egan-Jones website at www.egan-jones.com.

## ITEM 14

**(N) If the credit rating is assigned to asset-backed security: where Egan-Jones is providing a preliminary rating, an initial rating, or a rating for the first time after there has been a material change in Egan-Jones' reps, warranties and enforcement actions and the rating involves an ABS that was first rated by Egan-Jones on or after 9/26/11: (i) Information on the reps, warranties and enforcement mechanisms available to investors that were disclosed in the prospectus or offering docs for the ABS and (ii) How they differ from the reps, warranties, and enforcement mechanisms in issuances of similar securities. The above is as required by Paragraph (a)(1)(ii)(N)(1) and (2)**

Not applicable.

## ITEM 15

**A signed statement by a person within the nationally recognized statistical rating organization stating that the person has responsibility for the rating action as required by Paragraph 17g-7(a)(iii)**

In compliance with the US Securities and Exchange Commission (SEC) Rule 17g-7(a), the Egan-Jones analyst who published the report is responsible for the rating action and to the best knowledge of the person:

1. No Part of the credit rating was influenced by any other business activities,
2. The credit rating was based solely upon the merits of the obligor, security, or money market instrument being rated, and
3. The credit rating was an independent evaluation of the credit risk of the obligor, security, or money market instrument.

| Analyst | Date | Reviewer | Date |
|---|---|---|---|
| [signature] | 08/19/25 | Suky Liu | 08/19/25 |
| James Shi | | Suky Liu | |
| *Senior Director, Ratings Group* | | *Rating Analyst* | |

## LEGAL DISCLOSURE

© 2025 Egan-Jones Ratings Company, Inc. ("Egan-Jones"). All rights reserved.

The information upon which Egan-Jones ratings and reports are based is obtained by Egan-Jones from sources Egan-Jones believes to be accurate and reliable. Egan-Jones relies on third-party reports and information and data provided, and Egan-Jones has not, unless required by law or internal policies/procedures, independently verified or performed due diligence related to the accuracy of information, data, or reports. Egan-Jones has not consented to, nor will consent to, being named an "expert" under federal securities laws, including without limitation, Section 7 of the Securities Act of 1933. Please note that expected or final ratings are not recommendations to buy, hold or sell the securities. Egan-Jones is not an advisor and is not providing investment advice, strategy, or related services. Egan-Jones and its third-party suppliers ("Suppliers") hereby disclaim any representation or warranty, express or implied, as to the accuracy, timeliness, completeness, merchantability, and fitness for any particular purpose or non-infringement of any of such information. In no event shall Egan-Jones or its directors, officers, employees, independent contractors, agents, representatives, or Suppliers (collectively, Egan-Jones Representatives) be liable (1) for any inaccuracy, delay, loss of data, interruption in service, or error. (negligent or otherwise) or other circumstance or contingency within or outside the control of Egan-Jones or any Egan-Jones Representative in connection with or related to obtaining, collecting, compiling, analyzing, interpreting, communicating, publishing, or delivering any such information. Ratings and other opinions issued by Egan-Jones are, and must be construed solely as, statements of opinion and not statements of fact as to creditworthiness or recommendations to purchase, sell or hold any securities. A report providing an Egan-Jones rating is neither a prospectus nor a substitute for the information assembled, verified, and presented to investors by the issuer and its agents in connection with the sale of the securities. Egan-Jones is not responsible for the content or operation of third-party websites accessed through hypertext or other computer links, and Egan-Jones shall have no liability to any person or entity for the use of such third-party websites. This publication may not be reproduced, retransmitted, or distributed in any form without the prior written consent of Egan-Jones. Egan-Jones ratings are subject to disclaimers. Egan-Jones is not an NRSRO (as defined by the SEC) for sovereign/municipal issuers and structured finance/ABS issuers.

# EXHIBIT M

bring companies that are focused on advancing manufacturing technologies to support the green revolution. This was exemplified when the State of Kansas entered into an agreement with Panasonic Energy to put up a 30 GWh lithium-ion battery manufacturing plant that would create up to 4,000 jobs.

Solar Energy

## Harnessing the Power of the Sun

Solar energy has emerged as a leading contender in the quest for renewable energy sources, offering numerous benefits such as reduced greenhouse gas emissions and lower long-term energy costs. Neighborhood Power (www.neighborhoodpower.com), an affiliate company of Elite, has been providing its customers with 100% renewable energy for less over the past 15 years, and is seeing significant potentials due to the federal government's IRA, CHIPS and Infrastructure Acts. Neighborhood Power has provided a power-by-the-hour business model that initiates power purchase agreements primarily focused on solar power solutions and energy storage to commercial and industrial (C&I) customers. The solar energy sector stands out as one of the fastest-growing segments within the renewable energy market, seeing a past industry wide annual growth rate of 24%, with projections to hit 55% by 2025. Jobs in solar energy range from solar panel installation and maintenance technicians to solar energy system designers and engineers, procurement, and general contractor personnel, amounting to over 260,000 jobs in 2023 just in the US. With advancements in solar technology and decreasing costs of solar installations, the demand for skilled professionals in this field continues to rise.

However, the widespread adoption of solar energy faces a significant hurdle: the shortage of trained personnel. Despite the growing demand for solar installations and maintenance, finding skilled workers in this field remains a challenge. Several factors contribute to this issue. Stephen Gates, President of Neighborhood Power, says the challenge is to get the academic sector to train professionals ready for the renewable market. "It is imperative that we move fast to get academia to meet the expectations in the industry," Stephen emphasized. The following factors arise:

- **Lack of Formal Education Programs:** While there are educational programs and certifications available for solar energy, they are often limited in scope and availability. Many traditional educational institutions have been slow to incorporate comprehensive solar energy curricula into their programs, leaving aspiring professionals with few formal training options.
- **Technical Complexity:** Solar energy systems are complex and require specialized knowledge in areas such as

# EXHIBIT N


Chrome File Edit View History Bookmarks Profiles Tab Window Help
Contact - Elite Global Equity
elite.fund/contact-2/
Finish update
ELITE
HOME
ABOUT
FUND
BOND
CLIENTS
TEAM
NEWS
CONTACT
Our Offices
Cayman Islands
161 Shedden Road, PO Box 799,
Grand Cayman KY1-1103,
Cayman Islands
United States (Missouri)
United States of America
United States (Hawaii)
415 Dairy Road, Suite #E-216
Kahului, HI 96732,
United States of America
United Kingdom
First Floor, 85 Great Portland Street,
London, England, W1W 7LT

# EXHIBIT O


ELITE
CROWN LIMITED
Parent Company
ELITE
GLOBAL EQUITY LLC
US Delaware
Limited Liability Company
ELITE
GLOBAL EQUITY FUND
A Cayman Island Monetary
Authority (CIMA)
Regulated Entity
Project YieldCo's, each a SPE
domiciled in territory of project
financing

# EXHIBIT P

Top Content · People · Learning · Jobs · Games



**Don Nissanka**

Entrepreneur - Don is a serial entrepreneur with a global vision for strategic growth in renewable energy and the environment, cited for actively bringing advancement in cutting-edge technologies to the US market.

Lees Summit, Missouri, United States · **Contact Info**

614 followers · 407 connections

**See your mutual connections**

Join to view profile

Message

**Elite Global Equity Fund**

**University of Central Missouri**

## About

To focus on clean energy, environment, and socioeconomic opportunities around the world, with a goal to work closely with our ecosystem, take care of our people and make the world a better place to live.

## Experience

**Chief Executive Officer**
Elite Global Equity Fund
Mar 2021 - Present · 4 years 8 months
Cayman Islands

**Chief Strategy Officer**
Neighborhood Power Corporation
Jan 2018 - Present · 7 years 10 months
Maui, Hawaii

**Managing Partner**
Solar Tree Capital, LLC
Sep 2020 - Present · 5 years 2 months
Hawaii, United States

**Director**
ELITE CROWN DIAMOND LIMITED
Jan 2020 - Present · 5 years 10 months
London, England, United Kingdom

**Founder, President, & CEO**
Exergonix
Jan 2010 - 2021 · 11 years
Lees Summit, Missouri, United States

**Founder, President, & CEO - Kokam America**
Kokam
2005 - 2010 · 5 years
Lees Summit, Missouri, United States

### Director of Aerospace & Defense

EnerSys

2002 - 2005 · 3 years

Reading, Pennsylvania, United States

### Global Manager of Aviation and Defense

Invensys - Acquired by Schneider Electric

1999 - 2002 · 3 years

London, England, United Kingdom

### Plant Operations Manager

Hawker Powersource, Inc.

1995 - 1999 · 4 years

Warrensburg, Missouri, United States

### Quality Engineer

Gates Corporation

1992 - 1995 · 3 years

Warrensburg, Missouri, United States

### University of Central Missouri

5 years

**Mathematics Instructor**

1991 - 1993 · 2 years

Warrensburg, Missouri, United States

**Conference Operations Manager**

1988 - 1991 · 3 years

Warrensburg, Missouri, United States

## Education

**University of Central Missouri**

Master of Science - MS

1990 - 1992

**University of Central Missouri**

Bachelor of Science - BS

1987 - 1990

**University of Central Missouri**
Distinguished International Alumnus

**UNZA**
Associate's in

## Honors & Awards

**2006 Distinguished International Alumnus**
University of Central Missouri
2006

**Best Speaker Award - Society of Manufacturing Engineers**
SME

**Defense Logistics Agency (DLA) Contractor Recognition Award**
US Army

**Junior Engineers Technicians & Scientists 1st Place Winner**
JETS

**Lockheed Martin F-16 Contractor Recognition Award**
Lockheed Martin Aerospace

**Lumina Fundation**
Education
Recognition - Missouri Innovation Campus
https://focus.luminafoundation.org/archives/summer2012/

**Naval Surface Warfare Center (NSWC) Contractor Recognition Award**
US Navy

**Outstanding Performance Award - Society of Manufacturing Engineering**
SME

**Power Circle 2000**
Invensys PLC

**Power Circle 2001**
Invensys PLC

**US Air Force Contractor Recognition Award**
AFRL - US Air Force

## Languages

**Sinhalese**
Native or bilingual proficiency

**Spanish**
Elementary proficiency

**English**
Native or bilingual proficiency

## View Don's full profile

See who you know in common

Get introduced

Contact Don directly

Join to view full profile

2021 Audi Q8

$ 38 898 SHOP NOW

## Explore top content on LinkedIn

Find curated posts and insights for relevant topics all in one place.

View top content

# Add new skills with these courses




**Environmental, Social, and Governance (ESG) Fundamentals for Financial Decision-Making**




**ESG Risk Management and Opportunities**




**Data-Driven Decisions in Business Operations**

See all courses

© 2025 About

Accessibility

User Agreement

Privacy Policy

Your California Privacy Choices

Cookie Policy

Copyright Policy

Brand Policy

Guest Controls

Community Guidelines

Language

# EXHIBIT Q

**AEE Acquisitions Holdings LLC**
Broward Financial Center
500 East Broward Boulevard, 9th Floor
Fort Lauderdale, Florida 33394
United States of America

Attn: Mr. Gilbert Armenta, Sole Member

**Subject:** **RE: Acknowledgment of receipt of the completion documents; our determination as to the purported transfers of February 2021 to Mr. Lankan Bal; and the proceedings now commenced to cancel his title and to register FG Capital Infrastructure LLC**

28 August 2026
By email

Dear Mr. Armenta,

We write to confirm where our two companies stand on the quotas registered in February 2021 in the name of Mr. Lankan Bal – 48,576 quotas of AEEPower Holdings Sarl and 330 *participaciones sociales* of AEE Power Ventures, S.L.

We have received and reviewed the complete set of documents delivered on 19 August 2026, together with your sworn Attestation and Direction of 3 August 2026. On the strength of those documents and of our own records, we acknowledge that Mr. Morro had no authority to transfer the quotas, that the transfer was made without value, and that it was accordingly null and of no effect. It passed no title to Mr. Bal, and we do not recognize him as a holder of the quotas or as a shareholder of either company.

We are committed to putting the position right, and to doing so promptly. Sr. Nicolás Martín de Vidales Godino has already commenced the administrative process, in Spain and in Switzerland, to cancel the title standing in Mr. Bal's name and to return the quotas to their rightful owner, Mr. Gilbert Armenta, through his designee FG Capital Infrastructure LLC. We will convene the governing bodies to adopt the corresponding resolutions without delay, and you will receive certified copies once they are recorded. Registration in Geneva will take some

weeks, as the registry there requires the original instruments; that is a formality of the register and does not change the position set out here.

In the meantime, neither company will recognize Mr. Bal, register any dealing in the quotas by him or by anyone claiming through him, or make any payment to him.

You have our full support in this matter, and we remain at your disposal for whatever further is required.

Yours sincerely,

**Sr. José Ángel González Tausz**
Chairman, AEEPower Holdings Sàrl
Chairman, AEE Power Ventures, S.L.

**Sr. Fernando Jesús Pablo Bujanda**
Gérant Solidaire, AEEPower Holdings Sàrl
Managing Director, AEE Power Ventures, S.L.

# EXHIBIT R

Verified Correct Copy of Original 12/5/2025.

ENTERED
DEC 0 5 2025
By: SDR

CLACKAMAS CIRCUIT COURT
DEC 5 '25 PM1:28

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF CLACKAMAS

Family Law Department

25CN05440

| | |
|---|---|
| In the Matter of:<br>DEYLA SERENA TAPPAN,<br>Plaintiff,<br>and<br>STEPHEN DANIEL GATES,<br>Defendant. | CASE NO:<br>Related Case Number: 22DR20841<br>PLAINTIFF'S complaint for ORDER TO SHOW CAUSE RE: CONTEMPT |

COMES NOW Plaintiff, by and through her attorney, Chasta Pyle and the law firm of Holtey Brown Newsom LLC, and moves this Court for an Order to Show Cause:

1. Requiring Defendant to appear in the Clackamas County Circuit Court in 1000 Courthouse Road, Oregon City, Oregon to show cause why this Court should not grant relief for remedial sanctions for non-compliance with the terms of the *General Judgment for Dissolution of Marriage and Money Award for Child Support, Spousal Support, Equalizing Judgment (Stipulated)* (hereinafter "*General Judgment*") entered by the Clackamas County Circuit Court on December 12, 2022.



HOLTEY BROWN NEWSOM
1140 SW 11th Avenue, 4th Floor
Portland, Oregon 97205
(503) 224-9878

25CN05440
Complaint
13728386

Verified Correct Copy of Original 12/5/2025.

2. This Motion is supported by Plaintiff's *Declaration* attached to this Motion as Exhibit 1.
3. A copy of the *General Judgment* is attached to this *Motion* as Exhibit 2.
4. As described below, Defendant has failed to comply with the *General Judgment* and Plaintiff seeks remedial sanctions as set forth below.
5. It has been within the Defendant's power to obey the *General Judgment*.
6. Defendant failed to comply with the terms of the *General Judgment*:
   i. By failing to pay the $35,754 lump sum due 12 months after the entry of the *General Judgment* (December 13, 2023) as part of the equalizing judgment for the property division agreed upon by the parties and memorialized in Paragraph 8.A. and the Money Award of the *General Judgment*. Defendant has continued to make the portion of the equalizing judgment due in monthly payments, but has not made any payments towards the additional $35,754.
   ii. Defendant failed to pay June 2024 spousal support in the amount of $3,148.59 per Paragraph 10 and the Money Award of the General Judgment. Defendant continued to make spousal support payments in July 2024, but has remained one month behind since June 2024.
   iii. Defendant failed to make the equalizing judgment payments as agreed per Paragraph 8 from February 2025 – July 3025 and in September 2025. In these months, Defendant made payments of $4,500 instead of $4,800.



HOLTEY BROWN NEWSOM
1140 SW 11th Avenue, 4th Floor
Portland, Oregon 97205
(503) 224-9878

Verified Correct Copy of Original 12/5/2025

iv. Defendant failed to pay the monthly payment of $4,800 due as part of the equalizing judgment in August 2025 per Paragraph 8 and the Money Award of the General Judgment. Per Paragraph 9.D. part of this payment is for Defendant's portion of a joint consolidated student loan. At the time of our divorce, the loan servicer was unable to separate this loan. The loan servicer is now able to separate this consolidated loan upon receiving applications from both parties.

v. Failing to secure and/or provide proof to Wife of a life insurance policy in the amount of $1,000,000 to secure the spousal support obligation per Paragraph 5.A. of the General Judgment.

7. Plaintiff is seeking the following remedial sanctions as authorized by ORS 33.105:

i. Payment of an amount not to exceed $500.00 or one percent of Defendant's annual gross income, whichever is greater, for each day the contempt of court continues.

ii. An order designed to ensure compliance with a prior order of the court, specifically that requires:

i. Payment of the unpaid spousal support, child support, and equalizing judgment plus interest on all amounts in arrears.

ii. Defendant to cooperate with the refinance and division of the parties' jointly consolidated student loans so that Plaintiff cannot be further harmed by any continued failure of



HOLTEY BROWN NEWSOM
1140 SW 11th Avenue, 4th Floor
Portland, Oregon 97205
(503) 224-9878

Verified Correct Copy of Original 12/5/2025.

Defendant to make payments to Plaintiff or otherwise comply with the financial provisions of the *General Judgment*.

iii. Payment of all or part of the attorney fees and costs incurred by Plaintiff as a result of Defendant's contempt of court.

iv. Any other sanctions the Court determines would be an effective remedy for contempt.

v. Plaintiff is not seeking jail time as a sanction.

Dated this 5th day of December 2025.

HOLTEY BROWN NEWSOM, LLC

Chasta Pyle, OSB No. 171348
Of Attorneys for Plaintiff
cpyle@holteybrownnewsom.com

<u>Points & Authorities</u>
Declaration of Plaintiff
ORS 33.015(2)(b)
ORS 33.105(1)

Exhibit 1

Verified Correct Copy of Original 12/5/2025.

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF CLACKAMAS

Family Law Department

In the Matter of:

DEYLA SERENA TAPPAN,

Plaintiff,

and

STEPHEN DANIEL GATES,

Defendant.

CASE NO:

Related Case Number: 22DR20841

DECLARATION OF PLAINTIFF IN SUPPORT OF MOTION FOR ORDER TO SHOW CAUSE RE: CONTEMPT

I, Deyla Tappan, declare that the following is true:

1. I am the Plaintiff in the above-referenced matter.
2. Defendant and I were divorced by the *General Judgment for Dissolution of Marriage and Money Award for Child Support, Spousal Support, Equalizing Judgment (Stipulated)* in Clackamas County Case Number 22DR20841 signed by Judge Todd VanRysselberghe on December 12, 2022.
3. A copy of the *General Judgment* is attached as Exhibit 2.
4. Defendant and I heavily negotiated the terms of our *General Judgment* with attorneys and with each other before reaching the agreement memorialized in the *General Judgment*.



HOLTEY BROWN NEWSOM
1140 SW 11th Avenue, 4th Floor
Portland, Oregon 97205
(503) 224-9878

Verified Correct Copy of Original 12/5/2025.

5. While Defendant was awarded his retirement accounts and 100% of the interest in all of his businesses, I was awarded an equalizing judgment of $218,154 to be paid in monthly installments of $4,800 with an additional one-time payment of $35,754 due within 12 months of entry of judgment. This was memorialized in Paragraph 8 and the Money Award of the General Judgment.
6. The $35,754 equalizing judgment payment was due December 13, 2023. To date, Defendant has not made this payment.
7. In February, March, April, May, June, July, and September 2025, Defendant only paid $4,500 for the equalizing judgment payment, not $4,800 per the General Judgment. Defendant failed to make any payment towards the equalizing judgment in August 2025. Per Paragraph 9.D. of the General Judgment, part of this payment is for Defendant's portion of a joint consolidated student loan payment, which I paid in full despite not receiving the contribution from Defendant.
8. Additionally, I was awarded non-modifiable spousal support in the amount of $3,148.59 for 84 months beginning January 1, 2022. Defendant did not make a spousal support payment in June 2024 and has remained one month behind since that time. Defendant filed a motion to modify the spousal support award despite a clear agreement in the General Judgment that the spousal support award is non-modifiable.



HOLTEY BROWN NEWSOM
1140 SW 11th Avenue, 4th Floor
Portland, Oregon 97205
(503) 224-9878

Verified Correct Copy of Original 12/5/2025.

9. Per Paragraph 5.A. of the General Judgment, Defendant was ordered to provide me with proof he had secured a life insurance policy in the amount of $1,000,000. To date I have not received any proof that Defendant has secured a life insurance policy as ordered.

10. I am requesting Defendant pay my attorney fees and costs for bringing this motion.

11. I therefore request the relief set forth in the accompanying *Ex Parte Motion for Order to Show Cause Re: Contempt.* The allegations in my *Motion* and *Declaration* are true, and it is just and reasonable to grant the relief requested.

**I HEREBY DECLARE THAT THE ABOVE STATEMENT IS TRUE TO THE BEST OF MY KNOWLEGE AND BELIEF. I UNDERSTAND IT IS MADE FOR USE AS EVIDENCE IN COURT AND IS SUBJECT TO PENALTY FOR PERJURY.**

Dated this 12/04/2025.

Deyla Tappan
Deyla Tappan (Dec 4, 2025 17:53:32 PST)
Deyla Tappan, Plaintiff

To the best of the lawyer/filer's knowledge after appropriate inquiry, the signature purporting to be that of the Signer, Deyla Tappan, is in fact that of the Signer. If the document contains an authenticated signature, the lawyer/filer will retain the electronic document containing the authenticated signature for a period of no less than required by the record retention rules under the OSB unless the Court orders otherwise.

Dated this 5th day of December 2025.

HOLTEY BROWN NEWSOM, LLC

[signature]

Chasta Pyle, OSB No. 171348
Of Attorneys for Petitioner
cpyle@holteybrownnewsom.com



HOLTEY BROWN NEWSOM
1140 SW 11th Avenue, 4th Floor
Portland, Oregon 97205
(503) 224-9878

**EXHIBIT S**

**FATES GROUP, LLC v. NEIGHBORHOOD POWER CORPORATION et al.**
**Amount due under the Loan Agreement of 5 August 2016 and the First Amendment of 8 November 2016**
**As at 1 September 2026**

| | Principal | Interest | Fees | Total |
|---|---|---|---|---|
| Term Loan | 4,500,000.00 | 23,144,459.47 | 0.00 | 27,644,459.47 |
| Revolving Line | 2,892,416.63 | 13,060,476.65 | 0.00 | 15,952,893.28 |
| Fees and interest thereon | 0.00 | 589,746.76 | 560,634.99 | 1,150,381.75 |
| **TOTAL DUE AT 1 SEPTEMBER 2026** | **7,392,416.63** | **36,794,682.88** | **560,634.99** | **44,747,734.51** |

*Daily accrual after 1 September 2026* 24,089.08

# FATES GROUP, LLC — NEIGHBORHOOD POWER CORPORATION

## Interest, Fee and Penalty Schedule — Assumptions

*Every figure on every other sheet is a formula referring back to this sheet. Nothing downstream is typed in.*

### 1. CALCULATION DATE

| | | |
|---|---|---|
| Amount due as at | **01-Sep-2026** | *Limitation period expires 4 September 2026 — six years from the acknowledgment of 4 September 2020* |

### 2. RATES — Loan Agreement 5 August 2016, Section 2.3

| | | |
|---|---|---|
| Term Loan rate — s.2.3(a)(ii) as amended | 15.00% | |
| Revolving Line rate — s.2.3(a)(i) | 14.00% | |
| Default margin — s.2.3(b) | 5.00% | *"Obligations shall bear interest at a rate per annum which is five percentage points (5.00%) above the rate that is otherwise applicable thereto"* |
| Default rate applies from | 08-Nov-2016 | *Toggle. Set to 08-Nov-2016 (position taken since 2020), 05-Aug-2017 (Term Loan maturity), 24-Jun-2025 (default notice), or a future date for contract rates only* |
| **Term Loan default rate** | **20.00%** | *Applied only to days falling on or after the date above; earlier days carry the contract rate* |
| **Revolving Line default rate** | **19.00%** | |
| Day-count basis — s.2.3(c) | 360 | *"computed on the basis of a 360-day year for the actual number of days elapsed"* |

### 3. CAPITALISATION — s.2.3(c)

| | | |
|---|---|---|
| Frequency | Annual | *"Interest shall be capitalized on an annual basis by becoming a part of the Obligations, and such interest shall thereafter accrue interest at the rate then applicable under this Agreement (including any interest accrued at the Default Rate)"* |
| First capitalisation date | 08-Nov-2017 | |
| Number of capitalisation dates | 9 | *8 November 2017 through 8 November 2025 — anniversaries of the Amendment Effective Date* |

### 4. TERM LOAN

| Item | Amount | Interest start |
|---|---|---|
| Advances | 1,365,000.00 | 08-Nov-2016 |
| Remaining Principal | 3,135,000.00 | 08-Nov-2016 |
| **Term Loan principal** | **4,500,000.00** | **08-Nov-2016** |

### 5. REVOLVING LINE

| Item | Amount | Interest start | |
|---|---|---|---|
| Advance 1 | 1,570,000.00 | 08-Nov-2016 | |
| Advance 2 | 700,000.00 | 08-Nov-2016 | |
| Advance 3 | 150,000.00 | 12-Jul-2017 | |
| Advance 4 | 250,000.00 | 19-Jul-2017 | |
| Advance 5 | 222,416.63 | 26-Jul-2017 | |
| **Revolving Line principal** | **2,892,416.63** | | |
| **TOTAL PRINCIPAL ADVANCED** | **7,392,416.63** | | *Acknowledged in writing by Stephen Gates, President of Neighborhood Power Corporation, 4 September 2020* |

### 6. FEES

| | | | |
|---|---|---|---|
| Funding fee — s.2.4(a) | 40,000.00 | 05-Aug-2016 | *"A fully earned, non-refundable funding fee of $40,000, on the Effective Date"* |
| Commitment fee rate — s.2.4(b) as amended | 2.00% | | |
| Commitment fee base | 2,892,416.63 | | *"2% of the maximum aggregate principal amount of Advances outstanding under the Revolving Line during the preceding 12 months"* |
| Interest on unpaid fees | 20.00% | | *s.2.3(b): fees not paid when due "shall bear interest until paid at a rate equal to the highest rate applicable to the Obligations". Charged simple.* |

### 7. CONTRACT AND PROCEDURAL DATES

| | |
|---|---|
| Loan Agreement | 05-Aug-2016 |
| First Amendment / Amendment Effective Date | 08-Nov-2016 |
| Term Loan Maturity Date | 05-Aug-2017 |
| Revolving Line Maturity Date | 05-Aug-2018 |
| Debt acknowledgment letter — S. Gates | 04-Sep-2020 |
| Elite Crown Diamond letter — L. Bal | 12-Nov-2020 |
| Notice of default | 24-Jun-2025 |
| Notice of failure to cure | 24-Oct-2025 |
| Limitation period expires | [illegible] Sep 2026 |

## TERM LOAN — $4,500,000

*Interest accrues daily on a 360-day basis and capitalises annually into the Obligations under s.2.3(c).*

| Period from | Period to | Days | Opening Obligations | Rate | Interest accrued | Closing Obligations |
|---|---|---|---|---|---|---|
| 08-Nov-2016 | 08-Nov-2017 | 365 | 4,500,000.00 | 20.00% | 912,500.00 | 5,412,500.00 |
| 08-Nov-2017 | 08-Nov-2018 | 365 | 5,412,500.00 | 20.00% | 1,097,534.72 | 6,510,034.72 |
| 08-Nov-2018 | 08-Nov-2019 | 365 | 6,510,034.72 | 20.00% | 1,320,090.37 | 7,830,125.10 |
| 08-Nov-2019 | 08-Nov-2020 | 366 | 7,830,125.10 | 20.00% | 1,592,125.44 | 9,422,250.53 |
| 08-Nov-2020 | 08-Nov-2021 | 365 | 9,422,250.53 | 20.00% | 1,910,623.02 | 11,332,873.56 |
| 08-Nov-2021 | 08-Nov-2022 | 365 | 11,332,873.56 | 20.00% | 2,298,054.92 | 13,630,928.47 |
| 08-Nov-2022 | 08-Nov-2023 | 365 | 13,630,928.47 | 20.00% | 2,764,049.38 | 16,394,977.86 |
| 08-Nov-2023 | 08-Nov-2024 | 366 | 16,394,977.86 | 20.00% | 3,333,645.50 | 19,728,623.36 |
| 08-Nov-2024 | 08-Nov-2025 | 365 | 19,728,623.36 | 20.00% | 4,000,526.40 | 23,729,149.76 |
| 08-Nov-2025 | 01-Sep-2026 | 297 | 23,729,149.76 | 20.00% | 3,915,309.71 | 27,644,459.47 |
| **Total interest** | | | | | **23,144,459.47** | |
| **Principal** | | | | | **4,500,000.00** | |
| **TERM LOAN TOTAL DUE** | | | | | **27,644,459.47** | |

*Daily accrual after 1 September 2026* *15,358.03*

## REVOLVING LINE — $2,892,416.63 drawn

*Interest was payable monthly and was never paid. Unpaid interest capitalises annually into the Obligations under s.2.3(c).*

| Period from | Period to | Days | Opening Obligations | Advance drawn | Rate | Interest accrued | Interest carried | Closing Obligations |
|---|---|---|---|---|---|---|---|---|
| 08-Nov-2016 | 12-Jul-2017 | 246 | 0.00 | 2,270,000.00 | 19.00% | 294,721.67 | 294,721.67 | 2,564,721.67 |
| 12-Jul-2017 | 19-Jul-2017 | 7 | 2,270,000.00 | 150,000.00 | 19.00% | 8,940.56 | 303,662.22 | 2,723,662.22 |
| 19-Jul-2017 | 26-Jul-2017 | 7 | 2,420,000.00 | 250,000.00 | 19.00% | 9,864.17 | 313,526.39 | 2,983,526.39 |
| 26-Jul-2017 | 08-Nov-2017 | 105 | 2,670,000.00 | 222,416.63 | 19.00% | 160,288.09 | 473,814.48 | 3,366,231.11 |
| 08-Nov-2017 | 08-Nov-2018 | 365 | 3,366,231.11 | 0.00 | 19.00% | 648,467.02 | 648,467.02 | 4,014,698.13 |
| 08-Nov-2018 | 08-Nov-2019 | 365 | 4,014,698.13 | 0.00 | 19.00% | 773,386.99 | 773,386.99 | 4,788,085.11 |
| 08-Nov-2019 | 08-Nov-2020 | 366 | 4,788,085.11 | 0.00 | 19.00% | 924,898.44 | 924,898.44 | 5,712,983.55 |
| 08-Nov-2020 | 08-Nov-2021 | 365 | 5,712,983.55 | 0.00 | 19.00% | 1,100,542.80 | 1,100,542.80 | 6,813,526.36 |
| 08-Nov-2021 | 08-Nov-2022 | 365 | 6,813,526.36 | 0.00 | 19.00% | 1,312,550.15 | 1,312,550.15 | 8,126,076.51 |
| 08-Nov-2022 | 08-Nov-2023 | 365 | 8,126,076.51 | 0.00 | 19.00% | 1,565,398.35 | 1,565,398.35 | 9,691,474.86 |
| 08-Nov-2023 | 08-Nov-2024 | 366 | 9,691,474.86 | 0.00 | 19.00% | 1,872,069.89 | 1,872,069.89 | 11,563,544.75 |
| 08-Nov-2024 | 08-Nov-2025 | 365 | 11,563,544.75 | 0.00 | 19.00% | 2,227,588.41 | 2,227,588.41 | 13,791,133.16 |
| 08-Nov-2025 | 01-Sep-2026 | 297 | 13,791,133.16 | 0.00 | 19.00% | 2,161,760.12 | 2,161,760.12 | 15,952,893.28 |
| **Total interest** | | | | | | **13,060,476.65** | | |
| **Principal** | | | | | | **2,892,416.63** | | |
| **REVOLVING LINE TOTAL DUE** | | | | | | **15,952,893.28** | | |

*Daily accrual after 1 September 2026* *8,419.58*

## FEES — Sections 2.4(a) and 2.4(b)

*Unpaid fees bear interest at the highest rate applicable to the Obligations under s.2.3(b).*

| Fee | Due | Amount | Days to 1 Sep 2026 | Rate | Interest | Total |
|---|---|---|---|---|---|---|
| Funding fee — s.2.4(a) | 05-Aug-2016 | 40,000.00 | 3,679 | 19.87% | 81,227.78 | 121,227.78 |
| Commitment fee — anniversary 2017 | 08-Nov-2017 | 57,848.33 | 3,219 | 20.00% | 103,452.10 | 161,300.43 |
| Commitment fee — anniversary 2018 | 08-Nov-2018 | 57,848.33 | 2,854 | 20.00% | 91,721.75 | 149,570.08 |
| Commitment fee — anniversary 2019 | 08-Nov-2019 | 57,848.33 | 2,489 | 20.00% | 79,991.39 | 137,839.72 |
| Commitment fee — anniversary 2020 | 08-Nov-2020 | 57,848.33 | 2,123 | 20.00% | 68,228.89 | 126,077.23 |
| Commitment fee — anniversary 2021 | 08-Nov-2021 | 57,848.33 | 1,758 | 20.00% | 56,498.54 | 114,346.87 |
| Commitment fee — anniversary 2022 | 08-Nov-2022 | 57,848.33 | 1,393 | 20.00% | 44,768.18 | 102,616.51 |
| Commitment fee — anniversary 2023 | 08-Nov-2023 | 57,848.33 | 1,028 | 20.00% | 33,037.83 | 90,886.16 |
| Commitment fee — anniversary 2024 | 08-Nov-2024 | 57,848.33 | 662 | 20.00% | 21,275.33 | 79,123.66 |
| Commitment fee — anniversary 2025 | 08-Nov-2025 | 57,848.33 | 297 | 20.00% | 9,544.97 | 67,393.31 |
| **TOTAL FEES AND INTEREST THEREON** | | **560,634.99** | | | **589,746.76** | **1,150,381.75** |

## RECONCILIATION AND SENSITIVITY

### WHAT CHANGED FROM THE SCHEDULE SERVED ON 9 FEBRUARY 2026

| Item | Amount | Explanation |
|---|---|---|
| Prior schedule at 28 February 2026 | 36,315,969.00 | Cell DQ32 of NPC Revised Interest 2026 02 28 xlsx, served on defendants 9 February 2026 |
| Prior mechanics carried forward to 1 September 2026 | 38,137,461.00 | Six further months and one day on the same rates and the same construction |
| Less: term loan amounts counted twice | -983,567.00 | The opening capitalised balance of $922,500 was added to a total that already contained it, and the November 2016 stub interest of $61,067 appeared in two rows at once |
| Less: revolving line amounts counted twice | -6,712,815.00 | The cumulative delinquent interest row already contains every monthly interest figure and every interest-on-delinquent figure. Both of those rows were then added to it a second time |
| **Prior mechanics, arithmetic corrected** | **30,441,079.00** | The construction of the prior schedule, with the double counting removed |
| Add: annual capitalisation on the Term Loan | 10,299,808.00 | s 2.3(c) capitalises all accrued interest annually. The prior schedule capitalised only interest on previously capitalised interest, and never re-capitalised the continuing interest on principal after the first year |
| Add: annual capitalisation on the Revolving Line | 3,359,254.00 | The prior schedule froze the balance on which interest-on-delinquent-interest was charged at its September 2020 level and never moved it again. Capitalising annually on the true balance replaces that freeze |
| Add: ninth anniversary commitment fee | 57,848.00 | The prior schedule charged the fee from November 2018. s 2.4(b) as amended charges it from the first anniversary of the Amendment Effective Date, 8 November 2017 |
| Add: interest on unpaid fees | 589,746.00 | s 2.3(b), fees not paid when due bear interest until paid at the highest rate applicable to the Obligations. The prior schedule charged none |
| **TOTAL AT 1 SEPTEMBER 2026** | **44,747,735.00** | As computed on the Term Loan, Revolving Line and Fees tabs |

### SENSITIVITY — DATE FROM WHICH THE DEFAULT RATE APPLIES

*Set cell C12 on the Assumptions tab to the date shown*

| Default rate applies from | 7,392,416.63 | 36,794,682.88 | 560,634.99 | 44,747,734.51 |
|---|---|---|---|---|
| 8 November 2016 — first advance (position taken since 2020) | 7,392,416.63 | 36,794,682.88 | 560,634.99 | 44,747,734.51 |
| 5 August 2017 — Term Loan Maturity Date | 7,392,416.63 | 35,521,242.18 | 560,634.99 | 43,474,293.81 |
| 5 August 2018 — Revolving Line Maturity Date | 7,392,416.63 | 33,724,331.64 | 560,634.99 | 41,677,383.26 |
| 24 June 2025 — notice of default | 7,392,416.63 | 23,182,936.80 | 560,634.99 | 31,135,988.42 |
| Contract rates only, no default margin | 7,392,416.63 | 21,608,486.28 | 560,634.99 | 29,561,537.90 |